No. 22-1395

In the **United States Court of Appeals**
for the **Eighth Circuit**

ARKANSAS STATE CONFERENCE NAACP, ET AL.,

Plaintiffs – Appellants,

v.

ARKANSAS BOARD OF APPORTIONMENT, ET AL.,

Defendants – Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
Case No. 21-cv-01239-LPR, Hon. Lee P. Rudofsky

**BRIEF OF BIPARTISAN GROUP OF SUPPORTERS OF THE 1982
VOTING RIGHTS ACT AMENDMENTS AS AMICI CURIAE
IN SUPPORT OF PLAINTIFFS AND REVERSAL**

Craig S. Coleman
Jeffrey P. Justman
Erica Abshez Moran
Hannah M. Leiendecker
FAEGRE DRINKER BIDDLE &
REATH LLP
90 S. 7th Street, Suite 2200
Minneapolis, Minnesota 55402
T: (612) 766-7000
Craig.Coleman@faegredrinker.com
Jeff.Justman@faegredrinker.com
Erica.Moran@faegredrinker.com
Hannah.Leiendecker@faegredrinker.com

Alexandra K. Benton
FAEGRE DRINKER BIDDLE &
REATH LLP
1144 15th Street, Suite 3400
Denver, Colorado 80202
T: (303) 607-3500
Alexandra.Benton@faegredrinker.com

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE...................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT...........................3

ARGUMENT .................................................................................................6

    I.    Authoritative 1982 House And Senate Judiciary Committee
Reports Show That Congress Intended That Private Parties
Possess The Right To Enforce Section 2 Of The Voting Rights
Act. ...............................................................................................6

    II.    This Court Should Give The 1982 Reports Significant Weight. ..............9

        A.    House and Senate Reports are valuable interpretive tools. ............9

        B.    The Supreme Court relies on these Reports to interpret the
Voting Rights Act.................................................................10

        C.    This Court also relies on the Reports to interpret the
Voting Rights Act.................................................................12

    III.    The District Court Erred In Disregarding The Legislative History........14

        A.    The district court ignored the legislative backdrop of the
1982 amendments, at which point over 100 years of history
established that private plaintiffs could enforce civil rights
laws. ....................................................................................14

        B.    The district court improperly rejected legislative history as a
meaningful tool of statutory interpretation....................................19

CONCLUSION ..........................................................................................21

CERTIFICATE OF COMPLIANCE AND VIRUS SCANNING ...........................23

CERTIFICATE OF SERVICE......................................................................24

Appellate Case: 22-1395    Page: 2    Date Filed: 04/26/2022 Entry ID: 5151001

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                    **Page(s)**

*Alexander v. Sandoval*
    532 U.S. 275 (2001) ................................................................19

*Allen v. State Board of Elections,*
    393 U.S. 544 (1969) ...............................................................18

*Bank One, Utah v. Guttau,*
    190 F.3d 844 (8th Cir. 1999) .................................................14

*Bone Shirt v. Hazeltine,*
    461 F.3d 1011 (8th Cir. 2006) ........................................ 11, 13

*Boyle v. Anderson,*
    68 F.3d 1093 (8th Cir. 1995) .................................................13

*Brnovich v. Democratic Nat'l Committee,*
    141 S. Ct. 2321 (2021) .............................................................6

*Buckanga v. Sisseton Indep. Sch. Dist,*
    804 F.2d 469 (8th Cir. 1986) .................................................12

*Burton v. City of Belle Glade,*
    178 F.3d 1175 (11th Cir. 1999) .............................................11

*City of Mobile, Ala. v. Bolden,*
    446 U.S. 55 (1980) ............................................................. 6, 18

*Cottier v. City of Martin,*
    604 F.3d 553 (8th Cir. 2010) .................................................11

*Cox v. Levi,*
    592 F.2d 460 (8th Cir. 1979) .................................................13

*Does 1-2 v. Regents of the Univ. of Minnesota,*
    999 F.3d 571 (8th Cir. 2021) .................................................19

*Donovan v. Rose L. Firm,*
    768 F.2d 964 (8th Cir. 1985) .................................................13

*Fla. Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985) ...............................................................20

Appellate Case: 22-1395     Page: 3     Date Filed: 04/26/2022 Entry ID: 5151001

*Garcia v. United States,*
469 U.S. 70 (1984) ........................................................................9

*Gen. Mills, Inc. v. United States,*
554 F.3d 727 (8th Cir. 2009) ......................................................13

*Green v. Bock Laundry Mach. Co.,*
490 U.S. 504 (1989) ....................................................................20

*Harper v. City of Chicago Heights,*
223 F.3d 593 (7th Cir. 2000) ......................................................11

*J.I. Case Co. v. Borak,*
377 U.S. 426 (1964) ....................................................................17

*Jenkins v. Manning,*
116 F.3d 685 (3d Cir. 1997) ......................................................11

*Kingman Park Civic Ass'n v. Williams,*
348 F.3d 1033 (D.C. Cir. 2003) ................................................11

*Kirksey v. City of Jackson, Mississippi,*
663 F.2d 659 (5th Cir. 1981) ......................................................18

*Levy v. Lexington Cty., S.C.,*
589 F.3d 708 (4th Cir. 2009) ......................................................11

