No. 22-1395

# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

ARKANSAS STATE CONFERENCE NAACP., et al.,
Plaintiffs-Appellants,

v.

ARKANSAS BOARD OF APPORTIONMENT, et al.
Defendants-Appellees.

On Appeal from the United States District Court
for the Eastern District of Arkansas
No. 4:21-CV-01239 LPR (Hon. Lee P. Rudofsky)

## Defendants-Appellees' Brief

LESLIE RUTLEDGE
  Arkansas Attorney General

NICHOLAS J. BRONNI
  Arkansas Solicitor General

DYLAN L. JACOBS
  Deputy Solicitor General

ASHER L. STEINBERG
  Senior Assistant Solicitor General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center St., Suite 200
Little Rock, AR 72201
(501) 682-6302
Nicholas.Bronni@arkansasag.gov

## SUMMARY OF THE CASE AND STATEMENT
## REGARDING ORAL ARGUMENT

In 1965, Congress enacted Section 2 of the Voting Rights Act and authorized the Attorney General to enforce that provision. Fifteen years later, in a private suit brought under Section 2 and the Fifteenth Amendment, the Supreme Court questioned whether Section 2 provided a private right of action, but ultimately concluded that Section 2 merely restated the Fifteenth Amendment's ban on intentional discrimination. Congress swiftly abrogated the Court's holding on Section 2's substantive reach, making Section 2 claims more attractive to would-be plaintiffs, but it didn't address the Court's doubts that Section 2 provided a private right of action at all. This appeal presents that long-avoided question, and this Court should hold Section 2 provides no such right.

Plaintiffs don't dispute that Section 2 provides no express private right of action, and that the only express right of action to enforce Section 2 is conferred solely on the Attorney General. Their only textual argument is that certain provisions of the Voting Rights Act address remedies in private suits to enforce the Constitution's voting guarantees, thereby supposedly contemplating private Section 2 suits. But if Section 2 suits truly enforced the Constitution's voting guarantees, no one would care whether Section 2 provided a private right of action. The whole point of Section 2 is that it goes much farther than the Constitution ever did.

Defendants do not oppose Plaintiffs' request of 20 minutes for argument.

i

# TABLE OF CONTENTS

Summary of the Case and Statement Regarding Oral Argument .............................. i

Table of Authorities ...................................................................................... iiv

Statement of Jurisdiction............................................................................... viii

Statement of the Issue Presented.................................................................... ix

Statement of the Case...................................................................................1

    A.  The Voting Rights Act ........................................................................1

    B.  Factual and Procedural Background........................................................7

Standard of Review ......................................................................................14

Summary of the Argument..............................................................................15

Argument....................................................................................................17

    I.   Section 2 does not provide a private right of action......................................17

       A.  Section 2 does not unambiguously confer a private right. ......................18

       B.  Section 2 does not provide a private remedy. ...................................23

    II.  Plaintiffs' counterarguments fail. .......................................................26

       A.  No controlling precedent implies a private right of action
            under Section 2. ...................................................................26

           1.  *Morse* does not recognize a private right of action...........................26

               a.  *Morse*'s statements on Section 2 are dicta. .................................27

               b.  Morse lacks a Marks holding. ...................................................29

           2.  Plaintiffs' reliance on this Court's decision in *Roberts* is
              misplaced....................................................................................31

           3.  Congress has not ratified decisions entertaining private
              Section 2 suits...........................................................................32

       B.  Sections 3 and 14 do not imply Section 2 contains a right of
            action. ..............................................................................35

           1.  Section 2 suits do not "enforce the voting guarantees of
              the fourteenth or fifteenth amendment."...........................................36

ii

2.    Whatever their scope, Sections 3 and 14 do not imply private rights....................................................................43

C.  Plaintiffs' and the United States' remaining arguments for reversal fail. ..................................................................48

1.    Section 12(f) does not imply a right of action. ................................48

2.    Legislative history cannot create a cause of action...........................50

3.    Plaintiffs' newly raised request for leave to amend to replead under Section 1983 is not a basis for reversal.....................52

4.    Defendants did not waive the right-of-action issue. .........................53

Conclusion .......................................................................................56

Certificate of Compliance ..................................................................57

Certificate of Service .......................................................................58

iii

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Sandoval*, 532 U.S. 275 (2001).....................................................passim

*Allen v. State Bd. of Elections*, 393 U.S. 544 (1969).........................................passim

*AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2019)..........................................34

*Animal Legal Def. Fund v. Reynolds*, 8 F.4th 781 (8th Cir. 2021)...................30, 31

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 US. 320 (2015) ..........18, 32, 33, 50

*Beer v. United States*, 425 U.S. 130 (1976)..........................................................43

*Blessing v. Firestone*, 520 U.S. 329 (1997).........................................................22

*Bragdon v. Abbott*, 524 U.S. 624 (1998) ...............................................................33

*Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021)..............................6

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994).............................................................................................34

*City of Mobile v. Bolden*, 446 U.S. 55 (1980) .................................................passim

*Comm. for a Fair and Balanced Map v. Ill. Bd. of Elections*, No. 1:11-CV-5065,
    2011 WL 5185567 (N.D. Ill. Nov. 1, 2011) (three-judge court)........................21

*Cross v. Fox*, 23 F.4th 797 (8th Cir. 2022)..........................................12, 13, 14, 53

*Does v. Gillespie*, 867 F.3d 1034 (8th Cir. 2017).................................................18

*Freeman v. Fahey*, 374 F.3d 663 (8th Cir. 2004) .......................................ix, 25, 26

*Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002).....................................................passim

*Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966)..................................40

*In re Permian Basin Area Rate Cases*, 390 U.S. 747 (1968) ................................28

*Leach v. Mediacom*, 373 F.3d 895 (8th Cir. 2004) (per curiam)...........................25

*Longaker v. Bos. Sci. Corp.*, 715 F.3d 658 (8th Cir. 2013)..................................52

*Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088 (E.D. Cal. 2018).............................21

*Marks v. United States*, 430 U.S. 188 (1977) ...........................................16, 29, 30

*Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134 (1985).....................................25

*Merrill v. Milligan*, 142 S. Ct. 879 (2022).......................................................6, 8, 9

iv

*Midwest Foster Care & Adoption Ass'n v. Kincade,*
   712 F.3d 1190 (8th Cir. 2013) ............................................................ ix, 21, 22

*Mixon v. Ohio*, 193 F.3d 389 (6th Cir. 1999) ........................................... 35

*Morse v. Republican Party of Va.*, 517 U.S. 186 (1996) ................................. passim

*Osher v. City of St. Louis*, 903 F.3d 698 (8th Cir. 2018) ................................. 18, 32

*POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102 (2014) ............................ 44

*Raley v. Hyundai Motor Co.*, 642 F.3d 1271 (10th Cir. 2011) ............................ 49

*Roberts v. Wamser*, 883 F.2d 617 (8th Cir. 1989) ..................................... 12, 31, 32

*Robinson v. Norling*, 25 F. 4th 106 (8th Cir. 2022) .................................... 52

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) ......................................... 34

*Smith v. Boyd*, 945 F.2d 1041 (8th Cir. 1991) ....................................... 54

*Smithrud v. City of St. Paul*, 746 F.3d 391 (8th Cir. 2014) .............................. 54

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ............................... passim

*Steele v. City of Bemidji*, 257 F.3d 902 (8th Cir. 2001) ............................... 52

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148 (2008) ....... ix, 47

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmty. Project, Inc.*,
   576 U.S. 519 (2015) ................................................................... 33

*Thornburg v. Gingles*, 478 U.S. 30 (1986) .......................................... 6, 20, 22

*Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979) ............................... 5, 50

*United States v. 24.30 Acres of Land*, 104 F. App'x 134 (8th Cir. 2004) ............... 49

*United States v. Mask of Ka-Nefer-Nefer*, 752 F.3d 737 (8th Cir. 2014) ............... 52

*Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894 (2019) ............................... 51

*Webber v. White*, 422 F. Supp. 416 (N.D. Tex. 1976) ............................... 45, 46

*Whitcomb v. Chavis*, 403 U.S. 124 (1971) .......................................... 4

*White v. Regester*, 412 U.S. 755 (1973) ............................................ 4

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) ........................................... 28

Appellate Case: 22-1395    Page: 6    Date Filed: 06/09/2022 Entry ID: 5166069

**Statutes**

15 U.S.C. 78j(b) ......................................................... 46, 47

28 U.S.C. 1291 ............................................................ viii

28 U.S.C. 1331 ............................................................ viii

28 U.S.C. 1343(a)(3) ..................................................... viii

28 U.S.C. 1343(a)(4) ..................................................... viii

28 U.S.C. 1357 ............................................................ viii

28 U.S.C. 2201(a) ........................................................ viii

42 U.S.C. 1983 .......................................................... 45, 52

52 U.S.C. 10101 ...........................................................42

Private Securities Litigation Reform Act, codified at 15 U.S.C. 78u-4 .................47

Pub. L. No. 94-73, sec. 401, 89 Stat. 400 (1975)........................................3

Pub. L. No. 94-73, sec. 402, 89 Stat. 400 (1975)........................................4

Voting Rights Act Amendments of 1982, Pub. L. No. 97-205,
sec. 3, 96 Stat. 131 (1982) ...........................................................5

Voting Rights Act of 1965

    52 U.S.C. 10301 (sec. 2)........................................... passim

    52 U.S.C. 10301(a) (Sec. 2(a)) ................................... 19, 23

    52 U.S.C. 10301(b) (sec. 2(b)) ........................... 15, 19, 21, 50

    52 U.S.C. 10302 (sec. 3)........................................... passim

    52 U.S.C. 10302(a) (sec. 3(a)) .................................... passim

    52 U.S.C. 10302(b) (sec. 3(b)) .................................... passim

    52 U.S.C. 10302(c) (sec. 3(c)) .................................... passim

    52 U.S.C. 10303 (sec. 4)...............................................34

    52 U.S.C. 10303(a)(8) (sec. 4(a)(8))...................................34

    52 U.S.C. 10303(c) (sec. 4(c))........................................41

Appellate Case: 22-1395    Page: 7    Date Filed: 06/09/2022 Entry ID: 5166069

52 U.S.C. 10304 (sec. 5) .................................................. passim

52 U.S.C. 10304(b) (sec. 5(b)) ...............................................43

52 U.S.C. 10306 (sec. 10) ................................................ passim

52 U.S.C. 10306(a) (sec. 10(a)) ...............................................2

52 U.S.C. 10306(b) (sec. 10(b)) ...........................................2, 26

52 U.S.C. 10308 (sec. 12) ................................................. ix, 10

52 U.S.C. 10308(a) (sec. 12(a)) ........................................ 10, 49

52 U.S.C. 10308(b) (sec. 12(b)) .............................................49

52 U.S.C. 10308(c) (sec. 12(c)) ........................................ 10, 49

52 U.S.C. 10308(d) (sec. 12(d)) ............................... 10, 24, 49, 50

52 U.S.C. 10308(e) (sec. 12(e)) .............................................49

52 U.S.C. 10308(f) (sec. 12(f)) ....................... viii, 10, 48, 49

52 U.S.C. 10310 (sec. 14) ................................................ passim

52 U.S.C. 10310(e) (sec. 14(e)) ......................................... passim

## Other Authorities

H. Rep. No. 97-227 (1981) ..............................................6, 46

S. Rep. No. 94-295 (1975) ...................................................3

S. Rep. No. 97-417 (1982) ..............................................6, 51

## Constitutional Provisions

Ark. Const. art. 8 ...............................................................7