*Lorillard v. Pons,*
434 U.S. 575 (1978) ....................................................................18

*Missouri State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.,*
894 F.3d 924 (8th Cir. 2018) ................................................11, 12

*Morse v. Republican Party of Virginia,*
517 U.S. 186 (1996) ................................................................10, 17

*Myers v. Anderson,*
238 U.S. 368 (1915) ....................................................................16

*Nachman Corp. v. Pension Ben. Guar. Corp.,*
446 U.S. 359 (1980) ....................................................................20

*Nat'l Indus. Constructors, Inc. v. Occupational Safety & Health Rev. Comm'n,*
583 F.2d 1048 (8th Cir. 1978) ....................................................13

Appellate Case: 22-1395    Page: 4    Date Filed: 04/26/2022 Entry ID: 5151001

*Nixon v. Herndon,*
    273 U.S. 536 (1927) ...................................................................................16

*Old Pers. v. Brown,*
    312 F.3d 1036 (9th Cir. 2002) ...............................................................11

*Parker Drilling Mgmt. Servs., Ltd. v. Newton,*
    139 S. Ct. 1881 (2019) ...........................................................................14

*Pattison Sand Co., LLC v. Fed. Mine Safety & Health Rev. Comm'n,*
    688 F.3d 507 (8th Cir. 2012) ................................................................20

*Pope v. Cty. of Albany,*
    687 F.3d 565 (2d Cir. 2012) ..................................................................11

*Prescott v. Comm'r,*
    561 F.2d 1287 (8th Cir. 1977) .................................................................9

*Reyes v. City of Farmers Branch, Tex.,*
    586 F.3d 1019 (5th Cir. 2009) ...............................................................11

*Rural W. Tennessee Afr.-Am. Affs. Council v. Sundquist,*
    209 F.3d 835 (6th Cir. 2000) ................................................................11

*Sanchez v. Bond,*
    875 F.2d 1488 (10th Cir. 1989) .............................................................11

*Schumacher v. SC Data Ctr., Inc.,*
    2022 WL 997742 (8th Cir. Apr. 4, 2022) .............................................13

*Smith v. Allwright,*
    321 U.S. 649 (1944) ...............................................................................16

*St. Louis Effort for AIDS v. Lindley-Myers,*
    877 F.3d 1069 (8th Cir. 2017) ...............................................................13

*Thornburg v. Gingles,*
    478 U.S. 30 (1986) ...........................................................................10, 11

*Tuft v. McDonnell Douglas Corp.,*
    517 F.2d 1301 (8th Cir. 1975) ...............................................................13

*United States v. Shriver,*
    838 F.2d 980 (8th Cir. 1988) ................................................................13

Appellate Case: 22-1395    Page: 5    Date Filed: 04/26/2022 Entry ID: 5151001

*Uno v. City of Holyoke*,
 72 F.3d 973 (1st Cir. 1995) .................................................................. 11

*Webber v. White*,
 422 F. Supp. 416 (N.D. Tex. 1976) ....................................................... 18

*Whitfield v. Democratic Party of State of Ark.*,
 890 F.2d 1423 (8th Cir. 1989) .............................................................. 12

*Wiley v. Sinkler*,
 179 U.S. 58 (1900) ................................................................................ 16

*Wolfchild v. Redwood Cty.*,
 824 F.3d 761 (8th Cir. 2016) ................................................................ 20

*Zuber v. Allen*,
 396 U.S. 168 (1969) ............................................................................... 9

## FEDERAL STATUTES

28 U.S.C. § 1343(a)(4) ................................................................................ 16

42 U.S.C. § 1983 ........................................................................................ 15

52 U.S.C. § 10101(c) .................................................................................. 16

52 U.S.C. § 10301 ........................................................................... 5, 15, 16

## CONSTITUTIONAL PROVISIONS

U.S. CONST., amend. XIV ............................................................... 14, 16, 17

U.S CONST., amend. XV ................................................................ 14, 16, 17

## OTHER AUTHORITIES

H.R. REP. NO. 97-227 (1982) ...................................................................... 3

S. REP. NO. 97-417 (1982) .......................................................................... 3

Appellate Case: 22-1395    Page: 6    Date Filed: 04/26/2022 Entry ID: 5151001

## INTEREST OF AMICI CURIAE[1]

*Amici* are a bipartisan group including a former member of Congress and former staffers to Democratic and Republican Senators, Congressmen, and persons instrumental to passage of the 1982 amendments to the Voting Rights Act. Each of the *Amici* participated in, were intimately involved in, or supported the legislative effort that led to the enactment of the 1982 amendments. Each have personal knowledge of the legislative background of those amendments. They write to provide the Court with an accurate account of the legislative history of the 1982 amendments, particularly with respect to Congress's understanding of the existence of a private right of action under Section 2 of the Voting Rights Act.

In light of the district court's conclusion that "no private right of action exists to enforce § 2 of the Voting Rights Act" (Add. 15; R. Doc. 100, at 15), and the district court's rejection of specific language stating the precise opposite conclusion in legislative reports at the time (*id.* at 24 n.101; R. Doc. 100, at 24 n.101), *Amici* have an interest in ensuring that Congress's actions in 1982 are accurately understood as the Court considers this appeal.