U.S. Const. amend. XIV .................................................3, 40

U.S. Const. amend. XV.....................i, 1, 2, 4, 5, 39, 40, 41-42

U.S. Const. amend. XXIV .....................................................40

U.S. Const. amend. XXIV, sec. 1. ........................................40

Appellate Case: 22-1395     Page: 8     Date Filed: 06/09/2022 Entry ID: 5166069

**STATEMENT OF JURISDICTION**

The district court correctly held it lacked original jurisdiction under 28 U.S.C. 1331, 1343(a)(3)-(4), 1357, 2201(a), and 52 U.S.C. 10308(f) for want of a private right of action. This Court has appellate jurisdiction under 28 U.S.C. 1291.

# STATEMENT OF THE ISSUE PRESENTED

Whether Section 2 of the Voting Rights Act, which does not contain an express private right of action, provides an implied private right of action.

Apposite Authority: *Alexander v. Sandoval*, 532 U.S. 275 (2001); *Midwest Foster Care & Adoption Ass'n v. Kincade*, 712 F.3d 1190 (8th Cir. 2013); *Freeman v. Fahey*, 374 F.3d 663 (8th Cir. 2004); *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148 (2008); 52 U.S.C. 10301, 10308.

Appellate Case: 22-1395     Page: 10     Date Filed: 06/09/2022 Entry ID: 5166069

## STATEMENT OF THE CASE

### A.    The Voting Rights Act

In 1965, in response to some states' "unremitting and ingenious defiance of the Constitution," Congress enacted the Voting Rights Act. *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966). The Voting Rights Act was not the first statute Congress passed in the civil-rights era to secure African-Americans' voting rights; Congress previously enacted several statutes "outlaw[ing] some of the tactics" used to deny their right to vote and authorizing suit against them. *Id.* at 313. Nor did it meaningfully augment the voting rights secured by federal law; in substance, it mostly tracked the protections of the Fifteenth Amendment itself. Rather, the Voting Rights Act's innovation, and the source of its success, was its federal enforcement scheme.

1. The heart of the Voting Rights Act was an administrative preclearance procedure. Under Section 5, states and jurisdictions with a history of voting discrimination—the so-called "covered" jurisdictions—were barred from enforcing new voting laws until the Attorney General determined they would not "deny[] or abridg[e] the right to vote on account of race or color." Voting Rights Act of 1965 ("VRA"), Pub. L. No. 89-110, sec. 5, 79 Stat. 437 (1965). As the Supreme Court contemporaneously interpreted Section 5, that review was limited to

1

"determin[ing] whether their use would violate the Fifteenth Amendment." *South Carolina*, 383 U.S. at 334.

Other remedies applied nationally. Section 3 "strengthen[ed] existing procedures for attacking voting discrimination by means of litigation." *South Carolina*, 383 U.S. at 316. It provided that, in any suit the Attorney General filed "to enforce the guarantees of the fifteenth amendment," VRA sec. 3(a)-(c), a court could appoint federal examiners, *id.*, sec. 3(a); suspend the use of literacy tests, *id.*, sec. 3(b); or institute a judicial preclearance regime akin to Section 5's, *id.*, sec. 3(c)—all contingent on the court's finding "violations of the fifteenth amendment." *Id.*, sec. 3(a), 3(c); *see also* sec. 3(b) (permitting the suspension of tests if they "deni[ed] or abridge[d] the right . . . to vote on account of race or color"). Section 10 "declare[d]" that "in some areas," poll taxes "denied or abridged" the "constitutional right of citizens to vote," VRA sec. 10(a), and authorized the Attorney General to seek injunctive relief that was "necessary to implement [that] declaration." VRA sec. 10(b). Finally, Section 2 simply prohibited any voting rule "imposed or applied . . . to deny or abridge the right of any citizen of the United States to vote on account of race or color," VRA sec. 2—that is, that violated the Fifteenth Amendment.

By its terms, the whole of the Voting Rights Act was exclusively enforceable by the Attorney General. Besides the specific enforcement mechanisms

Appellate Case: 22-1395     Page: 12     Date Filed: 06/09/2022 Entry ID: 5166069

already mentioned, Section 12(d) of the Act authorized the Attorney General to sue to enforce any of its prohibitions. VRA sec. 12(d). Yet notwithstanding the absence of an express private right of action, in 1969 the Supreme Court held that private parties could sue to enforce Section 5. *Allen v. State Bd. of Elections*, 393 U.S. 544 (1969). Acknowledging that the Act "does not explicitly grant . . . private parties" a right of action, *id.* at 555, the Court nevertheless implied one, claiming "[t]he achievement of the Act's laudable goal could be severely hampered" if private plaintiffs could not enforce Section 5, *id.* at 556.

After a 1970 reauthorization of Section 5 in which Congress said nothing about private rights of action, Congress amended Section 3 in 1975 to provide that the remedies Section 3 made available in suits brought by the Attorney General to enforce the Fifteenth Amendment were also available in suits brought by "an aggrieved person" to enforce the Fifteenth Amendment. Pub. L. No. 94-73, sec. 401, 89 Stat. 400 (1975).[1] Like the original Section 3, that amendment did not create causes of action, but "strengthen[ed] existing procedures for attacking voting discrimination by means of litigation," *South Carolina*, 383 U.S. at 316, by augmenting the available remedies "under any statute" that authorized the Attorney General

---

[1] Congress also amended Section 3 to provide that its remedies were available in suits enforcing the Fourteenth Amendment, *id.*, sec. 205, explaining that it was "aware of the significant numbers of suits brought under the 14th Amendment to enforce the voting rights of Spanish-speaking citizens." S. Rep. No. 94-295, at 40 n.40 (1975).

Appellate Case: 22-1395     Page: 13     Date Filed: 06/09/2022 Entry ID: 5166069

or private parties to sue to enforce constitutional voting rights. 52 U.S.C. 10302(a)-(c). Similarly, an amendment to Section 14 authorized courts to grant prevailing parties attorney's fees in "any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment." Pub. L. No. 94-73, sec. 402. Here too, Congress strengthened existing private rights of action to enforce constitutional voting rights, but didn't create new ones.

2. For the first 15 years of the Voting Rights Act's life, the Supreme Court had no occasion to interpret Section 2. Since it added nothing, either substantively or remedially, to the Fifteenth Amendment, plaintiffs challenging what they saw as minority vote dilution simply sued under the Constitution. *See White v. Regester*, 412 U.S. 755 (1973); *Whitcomb v. Chavis*, 403 U.S. 124 (1971). But in 1980, a group of private plaintiffs challenging Mobile, Alabama's at-large elections for city council sued under Section 2 as well as the Fourteenth and Fifteenth Amendments, giving the Court its first occasion to interpret that provision. *City of Mobile v. Bolden*, 446 U.S. 55, 58 (1980).

The Court began its treatment of the Section 2 claim by "[a]ssuming, for present purposes, that there exists a private right of action to enforce this statutory provision." *Id.* at 60. In a footnote, it *cf.*-cited *Allen*, followed by a "*but see*" citation to two more recent decisions in which the Court declined to imply private rights of action, *id.* at 60 n.8, "adher[ing] to a stricter standard for the implication

4

of private causes of action" than it had when *Allen* was decided. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578 (1979). But the Court did not need to decide which of these lines of precedent to follow, because it concluded that Section 2's coverage was "no different from that of the Fifteenth Amendment itself." *Id.* at 61.

Turning to the Fifteenth Amendment claim, the Court held that a facially race-neutral electoral system, like Mobile's at-large system for electing its city council, "violates the Fifteenth Amendment only if motivated by discriminatory purpose." *Id.* at 62. Thus, the Court held that facially race-neutral electoral systems only violated Section 2 if motivated by discriminatory purpose.

3. Congress could not override the Court's constitutional holding, but it could abrogate its statutory holding by amending Section 2. In 1982, it did so, amending Section 2 to prohibit any electoral practice that "results" in a minority group's having "less opportunity than other members of the electorate . . . to elect representatives of their choice." Voting Rights Act Amendments of 1982, Pub. L. No. 97-205, sec. 3, 96 Stat. 131 (1982), codified at 52 U.S.C. 10301. As interpreted by the Supreme Court, this amendment would sweep far beyond the unconstitutional and intentionally discriminatory practices Section 2 originally forbade to generally require the creation of majority-minority districts whenever racially

5

polarized voting defeats minority-preferred candidates. *See Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986).[2]

But though Congress responded dramatically to *Bolden*'s interpretation of Section 2's liability standard, it did nothing to respond to *Bolden*'s questioning whether Section 2 contained a private right of action. Instead, in fractured committee reports, majorities of the House and Senate Judiciary Committees merely expressed the majorities' intentions that one exist. S. Rep. No. 97-417, at 30 (1982) (claiming the "existence of the private right of action under Section 2 . . . ha[d] been clearly intended by Congress since 1965."); H. Rep. No. 97-227, at 32 (1981) ("It is intended that citizens have a private cause of action."). They cited no statutory text expressing that intent. Nor did Congress act to create a private right of action when it reauthorized portions of the Voting Rights Act in 2006. Consequently, last year Justice Gorsuch, joined by Justice Thomas, wrote that whether Section 2 provides a private right of action is "an open question," which "[o]ur cases have assumed—without deciding"—the answer to. *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) (Gorsuch, J., concurring).

---

[2] The Supreme Court recently granted review to decide the correctness of this interpretation in *Merrill v. Milligan*, 142 S. Ct. 879 (2022).