*Amici* include:

---

[1] Counsel for *Amici* certify they and their counsel authored this brief in its entirety, and no party or its counsel, nor any person or entity other than *Amici* or their counsel, made a monetary contribution to this brief's preparation or submission. All parties have provided written consent to the filing of this brief.

Appellate Case: 22-1395    Page: 7    Date Filed: 04/26/2022 Entry ID: 5151001

- David F. Durenberger (R-Minn.), a United States Senator who represented Minnesota from 1978-1995. Sen. Durenberger was a senator in 1982, and participated in the debate regarding the 1982 amendments to the Voting Rights Act.

- Armand Derfner, the former director of the Voting Rights Act Project for the Joint Center for Political Studies in Washington, D.C. Mr. Derfner litigated multiple, seminal cases under the Voting Rights Act brought by private plaintiffs, and he testified before both the House and Senate Judiciary Committees in support of the 1982 amendments to the Voting Rights Act.

- Michael R. Klipper, former Senate Judiciary Committee Chief Counsel to Senator Charles McC. Mathias, Jr. (R. Md.), the chief sponsor of Senate Bill 1992 (97th Congress) ("Senate Bill 1992").

- Philip Kiko, who served as the Legislative Director and Legal Counsel for former Congressman F. James Sensenbrenner Jr. (R-Wi.) from 1979 through 1983 and as General Counsel/Chief of Staff to the House Judiciary Committee from 2001 to 2007. Mr. Kiko also served as the Chief Administrative Officer of the U.S. House of Representatives from August 1, 2016 to January 3, 2021.

- Ralph G. Neas, former [1981-95] Executive Director, The Leadership Conference on Civil Rights, a leading participant in legislative history of the 1982 Amendments to the Voting Rights Act, and former Chief Counsel to Senator Edward W. Brooke (R. Mass.) and Senator David F. Durenberger (R. Minn.).

Appellate Case: 22-1395    Page: 8    Date Filed: 04/26/2022 Entry ID: 5151001

- Burton V. Wides, former Senate Judiciary Committee Chief Counsel to Senator Edward M. Kennedy (D. Mass.), the chief co-sponsor of Senate Bill 1992.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In 1982, Congress amended the Voting Rights Act, including the amendments to Section 2 that are at the heart of this appeal. The amendments made it clear that private plaintiffs could bring claims under the Voting Rights Act to remedy both (1) intentional discrimination against minority voters and (2) election procedures that resulted in discrimination against minority voters. *Amici* were members of Congress, congressional staffers, and nongovernmental legal community leaders intimately involved with those amendments, **so they have as good an understanding as anyone about Congress's understanding of the existence of a private right of action under Section 2**. Based on their experience and personal knowledge, *Amici* offer the following four points to aid in the Court's review of the district court's unprecedented decision that there is no private right of action to enforce Section 2 of the Voting Rights Act.

***First***, Congress explicitly intended that Section 2, as amended, includes a private right of action. Both the House Report and the Senate Report prepared in connection with the 1982 amendments make this plain. In the House Report, the House Committee on the Judiciary stated: "***[i]t is intended that citizens have a private right of action to enforce their rights under Section 2.***" H.R. REP. NO. 97-227 at 32 (1982) ("House Report"). In the corresponding Senate Report, the Senate

3

Committee on the Judiciary stated: "***the Committee reiterates the existence of the private right of action under Section 2.***" S. REP. NO. 97-417 at 30 (1982) ("Senate Report"). These plain pronouncements of Congress's intention should end the inquiry. The district court's rejection of these clear expressions of legislative intent (Add. 24 n.101; R. Doc. 100, at 24 n.101) is unprecedented and ignores universal, contemporaneous understanding from members of both parties regarding Section 2 enforcement.

***Second***, these two statements expressly recognizing a private right of action are far from stray remarks. There are ***numerous*** other references in the House and Senate Reports showing that Congress intended to continue the longstanding practice of having private plaintiffs enforce Section 2.

***Third***, this legislative history is the sort that has received, and should continue to receive, significant weight in interpreting the enforcement scheme in Section 2. Contrary to the district court's decision—which gave these reports zero weight (Add. 24 n.101; R. Doc. 100, at 24 n.101)—both the Supreme Court and this Court have favorably cited the House and Senate Reports in interpreting the Voting Rights Act. Indeed, the very framework developed by the Supreme Court to interpret Section 2 was derived from the Senate Report itself. This Court should continue to give the Reports the same great weight, rather than no weight at all.

**Finally**, the longstanding tradition of private enforcement further supports the conclusion that private parties should be able to enforce Section 2. Congress does not legislate in a vacuum. In 1982, Congress legislated against a backdrop in which private plaintiffs possessed and regularly exercised a private right of action to enforce Section 2. Because Congress recognized and approved of such private enforcement, there can be no question that the 1982 amendments maintained that private right of action. The district court's contrary conclusion ignores or sets aside this clear legislative history and background, which *Amici* are familiar with because they were there and participated in the process of enacting the 1982 amendments.