6

## B.    Factual and Procedural Background

1. In Arkansas, the Board of Apportionment, comprising the Governor, the Secretary of State and the Attorney General, draws district lines for the State's General Assembly every decade after the completion of the census.  Ark. Const. art. 8.  This redistricting cycle, because of delays in the census's completion, the Board did not adopt a new districting plan until November 29, 2021.  Add. 4; R. Doc. 100, at 4.  Though adopted on November 29, it did not take legal effect until December 29.  *Id.*

2. That day, Plaintiffs filed suit and a motion for a preliminary injunction, challenging the Board's State House plan.  Add. 4; R. Doc. 100, at 4.  Plaintiffs claimed that because the plan contained 11 majority-black House districts out of 100 total districts, instead of 16 majority-black districts in proportion to the State's 16% black population, the plan violated Section 2 of the Voting Rights Act.  *Id.* at 2.  Plaintiffs made no constitutional claims, and only sued under Section 2 itself, not Section 1983 or any other cause of action.  *Id.* at 1, 17 n.76.

On January 19, 2022, 21 days after the Plaintiffs filed suit, Defendants filed a response to Plaintiffs' preliminary-injunction motion, arguing, in large part, that injunctive relief would be inequitable given the imminent primary.  R. Doc. 53. But by agreement of the parties, Defendants' deadline to file their responsive

7

pleading was extended to fourteen days after the district court ruled on the preliminary-injunction motion. R. Doc. 47.

The following day, citing Justice Gorsuch's opinion in *Brnovich*, the district court entered an order inviting briefing on whether Section 2 provides a private right of action; that order did not modify the existing briefing schedule. App. 42-43; R. Doc. 55, at 1-2. Accepting that invitation, Plaintiffs addressed the district court's question in their preliminary-injunction reply, R. Doc. 68, at 45-49, as did the United States, which filed a statement of interest to argue Section 2 provides a right of action. R. Doc. 71. Defendants addressed the question in their surreply, which they were previously granted leave to file on an issue of standing the district court raised after Defendants filed their response, and argued Section 2 does not provide a right of action. R. Doc. 77.

The district court conducted a five-day hearing on Plaintiffs' preliminary-injunction motion, hearing "four lengthy days of testimony" and "one lengthy day of closing arguments." Add. 6; R. Doc. 100, at 6. On the hearing's fourth day, *id.* at 7, the Supreme Court issued an order in *Merrill v. Milligan*, 142 S. Ct. 879 (2022), staying an injunction entered in a Section 2 case. In an opinion concurring in the stay, Justice Kavanaugh—as Defendants stressed below in their preliminary-injunction response—explained that courts "should not enjoin a state's election laws

8

in the period close to an election," *id.* at 880 (Kavanaugh, J., concurring), unless compliance is "feasible without significant cost, confusion, or hardship," *id.* at 881.

In response to *Merrill*, Plaintiffs claimed in closing arguments that Arkansas's election schedule would make compliance less burdensome than it was in *Merrill*. Add. 8; R. Doc. 100, at 8. The district court viewed this argument as "an incredibly difficult sell." *Id.* Alternatively, Plaintiffs made the extraordinary, last-minute request that the district court allow the 2022 elections to take place under the Board's plan, but then order a special election for the entire Arkansas House of Representatives in 2023 under a remedial plan. *Id.* Thus, the only serious question before the district court was whether to merely deny the preliminary-injunction motion or to dismiss the case for lack of a cause of action.

3. In a comprehensive and careful opinion, the district court held that Plaintiffs lacked a right of action to sue under Section 2. Applying the familiar implied-right-of-action framework from *Alexander v. Sandoval*, 532 U.S. 275 (2001), the district court assumed without deciding that Section 2 confers a private right. Add. 17; R. Doc. 100, at 17. But even making that assumption, it held Section 2 plainly did not confer a private remedy. *Id.* at 17-18, 24 n.101.

The district court began with statutory text. Starting in Section 2, it noted that provision is "completely silent" about private remedies. Add. 19; R. Doc. 100, at 19. Yet the district court didn't stop there; it "consider[ed] the text and structure

9

of the entire Act" before concluding a private remedy was absent. *Id.* First, it considered Section 12 of the Voting Rights Act, that statute's core enforcement provision. "[C]omprehensive[ly] reading" that section, the district court found it was "focused entirely on enforcement proceedings instituted by the Attorney General." *Id.* Subsection (d) of that section, it noted, authorized the Attorney General to seek injunctive relief to enforce Section 2, *id.* at 20, while subsections (a) and (c) authorized fines and criminal penalties that private parties could not enforce, *id.* at 19-20. The district court even considered a subsection of Section 12 that Plaintiffs did not raise, but "that might potentially cut in Plaintiffs' favor." *Id.* at 20. That provision, Section 12(f), confers jurisdiction on district courts to hear proceedings under Section 12 without regard to whether a voter had exhausted administrative remedies. But the district court concluded that provision only means that the Attorney General does not have to wait for voters on whose behalf he sues to exhaust their administrative remedies before he brings a Section 12 action. *Id.* at 21-22.

The district court then turned to the two provisions of the Act that Plaintiffs argued signaled Congress's intent to provide a private right of action, Sections 3 and 14. Those provisions, as discussed above, *supra* at 2-4, provide special remedies and attorney's fees in private suits to enforce the Fourteenth and Fifteenth Amendments' voting guarantees.

10

The district court held that those provisions did not signal Congress believed Section 2 contained a right of action. It explained that "[a]fter the 1982 amendment," which expanded Section 2's prohibitions far beyond that of the Constitution, "a proceeding to enforce § 2 . . . is not a proceeding 'to enforce the voting guarantees of the fourteenth or fifteenth amendment'" themselves. Add. 23; R. Doc. 100, at 23. Plaintiffs' argument that a Section 2 suit was such a proceeding would "rewrite" the statute, the court reasoned, modifying Section 3's "proceeding under any statute *to enforce* the voting guarantees of the fourteenth or fifteenth amendment" to mean "a proceeding under any statute *that enforces* the voting guarantees of the fourteenth or fifteenth amendments." *Id.* at 23 n.97. But even if that language could be contorted to refer to purely statutory causes of action, the district court noted it could "just as easily be nothing more than congressional recognition" of the judicially implied right of action under Section 5, not an extremely subtle authorization of new rights of action throughout the Voting Rights Act. *Id.* at 28 n.117.

In sum, the district court concluded that the Act's text and structure did not manifest congressional intent to provide a private remedy, and "strongly suggest that exclusive enforcement authority resides in the Attorney General." Add. 24; R. Doc. 100, at 24. Finding the statute "clear," the district court didn't need to resort to legislative history to interpret it. *Id.* at 24 n.101.

Turning to Plaintiffs' claims that precedent mandated the court to recognize a right of action, the district court concluded that the statements on which Plaintiffs relied were dicta. It first addressed the Supreme Court's decision in *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996), a fragmented 2-3-4 decision that held Section 10 privately enforceable. The district court agreed *Morse* was "binding precedent" as to its Section 10 holding, but it held that the separate opinions' brief discussion of private suits under Section 2 was dicta. Add. 28; R. Doc. 100, at 28. Moreover, it noted that *Morse*'s interpretive approach—which theorized courts should revive 1960s right-of-action jurisprudence when interpreting 1960s statutes—was later rejected by a majority of the Court in *Sandoval*. *Id.* at 27-28.

Next, it addressed this Court's 33-year-old decision in *Roberts v. Wamser*, 883 F.2d 617 (8th Cir. 1989), which held that unsuccessful candidates could not sue under Section 2, but briefly suggested voters could. The district court explained that *Roberts*'s brief discussion of who could bring suit was unnecessary to the decision, Add. 72; R. Doc. 100, at 72, and that its "highly generalized discussion" of Section 3 did not comport with subsequent Supreme Court decisions on implying private rights, *id.* at 73.

Finally, the district court held the right-of-action question was jurisdictional, and therefore one it had an obligation to raise sua sponte. It explained that *Cross v. Fox*, 23 F.4th 797 (8th Cir. 2022), "very clearly held that the existence (or non-

12

existence of a private right of action is a jurisdictional question." Add. 32; R. Doc. 100, at 32. And it held that *Cross* settled the prior "confusion in the Eighth Circuit caselaw" about whether the right-of-action question is jurisdictional by holding that the line of circuit precedent holding it was controlled. *Id.* at 33.

However, the district court noted that deciding whether Defendants waived the right-of-action issue "may well be an academic exercise." *Id.* at 38 n.162. Defendants, it explained, had yet to file a motion to dismiss or responsive pleading, which was not due until two weeks after the district court ruled on the preliminary-injunction motion. *Id.* And when they did, they would inevitably raise the right-of-action question, given the position they had taken after the court raised it. *Id.* So holding the issue waived for purposes of the preliminary-injunction motion (which was doomed to fail for other reasons, including, as Defendants had strenuously argued, on *Purcell* grounds) would merely postpone its decision by a couple weeks.

Consequently, the district court ruled that only the United States could prosecute Plaintiffs' suit. It gave the United States five days to decide whether to enter the action. Add. 41; R. Doc. 100, at 41. The United States declined. App. 86; R. Doc. 101 at 1. The district court then dismissed the case without prejudice. App. 89; R. Doc. 102.

## STANDARD OF REVIEW

This Court reviews "questions of subject-matter jurisdiction *de novo*."

*Cross*, 23 F.4th at 800.

14

## SUMMARY OF THE ARGUMENT

The main theme of Plaintiffs' arguments is that holding Section 2 lacks a private right of action would be unprecedented. But what would be unprecedented is holding (rather than assuming) Section 2 provides a right of action given the total want of statutory indications that Congress intended to provide one. Plaintiffs' attempt to read a right of action into Section 2's silence faces a series of insurmountable obstacles that could only be overcome by disregarding existing right-of-action doctrine.

First, under current doctrine, to read a private cause of action into a statute, that statute must protect individual plaintiffs' private rights, and Section 2 doesn't do that. Instead, Section 2 only guarantees protected "class[es] of citizens" the opportunity to elect candidates preferred by majorities of those classes, 52 U.S.C. 10301(b), whether or not any individual minority voter can elect the candidates he prefers. Indeed, under current Supreme Court doctrine interpreting Section 2, courts hearing private Section 2 suits treat the electoral opportunities of the individual plaintiffs before them as irrelevant—a telltale sign of how little Section 2 has to do with protecting private rights.

Second, Section 2 does not provide a private remedy. Section 2 itself is silent on remedies. The Voting Rights Act's enforcement section expressly grants enforcement authority to the Attorney General, saying nothing about suits by

15

individuals.  The implication of that express grant—and its accompanying silence on private suits—is obvious.  This Court has held multiple times, solely on the basis of statutory silence on private suits and express grants of enforcement authority to others, that statutes lack private rights of action.