Put simply, Congress intended there to be a private right of action to enforce Section 2 following the 1982 amendments to the Voting Rights Act, and *Amici* are aware of nothing to the contrary. Moreover, both the House and the Senate Reports explicitly state that a private right of action exists to enforce Section 2. The district court erred when it ignored the uncontroverted legislative history of the 1982 amendments. The Court should therefore hold that there is a private right of action to enforce Section 2 of the Voting Rights Act.[2]

---

[2] *Amici* take no position on the merits of plaintiffs' case—only that Section 2 allows private plaintiffs to seek to vindicate rights under Section 2.

Appellate Case: 22-1395    Page: 11    Date Filed: 04/26/2022 Entry ID: 5151001

# ARGUMENT

**I.** **Authoritative 1982 House And Senate Judiciary Committee Reports Show That Congress Intended That Private Parties Possess The Right To Enforce Section 2 Of The Voting Rights Act.**

Section 2 of the Voting Rights Act prohibits voting practices or procedures that discriminate on the basis of race, color, or membership in certain minority groups. 52 U.S.C. § 10301. Prior to the 1982 amendments, courts and litigants understood there to be a private right of action to enforce Section 2, as explained in plaintiffs' merits brief on appeal, at 3 n.1. *See also infra* at III.A.

In 1982, Congress amended Section 2 principally to address the Supreme Court's decision from two years earlier in *City of Mobile, Ala. v. Bolden*, 446 U.S. 55 (1980), which (via a plurality opinion) stated that a racially neutral state law would violate Section 2 "only if motivated by a discriminatory purpose." *Id.* at 62; *see Brnovich v. Democratic Nat'l Committee*, 141 S. Ct. 2321, 2332 (2021). The 1982 amendments made clear that such an interpretation was *not* what Congress intended. In amending the Voting Rights Act, Congress overruled *Bolden* and said that Section 2 claims could be proved *either* where there was a showing of discriminatory intent *or* where there were racially discriminatory results (even if the discrimination was unintentional).

By correcting *Bolden* and broadening the scope of Section 2 in 1982, Congress never intended to restrict the people who could enforce it. Indeed, there was unanimous *agreement* at the time that it could be enforced *both* by the Attorney General and private litigants. Two authoritative committee reports make this obvious.

6

First, consider the House Report, in which the House Committee on the

Judiciary stated:

> It is intended that citizens have a private cause of action to enforce their rights under Section 2. This is not intended to be an exclusive remedy for voting rights violations, since such violations may also be challenged by citizens under 42 U.S.C. §§ 1971, 1983 and other voting rights statutes. If they prevail they are entitled to attorneys' fees under 42 U.S.C. §§ 1973*l*(e) and 1988.

House Report at 32, available at https://bit.ly/3Exc192. Likewise, in the

corresponding Senate Report, the Senate Committee on the Judiciary stated:

> Finally, the Committee reiterates the existence of the private right of action under Section 2, as has been clearly intended by Congress since 1965. See *Allen* v. *Board of Elections*, 393 U.S. 544 1969).

Senate Report at 30, available at 1982 WL 25033. These statements leave no question

about Congress's intent as to a private right of action under Section 2.

Though this Court need not delve deeper, there are ***many other indicia***

consistent with these express statements. The Reports are replete with examples

supporting the right of private plaintiffs and public interest groups to enforce the

Voting Rights Act. *See, e.g.* House Report at 31 n.105 ("As another example, purging

of voter registration rolls would violate Section 2 if ***plaintiffs*** show a result which

demonstrably disadvantages minority voters."); 71 ("Following this redistricting, a suit

is filed ***by plaintiffs*** alleging a violation of amended Section 2."); *see also* Senate

Report at 16 ("In pre-*Bolden* cases ***plaintiffs*** could prevail by showing that a

Appellate Case: 22-1395    Page: 13    Date Filed: 04/26/2022 Entry ID: 5151001

challenged election law or procedure . . . ."); 28 ("If as a result of the challenged practice or structure **_plaintiffs_** do not have an equal opportunity to participate in the political processes and to elect candidates of their choice, there is a violation of this section."); 158 n.180 (Report of the Subcommittee on the Constitution) (indicating that claims could be brought by "'public interest' litigating organizations") (all emphases added). By referencing enforcement by "**plaintiffs**," or "public interest litigating organizations," these Reports show that private plaintiffs played an integral role in enforcing the Voting Rights Act. That conclusion was reinforced again in 2006, when Congress re-authorized the Voting Rights Act. *See* H.R. REP. 109-479, 2006 WL 1403199, at 10 (describing the 1982 amendment as Congress amending Section 2 to change the standard for "plaintiffs bringing lawsuits under the section"); *id.* at 53 (noting that "African American plaintiffs filed and won the largest number of suits under Section 2" in the prior 25 years, with "Latino citizens close behind").

Importantly, these are not drops in an ocean of legislative history that is otherwise characterized by vigorous, conflicting debate. To the contrary, there is no evidence that any question was ever raised by members of Congress that **_both_** private litigants and the Attorney General could sue to enforce Section 2's guarantees. The understanding was noncontroversial, universal, and bipartisan. *Amici* who were closely involved in the drafting, hearing, and debate for the 1982 amendments, affirm that it was understood that Section 2 includes a private right of action.

8

## II. This Court Should Give The 1982 Reports Significant Weight.

The House and Senate Reports are highly persuasive authority for understanding Congress's intentions in passing the 1982 amendments to the Voting Rights Act. Contrary to the district court's reasoning (Add. 24 n.101; R. Doc. 100, at 24 n.101), House and Senate Committee reports are among the most persuasive interpretive tools that inform the meaning and interpretation of the Voting Rights Act.