Lacking any evidence of congressional authorization of private Section 2 suits in the text, Plaintiffs seek refuge in precedent, and a tenuous inference from provisions contemplating private *constitutional* voting-rights suits.  The statements Plaintiffs rely upon are dicta: in all of the cases they cite, the question of voters' right to sue under Section 2 wasn't before the court, and it wasn't necessary to any question that was.  Making matters worse, their sole Supreme Court authority was a fractured 2-3-4 opinion that lacks a *Marks* holding.  And all of the dicta Plaintiffs cite precede and are indefensible under the Supreme Court's current approach to implying private rights of action.

As for the Voting Rights Act's several references to suits brought by private parties to enforce the Constitution's voting guarantees, Plaintiffs' attempt to infer a Section 2 right of action from them likewise falls far short.  To start, a Section 2 suit is not a suit to enforce the Constitution itself.  Rather, it is a suit to enforce Section 2's disparate-impact regime.  A cause of action to enforce the Constitution does not include a cause of action to enforce statutes enforcing it, for the same

16

reason the Supreme Court has held a cause of action to enforce a statute does not include a cause of action to enforce regulations enforcing the statute.

But even if suits to enforce the Constitution's voting guarantees included purely statutory voting-rights suits, the fact that Congress legislates on the procedure and remedies in private voting-rights suits doesn't imply that every voting-rights statute contains a private right of action.  It merely implies that Congress assumed *some* private voting-rights suits exist.  That assumption would be correct whether or not Section 2 contained a private right of action, so a Section 2 right of action needn't be conjured to justify the assumption.  Section 2 does not provide a private right of action, and the district court's judgment should be affirmed.

## ARGUMENT

### I.  Section 2 does not provide a private right of action.

There is no private right of action to enforce Section 2.  The reasons for that conclusion are simple.  Section 2 confers a right on minority groups, not individual voters.  Neither Section 2, nor any other provision of the Voting Rights Act, contains an express private right of action to enforce Section 2's prohibitions.  And the only provision of the Act that speaks to Section 2 enforcement authorizes the Attorney General—and no one else—to sue to enforce Section 2.

Whether a statute contains a private right of action is a question of statutory interpretation.  For no less than "substantive federal law itself, private rights of

17

action to enforce federal law must be created by Congress." *Sandoval*, 532 U.S. at 286. "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.*

That task is made easier by the requirement that Congress's intent be unambiguous. Indeed, today, talk of implied rights of action is a misnomer, because under current doctrine, "a private right of action under federal law is not created by mere implication, but must be unambiguously conferred." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 US. 320, 332 (2015) (internal quotation marks omitted); *see also Osher v. City of St. Louis*, 903 F.3d 698, 702 (8th Cir. 2018) ('[N]othing short of an unambiguously conferred right' will support an implied right of action.") (some internal quotation marks omitted) (quoting *Does v. Gillespie*, 867 F.3d 1034, 1040 (8th Cir. 2017)). In the case of Section 2, Congress neither "unambiguously confer[red] a private right," nor "display[ed] an intent to provide a private remedy." *Id.*

A. <u>Section 2 does not unambiguously confer a private right.</u>

The first question in deciding whether a statute contains a private right of action is whether it "unambiguously confers a private right." *Osher*, 903 F.3d at 702. That right must be individual, not aggregate. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002) (holding that both the test for whether a right is enforceable under

18

Section 1983 and whether a statute contains a right of action turns on whether "Congress intended to confer individual rights upon a class of beneficiaries"). The district court did not address whether Section 2 confers a private right, reasoning that even if it did, Congress had not provided a private remedy. Add. 17; R. Doc. 100, at 17. Its focus on the latter question is understandable, as Section 2 unambiguously *lacks* a private remedy. However, Section 2 also falls well short of unambiguously conferring an individual right. Rather, it only confers rights on minority groups in the aggregate.

Section 2 contains two subsections. The first appears to describe an individual right; it forbids voting practices that "result[] in a denial or abridgement of the right of any citizen . . . to vote on account of race or color . . . as provided in subsection (b)." 52 U.S.C. 10301(a). But subsection (b), added in 1982, explains what that means—and critically, explains that the right subsection (a) confers is a group right. It provides that "[a] violation of subsection (a) is established if . . . the political processes leading to nomination or election . . . are not equally open to participation by members of a *class of citizens* protected by subsection (a) in that *its members* have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. 10301(b) (emphasis added).

19

Congress's addition of this language starkly deindividualized the Section 2 right. Indeed, whether a state has violated Section 2 has nothing to do with the electoral opportunity enjoyed by any individual voter. Rather, what Section 2 protects is the electoral opportunity of minority groups.

Unlike ordinary antidiscrimination statutes, proving that an individual voter suffered discrimination doesn't suffice to prove a Section 2 violation. Instead, Section 2 plaintiffs must prove that a "minority group" has "distinctive minority group interests" in the form of candidates they cohesively prefer, *Gingles*, 478 U.S. at 51, and that white bloc voting usually defeats the group's preferred candidates, *see id.* The ultimate question is whether, in the aggregate, "the ability of minority voters to elect their chosen representatives is inferior to that of white voters." *Id.* at 48 n.15. If an individual minority voter's preferred candidates are usually defeated by white bloc voting, but the candidates preferred by his "minority group" aren't defeated (or if his group has no cohesive preferences either way), there is no Section 2 violation.

Conversely, courts have never inquired into whether individual Section 2 plaintiffs' preferred candidates are usually defeated, or even which candidates individual plaintiffs prefer. To sue under Section 2, courts that entertain individual Section 2 suits merely require—at most—that a plaintiff "(1) is registered to vote and resides in the district where the discriminatory dilution occurred; and (2) is a

Appellate Case: 22-1395    Page: 30    Date Filed: 06/09/2022 Entry ID: 5166069

member of the minority group whose voting strength was diluted." *Comm. for a Fair and Balanced Map v. Ill. Bd. of Elections*, No. 1:11-CV-5065, 2011 WL 5185567, at *1 n.1 (N.D. Ill. Nov. 1, 2011) (three-judge court) (collecting cases).[3] If a Section 2 plaintiff *opposes* the minority-preferred candidates that he complains white bloc voting defeats, that doesn't defeat his claim under existing law. Odd as that is, it follows directly from Section 2's text, which says Section 2 is violated where "a [racial] class of citizens" have less opportunity than other racial groups to elect their preferred candidates. 52 U.S.C. 10301(b).

Because Section 2 protects group rights, not individual rights, it follows that it does not create private rights that individual plaintiffs can enforce. For "[s]tatutes with an 'aggregate,' rather than an individual, focus 'cannot give rise to individual rights.'" *Midwest Foster Care & Adoption Ass'n v. Kincade*, 712 F.3d 1190, 1200 (8th Cir. 2013) (some internal quotation marks omitted) (quoting *Gonzaga*, 536 U.S. at 288).

In fact, Section 2 functions much like the statutes this Court and the Supreme Court have held pursue unenforceable, aggregate ends. In all of those cases, a crucial factor was the statute's "substantial compliance regime." *Midwest Foster Care*, 712 F.3d at 1200; *see also Gonzaga*, 536 U.S. at 288; *Blessing v. Firestone*,

---

[3] Some courts don't even require that much. *See, e.g.*, *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1112 n.14 (E.D. Cal. 2018) (holding plaintiffs need not reside in challenged districts).

Appellate Case: 22-1395     Page: 31     Date Filed: 06/09/2022 Entry ID: 5166069

520 U.S. 329, 343-44 (1997).  Under those regimes, a state could comply with the statute even if "any individual plaintiff," *id.* at 344, or even "a sizable minority" of the statute's intended beneficiaries, *Midwest Foster Care*, 712 F.3d at 1201, was not assured the right the statute supposedly guaranteed.  Substantial compliance sufficed.

Section 2 works just the same way.  So long as the *majority* of a "minority group" can elect its preferred candidates, it doesn't matter under Section 2 that an individual plaintiff, or even a sizable minority of the minority group, cannot.  *See Gingles*, 478 U.S. at 48 n.15 (explaining Section 2 claims fail unless minority groups "experience substantial difficulty electing representatives of their choice"). Indeed, it would be impossible for Section 2 to be "concerned with 'whether the needs of any particular person have been satisfied.'"  *Gonzaga*, 536 U.S. at 288 (quoting *Blessing*, 520 U.S. at 343) (holding that statutes that are not don't create individually enforceable rights).  So long as some minority voters prefer different candidates from others, Section 2 can only protect minority groups in the aggregate, not each and every minority voter.

Accordingly, Section 2 does not confer an individually enforceable right, but only an aggregate right on minority groups.  And even if it might be read to confer an individual right, it certainly does not confer one unambiguously.  Plaintiffs cannot sue to enforce Section 2.

Appellate Case: 22-1395     Page: 32     Date Filed: 06/09/2022 Entry ID: 5166069

B.    Section 2 does not provide a private remedy.

If a statute unambiguously confers a private right, the next question is whether it displays an intent to provide a private remedy. Here too, Section 2 falls well short; it says nothing, explicitly or implicitly, about private rights of action. This shouldn't be surprising. It would be far stranger if Congress created a right that doesn't inure to the benefit of any individual in particular, but then gave individual plaintiffs the power to enforce it. Indeed, the casual assumption that Section 2 is privately enforceable has led to a bizarre form of representative litigation, where individual plaintiffs assert claims on behalf of racial groups, on the basis of statistical evidence about those groups' electoral success or failure, without offering any evidence of how their own rights have been infringed. Congress did not create that scheme, and there is no indication in the text of the Voting Rights Act that Congress intended it.

Beginning with what should be common ground, "Section 2 is completely silent as to the remedies available for a violation of that statutory provision." Add. 19; R. Doc. 100, at 19. It only prohibits certain types of voting qualifications, practices and procedures. *See* 52 U.S.C. 10301(a). Given that silence, the very Supreme Court decision Plaintiffs claim held Section 2 contains a private right of action actually acknowledges that "[Section] 2 . . . provides no right to sue on its

23

face" and "lack[s] . . . express authorizing language" for private suits.  *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (Stevens, J., plurality opinion).