### A. House and Senate Reports are valuable interpretive tools.

While not all legislative history is considered equal, the most "authoritative source[s] for finding the Legislature's intent" are committee reports like the House and Senate Reports. *Garcia v. United States*, 469 U.S. 70, 76 (1984). That is because "they represent[] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation." *Zuber v. Allen*, 396 U.S. 168, 186 (1969); *see also Prescott v. Comm'r*, 561 F.2d 1287, 1291 (8th Cir. 1977) ("The committee report, as the 'considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation', is of great value in determining congressional intent.").

If there were ever a case where Congress's intent was clear from House and Senate reports, it would be this one, because both the House and Senate Reports include unequivocal statements that Section 2 includes a private right of action. *See* Section I, *supra*.

**B.     The Supreme Court relies on these Reports to interpret the Voting Rights Act.**

The House and Senate Reports are particularly probative in the context of the Voting Rights Act because the Supreme Court has repeatedly relied on them in interpreting the Act.

To start, the Court relied on a 1975 Senate Report to determine whether a private right of action existed under Section 10 of the Voting Rights Act. *See Morse v. Republican Party of Virginia*, 517 U.S. 186, 233–34 (1996). Because a Senate Report—not some other interpretive tool—indicated "that the purpose of the [1975 change to the Act] was to provide the same remedies to private parties as had formerly been available to the Attorney General alone," the Court held that "Congress must have intended [Section 10] to provide private remedies." *Id.*

The decision in *Morse* also looked to the very same 1982 House and Senate Reports to determine the scope of Section 5 of the Act. *Id.* at 210 n.25. The Court cited both Reports as authority on what "Congress intended," making clear that the House and Senate Reports reflect the consensus of congressional thinking and are reliable tools in interpreting the scope of the Voting Rights Act. *Id.*

Not only that, but the Supreme Court explicitly relied on the 1982 Senate Report to ***define the standard*** for enforcing Section 2. In *Thornburg v. Gingles*, 478 U.S. 30, 36 (1986), the Court drew from the very same Senate Report to identify the factors courts should consider when evaluating a Section 2 claim. It adopted the list of

10

"typical factors" set forth in the Report, including the history of voting-related discrimination and the extent to which voting is racially polarized, among others. *Id.* These factors became known as "the *Gingles* factors" that courts regularly apply to determine the validity of a Section 2 claim. *See, e.g.*, *Missouri State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 931 (8th Cir. 2018) (applying the *Gingles* factors).[3]

When the government in *Gingles* questioned whether the Supreme Court should give such weight to the Senate Report, the Supreme Court doubled down. It said that it was "not persuaded that the legislative history of amended § 2 contains anything to lead [it] to conclude that this Senate Report should be accorded little weight" and that it "repeatedly recognized that **the authoritative source for legislative intent lies in the Committee Reports on the bill**." *Gingles,* 478 U.S. at 44 n.7 (emphasis added).

---

[3] There are many more authorities applying the *Gingles* factors to consider Section 2 claims. *See Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1018 (8th Cir. 2006) (applying *Gingles* factors); *Cottier v. City of Martin*, 604 F.3d 553, 558 (8th Cir. 2010); *Pope v. Cty. of Albany*, 687 F.3d 565, 574 (2d Cir. 2012); *Levy v. Lexington Cty., S.C.*, 589 F.3d 708, 714 (4th Cir. 2009); *Reyes v. City of Farmers Branch, Tex.*, 586 F.3d 1019, 1023 (5th Cir. 2009); *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1042 (D.C. Cir. 2003); *Old Pers. v. Brown*, 312 F.3d 1036, 1039 (9th Cir. 2002); *Harper v. City of Chicago Heights*, 223 F.3d 593, 600 (7th Cir. 2000); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999); *Rural W. Tennessee Afr.-Am. Affs. Council v. Sundquist,* 209 F.3d 835, 839 (6th Cir. 2000); *Jenkins v. Manning*, 116 F.3d 685, 690 (3d Cir. 1997); *Uno v. City of Holyoke*, 72 F.3d 973, 979 (1st Cir. 1995); *Sanchez v. Bond,* 875 F.2d 1488, 1492 (10th Cir. 1989). This long list of cases shows both the long-settled law stemming from the Supreme Court's adoption of the Reports, and also the extensive history of private enforcement of Section 2.

Thus, House and Senate Reports are generally reliable indicators of congressional intent, and that is **particularly** true in the context of the Voting Rights Act. The Supreme Court has repeatedly relied on the Reports as tools in interpreting the Voting Rights Act. The fact that both Reports explicitly state that Congress intended to create a private right of action to enforce Section 2 is similarly highly probative evidence of Congress's intent and should be given considerable weight.

## C. This Court also relies on the Reports to interpret the Voting Rights Act.

Following what should be an uncontroversial interpretive principle, this Court from time to time also relies on the House and Senate Reports to understand Congress's intent under the Voting Rights Act.