Next, and this too should be common ground, "the only remedial provision that Congress provided for violations of [Section] 2" vests enforcement authority solely in the Attorney General.  Add. 19; R. Doc. 100, at 19.  That provision, unamended since its enactment in 1965, provides that "[w]henever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section [2]," or seven other enumerated provisions of the Voting Rights Act, "the Attorney General may institute for the United States, or in the name of the United States, an action for preventive relief."  52 U.S.C. 10308(d).  If Congress had intended for private enforcement of Section 2, it hardly makes sense that it would have gone to the trouble of expressly granting the Attorney General a cause of action to enforce Section 2 and seven other enumerated provisions and then leave it to courts to imply or not imply a private right of action.  And it makes even less sense, if Congress intended a private right of action, that it would continue to say nothing about the existence of such actions after *Bolden* suggested Section 2 might not provide such a right.  *See Bolden*, 446 U.S. at 60 & n.8.

The implications of Congress's creating an express cause of action for the Attorney General, but declining to do so for private plaintiffs, aren't just a matter

24

of common sense.  The Supreme Court has held that the provision of one kind of remedy is "strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly."  *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985); *see also Sandoval*, 532 U.S at 290 ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.").  Indeed, the Supreme Court has said that in some cases "the suggestion is so strong that it precludes a finding of congressional intent to create a private right of action, even though other aspects of the statute . . . suggest the contrary."  *Id.*

This Court has likewise treated the express provision of alternative methods of enforcement as conclusive.  On multiple occasions, it has held that a statute did not imply a private right of action solely because it provided other methods of enforcement and was silent on private suits.  For example, in *Leach v. Mediacom*, this Court rejected an appeal to imply a private right of action in a single paragraph, simply reasoning that "there is no implied private right of action under [a statute regulating cable television], as Congress expressly gave the [cable] franchiser enforcement authority."  373 F.3d 895, 896 (8th Cir. 2004) (per curiam).

Even more on point, in *Freeman v. Fahey*, 374 F.3d 663 (8th Cir. 2004), this Court rejected out of hand a claim that an anti-discrimination provision of a federal housing statute provided a private right of action.  It did so solely on the

25

ground that it "provide[d] for administrative enforcement . . . by the Secretary of Housing and Urban Development, and for judicial enforcement through a civil action by the Attorney General, suggesting Congress intended to place enforcement in the[ir] hands . . . rather than private parties." *Id.* at 665. The Court reached that conclusion even though, unlike Section 2, the provision at issue plainly conferred an individual right, protecting any "person" from being personally "subjected to discrimination" in a federal housing program. *Id.* (quoting 42 U.S.C. 5309(a)). The inference from Congress's expressly granting the Attorney General enforcement authority is just as conclusive here. Section 2 does not display an intent to provide a private remedy.

## II. Plaintiffs' counterarguments fail.

### A. No controlling precedent implies a private right of action under Section 2.

Undeterred by the stark absence of a private remedy in Section 2's text, Plaintiffs insist that precedent requires this Court to imply one. But their argument rests on mere unexamined assumptions and dicta.

#### 1. *Morse* does not recognize a private right of action.

Plaintiffs first rely on *Morse v. Republican Party of Virginia*. In that case, five Justices held in separate opinions that Section 10 of the Voting Rights Act, which authorizes the Attorney General to sue to enjoin the enforcement of unconstitutional poll taxes, *see* 52 U.S.C. 10306(b), impliedly authorizes private suits.

26

*See Morse*, 517 U.S. at 230-34 (opinion of Stevens, J., joined by Ginsburg, J.); *id.* at 240 (Breyer, J., concurring in the judgment, joined by O'Connor and Stevens, JJ.). The two groups of Justices concurring in the judgment gave different rationales for that result, with Justice Stevens relying on *Allen*'s implication of a private right of action under Section 5 and the 1975 amendments' references to voting suits by "aggrieved persons," and Justice Breyer relying solely on *Allen*. In the process of holding Section 10 privately actionable, both suggested in passing remarks that Section 2 was also privately actionable.

Plaintiffs portray the sum total of Justice Stevens's and Justice Breyer's remarks on Section 2 as a majority holding that Section 2 is privately actionable. Appellants' Br. at 21-22. That is incorrect for at least two reasons. First, the respective opinions' statements on Section 2 were not necessary to the result of either opinion; they were unreasoned dicta. Second, given the divergence between the two opinions' rationales, the only holding of *Morse* is its specific result: that private suits can be brought under Section 10.

        a.    *Morse*'s statements on Section 2 are dicta.

Plaintiffs assert without explanation that Justices Stevens's and Breyer's statements on Section 2 were "*necessary*" to *Morse*'s result. Appellants' Br. at 22. That is wrong.

Appellate Case: 22-1395     Page: 37     Date Filed: 06/09/2022 Entry ID: 5166069

The statements about Section 2 in Justice Breyer's opinion, which spoke for three of the five Justices in the majority, are patently gratuitous. Justice Breyer's entire rationale was that *Allen*, a Section 5 case, applied equally to Section 10. *See Morse*, 517 U.S. at 240 ("[T]he rationale of *Allen* . . . applies with similar force . . . to § 10. The differences . . . between §§ 5 and 10 are not determinative.") (citations omitted). Conclusions about other VRA provisions were unnecessary to that result. At a couple points, Justice Breyer suggested, with no reasoning, that *Allen* applied to Section 2 as well. But he did not reason from Section 2 to Section 10; he reasoned from *Allen* to both Sections 2 and 10, in a case only involving the latter. His remarks on Section 2 are not binding. *See In re Permian Basin Area Rate Cases*, 390 U.S. 747, 775 (1968) ("[T]his Court does not decide important questions of law by cursory dicta inserted in unrelated cases."). And their rationale— that *Allen*'s approach to implying causes of action should be extended—has since been rejected. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) (citing *Allen* as an exemplar of a "different approach to recognizing implied causes of action than [the Court] follows now"); *cf. Sandoval*, 532 U.S. at 287 (refusing to "revert . . . to the understanding of private causes of action that held sway 40 years ago when Title VI was enacted").

Unlike Justice Breyer, Justice Stevens did reason—at one point—from the presumed actionability of Section 2 to the actionability of Section 10, arguing it

28

would be anomalous to allow suits under the former but not the latter. But that reasoning was unnecessary to his decision, which turned on the combination of *Allen*, *see Morse*, 517 U.S. at 231-32, and the 1975 amendments, *see id.* at 233-34. It is specious to suggest that in spite of both concluding that *Allen*'s rationale "appl[ied] as forcefully to § 10" as Section 5, *id.* at 231, and that Congress "recognized that private rights of action were equally available under § 10" by enacting the 1975 amendments, *id.* at 233, Section 2's actionability was necessary to Justice Stevens's Section 10 holding.

Further, like Justice Breyer's dicta, Justice Stevens's is unpersuasive. His suggestion that Section 2 was actionable rested merely on a quotation from a committee report that he acknowledged was contrary to the "face" of the statute, *id.* at 232, and the Court's past inadvertent assumptions of a private right of action, which he in turn assumed were correct. *See id.* (citing cases in which the Court "entertained" private Section 2 suits without holding Section 2 privately actionable). That is not how the Supreme Court would decide the right-of-action question today.

b. Morse lacks a Marks holding.

*Morse* lacked a majority opinion. When the Supreme Court issues a fractured opinion, courts apply the narrowest-ground rule of *Marks v. United States*, 430 U.S. 188 (1977). "But where a concurring opinion is not a logical subset of

29

the plurality's rationale, or vice-versa, it is not possible to discern a holding in the case," because it is not possible to discern which is the narrowest ground.  *Animal Legal Def. Fund v. Reynolds*, 8 F.4th 781, 785 (8th Cir. 2021).

That is the case here.  Justice Stevens would have applied a combination of *Allen*'s rationale and the 1975 amendments to imply rights of action into an indeterminate number of Voting Rights Act provisions.  Justice Breyer would have applied *Allen* to imply rights of action into Voting Rights Act provisions whose differences from Section 5 are, in his view, "not determinative."  *Morse*, 517 U.S. at 240.  It is impossible to forecast with precision what the results of each test would be, let alone that one is a logical subset of the other.  As a consequence, "the only binding aspect" of *Morse* "is its specific result," *Animal Legal Def. Fund*, 8 F.4th at 785:  that there is a private right of action under Section 10.

Contrary to the United States' suggestion, U.S. Br. at 9, the fact that Justices Stevens and Breyer may have agreed on Section 2 does not make that point of agreement a mini-*Marks* holding.  It is always possible to delineate some areas of agreement between two opinions concurring in a result, but unless one is clearly narrower than the other, only the result controls.  For example, *Animal Legal Defense Fund* held *United States v. Alvarez* lacked a *Marks* holding because the plurality would have applied strict scrutiny to regulations of false speech with some categorical exceptions, while the concurring opinion would have applied

30

intermediate scrutiny to all regulations of false speech. Those two rules have any number of points of overlap, but because each opinion potentially protected some speech the other would not, this Court held only *Alvarez*'s result was binding. *See* 8 F.4th at 785.

### 2. Plaintiffs' reliance on this Court's decision in *Roberts* is misplaced.

Plaintiffs next claim this Court's 1989 decision in *Roberts v. Wamser* holds that private parties can enforce Section 2. There, this Court held that unsuccessful candidates cannot sue under Section 2. 883 F.2d 617, 624 (8th Cir. 1989). In dicta, the Court suggested that "'aggrieved persons,' a category . . . limited to persons whose voting rights have been denied or impaired," could. *Id.* As the district court explained, that statement was "unnecessary to the resolution of the case." Add. 29; R. Doc. 100, at 29. The United States contends that the *Roberts* court could not have decided that candidates lack standing to sue without first holding that "*some* private plaintiffs can." U.S. Br. at 11. The district court aptly explained why that is wrong. It sufficed to resolve the case to hold that *if*, as the plaintiff contended, "aggrieved persons" as referenced in Section 3 of the Act can sue, unsuccessful candidates are not aggrieved persons. *See* Add. 29; R. Doc. 100, at 29.

31

But even if *Roberts* had held Section 2 was privately actionable, "it has been superseded by intervening precedent." *Osher v. City of St. Louis*, 903 F.3d 698, 702 (8th Cir. 2018). *Osher* is directly on point. There, this Court held that a prior Eighth Circuit precedent that implied a right of action was superseded by subsequent Supreme Court precedent, whose test that case did not apply. Like that superseded precedent, *Roberts* "never addressed whether the [Voting Rights] Act unambiguously confers a private right or displays an intent to provide a private remedy," as *Sandoval*, *Armstrong*, and other subsequent cases require. *Id.* It merely assumed that a reference to constitutional voting suits by "aggrieved persons" in the Act's remedial provision implicitly authorized private suits throughout the Act.