For example, in *Missouri State Conference of the NAACP v. Ferguson-Florissant School District*, this Court declared that the "the legislative history of the 1982 amendment to § 2 indicates that it was aimed particularly at discriminatory at-large election systems which dilute minority voting strength." 894 F.3d 924, 930 (8th Cir. 2018) (quoting *Buckanga v. Sisseton Indep. Sch. Dist.*, 804 F.2d 469, 471 (8th Cir. 1986)). *See also, e.g.*, *Buckanga* (citing multiple house and senate reports to determine the purpose of the Voting Rights Act and establish the "factors" courts consider "in analyzing the discriminatory result of an election system or practice"); *Whitfield v. Democratic Party of State of Ark.*, 890 F.2d 1423, 1427 (8th Cir. 1989), *on reh'g*, 902 F.2d 15 (8th Cir. 1990) ("We believe this legislative discussion, which encompasses both special practices and

12

general prohibitions clearly supports our analysis of congressional intent on the scope of section 2 of the Act."); *Bone Shirt*, 461 F.3d at 1021.

Nor is the Voting Rights Act the only federal statute whose interpretation can be gleaned from looking at House or Senate Reports. *See, e.g.*, *Schumacher v. SC Data Ctr., Inc.*, No. 19-3266, 2022 WL 997742, at *5 (8th Cir. Apr. 4, 2022) (using legislative history to interpret the Fair Credit Reporting Act); *St. Louis Effort for AIDS v. Lindley-Myers*, 877 F.3d 1069, 1072 (8th Cir. 2017) (same, for 42 U.S.C. § 1983); *Gen. Mills, Inc. v. United States*, 554 F.3d 727, 730 (8th Cir. 2009) (same, for portions of the Internal Revenue Code); *Boyle v. Anderson*, 68 F.3d 1093, 1102 (8th Cir. 1995) (same, for ERISA); *United States v. Shriver*, 838 F.2d 980, 982 (8th Cir. 1988) ("To resolve this issue we need look no further than the legislative history of § 844(h), which expressly reveals [the answer]."); *Donovan v. Rose L. Firm*, 768 F.2d 964, 973 (8th Cir. 1985) (same, for the Labor-Management Reporting and Disclosure Act); *Cox v. Levi*, 592 F.2d 460, 462–63 (8th Cir. 1979) (same, for Freedom of Information Act); *Nat'l Indus. Constructors, Inc. v. Occupational Safety & Health Rev. Comm'n*, 583 F.2d 1048, 1053 (8th Cir. 1978) (same, for the Occupational Safety and Health Act); *Tuft v. McDonnell Douglas Corp.*, 517 F.2d 1301, 1305–08 (8th Cir. 1975); (same, for Title VII of the Civil Rights Act and the Equal Employment Opportunity Act).

Just as it has done repeatedly in the past, this Court may, and should, look to the legislative history underlying the Voting Rights Act to reaffirm that Congress's understanding of Section 2 includes a private right of action.

## III. The District Court Erred In Disregarding The Legislative History

Against this weight of authority and longstanding practice, the district court refused to consider the Senate and House Reports, because "[w]here the text and structure give a clear answer, the inquiry is at an end" and "[c]ommitee reports cannot be employed by unelected judges to alter the effect of the actual words used in the bill that became law." (Add. 24 n.101; R. Doc. 100, at 24 n.101.) Its analysis is wrong, for two distinct reasons.

### A. The district court ignored the legislative backdrop of the 1982 amendments, at which point over 100 years of history established that private plaintiffs could enforce civil rights laws.

The district court erred, first, in ignoring the legislative backdrop of the 1982 amendments, at which point decades and decades of history established that private plaintiffs could enforce civil rights laws generally, and Section 2 specifically.

Congress does not legislate in a vacuum. Instead, it "legislates against the backdrop of existing law." *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2019). This means "that Congress enacts legislation with knowledge of relevant judicial decisions." *Bank One, Utah v. Guttau*, 190 F.3d 844, 849 (8th Cir. 1999). The backdrop for both the Voting Rights Act and the 1982 amendments confirm that Congress recognized the need for private enforcement of the Act's protections.

*First*, Congress understood that the meaning and purpose of Section 2 necessitate private enforcement. Section 2 of the Voting Rights Act was designed to help private citizens enforce their rights under the Fourteenth and Fifteenth

Amendments. On May 31, 1870, four months after ratification of the Fifteenth Amendment, Congress passed the Enforcement Act of 1870, which banned race discrimination in voting. That act stated that

> "all citizens of the United States who are or shall be otherwise qualified by law to vote at any election by the people in any State … shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude . . ."

This section remains good law, and is currently codified at 52 U.S.C. § 10301(a).[4] In April 1871, a year after the Enforcement Act, Congress unequivocally established the right of private enforcement of voting rights by enacting the Ku Klux Klan Act of 1871, which provided for an "action at law, suit in equity or other proper proceeding for redress" for any person whose "rights, privileges or immunities secured by the Constitution of the United States" were violated by a person acting under color of state law. Ch. 22, § 2, 17 Stat. 13 (1871) (codified at 42 U.S.C. § 1983). Congress codified this provision in 1874, in the Revised Statutes, R.S. 1979, but with a decisive change: replacing the words "secured by the Constitution of the United States" with "secured by the Constitution **and laws** . . ." (emphasis added). The revised provision, including words "and laws," has likewise remained in the law ever since, showing Congress's enduring commitment to private enforcement of civil rights.