3. Congress has not ratified decisions entertaining private Section 2 suits.

Both Plaintiffs and the United States suggest that even if no binding precedent holds that Section 2 is privately enforceable, Congress has ratified a "consensus view" that Section 2 is privately enforceable. U.S. Br. at 12; *see also* Appellants' Br. at 48-49. The fatal flaw in this argument is that when Congress last acted on Section 2, in 1982, there was no consensus view to ratify. Rather, the Supreme Court had just expressly left the question open.

As the United States explains, U.S. Br. at 12, when a statute's meaning has been "settled" by "judicial interpretations," *Bragdon v. Abbott*, 524 U.S. 624, 645

32

(1998)—either by the Supreme Court or by "unanimous holdings of the Courts of Appeals," *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmty. Project, Inc.*, 576 U.S. 519, 536 (2015)—Congress's reenactment or amendment of that statute sometimes suggests acquiescence to the interpretation. But Plaintiffs and the United States fail to identify a Supreme Court holding, or consensus of lower-court holdings, that settled whether Section 2 had a private right of action at the relevant time.

The United States suggests that when Congress amended Section 2 in 1982, it ratified the Supreme Court's assumption in *Bolden* that Section 2 was privately enforceable. U.S. Br. at 13-14. But an assumption is not a settlement. Not only did the Supreme Court merely "[a]ssum[e], for present purposes," that Section 2 was privately enforceable, *Bolden*, 446 U.S. at 60, it cited private-right-of-action cases cutting the other way. *See id.* at 60 n.8. That citation "demonstrates quite clearly that the question whether [Section 2] could be privately enforced was *un*settled," and should have prompted not "legislative silence but rather express specification of the availability of private enforcement (if that was what Congress intended)." *Armstrong*, 575 U.S. at 331 (addressing congressional inaction in response to a certiorari grant that similarly flagged an open question).

Plaintiffs, for their part, allude without citation to "nearly two decades of Section 2 cases brought by private litigants and decided on the merits."

Appellate Case: 22-1395    Page: 43    Date Filed: 06/09/2022 Entry ID: 5166069

Appellants' Br. at 48. But the only pre-1982 Section 2 cases they cite in their brief, besides *Bolden*, are three district court decisions from between 1966 and 1972 that did not address the cause-of-action question, *id.* at 3 n.1, and in any event could not supersede the Supreme Court's reserving the question a decade later. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 186 (1994) (rejecting argument that Congress ratified lower-court consensus because "[t]his Court ha[d] reserved the issue" in question).

Next, Plaintiffs and the United States claim Congress ratified decisions authorizing private Section 2 suits in 2006, "[w]hen Congress reauthorized the VRA." Appellants' Br. at 48-49. That argument fails out the gate, because Congress did not reauthorize Section 2 in 2006. "Section 2 is permanent" and did not have to be reauthorized. *Shelby Cnty. v. Holder*, 570 U.S. 529, 537 (2013). What Congress reauthorized for another 25 years were Section 4's coverage formula and Section 5's preclearance regime, which had been set to expire in 2007. *See id.* at 538-39; 52 U.S.C. 10303(a)(8). Congress's reauthorization of and "isolated amendments" to other provisions of the Act do not signal acquiescence to interpretations of Section 2. *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1351 (2019).

Yet even if they did, Plaintiffs and the United States again fail to identify any settled interpretation Congress could have ratified. Both suggest Congress ratified *Morse*'s statements on Section 2. Appellants' Br. at 48; U.S. Br. at 14. But

the very fact they make this argument reveals its error. If *Morse*'s statements were holdings, they would not need to claim Congress ratified them. On the other hand, if *Morse*'s statements were dicta (as they were), they could not be ratified; Congress ratifies holdings and settled interpretations, not dicta and assumptions. Plaintiffs—but not the United States—say Congress ratified "decades" of private Section 2 litigation in lower courts. Appellants' Br. at 48. Yet Plaintiffs identify only one pre-2006 lower-court case that *held*, rather than merely assumed, Section 2 contains a private right of action. *Id.* at 24 n.10 (citing *Mixon v. Ohio*, 193 F.3d 389 (6th Cir. 1999)). So there was no lower-court consensus to ratify.

B.    Sections 3 and 14 do not imply Section 2 contains a right of action.

Recognizing the cause-of-action question remains open, Plaintiffs ultimately stake their entire case on a pair of remedial provisions of the Voting Rights Act, Sections 3 and 14(e). Those provisions entitle private prevailing parties to certain remedies in suits, under any statute, to enforce the voting guarantees of the Fourteenth and Fifteenth Amendments.

Plaintiffs implausibly deduce a right of action to enforce Section 2 from these remedial provisions for constitutional voting-rights suits in two steps. First, they claim that because Section 2 enforces the Constitution's voting guarantees, a suit to enforce Section 2 in turn is a suit to enforce the Constitution's voting guarantees. Second, they reason that because these provisions contemplate the

35

existence of private suits to enforce the Constitution's voting guarantees, and because a Section 2 suit is one, these provisions contemplate private Section 2 suits.

Both steps of that argument fail. Though Section 2's results test prophylactically enforces the Constitution, a Section 2 suit does not enforce the Constitution; it enforces Section 2's prophylactic results test. Second, even if a Section 2 suit enforced constitutional voting guarantees, the fact that Congress legislates about private suits to enforce constitutional voting guarantees does not imply there must be a private right of action under *every* statute that enforces constitutional voting guarantees. It merely implies that *some* private rights of action in that genre exist. And when Congress amended Section 3 and enacted Section 14(e), there were multiple private rights of action of that kind, including the judicially implied private right of action under Section 5. Congress's legislation on the remedies available in private suits to enforce constitutional voting guarantees is best understood to regulate remedies under already-existing private rights, not to hint at the creation of new ones.

          1.    Section 2 suits do not "enforce the voting guarantees of the fourteenth or fifteenth amendment."

a. The remedial provisions on which Plaintiffs stake their case, Sections 3 and 14(e), respectively say that when "an aggrieved person institutes a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment," 52 U.S.C. 10302(a), or, more simply, when a private party brings an

36

"action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment," *id.*, 10310(e), they are entitled to certain equitable remedies if they prove a constitutional violation, *id.*, 10302(a)-(c), or to attorney's fees if they prevail, *id.*, 10310(e).

As Section 14(e)—which was enacted at the same time as the "aggrieved person" language in Section 3—suggests, Section 3's "to enforce the voting guarantees of the fourteenth or fifteenth amendment" modifies "a proceeding," not "any statute." It would be unnatural in the extreme to use "a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment" to mean "a proceeding under any statute *that enforces*," or "any statute *enacted to enforce*," the voting guarantees of the fourteenth or fifteenth amendments. If Congress had meant that it would have said it. *See* Add. 23 n.97; R. Doc. 100, at 23 n.97. By contrast, it is perfectly natural to write, as Congress did in Section 14, of a "proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment." Thus, the proceedings Section 3 describes are only proceedings to enforce the Fourteenth and Fifteenth Amendments' voting guarantees.

b. Plaintiffs do not—at least not explicitly—challenge this reading of Section 3. Nor do they dispute that Section 2 "prohibits conduct which is not itself unconstitutional." Appellants' Br. at 37. Instead, they argue that "Section 2's results standard enforces the Reconstruction Amendments'" ban of intentional

37

discrimination, *id.* at 38, and that a Section 2 suit, therefore, also enforces the Reconstruction Amendments. That is a blatant fallacy, like saying that if a regulation enforces a statute by prohibiting conduct that a statute does *not* reach, a suit to enforce the regulation also enforces the statute, and can be brought under a cause of action to enforce the statute itself. Section 2, whatever its relation to the Reconstruction Amendments, prohibits state laws they do not: districts with race-neutral motivations that merely result in disparate electoral outcomes. A suit to enforce that prohibition does not enforce the Constitution.

In fact, *Sandoval*, the Supreme Court's landmark decision on implying private rights of action, rejected an argument identical to Plaintiffs' in a strikingly analogous context. There, Congress had provided a right of action to enforce Title VI's prohibition of intentional discrimination. *See Sandoval*, 532 U.S. at 280. The government, exercising its authority to enforce that prohibition, promulgated a disparate-impact regulation. *See id.* at 278. Plaintiffs sued to enforce the regulations, arguing that if they had a right of action to enforce Title VI, they must have a right of action to enforce Title VI regulations.

The Court resoundingly rejected that argument. Because the disparate-impact regulations "forbid conduct that [Title VI] permits," it was "clear that the private right of action to enforce [Title VI] does not include a private right to enforce these regulations." *Id.* at 285. Rather, a separate private right of action was

38

required.  Plaintiffs' argument is identical to the one rejected in *Sandoval*:  because Section 3 implies a right of action to enforce constitutional voting guarantees against intentional discrimination, it implies a right of action to enforce a disparate-impact statute that enforces those guarantees.  Not so: because Section 2 forbids conduct that the Fourteenth and Fifteenth Amendments permit, a right of action to enforce the Fourteenth and Fifteenth Amendments does not include a right to enforce Section 2.  Section 3 and 14 are plainly limited to suits alleging constitutional violations.

c.  Section 3's context and structure reinforce that plain meaning.  Two of its three subsections unambiguously provide remedies *only* where a court finds a Fourteenth or Fifteenth Amendment violation.  *See* 52 U.S.C. 10302(a), (c) (both requiring a finding that "violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred").  That limitation patently indicates that "a proceeding . . . to enforce the voting guarantees of the fourteenth or fifteenth amendment" is one that claims those amendments have been violated.  Otherwise, Section 3(a) and (c) would bizarrely apply in cases where those provisions' remedies are not even potentially available.

Plaintiffs argue the opposite.  They claim that "a proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment" must include non-constitutional claims because otherwise "voting guarantees" would be surplusage.

39

Appellants' Br. at 36. But on that reading, "voting guarantees" would serve the useless purpose of making Section 3(a) and (c) applicable to cases where—by definition—a plaintiff could never satisfy their purely constitutional test for relief. Besides, the work "voting guarantees" does is obvious. The Fourteenth Amendment, unlike the Fifteenth, affords many *non*-voting rights. That is why Congress added the word "voting" when it amended Section 3 to reference the Fourteenth as well as the Fifteenth Amendment. Pub. L. No. 94-73, sec. 410, 89 Stat. 400 (1975).

d. Plaintiffs' remaining arguments for why Section 3 applies to suits that don't claim Fourteenth or Fifteenth Amendment violations are equally unavailing. They first reprise their reliance on *Morse*, claiming it held Section 3 applies in Section 10 suits against poll taxes, which they say only the Twenty-Fourth Amendment prohibits. Appellants' Br. at 34. Thus, they claim, Section 3 has a broader reach than the district court thought. The first problem with this argument is that only two Justices in the *Morse* majority relied on Section 3, in an opinion Plaintiffs do not (and could not) claim controls under *Marks*. *See Morse*, 517 U.S. at 233 (opinion of Stevens, J.). The second and more serious problem is that the Fourteenth Amendment *does* prohibit poll taxes, *see Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966), as would the Fifteenth Amendment if a poll tax were

40

motivated by a discriminatory purpose.[4]  Indeed, Section 10 cites those amendments and only authorizes suits to "implement" their prohibition.  52 U.S.C. 10306(b).  That is why, in reasoning that Section 3 applied to Section 10, Justice Stevens wrote that Section 10 is "by its terms, a statute designed for enforcement of the guarantees of the Fourteenth and Fifteenth Amendments."  *Morse*, 517 U.S. at 233-34.  The same cannot be said of Section 2.