---

[4] The statute now states: "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

Appellate Case: 22-1395    Page: 21    Date Filed: 04/26/2022 Entry ID: 5151001

For many years, enforcement of voting rights was done by federal criminal prosecutions or private civil suits (primarily for damages) brought under these statutes.[5] The federal government was not authorized to bring civil suits to combat racial discrimination of any kind.

It was only in 1957 with the passage of the Civil Rights Act that Congress first authorized the Attorney General by statute to enforce voting rights violations—but not for damages, only for "preventive relief." *See* 52 U.S.C. § 10101(c). The 1957 Act preserved the private right to bring suit in 28 U.S.C. § 1343(a)(4), a new section providing federal jurisdiction for civil rights suits including for damages (which only private parties could bring). That section expressly allowed a plaintiff to sue to "recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

Thus, for 150 years private citizens have possessed the right to sue in a federal court to secure the right to vote against racial discrimination. Congress understood that Section 2 of the Voting Rights Act, as amended in 1982, is no more than a reiteration of the 150-year-old baseline rule.[6] *See* House Report at 3 ("The [Voting

---

[5] *See, e.g.*, *Nixon v. Herndon*, 273 U.S. 536 (1927); *Wiley v. Sinkler*, 179 U.S. 58 (1900); *Myers v. Anderson*, 238 U.S. 368 (1915); and *Smith v. Allwright*, 321 U.S. 649 (1944).
[6] The district court incorrectly reasoned that "after the 1982 amendment, a proceeding to enforce § 2 of the Voting Rights Act is not a proceeding 'to enforce the voting guarantees of the fourteenth or fifteenth amendment' because the voting rights protected by § 2 are different from, and broader than, the far narrower guarantees in the Fourteenth and Fifteenth Amendments." (Add. 23; R. Doc. 100, at 23.) Section 2

16

Rights] Act provides evidence of this Nation's commitment to assure that none of its citizens are deprived of this most basic right guaranteed by the fourteenth and fifteenth amendment."); *see also* Senate Report at 9 (noting that the 1975 amendment expanded Section 2 based on the Fourteenth and Fifteenth Amendments).

**Second**, the legal context at the time of the 1982 amendments confirms Congress's commitment to private enforcement of the Voting Rights Act. It was not necessary for Congress to explicitly include a private right of action because courts had repeatedly interpreted remedial statutes like the Voting Rights Act to include one. As the Supreme Court explained in *Morse*, "during the 1960s" the Supreme Court had "consistently found" that civil rights statutes contained a private right of action "notwithstanding the absence of an express direction from Congress." 517 U.S. at 231. The Voting Rights Act was passed "only one year after [the] Court's decision in *J.I. Case Co. v. Borak*, 377 U.S. 426 (1964), which applied a highly liberal standard for finding private remedies." *Id.* (internal citations omitted). *J.I. Case Co.* went as far as to find it was the "duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose." 377 U.S. at 433. Thus, at the time the Voting Rights Act was passed in 1965, courts regularly found private rights of action without any requirement of a specific reference in the text.

---

is not divorced from the rights of the Fourteenth and Fifteenth Amendments but rather was enacted to protect them.

Appellate Case: 22-1395    Page: 23    Date Filed: 04/26/2022 Entry ID: 5151001

Congress passed the 1982 amendments to the Voting Rights Act against this legal backdrop. The Supreme Court had previously held that a private right of action existed under Section 5 in *Allen v. State Board of Elections*, 393 U.S. 544, 555–557 (1969), even without an express grant. Congress had no reason to doubt that Section 2 similarly included a private right of action. Many cases had already been brought by private litigants at the time of the 1982 amendments. *See, e.g.*, *Bolden*, 446 U.S. at 58; *Kirksey v. City of Jackson, Mississippi*, 663 F.2d 659, 664 (5th Cir. 1981), *decision clarified on denial of reh'g sub nom. Kirksey v. City of Jackson, Miss.*, 669 F.2d 316 (5th Cir. 1982); *Webber v. White*, 422 F. Supp. 416 (N.D. Tex. 1976).[7] "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). With courts routinely hearing Voting Rights Act claims brought by private litigants, Congress had no need to include an explicit reference to a private right of action under Section 2.

Ignoring these principles, the district court reasoned that the Supreme Court has since heightened the requirements for finding a private cause of action in *Alexander v. Sandoval* 532 U.S. 275, 286 (2001) (addressing private right of action in Title VI). But it did not issue that decision until 2001, decades after the passage of the

---

[7] Private cases brought under Section 2 of the Voting Rights Act since the 1982 amendments have been well-documented. *See* "To Participate and Elect: The Voting Rights Act at 40," MICHIGAN LAW VOTING RIGHTS INITIATIVE, https://voting.law.umich.edu/ (last visited April 14, 2022).

Appellate Case: 22-1395     Page: 24     Date Filed: 04/26/2022 Entry ID: 5151001

Voting Rights Act and nearly 20 years after the 1982 amendments. Nothing about *Sandoval* changed what Congress understood when adopting and amending Section 2—that courts would allow private citizens to enforce the Voting Rights Act. Indeed, in other contexts, this Court has continued to recognize implied private rights of action post-*Sandoval*. *See, e.g.*, *Does 1-2 v. Regents of the Univ. of Minnesota*, 999 F.3d 571, 580 (8th Cir. 2021) (Loken, J.) (recognizing the "well-established implied private right of action for alleged violations of Title VI [of the Civil Rights Act of 1964], which prohibits discrimination on the basis of race in federally-funded programs").