Turning to Section 3's text, Plaintiffs claim that one of Section 3's subsections, Section 3(b), authorizes remedies absent a constitutional violation.  Appellants' Br. at 35.  The relevant language authorizes the suspension of "tests and devices" if a court finds they have been used "for the purpose or with the effect of denying or abridging the right of any citizen . . . to vote on account of race or color."  52 U.S.C. 10302(b).  Presumably relying on *Bolden*'s intent requirement, Plaintiffs suggest Section 3(b)'s effect prong contemplates Section 3 would apply in non-constitutional suits.  That is incorrect.  Even *Bolden* acknowledged that "voter eligibility requirements" are subject to strict scrutiny regardless of their motives, 446 U.S. at 77 n.25, and "tests and devices" are voter eligibility requirements.  52 U.S.C. 10303(c) (defining the phrase).  And when Congress enacted Section 3 in 1965, the Supreme Court had "repeatedly . . . construed" the Fifteenth

---

[4] In fact, those amendments are the only constitutional prohibitions on poll taxes in state elections because the Twenty-Fourth Amendment applies only in federal elections.  *See* U.S. Const. amend XXIV, sec. 1.

Amendment "to invalidate state voting qualifications . . . which are discriminatory on their face *or in practice*." *South Carolina*, 383 U.S. at 817 (emphasis added). Section 3(b), then, did no more than recite the governing constitutional standard, and only reinforces Section 3's limitation to constitutional claims.

c. Finally, the United States makes a structural argument on Plaintiffs' behalf, arguing that it would be odd for Section 3 to reference lawsuits under other statutes, but not the Voting Rights Act itself. U.S. Br. at 21. That argument might initially have some surface appeal, but it ignores historical context. To start, it overlooks the fact that when Congress enacted Section 3 in 1965, it had previously created multiple causes of action against unconstitutional voting practices. *See South Carolina*, 383 U.S. at 313 (citing, *e.g.*, 42 U.S.C. 1971, recodified at 52 U.S.C. 10101). And as the Supreme Court explained in upholding the Voting Rights Act a year later, Section 3 "strengthen[ed]" those "existing procedures for attacking voting discrimination" by authorizing various forms of federal and judicial oversight in actions brought under those statutes. *Id.* at 316.

Moreover, the United States' argument overlooks the fact that—at the time of enactment—Section 3 also applied to much of the Voting Rights Act itself. Indeed, Section 2, as originally enacted, simply prohibited unconstitutional voting

42

procedures.[5]  *See Bolden*, 446 U.S. at 60-61.  Section 5, as originally enacted and understood, only blocked new voting laws that "would violate the Fifteenth Amendment."  *South Carolina*, 383 U.S. at 334.[6]  And Section 10, even today, only authorizes suit to "implement the declaration" of Congress that poll taxes are unconstitutional.  52 U.S.C. 10306(b).  Section 3 may now apply to fewer VRA provisions than it did when enacted, but that is simply the result of Congress's choice to untether those provisions from the constitutional prohibitions they enforce.  Having done so, a suit under Section 2 is no longer a suit to enforce the voting guarantees of the Fourteenth and Fifteenth Amendments.

    2.  Whatever their scope, Sections 3 and 14 do not imply private rights.

  A Section 2 suit is not a proceeding to enforce the voting guarantees of the Fourteenth and Fifteenth Amendments, so Sections 3 and 14's references to private parties' bringing such proceedings do not imply the existence of private Section 2

---

[5] This does not mean that before the 1982 amendments private plaintiffs could sue under Section 2, but only that Section 3 applied in that period to Attorney General lawsuits to enforce Section 2, and to private Section 2 suits *if* private parties could bring them.  Even if Section 3 applies to a provision of the Voting Rights Act, it doesn't necessarily mean that that provision is privately enforceable.  *See infra*, II.B.2.

[6] The Supreme Court's reading of Section 5 didn't begin to stray from the Constitution until after Congress amended Section 3 to refer to suits by aggrieved persons.  *See Beer v. United States*, 425 U.S. 130, 141 (1976) (adopting an effects-based retrogression test).  Congress eventually codified the Court's reading.  *See* 52 U.S.C. 10304(b).

43

suits.  But even if Section 3 applied to all private voting-rights suits, the fact that Congress legislated on the remedies available in private voting-rights suits would not imply a right of action into Section 2.  Rather, all that can be inferred from Congress's enacting legislation about private voting-rights suits is that Congress believed *some* private voting-rights suits exist—which, of course, they do.  It does not imply that every voting-rights statute Congress ever enacted contains an implied right of action.

Plaintiffs make two arguments about Sections 3 and 14, only one of which is colorable.  The first—not supported by the United States—is that Sections 3 and 14 don't merely assume Section 2 contains a private remedy, but actually provide that private remedy.  That argument simply rests on wordplay with the phrase "private remedy."  Sections 3 and 14 certainly provide remedies that are available in private voting suits, such as attorney's fees.  But when the Supreme Court talks about Congress's intent to provide a "private remedy" in the right-of-action context, what it means is a private right to sue, not the particular remedies available in a private suit.  *See, e.g.*, *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107-08 (2014) (referring in consecutive sentences to a "cause of action" as "the private remedy"); *Gonzaga*, 536 U.S. at 284 (describing Section 1983 as "a private remedy"); *Sandoval*, 532 U.S. at 293 n.8 (using "implied remedy," "a private remedy," and "a private right of action" interchangeably).  And Sections 3 and 14 do

44

not provide a right of action; they provide procedures and remedies for private suits authorized elsewhere. *See, e.g.*, 52 U.S.C. 10310(e) (authorizing attorney's fees "[i]n any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment"). As the first court to interpret the "aggrieved person" language in Section 3 held, Section 3 "does not give rise to a substantive cause of action." *Webber v. White*, 422 F. Supp. 416, 423 (N.D. Tex. 1976). It "simply sets forth the procedure and remedies available *in*" an action to enforce the Constitution's voting guarantees. *Id.* (emphasis added).

Plaintiffs' less audacious argument, which is supported by the United States, is that Sections 3 and 14 merely "contemplate[]" a private right of action. Appellants' Br. at 30; U.S. Br. at 20 (claiming Section 3 "reflects Congress's understanding" that a private right of action exists). Plaintiffs are right about this much: Sections 3 and 14 assume that private parties have some voting-rights causes of action. Congress would not have legislated on the remedies available in "proceeding[s] instituted" by "aggrieved person[s] under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment," 52 U.S.C. 10302(b), if it thought there were no statutes that authorized such proceedings. But Section 2 does not have to contain a private right of action for Congress's assumption to make sense. Section 1983 suits have always existed to vindicate constitutional voting rights. The Supreme Court's decision in *Allen*, issued six years before Congress added

45

"aggrieved persons" to Section 3 and enacted Section 14(e), implied a private right of action under Section 5. And even one of the committee reports Plaintiffs cite for the private right of action under Section 2 says Section 2 was not "an exclusive remedy for voting rights violations, since such violations may also be challenged by citizens under 42 U.S.C. §§ 1971, 1983 and other voting rights statutes." H. Rep. No. 97-227, at 32 (1981). Congress knew there were plenty of avenues for private plaintiffs to advance their voting rights.

For Plaintiffs' argument to work, then, it doesn't suffice to say Sections 3 and 14 show Congress believed that private parties had some voting-rights causes of action. Instead, Plaintiffs' inference only follows if Sections 3 and 14 show Congress believed that *every* voting-rights statute is privately actionable. But to state that premise is to refute it. The fact that Congress legislated on "the proce-dure and remedies available" in private voting suits, *Webber*, 422 F. Supp. at 423, just shows it believed there were private voting-rights suits, not that there was a private voting-rights cause of action under every rock.

A Supreme Court decision on an analogous provision to Section 3 in securi-ties law illustrates the fallacy of Plaintiffs' (and the United States') argument. In a series of decisions in the 1970s, the Supreme Court recognized an implied right of action for securities fraud under Section 10(b) of the Securities Exchange Act. Decades later, Congress enacted the Private Securities Litigation Reform Act,

46

which comprehensively regulated the procedures governing "any private action arising under [the Securities Exchange Act]." 15 U.S.C. 78u-4(a)-(e). After that enactment, plaintiffs sought an expansion of the 10(b) right of action to reach actors who violate Section 10(b) by scheming with others, but don't make misrepresentations themselves. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 156 (2008).

The Court agreed with plaintiffs that the PSLRA "ratified the implied right of action" under Section 10(b) and that it was intended to "touch upon th[at] implied right of action." *Id.* at 165. But it did not agree that by providing procedures for "any private action" under the Securities Exchange Act, Congress suggested it believed any violation of the Securities Exchange Act was privately actionable. Instead, the Court drew just the opposite inference, concluding it was "appropriate for us to assume that . . . Congress accepted the § 10(b) private cause of action as then defined but chose to extend it no further." *Id.* at 166.

A similar narrow inference applies here. If enacting an entire statute on the procedures in "any private action" under the Securities Exchange Act isn't enough to signal that all the prohibitions of that Act are privately actionable, Congress's far more oblique reference to proceedings to enforce the voting guarantees of the Fourteenth or Fifteenth Amendment can't suffice to signal that the entirety of the Voting Rights Act is privately actionable. Rather, at most, Congress's enactment

47

of legislation regulating private voting suits, after the Court implied a private right of action under Section 5, might be read to accept the right of action the Court already implied, but not create new ones—as Justice Thomas argued for four members of the Court in *Morse*.[7]  *See Morse*, 517 U.S. at 289 (Thomas, J., dissenting) (contending the "most logical deduction from the inclusion of 'aggrieved person' in [Section 3] is that Congress meant to address those cases brought pursuant to the private right of action that this Court had recognized as of 1975").