Moreover, nothing in *Sandoval* wiped out courts' ability to consider context as one tool in the statutory interpretation arsenal. To the contrary, *Sandoval* held that "[i]n determining whether statutes create private rights of action, as in interpreting statutes generally . . . legal context matters only to the extent it clarifies text." *Sandoval*, 532 U.S. at 288. In the Voting Rights Act, as elsewhere, the legal context clarifies that, at the time the Act was passed, and at the time of the 1982 amendments, Congress understood courts would interpret the Act to confer a private right of action.

**B.    The district court improperly rejected legislative history as a meaningful tool of statutory interpretation.**

The district court also improperly rejected the legislative history because the "text and structure [gave] a clear answer." (Add. 24 n.101; R. Doc. 100, at 24 n.101.) Among interpretive tools, the district court gave structure more weight than legislative

19

history, contrary to governing law—from the Supreme Court and this Court—which treats structure and legislative history equally if a statute's text is arguably ambiguous.

When evaluating tools beyond the text of a statute, the longstanding principle is one of parity: if there is any ambiguity in a statute, courts then "seek guidance from legislative history and from the . . . overall structure." *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 508–09 (1989); *see also Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 737 (1985) (when a statute is ambiguous, a court "seek[s] guidance in the statutory structure, relevant legislative history, congressional purposes expressed [in the statute at issue], and general principles [of law relevant to the statute at issue]"); *Nachman Corp. v. Pension Ben. Guar. Corp.*, 446 U.S. 359, 370 (1980) ("We first consider petitioner's textual argument divorced from the statute as a whole; we next examine the structure and history. . . .").

This longstanding principle continues to be applied in this Circuit. Indeed, the Court's cases show that it is not only appropriate, but necessary, for courts to consider structure and legislative history contemporaneously. *See, e.g., Wolfchild v. Redwood Cty.*, 824 F.3d 761, 769 (8th Cir. 2016) (discerning the intent of Congress from the "structure . . . and the legislative history"); *Pattison Sand Co., LLC v. Fed. Mine Safety & Health Rev. Comm'n*, 688 F.3d 507, 515 (8th Cir. 2012) (considering decisions that analyzed both "structure and legislative history"). The district court should have done the same here, particularly because the legislative history is highly probative and contains unequivocal statements of Congress's intent. But it didn't.

20

## CONCLUSION

The 1982 amendments to Section 2 of the Voting Rights Act were adopted to broaden its scope following an unduly cramped interpretation from the Supreme Court. As *Amici* know first-hand, there is no indication that Congress meant to *narrow* the universe of people who could enforce the Act when it *broadened* the scope of the statute. *Amici* were involved in the shaping of the 1982 law. They helped draft the 1982 amendments, participated in legislative hearings and debate, observed congressional consideration of amendments offered to the legislation, and voted in favor of the final bill. The House and Senate Reports supporting the final bill are clear on the existence of a private right of action and were noncontroversial at the time. *Amici* are not aware of a single congressperson, judge, executive branch official, or other public figure questioning the need for and existence of a private right of action to enforce Section 2 at the time. That reality was universally understood to be true. The district court committed manifest error in concluding otherwise.

Appellate Case: 22-1395    Page: 27    Date Filed: 04/26/2022 Entry ID: 5151001

Dated: April 25, 2022        **FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ Jeffrey P. Justman*
Craig S. Coleman
Jeffrey P. Justman
Erica Abshez Moran
Hannah M. Leiendecker
FAEGRE DRINKER BIDDLE & REATH LLP
90 S. 7th Street, Suite 2200
Minneapolis, Minnesota 55402
T: (612) 766-7000
Craig.Coleman@faegredrinker.com
Jeff.Justman@faegredrinker.com
Erica.Moran@faegredrinker.com
Hannah.Leiendecker@faegredrinker.com

Alexandra K. Benton
FAEGRE DRINKER BIDDLE &
REATH LLP
1144 15th Street, Suite 3400
Denver, Colorado 80202
T: (303) 607-3500
Alexandra.Benton@faegredrinker.com

*Counsel for Amici Curiae*

22

## CERTIFICATE OF COMPLIANCE AND VIRUS SCANNING

1.      This brief complies with the word count limitations set forth in Fed. R. App. P. 29(a)(5) because it contains 5,381 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Microsoft 365 in Garamond 14-point font.

3.      In accordance with 8th Cir. R. 28A(h), I certify that this brief has been scanned for viruses and is virus free.

Dated: April 25, 2022

*/s/ Jeffrey P. Justman*

Jeffrey P. Justman

Appellate Case: 22-1395     Page: 29     Date Filed: 04/26/2022 Entry ID: 5151001

**CERTIFICATE OF SERVICE**

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I hereby certify that on April 25, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ *Jeffrey P. Justman*
Jeffrey P. Justman

Appellate Case: 22-1395    Page: 30    Date Filed: 04/26/2022 Entry ID: 5151001