    C.    <u>Plaintiffs' and the United States' remaining arguments for reversal fail.</u>

        1.    Section 12(f) does not imply a right of action.

The United States argues at length that Section 12(f)'s jurisdictional grant over proceedings instituted under Section 12 implies that Section 2 contains a right of action.  U.S. Br. at 18-20.  Plaintiffs decline to make that argument; in fact, they fault the district court for raising it on their behalf, "even though neither Plaintiffs nor the DOJ claimed Section 12 provided a private remedy for Section 2."  Appellants' Br. at 14.  Given that criticism, Plaintiffs have waived the government's argument—even though the right-of-action question is jurisdictional.  For while courts are obliged to consider arguments they lack jurisdiction, even sua sponte, parties can waive arguments in support of jurisdiction.  *See Raley v. Hyundai*

---

[7] Only two members of the Court rejected this view; the three who joined Justice Breyer's opinion did not comment on Sections 3 and 14.

48

*Motor Co.*, 642 F.3d 1271, 1275-76 (10th Cir. 2011) (Gorsuch, J.); *United States v. 24.30 Acres of Land*, 104 F. App'x 134, 135 (8th Cir. 2004).

In any event, the government's argument fails for multiple reasons. Section 12(f) is one of many dated jurisdictional grants scattered throughout the United States Code that became superfluous when Congress eliminated the federal-question amount-in-controversy requirement, and it confers jurisdiction on the district courts to hear "proceedings instituted pursuant to this section." 52 U.S.C. 10308(f). The only proceedings "this section" authorizes are civil suits by the Attorney General, *see id.*, 10308(d)-(e), and criminal prosecutions, *id.*, 10308(a)-(c); the United States doesn't claim otherwise. Nevertheless, the government argues that Section 12(f)'s clause granting jurisdiction "without regard to whether a person asserting rights" under the Act has exhausted alternative remedies implies private suits. That can't be right, because Section 12(f) only confers jurisdiction over suits under "this section," and there are no private Section 12 suits. Thus, the only logical reading of the exhaustion clause is the district court's: the Attorney General can sue on behalf of voters notwithstanding their failure to exhaust. Add. 22; R. Doc. 100, at 22.

But more fundamentally, however Section 12(f) is understood, it is black-letter private-right-of-action law that a statute's jurisdictional provision "creates no

49

cause of action." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 577 (1979).
Only "substantive provisions" do that. *Id.*

>           2.      Legislative history cannot create a cause of action.

Much of Plaintiffs' brief seeks to leverage statements in committee reports
that Congress intended for a right of action. Appellants' Br. at 44-51. Of course,
nothing like those statements can be found in the amendments those reports pur-
ported to explain, or anywhere else in the Voting Rights Act's text. It is doubtful
that legislative history could ever shed probative light on the right-of-action in-
quiry; after all, "a private right of action under federal law . . . must be unambigu-
ously conferred." *Armstrong*, 575 U.S. at 332. Yet whatever the role of legislative
history in cases of textual ambiguity, it has no place when "the text and structure of
the statute" make it "clear that Congress did not provide a cause of action." *Sand-
oval*, 532 U.S. at 288 n.7. In the case of Section 2, Congress provided a group
right to "class[es] of citizens" that assures nothing to any individual voter, 52
U.S.C. 10301(b), and it expressly gave the Attorney General authority to enforce
Section 2 while saying nothing about private suits, 52 U.S.C. 10308(d). There is
no ambiguity for legislative history to resolve.

Yet if the Court considers legislative history, it hurts Plaintiffs' case more
than it helps. Indeed, the legislative history demonstrates that despite being per-
fectly aware of the right-of-action problem, Congress knowingly declined to do

50

anything about it. The 1982 amendments were, as is well documented, a reaction to *Bolden*, a decision mentioned hundreds of times in the committee reports Plaintiffs cite. *Bolden* expressly questioned whether "there exists a private right of action to enforce" Section 2, citing the Court's newer cases requiring textual indicia of intent to provide a right of action. 446 U.S. at 60 & n.8. And demonstrating Congress didn't just overlook that language, both the House and Senate committee reports on the 1982 amendments, for the first time in the Voting Rights Act's legislative history, mentioned the Section 2 right-of-action question. Appellants' Br. at 45.

But despite this awareness—and the excellent opportunity in the 1982 rewrite of Section 2 to make any cause of action express—Congress did nothing. Instead, fractured committee reports merely offered an Orwellian nothing-to-see-here, assuring a judicial audience that "the existence of the private right of action under Section 2" had been "clearly intended by Congress since 1965." S. Rep. No. 97-417, at 30 (1982). If that were so, why did the full Congress not at least make that intention clear in the statute two decades after the fact? Perhaps silence on a private right of action was the legislative price of a heightened liability standard; perhaps there is some other explanation. Ultimately it isn't the role of courts to guess. *See, e.g.*, *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1908 (2019) (In relying upon "hidden legislative wishes, we risk displacing the legislative

compromises actually reflected in the statutory text . . . The only thing a court can be sure of is what can be found in the law itself.").   All that can be said is that Congress thought about the issue, knew of the Court's turn against implying rights of action, and still failed to state an intent to provide a right of action in the statute.

> 3.    Plaintiffs' newly raised request for leave to amend to replead under Section 1983 is not a basis for reversal.

Though Plaintiffs did not raise Section 1983 in their complaint or seek leave to amend to do so below, they now argue in a footnote that the district court erred by not giving them leave to amend to replead under Section 1983.  Appellants' Br. at 29 n.16.  To excuse their forfeiture, they cite a case holding that this Court may reach forfeited issues when their resolution is "beyond doubt."  *Id.* (citing *Robinson v. Norling*, 25 F. 4th 1061, 1063 (8th Cir. 2022)).  That case, however, did not involve a forfeited request for leave to amend, or, contrary to Plaintiffs' claim, a "pleading defect" of any kind.  *Id.*  Where a plaintiff fails to seek leave to amend in the district court, this Court's rule is unwavering: "a party 'cannot fault the District Court for not granting him leave to amend when he did not seek permission to do so.'"  *Longaker v. Bos. Sci. Corp.*, 715 F.3d 658, 663 (8th Cir. 2013)) (quoting *Steele v. City of Bemidji*, 257 F.3d 902, 905 (8th Cir. 2001)); *see also United States v. Mask of Ka-Nefer-Nefer*, 752 F.3d 737, 742 (8th Cir. 2014) (explaining "Eighth Circuit law has long" barred review of forfeited requests for amendment).

Appellate Case: 22-1395     Page: 62     Date Filed: 06/09/2022 Entry ID: 5166069

Moreover, as the district court's dismissal was without prejudice, nothing prevents Plaintiffs from refiling under Section 1983 now.

In any event, Plaintiffs' argument fails on the merits, and unquestionably fails under the "beyond doubt" standard for excusing their forfeiture they propose. Section 1983 could potentially provide Plaintiffs a private remedy, but as explained above, *supra* I.A, Section 2 does not unambiguously confer an individual right. Rather, it confers a group right that doesn't necessarily benefit any individual. And absent an unambiguously conferred individual right, Plaintiffs cannot sue under Section 1983. *See Gonzaga*, 536 U.S. at 283. Whatever arguments Plaintiffs might make on reply, they should be addressed by the district court in the first instance.

### 4. Defendants did not waive the right-of-action issue.

In another footnote, Plaintiffs argue Defendants waived the right-of-action issue by not raising it in their response to the preliminary-injunction motion. Appellants' Br. at 26 n.15. The district court correctly held that under this Court's decision in *Cross v. Fox*, 23 F.4th 797 (8th Cir. 2022), the existence of a private right of action is jurisdictional. Invoking the prior-panel rule, Plaintiffs note that two opinions of this Court in 2021 said otherwise, but decisions preceding *those* decisions, cited in *Cross*, held the right-of-action question is jurisdictional. *See Cross*, 23 F.4th at 800 (citing circuit precedent from 2012 and 2019). Whichever line of

precedent came first, *Cross* resolved that question, holding the decisions it cited controls. That decision on the meaning of this Court's precedent is itself a precedent that bars relitigation of the question before later panels.

But even if the question weren't jurisdictional, Defendants did not waive—or even (and more appositely) forfeit—the issue. As the district court noted, Defendants had yet to file their responsive pleading when the court raised and ruled on the right-of-action question, Add. 38 n.162; R. Doc. 100, at 38 n.162, so they did not forfeit the argument that Plaintiffs' suit should be dismissed for lack of a right of action. And under this Court's precedent, a district court may dismiss a case for failure to state a claim sua sponte so long as it provides pre-dismissal notice, as the district court amply did here. *See Smith v. Boyd*, 945 F.2d 1041, 1042-43 (8th Cir. 1991); *see also Smithrud v. City of St. Paul*, 746 F.3d 391, 396 n.3 (8th Cir. 2014). The district court may have only raised the right-of-action issue because it held the question was jurisdictional, but it could have ruled exactly the same way had it held the opposite. And were this Court to reverse on the ground of forfeiture, Defendants would move to dismiss below, the district court would reach the same result anew, and the same issues would be re-briefed on a second appeal.

Accordingly, if the Court concludes the right-of-action question is not juris-dictional, the proper course is not to reverse, but to remand to the district court with instructions to modify its judgment to a dismissal with prejudice.

Appellate Case: 22-1395    Page: 65    Date Filed: 06/09/2022 Entry ID: 5166069

## CONCLUSION

For the foregoing reasons, the District Court's order should be affirmed.

Respectfully submitted,

LESLIE RUTLEDGE
　Arkansas Attorney General

NICHOLAS J. BRONNI
　Arkansas Solicitor General

DYLAN L. JACOBS
　Deputy Solicitor General

ASHER STEINBERG
　Senior Assistant Solicitor General

OFFICE OF THE ARKANSAS
　ATTORNEY GENERAL
323 Center St., Suite 200
Little Rock, AR 72201
(501) 682-6302
Nicholas.Bronni@arkansasag.gov

*Attorneys for Appellees*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,998 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in 14-point Times New Roman, using Microsoft Word.

I further certify that this PDF file was scanned for viruses, and no viruses were found on the file.

/s/ *Nicholas J. Bronni*

Nicholas J. Bronni

Appellate Case: 22-1395    Page: 67    Date Filed: 06/09/2022 Entry ID: 5166069

## CERTIFICATE OF SERVICE

I certify that on June 8, 2022, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which shall send notification of such fil-

ing to any CM/ECF participants

/s/ *Nicholas J. Bronni*

Nicholas J. Bronni

Appellate Case: 22-1395   Page: 68   Date Filed: 06/09/2022 Entry ID: 5166069