

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.519.7359
F/212-549-2675
WWW.ACLU.ORG

June 9, 2023

Michael E. Gans, Clerk of Court
United States Court of Appeals, Eighth Circuit
Thomas F. Eagleton Courthouse
111 South 10th Street
St. Louis, MO 63102

   Re: Supplemental Authority in *Arkansas NAACP et al., v. Arkansas Board of Apportionment et al.*

Dear Mr. Gans,

   Pursuant to F.R.A.P. 28(j), Appellants respectfully submit supplemental authority regarding whether private parties may enforce Section 2 of the Voting Rights Act ("Section 2").

   On June 8, in a Section 2 case brought solely by private plaintiffs, the Supreme Court affirmed a three-judge panel's determination that "plaintiffs demonstrated a reasonable likelihood of success on their claim that [Alabama's congressional redistricting plan] violates §2." *Allen v. Milligan*, Nos. 21-1086 and 21-1087, 599 U.S. ___ (2023), slip op. at 9 (Exhibit A).

   *Milligan* implicitly recognized a private right of action to enforce Section 2, pointing to 37 years of jurisprudence—including several private plaintiff suits—under the *Gingles* framework that "Congress has never disturbed." *Id.* at 11. The Court in *Milligan* would not have affirmed an order requiring Alabama to redraw its congressional map if it lacked jurisdiction. Even the principal dissent recognized this is at most a waivable non-jurisdictional issue. *Cf. id.* at 47 n.22 (Thomas, J., dissenting) (noting question "whether §2 contains a private right of action" was "argued below but was not raised in this Court," and not questioning the jurisdiction to reach the merits). This is fatal to Defendants-Appellees because the District Court found that the private right of action "issue was waived by Defendants." *Ark. State Conference NAACP v. Ark. Bd. of Apportionment*, 586 F. Supp. 3d 893, 916 (E.D. Ark. 2022).

   Also, on June 8, the Supreme Court held that private plaintiffs can enforce their rights created by federal statute via 42 U.S.C. § 1983. *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, No. 21-806, 599 U.S. ___ (2023) (Exhibit B). The Court held that the presumption of § 1983 enforceability for federal statutory rights cannot be rebutted merely by pointing to "a detailed enforcement regime that also protects those interests," unless that enforcement regime is "*incompatible* with individual enforcement under §1983." *Talevski*, slip op. at 19 (citation omitted). *Talevski* clarifies that § 1983 provides another basis for Appellants to enforce their

Section 2 rights because the statute contains unambiguous rights-creating language and there is no detailed enforcement regime incompatible with individual enforcement.

Respectfully,

Sophia Lin Lakin

Attorney for the Appellants

American Civil Liberties Union Foundation, Inc.

EXHIBIT A

Appellate Case: 22-1395    Page: 3    Date Filed: 06/09/2023 Entry ID: 5285428

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ALLEN, ALABAMA SECRETARY OF STATE, ET AL. *v.* MILLIGAN ET AL.

### APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA

No. 21–1086.　Argued October 4, 2022—Decided　June 8, 2023*

The issue presented is whether the districting plan adopted by the State of Alabama for its 2022 congressional elections likely violated §2 of the Voting Rights Act, 52 U. S. C. §10301. As originally enacted in 1965, §2 of the Act tracked the language of the Fifteenth Amendment, providing that "[t]he right of citizens of the United States to vote shall not be denied or abridged . . . on account of race, color, or previous condition of servitude." In *City of Mobile* v. *Bolden*, 446 U. S. 55, this Court held that the Fifteenth Amendment—and thus §2—prohibits States from acting with a "racially discriminatory motivation" or an "invidious purpose" to discriminate, but it does not prohibit laws that are discriminatory only in effect. *Id.*, at 61–65 (plurality opinion). Criticism followed, with many viewing *Mobile*'s intent test as not sufficiently protective of voting rights. But others believed that adoption of an effects test would inevitably require a focus on proportionality, calling voting laws into question whenever a minority group won fewer seats in the legislature than its share of the population. Congress ultimately resolved this debate in 1982, reaching a bipartisan compromise that amended §2 to incorporate both an effects test and a robust disclaimer that "nothing" in §2 "establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." §10301(b).

_____

*Together with No. 21–1087, *Allen, Alabama Secretary of State, et al.* v. *Caster et al.*, on certiorari before judgment to the United States Court of Appeals for the Eleventh Circuit.

Syllabus

In 1992, §2 litigation challenging the State of Alabama's then-existing districting map resulted in the State's first majority-black district and, subsequently, the State's first black Representative since 1877. Alabama's congressional map has remained remarkably similar since that litigation. Following the 2020 decennial census, a group of plaintiffs led by Alabama legislator Bobby Singleton sued the State, arguing that the State's population growth rendered the existing congressional map malapportioned and racially gerrymandered in violation of the Equal Protection Clause. While litigation was proceeding, the Alabama Legislature's Committee on Reapportionment drew a new districting map that would reflect the distribution of the prior decade's population growth across the State. The resulting map largely resembled the 2011 map on which it was based and similarly produced only one district in which black voters constituted a majority. That new map was signed into law as HB1.

Three groups of Alabama citizens brought suit seeking to stop Alabama's Secretary of State from conducting congressional elections under HB1. One group (*Caster* plaintiffs) challenged HB1 as invalid under §2. Another group (*Milligan* plaintiffs) brought claims under §2 and the Equal Protection Clause of the Fourteenth Amendment. And a third group (the *Singleton* plaintiffs) amended the complaint in their ongoing litigation to challenge HB1 as a racial gerrymander under the Equal Protection Clause. A three-judge District Court was convened, and the *Singleton* and *Milligan* actions were consolidated before that District Court for purposes of preliminary injunction proceedings, while *Caster* proceeded before one of the judges on a parallel track. After an extensive hearing, the District Court concluded in a 227-page opinion that the question whether HB1 likely violated §2 was not "close." The Court preliminarily enjoined Alabama from using HB1 in forthcoming elections. The same relief was ordered in *Caster*.

*Held*: The Court affirms the District Court's determination that plaintiffs demonstrated a reasonable likelihood of success on their claim that HB1 violates §2. Pp. 9–22, 25–34.

(a) The District Court faithfully applied this Court's precedents in concluding that HB1 likely violates §2. Pp. 9–15.

(1) This Court first addressed the 1982 amendments to §2 in *Thornburg* v. *Gingles*, 478 U. S. 30, and has for the last 37 years evaluated §2 claims using the *Gingles* framework. *Gingles* described the "essence of a §2 claim" as when "a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters." *Id.*, at 47. That occurs where an "electoral structure operates to minimize or cancel out" minority voters' "ability to elect their preferred candidates." *Id.*, at 48. Such a risk is greatest "where minority and majority

voters consistently prefer different candidates" and where minority voters are submerged in a majority voting population that "regularly defeat[s]" their choices. *Ibid.*

To prove a §2 violation under *Gingles*, plaintiffs must satisfy three "preconditions." *Id.*, at 50. First, the "minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district." *Wisconsin Legislature* v. *Wisconsin Elections Comm'n*, 595 U. S. ___, ___ (*per curiam*). "Second, the minority group must be able to show that it is politically cohesive." *Gingles*, 478 U. S., at 51. And third, "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." *Ibid.* A plaintiff who demonstrates the three preconditions must then show, under the "totality of circumstances," that the challenged political process is not "equally open" to minority voters. *Id.*, at 45–46. The totality of circumstances inquiry recognizes that application of the *Gingles* factors is fact dependent and requires courts to conduct "an intensely local appraisal" of the electoral mechanism at issue, as well as a "searching practical evaluation of the past and present reality." *Id.*, at 79. Congress has not disturbed the Court's understanding of §2 as *Gingles* construed it nearly 40 years ago. Pp. 9–11.

(2) The extensive record in these cases supports the District Court's conclusion that plaintiffs' §2 claim was likely to succeed under *Gingles*. As to the first *Gingles* precondition, the District Court correctly found that black voters could constitute a majority in a second district that was "reasonably configured." The plaintiffs adduced eleven illustrative districting maps that Alabama could enact, at least one of which contained two majority-black districts that comported with traditional districting criteria. With respect to the compactness criteria, for example, the District Court explained that the maps submitted by one expert "perform[ed] generally better on average than" did HB1, and contained no "bizarre shapes, or any other obvious irregularities." Plaintiffs' maps contained equal populations, were contiguous, and respected existing political subdivisions. Indeed, some of plaintiffs' proposed maps split the same (or even fewer) county lines than the State's.

The Court finds unpersuasive the State's argument that plaintiffs' maps were not reasonably configured because they failed to keep together the Gulf Coast region. Even if that region is a traditional community of interest, the District Court found the evidence insufficient to sustain Alabama's argument that no legitimate reason could exist to split it. Moreover, the District Court found that plaintiffs' maps were reasonably configured because they joined together a different community of interest called the Black Belt—a community with a high

proportion of similarly situated black voters who share a lineal con-
nection to "the many enslaved people brought there to work in the an-
tebellum period."

As to the second and third *Gingles* preconditions, the District Court
determined that there was "no serious dispute that Black voters are
politically cohesive, nor that the challenged districts' white majority
votes sufficiently as a bloc to usually defeat Black voters' preferred
candidate." The court noted that, "on average, Black voters supported
their candidates of choice with 92.3% of the vote" while "white voters
supported Black-preferred candidates with 15.4% of the vote." Even
Alabama's expert conceded "that the candidates preferred by white
voters in the areas that he looked at regularly defeat the candidates
preferred by Black voters." Finally, the District Court concluded that
plaintiffs had carried their burden at the totality of circumstances
stage given the racial polarization of elections in Alabama, where
"Black Alabamians enjoy virtually zero success in statewide elections"
and where "Alabama's extensive history of repugnant racial and vot-
ing-related discrimination is undeniable and well documented." The
Court sees no reason to disturb the District Court's careful factual
findings, which are subject to clear error review and have gone unchal-
lenged by Alabama in any event. Pp. 11–15.

(b) The Court declines to remake its §2 jurisprudence in line with
Alabama's "race-neutral benchmark" theory.

(1) The Court rejects the State's contention that adopting the race-
neutral benchmark as the point of comparison in §2 cases would best
match the text of the VRA. Section 2 requires political processes in a
State to be "equally open" such that minority voters do not "have less
opportunity than other members of the electorate to participate in the
political process and to elect representatives of their choice."
§10301(b). Under the Court's precedents, a district is not equally open
when minority voters face—unlike their majority peers—bloc voting
along racial lines, arising against the backdrop of substantial racial
discrimination within the State, that renders a minority vote unequal
to a vote by a nonminority voter. Alabama would ignore this precedent
in favor of a rationale that a State's map cannot "abridge[]" a person's
right to vote "on account of race" if the map resembles a sufficient num-
ber of race-neutral alternatives. But this Court's cases have consist-
ently focused, for purposes of litigation, on the specific illustrative
maps that a plaintiff adduces. Deviation from that map shows it is
*possible* that the State's map has a disparate effect on account of race.
The remainder of the *Gingles* test helps determine whether that possi-
bility is reality by looking to polarized voting preferences and the
frequency of racially discriminatory actions taken by the State.

The Court declines to adopt Alabama's interpretation of §2, which

would "revise and reformulate the *Gingles* threshold inquiry that has been the baseline of [the Court's] §2 jurisprudence" for decades. *Bartlett* v. *Strickland*, 556 U. S. 1, 16 (plurality opinion). Pp. 15–18.

  (2) Alabama argues that absent a benchmark, the *Gingles* framework ends up requiring the racial proportionality in districting that §2(b) forbids. The Court's decisions implementing §2 demonstrate, however, that when properly applied, the *Gingles* framework itself imposes meaningful constraints on proportionality. See *Shaw* v. *Reno*, 509 U. S. 630, 633–634; *Miller* v. *Johnson*, 515 U. S. 900, 906; *Bush* v. *Vera*, 517 U. S. 952, 957 (plurality opinion). In *Shaw* v. *Reno*, for example, the Court considered the permissibility of a second majority-minority district in North Carolina, which at the time had 12 seats in the U. S. House of Representatives and a 20% black voting age population. 509 U. S., at 633–634. Though North Carolina believed §2 required a second majority-minority district, the Court found North Carolina's approach an impermissible racial gerrymander because the State had "concentrated a dispersed minority population in a single district by disregarding traditional districting principles such as compactness, contiguity, and respect for political subdivisions." *Id.*, at 647.

  The Court's decisions in *Bush* and *Shaw* similarly declined to require additional majority-minority districts under §2 where those districts did not satisfy traditional districting principles.

  The Court recognizes that reapportionment remains primarily the duty and responsibility of the States, not the federal courts. Section 2 thus never requires adoption of districts that violate traditional redistricting principles and instead limits judicial intervention to "those instances of intensive racial politics" where the "excessive role [of race] in the electoral process . . . den[ies] minority voters equal opportunity to participate." S. Rep. No. 97–417, pp. 33–34. Pp. 18–22.

  (c) To apply its race-neutral benchmark in practice, Alabama would require plaintiffs to make at least three showings. First, Alabama would require §2 plaintiffs to show that the illustrative maps adduced for the first *Gingles* precondition are not based on race. Alabama would next graft onto §2 a requirement that plaintiffs demonstrate, at the totality of circumstances stage, that the State's enacted plan contains fewer majority-minority districts than what an "average" race-neutral plan would contain. And finally, Alabama would have plaintiffs prove that any deviation between the State's plan and a race-neutral plan is explainable "only" by race. The Court declines to adopt any of these novel requirements.

  Here, Alabama contends that because HB1 sufficiently "resembles" the "race-neutral" maps created by the State's experts—all of which lack two majority-black districts—HB1 does not violate §2. Alabama's reliance on the maps created by its experts Dr. Duchin and Dr. Imai is

misplaced because those maps do not accurately represent the districting process in Alabama. Regardless, the map-comparison test that Alabama proposes is flawed in its fundamentals. Neither the text of §2 nor the fraught debate that produced it suggests that "equal access" to the fundamental right of voting turns on technically complicated computer simulations. Further, while Alabama has repeatedly emphasized that HB1 cannot have violated §2 because none of plaintiffs' two million odd maps contained more than one majority-minority district, that (albeit very big) number is close to irrelevant in practice, where experts estimate the possible number of Alabama districting maps numbers is at least in the trillion trillions.

Alabama would also require plaintiffs to demonstrate that any deviations between the State's enacted plan and race-neutral alternatives "can be explained *only* by racial discrimination." Brief for Alabama 44 (emphasis added). But the Court's precedents and the legislative compromise struck in the 1982 amendments clearly rejected treating discriminatory intent as a requirement for liability under §2. Pp. 22, 25–30.

(d) The Court disagrees with Alabama's assertions that the Court should stop applying §2 in cases like these because the text of §2 does not apply to single-member redistricting and because §2 is unconstitutional as the District Court applied it here. Alabama's understanding of §2 would require abandoning four decades of the Court's §2 precedents. The Court has unanimously held that §2 and the *Gingles* framework apply to claims challenging single-member districts. *Growe* v. *Emison*, 507 U. S. 25, 40. As Congress is undoubtedly aware of the Court's construction of §2 to apply to districting challenges, statutory *stare decisis* counsels staying the course until and unless Congress acts. In any event, the statutory text supports the conclusion that §2 applies to single-member districts. Indeed, the contentious debates in Congress about proportionality would have made little sense if §2's coverage was as limited as Alabama contends.

The Court similarly rejects Alabama's argument that §2 as applied to redistricting is unconstitutional under the Fifteenth Amendment. The Court held over 40 years ago "that, even if §1 of the [Fifteenth] Amendment prohibits only purposeful discrimination," *City of Rome* v. *United States*, 446 U. S. 156, 173, the VRA's "ban on electoral changes that are discriminatory in effect is an appropriate method of promoting the purposes of the Fifteenth Amendment," *id.,* at 177. Alabama's contention that the Fifteenth Amendment does not authorize race-based redistricting as a remedy for §2 violations similarly fails. The Court is not persuaded by Alabama's arguments that §2 as interpreted in *Gingles* exceeds the remedial authority of Congress.

The Court's opinion does not diminish or disregard the concern that

§2 may impermissibly elevate race in the allocation of political power within the States. Instead, the Court simply holds that a faithful application of precedent and a fair reading of the record do not bear those concerns out here. Pp. 30–34.

Nos. 21–1086, 582 F. Supp. 3d 924, and 21–1087, affirmed.

ROBERTS, C. J., delivered the opinion of the Court, except as to Part III–B–1. SOTOMAYOR, KAGAN, and JACKSON, JJ., joined that opinion in full, and KAVANAUGH, J., joined except for Part III–B–1. KAVANAUGH, J., filed an opinion concurring in all but Part III–B–1. THOMAS, J., filed a dissenting opinion, in which GORSUCH, J., joined, in which BARRETT, J., joined as to Parts II and III, and in which ALITO, J., joined as to Parts II–A and II–B. ALITO, J., filed a dissenting opinion, in which GORSUCH, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports. Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

————————

Nos. 21–1086 and 21–1087

————————

## WES ALLEN, ALABAMA SECRETARY OF STATE, ET AL., APPELLANTS

21–1086　　　　　　　*v.*

## EVAN MILLIGAN, ET AL.

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA

## WES ALLEN, ALABAMA SECRETARY OF STATE, ET AL., PETITIONERS

21–1087　　　　　　　*v.*

## MARCUS CASTER, ET AL.

### ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[June 8, 2023]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court, except as to Part III–B–1.*

In January 2022, a three-judge District Court sitting in Alabama preliminarily enjoined the State from using the districting plan it had recently adopted for the 2022 congressional elections, finding that the plan likely violated Section 2 of the Voting Rights Act, 52 U. S. C. §10301. This Court stayed the District Court's order pending further review. 595 U. S. ___ (2022). After conducting that review, we now affirm.

————————

*JUSTICE KAVANAUGH joins all but Part III–B–1 of this opinion.

I

A

Shortly after the Civil War, Congress passed and the States ratified the Fifteenth Amendment, providing that "[t]he right of citizens of the United States to vote shall not be denied or abridged . . . on account of race, color, or previous condition of servitude." U. S. Const., Amdt. 15, §1. In the century that followed, however, the Amendment proved little more than a parchment promise. Jim Crow laws like literacy tests, poll taxes, and "good-morals" requirements abounded, *South Carolina* v. *Katzenbach*, 383 U. S. 301, 312–313 (1966), "render[ing] the right to vote illusory for blacks," *Northwest Austin Municipal Util. Dist. No. One* v. *Holder*, 557 U. S. 193, 220–221 (2009) (THOMAS, J., concurring in judgment in part and dissenting in part). Congress stood up to little of it; "[t]he first century of congressional enforcement of the [Fifteenth] Amendment . . . can only be regarded as a failure." *Id.*, at 197 (majority opinion).

That changed in 1965. Spurred by the Civil Rights movement, Congress enacted and President Johnson signed into law the Voting Rights Act. 79 Stat. 437, as amended, 52 U. S. C. §10301 *et seq.* The Act "create[d] stringent new remedies for voting discrimination," attempting to forever "banish the blight of racial discrimination in voting." *Katzenbach*, 383 U. S., at 308. By 1981, in only sixteen years' time, many considered the VRA "the most successful civil rights statute in the history of the Nation." S. Rep. No. 97–417, p. 111 (1982) (Senate Report).

These cases concern Section 2 of that Act. In its original form, "§2 closely tracked the language of the [Fifteenth] Amendment" and, as a result, had little independent force. *Brnovich* v. *Democratic National Committee*, 594 U. S. ___, ___ (2021) (slip op., at 3).[1] Our leading case on §2 at the

_____

[1] As originally enacted, §2 provided that "[n]o voting qualification or

time was *City of Mobile* v. *Bolden*, which involved a claim by black voters that the City's at-large election system effectively excluded them from participating in the election of city commissioners. 446 U. S. 55 (1980). The commission had three seats, black voters comprised one-third of the City's population, but no black-preferred candidate had ever won election.

The Court ruled against the plaintiffs. The Fifteenth Amendment—and thus §2—prohibits States from acting with a "racially discriminatory motivation" or an "invidious purpose" to discriminate. *Id.*, at 61–65 (plurality opinion). But it does not prohibit laws that are discriminatory only in effect. *Ibid.* The *Mobile* plaintiffs could "register and vote without hindrance"—"their freedom to vote ha[d] not been denied or abridged by anyone." *Id.*, at 65. The fact that they happened to lose frequently was beside the point. Nothing the City had done "purposeful[ly] exclu[ded]" them "from participati[ng] in the election process." *Id.*, at 64.

Almost immediately after it was decided, *Mobile* "produced an avalanche of criticism, both in the media and within the civil rights community." T. Boyd & S. Markman, The 1982 Amendments to the Voting Rights Act: A Legislative History, 40 Wash. & Lee L. Rev. 1347, 1355 (1983) (Boyd & Markman). The New York Times wrote that the decision represented "the biggest step backwards in civil rights to come from the Nixon Court." N. Y. Times, Apr. 23, 1980, p. A22. And the Washington Post described *Mobile* as a "major defeat for blacks and other minorities fighting electoral schemes that exclude them from office." Washington Post, Apr. 23, 1980, p. A5. By focusing on discriminatory intent and ignoring disparate effect, critics argued, the Court had abrogated "the standard used by the courts to

────────

prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color." 42 U. S. C. §1973 (1970 ed.).

determine whether [racial] discrimination existed . . . : Whether such discrimination existed." It's Results That Count, Philadelphia Inquirer, Mar. 3, 1982, p. 8–A.

But *Mobile* had its defenders, too. In their view, abandoning the intent test in favor of an effects test would inevitably require a focus on *proportionality*—wherever a minority group won fewer seats in the legislature than its share of the population, the charge could be made that the State law had a discriminatory effect. That, after all, was the type of claim brought in *Mobile*. But mandating racial proportionality in elections was regarded by many as intolerable. Doing so, wrote Senator Orrin Hatch in the Washington Star, would be "strongly resented by the American public." Washington Star, Sept. 30, 1980, p. A–9. The Wall Street Journal offered similar criticism. An effects test would generate "more, not less, racial and ethnic polarization." Wall Street Journal, Jan. 19, 1982, p. 28.

This sharp debate arrived at Congress's doorstep in 1981. The question whether to broaden §2 or keep it as is, said Hatch—by then Chairman of the Senate Subcommittee before which §2 would be debated—"involve[d] one of the most substantial constitutional issues ever to come before this body." 2 Hearings before the Subcommittee on the Constitution of the Senate Committee on the Judiciary, 97th Cong., 2d Sess., pt. 1, p. 1 (1982).

Proceedings in Congress mirrored the disagreement that had developed around the country. In April 1981, Congressman Peter W. Rodino, Jr.—longtime chairman of the House Judiciary Committee—introduced a bill to amend the VRA, proposing that the words "to deny or abridge" in §2 be replaced with the phrase "*in a manner which results in a denial or abridgement.*" H. R. 3112, 97th Cong., 1st Sess., 2 (as introduced) (emphasis added). This was the effects test that *Mobile*'s detractors sought.

But those wary of proportionality were not far behind. Senator Hatch argued that the effects test "was intelligible

only to the extent that it approximated a standard of proportional representation by race." Boyd & Markman 1392. The Attorney General had the same concern. The effects test "would be triggered whenever election results did not mirror the population mix of a particular community," he wrote, producing "essentially a quota system for electoral politics." N. Y. Times, Mar. 27, 1982, p. 23.

The impasse was not resolved until late April 1982, when Senator Bob Dole proposed a compromise. Boyd & Markman 1414. Section 2 would include the effects test that many desired but also a robust disclaimer against proportionality. Seeking to navigate any tension between the two, the Dole Amendment borrowed language from a Fourteenth Amendment case of ours, *White* v. *Regester*, 412 U. S. 755 (1973), which many in Congress believed would allow courts to consider effects but avoid proportionality. The standard for liability in voting cases, *White* explained, was whether "the political processes leading to nomination and election were not equally open to participation by the group in question—[in] that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." *Id.*, at 766.

The Dole compromise won bipartisan support and, on June 18, the Senate passed the 1982 amendments by an overwhelming margin, 85–8. Eleven days later, President Reagan signed the Act into law. The amended §2 reads as follows:

> "(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . as provided in subsection (b).
>
> "(b) A violation of subsection (a) is established if,

based on the totality of circumstances, it is shown that
the political processes leading to nomination or election
in the State or political subdivision are not equally
open to participation by members of a class of citizens
. . . in that its members have less opportunity than
other members of the electorate to participate in the
political process and to elect representatives of their
choice. The extent to which members of a protected
class have been elected to office in the State or political
subdivision is one circumstance which may be consid-
ered: *Provided*, That nothing in this section establishes
a right to have members of a protected class elected in
numbers equal to their proportion in the population."
52 U. S. C. §10301.

B

For the first 115 years following Reconstruction, the
State of Alabama elected no black Representatives to Con-
gress. See *Singleton* v. *Merrill*, 582 F. Supp. 3d 924, 947
(ND Ala. 2022) (*per curiam*). In 1992, several plaintiffs
sued the State, alleging that it had been impermissibly di-
luting the votes of black Alabamians in violation of §2. See
*Wesch* v. *Hunt*, 785 F. Supp. 1491, 1493 (SD Ala.). The law-
suit produced a majority-black district in Alabama for the
first time in decades. *Id.*, at 1499. And that fall, Birming-
ham lawyer Earl Hillard became the first black Representa-
tive from Alabama since 1877. 582 F. Supp. 3d, at 947.

Alabama's congressional map has "remained remarkably
similar" after *Wesch*. Brief for Appellants in No. 21–1086
etc., p. 9 (Brief for Alabama). The map contains seven con-
gressional districts, each with a single representative. See
Supp. App. 205–211; 582 F. Supp. 3d, at 951. District 1 en-
compasses the Gulf Coast region in the southwest; District
2—known as the Wiregrass region—occupies the southeast;
District 3 covers the eastern-central part of the State; Dis-
tricts 4 and 5 stretch width-wise across the north, with the

latter layered atop the former; District 6 is right in the State's middle; and District 7 spans the central west. *Id.*, at 951.

In 2020, the decennial census revealed that Alabama's population had grown by 5.1%. See 1 App. 86. A group of plaintiffs led by Alabama legislator Bobby Singleton sued the State, arguing that the existing congressional map was malapportioned and racially gerrymandered in violation of the Equal Protection Clause. 582 F. Supp. 3d, at 938–939. While litigation was proceeding, the Alabama Legislature's Committee on Reapportionment began creating a new districting map. *Ibid.* Although the prior decade's population growth did not change the number of seats that Alabama would receive in the House, the growth had been unevenly distributed across the State, and the existing map was thus out of date.

To solve the problem, the State turned to experienced mapmaker Randy Hinaman, who had created several districting maps that Alabama used over the past 30 years. *Id.*, at 947–948. The starting point for Hinaman was the then-existing 2011 congressional map, itself a product of the 2001 map that Hinaman had also created. Civ. No. 21–1530 (ND Ala.), ECF Doc. 70–2, pp. 40, 93–94; see also 582 F. Supp. 3d, at 950. Hinaman worked to adjust the 2011 map in accordance with the redistricting guidelines set by the legislature's Reapportionment Committee. *Id.*, at 948–950; 1 App. 275. Those guidelines prioritized population equality, contiguity, compactness, and avoiding dilution of minority voting strength. 582 F. Supp. 3d, at 1035–1036. They also encouraged, as a secondary matter, avoiding incumbent pairings, respecting communities of interest, minimizing the number of counties in each district, and preserving cores of existing districts. *Id.*, at 1036–1037.

The resulting map Hinaman drew largely resembled the 2011 map, again producing only one district in which black voters constituted a majority of the voting age population.

Supp. App. 205–211. The Alabama Legislature enacted Hinaman's map under the name HB1. 582 F. Supp. 3d, at 935, 950–951. Governor Ivey signed HB1 into law on November 4, 2021. *Id.*, at 950.

## C

Three groups of plaintiffs brought suit seeking to stop Alabama's Secretary of State from conducting congressional elections under HB1. The first group was led by Dr. Marcus Caster, a resident of Washington County, who challenged HB1 as invalid under §2. *Id.*, at 934–935, 980. The second group, led by Montgomery County resident Evan Milligan, brought claims under §2 and the Equal Protection Clause of the Fourteenth Amendment. *Id.*, at 939–940, 966. Finally, the *Singleton* plaintiffs, who had previously sued to enjoin Alabama's 2011 congressional map, amended their complaint to challenge HB1 as an impermissible racial gerrymander under the Equal Protection Clause. *Id.*, at 938–939.

A three-judge District Court was convened, comprised of Circuit Judge Marcus and District Judges Manasco and Moorer. The *Singleton* and *Milligan* actions were consolidated before the three-judge Court for purposes of preliminary injunction proceedings, while *Caster* proceeded before Judge Manasco on a parallel track. 582 F. Supp. 3d, at 934–935. A preliminary injunction hearing began on January 4, 2022, and concluded on January 12. *Id.*, at 943. In that time, the three-judge District Court received live testimony from 17 witnesses, reviewed more than 1000 pages of briefing and upwards of 350 exhibits, and considered arguments from the 43 different lawyers who had appeared in the litigation. *Id.*, at 935–936. After reviewing that extensive record, the Court concluded in a 227-page opinion that the question whether HB1 likely violated §2 was not "a close one." It did. *Id.*, at 1026. The Court thus preliminarily enjoined Alabama from using HB1 in forthcoming elections.

*Id.*, at 936.[2]

Four days later, on January 28, Alabama moved in this Court for a stay of the District Court's injunction. This Court granted a stay and scheduled the cases for argument, noting probable jurisdiction in *Milligan* and granting certiorari before judgment in *Caster*. 595 U. S. ___ (2022).

## II

The District Court found that plaintiffs demonstrated a reasonable likelihood of success on their claim that HB1 violates §2. We affirm that determination.

### A

For the past forty years, we have evaluated claims brought under §2 using the three-part framework developed in our decision *Thornburg* v. *Gingles*, 478 U. S. 30 (1986). *Gingles* concerned a challenge to North Carolina's multimember districting scheme, which allegedly diluted the vote of its black citizens. *Id.*, at 34–36. The case presented the first opportunity since the 1982 amendments to address how the new §2 would operate.

*Gingles* began by describing what §2 guards against. "The essence of a §2 claim," the Court explained, "is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters." *Id.*, at 47. That occurs where an "electoral structure operates to minimize or cancel out" minority voters' "ability to elect their preferred candidates." *Id.*, at 48. Such a risk is greatest

_____

[2]Judge Manasco, presiding in *Caster*, also preliminarily enjoined Alabama from using HB1. Her opinion was based on the same evidentiary record as was before the three-judge Court, and it adopted in full that Court's "recitation of the evidence, legal analysis, findings of fact and conclusions of law." 1 App. to Emergency Application for Stay in No. 2:21–cv–1536, p. 4; see also 582 F. Supp. 3d, at 942–943, and n. 4. Any reference to the "District Court" in this opinion applies to the *Caster* Court as well as to the three-judge Court.

"where minority and majority voters consistently prefer different candidates" and where minority voters are submerged in a majority voting population that "regularly defeat[s]" their choices. *Ibid.*

To succeed in proving a §2 violation under *Gingles*, plaintiffs must satisfy three "preconditions." *Id.*, at 50. First, the "minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district." *Wisconsin Legislature* v. *Wisconsin Elections Comm'n*, 595 U. S. ___, ___ (2022) (*per curiam*) (slip op., at 3) (citing *Gingles*, 478 U. S., at 46–51). A district will be reasonably configured, our cases explain, if it comports with traditional districting criteria, such as being contiguous and reasonably compact. See *Alabama Legislative Black Caucus* v. *Alabama*, 575 U. S. 254, 272 (2015). "Second, the minority group must be able to show that it is politically cohesive." *Gingles*, 478 U. S., at 51. And third, "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." *Ibid.* Finally, a plaintiff who demonstrates the three preconditions must also show, under the "totality of circumstances," that the political process is not "equally open" to minority voters. *Id.*, at 45–46; see also *id.*, at 36–38 (identifying several factors relevant to the totality of circumstances inquiry, including "the extent of any history of official discrimination in the state . . . that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process").

Each *Gingles* precondition serves a different purpose. The first, focused on geographical compactness and numerosity, is "needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district." *Growe* v. *Emison*, 507 U. S. 25, 40 (1993). The second, concerning the political cohesiveness of the minority group, shows that a representative of its choice

would in fact be elected. See *ibid.* The third precondition, focused on racially polarized voting, "establish[es] that the challenged districting thwarts a distinctive minority vote" at least plausibly on account of race. *Ibid.* And finally, the totality of circumstances inquiry recognizes that application of the *Gingles* factors is "peculiarly dependent upon the facts of each case." 478 U. S., at 79. Before courts can find a violation of §2, therefore, they must conduct "an intensely local appraisal" of the electoral mechanism at issue, as well as a "searching practical evaluation of the 'past and present reality.'" *Ibid.*

*Gingles* has governed our Voting Rights Act jurisprudence since it was decided 37 years ago. Congress has never disturbed our understanding of §2 as *Gingles* construed it. And we have applied *Gingles* in one §2 case after another, to different kinds of electoral systems and to different jurisdictions in States all over the country. See *Voinovich* v. *Quilter*, 507 U. S. 146 (1993) (Ohio); *Growe*, 507 U. S., at 25 (Minnesota); *Johnson* v. *De Grandy*, 512 U. S. 997 (1994) (Florida); *Holder* v. *Hall*, 512 U. S. 874 (1994) (Georgia); *Abrams* v. *Johnson*, 521 U. S. 74 (1997) (Georgia); *League of United Latin American Citizens* v. *Perry*, 548 U. S. 399, 423 (2006) (*LULAC*) (Texas); *Bartlett* v. *Strickland*, 556 U. S. 1 (2009) (plurality opinion) (North Carolina); *Cooper* v. *Harris*, 581 U. S. 285 (2017) (North Carolina); *Abbott* v. *Perez*, 585 U. S. ___ (2018) (Texas); *Wisconsin Legislature*, 595 U. S. ___ (Wisconsin).

### B

As noted, the District Court concluded that plaintiffs' §2 claim was likely to succeed under *Gingles*. 582 F. Supp. 3d, at 1026. Based on our review of the record, we agree.

With respect to the first *Gingles* precondition, the District Court correctly found that black voters could constitute a majority in a second district that was "reasonably configured." 1 App. to Emergency Application for Stay in No. 21–

1086 etc., p. 253 (MSA). The plaintiffs adduced eleven il-
lustrative maps—that is, example districting maps that Al-
abama could enact—each of which contained two majority-
black districts that comported with traditional districting
criteria. With respect to compactness, for example, the Dis-
trict Court explained that the maps submitted by one of
plaintiffs' experts, Dr. Moon Duchin, "perform[ed] generally
better on average than" did HB1. 582 F. Supp. 3d, at 1009.
A map offered by another of plaintiffs' experts, Bill Cooper,
produced districts roughly as compact as the existing plan.
*Ibid.* And none of plaintiffs' maps contained any "tentacles,
appendages, bizarre shapes, or any other obvious irregular-
ities that would make it difficult to find" them sufficiently
compact. *Id.*, at 1011. Plaintiffs' maps also satisfied other
traditional districting criteria. They contained equal popu-
lations, were contiguous, and respected existing political
subdivisions, such as counties, cities, and towns. *Id.*, at
1011, 1016. Indeed, some of plaintiffs' proposed maps split
the same number of county lines as (or even *fewer* county
lines than) the State's map. *Id.*, at 1011–1012. We agree
with the District Court, therefore, that plaintiffs' illustra-
tive maps "strongly suggest[ed] that Black voters in Ala-
bama" could constitute a majority in a second, reasonably
configured, district. *Id.*, at 1010.

The State nevertheless argues that plaintiffs' maps were
not reasonably configured because they failed to keep to-
gether a traditional community of interest within Alabama.
See, *e.g.*, *id.*, at 1012. A "community of interest," according
to Alabama's districting guidelines, is an "area with recog-
nized similarities of interests, including but not limited to
ethnic, racial, economic, tribal, social, geographic, or histor-
ical identities." *Ibid.* Alabama argues that the Gulf Coast
region in the southwest of the State is such a community of
interest, and that plaintiffs' maps erred by separating it
into two different districts. *Ibid.*

We do not find the State's argument persuasive. Only

two witnesses testified that the Gulf Coast was a community of interest. *Id.*, at 1015. The testimony provided by one of those witnesses was "partial, selectively informed, and poorly supported." *Ibid.* The other witness, meanwhile, justified keeping the Gulf Coast together "simply" to preserve "political advantage[]": "You start splitting counties," he testified, "and that county loses its influence. That's why I don't want Mobile County to be split." *Id.*, at 990, 1015. The District Court understandably found this testimony insufficient to sustain Alabama's "overdrawn argument that there can be no legitimate reason to split" the Gulf Coast region. *Id.*, at 1015.

Even if the Gulf Coast did constitute a community of interest, moreover, the District Court found that plaintiffs' maps would still be reasonably configured because they joined together a different community of interest called the Black Belt. *Id.*, at 1012–1014. Named for its fertile soil, the Black Belt contains a high proportion of black voters, who "share a rural geography, concentrated poverty, unequal access to government services, . . . lack of adequate healthcare," and a lineal connection to "the many enslaved people brought there to work in the antebellum period." *Id.*, at 1012–1013; see also 1 App. 299–304. The District Court concluded—correctly, under our precedent—that it did not have to conduct a "beauty contest[]" between plaintiffs' maps and the State's. There would be a split community of interest in both. 582 F. Supp. 3d, at 1012 (quoting *Bush* v. *Vera*, 517 U. S. 952, 977–978 (1996) (plurality opinion)).

The State also makes a related argument based on "core retention"—a term that refers to the proportion of districts that remain when a State transitions from one districting plan to another. See, *e.g.*, Brief for Alabama 25, 61. Here, by largely mirroring Alabama's 2011 districting plan, HB1 performs well on the core retention metric. Plaintiffs' illustrative plans, by contrast, naturally fare worse because they change where the 2011 district lines were drawn. See

*e.g.*, Supp. App. 164–173. But this Court has never held that a State's adherence to a previously used districting plan can defeat a §2 claim. If that were the rule, a State could immunize from challenge a new racially discriminatory redistricting plan simply by claiming that it resembled an old racially discriminatory plan. That is not the law: §2 does not permit a State to provide some voters "less opportunity . . . to participate in the political process" just because the State has done it before. 52 U. S. C. §10301(b).

As to the second and third *Gingles* preconditions, the District Court determined that there was "no serious dispute that Black voters are politically cohesive, nor that the challenged districts' white majority votes sufficiently as a bloc to usually defeat Black voters' preferred candidate." 582 F. Supp. 3d, at 1016 (internal quotation marks omitted). The Court noted that, "on average, Black voters supported their candidates of choice with 92.3% of the vote" while "white voters supported Black-preferred candidates with 15.4% of the vote." *Id.*, at 1017 (internal quotation marks omitted). Plaintiffs' experts described the evidence of racially polarized voting in Alabama as "intens[e]," "very strong," and "very clear." *Ibid.* Even Alabama's expert conceded "that the candidates preferred by white voters in the areas that he looked at regularly defeat the candidates preferred by Black voters." *Id.*, at 1018.

Finally, the District Court concluded that plaintiffs had carried their burden at the totality of circumstances stage. The Court observed that elections in Alabama were racially polarized; that "Black Alabamians enjoy virtually zero success in statewide elections"; that political campaigns in Alabama had been "characterized by overt or subtle racial appeals"; and that "Alabama's extensive history of repugnant racial and voting-related discrimination is undeniable and well documented." *Id.*, at 1018–1024.

We see no reason to disturb the District Court's careful factual findings, which are subject to clear error review and

have gone unchallenged by Alabama in any event. See *Cooper*, 581 U. S., at 309. Nor is there a basis to upset the District Court's legal conclusions. The Court faithfully applied our precedents and correctly determined that, under existing law, HB1 violated §2.

## III

The heart of these cases is not about the law as it exists. It is about Alabama's attempt to remake our §2 jurisprudence anew.

The centerpiece of the State's effort is what it calls the "race-neutral benchmark." The theory behind it is this: Using modern computer technology, mapmakers can now generate millions of possible districting maps for a given State. The maps can be designed to comply with traditional districting criteria but to not consider race. The mapmaker can determine how many majority-minority districts exist in each map, and can then calculate the median or average number of majority-minority districts in the entire multi-million-map set. That number is called the race-neutral benchmark.

The State contends that this benchmark should serve as the point of comparison in §2 cases. The benchmark, the State says, was derived from maps that were "race-blind"— maps that cannot have "deni[ed] or abridge[d]" anyone's right to vote "on account of race" because they never took race into "account" in the first place. 52 U. S. C. §10301(a). Courts in §2 cases should therefore compare the number of majority-minority districts in the State's plan to the benchmark. If those numbers are similar—if the State's map "resembles" the benchmark in this way—then, Alabama argues, the State's map also cannot have "deni[ed] or abridge[d]" anyone's right to vote "on account of race." *Ibid.*

Alabama contends that its approach should be adopted for two reasons. First, the State argues that a race-neutral benchmark best matches the text of the Voting Rights Act.

Section 2 requires that the political processes be "equally open." §10301(b). What that means, the State asserts, is that the State's map cannot impose "obstacles or burdens that block or seriously hinder voting on account of race." Brief for Alabama 43. These obstacles do not exist, in the State's view, where its map resembles a map that never took race into "account." *Ibid.* Second, Alabama argues that the *Gingles* framework ends up requiring racial proportionality in districting. According to the State, *Gingles* demands that where "another majority-black district could be drawn, it must be drawn." Brief for Alabama 71 (emphasis deleted). And that sort of proportionality, Alabama continues, is inconsistent with the compromise that Congress struck, with the text of §2, and with the Constitution's prohibition on racial discrimination in voting.

To apply the race-neutral benchmark in practice, Alabama would require §2 plaintiffs to make at least three showings. First, the illustrative plan that plaintiffs adduce for the first *Gingles* precondition cannot have been "based" on race. Brief for Alabama 56. Second, plaintiffs must show at the totality of circumstances stage that the State's enacted plan diverges from the average plan that would be drawn without taking race into account. And finally, plaintiffs must ultimately prove that any deviation between the State's plan and a race-neutral plan is explainable "only" by race—not, for example, by "the State's naturally occurring geography and demography." *Id.*, at 46.

As we explain below, we find Alabama's new approach to §2 compelling neither in theory nor in practice. We accordingly decline to recast our §2 case law as Alabama requests.

### A

#### 1

Section 2 prohibits States from imposing any "standard, practice, or procedure . . . in a manner which results in a denial or abridgement of the right of any citizen . . . to vote

on account of race or color." 52 U. S. C. §10301(a). What that means, §2 goes on to explain, is that the political processes in the State must be "equally open," such that minority voters do not "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." §10301(b).

We have understood the language of §2 against the background of the hard-fought compromise that Congress struck. To that end, we have reiterated that §2 turns on the presence of discriminatory effects, not discriminatory intent. See, *e.g.*, *Chisom* v. *Roemer*, 501 U. S. 380, 403–404 (1991). And we have explained that "[i]t is patently clear that Congress has used the words 'on account of race or color' in the Act to mean 'with respect to' race or color, and not to connote any required purpose of racial discrimination." *Gingles*, 478 U. S., at 71, n. 34 (plurality opinion) (some alterations omitted). Individuals thus lack an equal opportunity to participate in the political process when a State's electoral structure operates in a manner that "minimize[s] or cancel[s] out the[ir] voting strength." *Id.*, at 47. That occurs where an individual is disabled from "enter[ing] into the political process in a reliable and meaningful manner" "in the light of past and present reality, political and otherwise." *White*, 412 U. S., at 767, 770. A district is not equally open, in other words, when minority voters face—unlike their majority peers—bloc voting along racial lines, arising against the backdrop of substantial racial discrimination within the State, that renders a minority vote unequal to a vote by a nonminority voter.

The State's reading of §2, by contrast, runs headlong into our precedent. Alabama asserts that a State's map does not "abridge[]" a person's right to vote "on account of race" if the map resembles a sufficient number of race-neutral alternatives. See Brief for Alabama 54–56. But our cases have consistently focused, for purposes of litigation, on the

specific illustrative maps that a plaintiff adduces. Deviation from that map shows it is *possible* that the State's map has a disparate effect on account of race. The remainder of the *Gingles* test helps determine whether that possibility is reality by looking to polarized voting preferences and the frequency of racially discriminatory actions taken by the State, past and present.

A State's liability under §2, moreover, must be determined "based on the totality of circumstances." 52 U. S. C. §10301(b). Yet Alabama suggests there is only one "circumstance[]" that matters—how the State's map stacks up relative to the benchmark. That single-minded view of §2 cannot be squared with the VRA's demand that courts employ a more refined approach. And we decline to adopt an interpretation of §2 that would "revise and reformulate the *Gingles* threshold inquiry that has been the baseline of our §2 jurisprudence" for nearly forty years. *Bartlett*, 556 U. S., at 16 (plurality opinion); see also *Wisconsin Legislature*, 595 U. S., at ___ (slip op., at 7) (faulting lower court for "improperly reduc[ing] *Gingles*' totality-of-circumstances analysis to a single factor"); *De Grandy*, 512 U. S., at 1018 ("An inflexible rule would run counter to the textual command of §2, that the presence or absence of a violation be assessed 'based on the totality of circumstances.'").[3]

### 2

Alabama also argues that the race-neutral benchmark is required because our existing §2 jurisprudence inevitably demands racial proportionality in districting, contrary to the last sentence of §2(b). But properly applied, the *Gingles* framework itself imposes meaningful constraints on pro-

---

[3]The principal dissent complains that "what the District Court did here is essentially no different from what many courts have done for decades under this Court's superintendence." *Post*, at 47 (opinion of THOMAS, J.). That is not such a bad definition of *stare decisis*.

portionality, as our decisions have frequently demonstrated.

In *Shaw* v. *Reno*, for example, we considered the permissibility of a second majority-minority district in North Carolina, which at the time had 12 seats in the U. S. House of Representatives and a 20% black voting age population. 509 U. S. 630, 633–634 (1993). The second majority-minority district North Carolina drew was "160 miles long and, for much of its length, no wider than the [interstate] corridor." *Id.*, at 635. The district wound "in snakelike fashion through tobacco country, financial centers, and manufacturing areas until it gobble[d] in enough enclaves of black neighborhoods." *Id.*, at 635–636. Indeed, the district was drawn so imaginatively that one state legislator remarked: "[I]f you drove down the interstate with both car doors open, you'd kill most of the people in the district." *Id.*, at 636.

Though North Carolina believed the additional district was required by §2, we rejected that conclusion, finding instead that those challenging the map stated a claim of impermissible racial gerrymandering under the Equal Protection Clause. *Id.*, at 655, 658. In so holding, we relied on the fact that the proposed district was not reasonably compact. *Id.*, at 647. North Carolina had "concentrated a *dispersed* minority population in a single district by disregarding traditional districting principles such as compactness, contiguity, and respect for political subdivisions." *Ibid.* (emphasis added). And "[a] reapportionment plan that includes in one district individuals who belong to the same race, *but who are otherwise separated by geographical and political boundaries*," we said, raised serious constitutional concerns. *Ibid.* (emphasis added).

The same theme emerged in our 1995 decision *Miller* v. *Johnson*, where we upheld a district court's finding that one of Georgia's ten congressional districts was the product of an impermissible racial gerrymander. 515 U. S. 900, 906, 910–911. At the time, Georgia's black voting age population

was 27%, but there was only one majority-minority district. *Id.*, at 906. To comply with the VRA, Georgia thought it necessary to create two more majority-minority districts— achieving proportionality. *Id.*, at 920–921. But like North Carolina in *Shaw*, Georgia could not create the districts without flouting traditional criteria. One district "centered around four discrete, widely spaced urban centers that ha[d] absolutely nothing to do with each other, and stretch[ed] the district hundreds of miles across rural counties and narrow swamp corridors." 515 U. S., at 908. "Geographically," we said of the map, "it is a monstrosity." *Id.*, at 909.

In *Bush* v. *Vera*, a plurality of the Court again explained how traditional districting criteria limited any tendency of the VRA to compel proportionality. The case concerned Texas's creation of three additional majority-minority districts. 517 U. S., at 957. Though the districts brought the State closer to proportional representation, we nevertheless held that they constituted racial gerrymanders in violation of the Fourteenth Amendment. That was because the districts had "no integrity in terms of traditional, neutral redistricting criteria." *Id.*, at 960. One of the majority-black districts consisted "of narrow and bizarrely shaped tentacles." *Id.*, at 965. The proposed majority-Hispanic district resembled "a sacred Mayan bird" with "[s]pindly legs reach[ing] south" and a "plumed head ris[ing] northward." *Id.*, at 974.

The point of all this is a simple one. Forcing proportional representation is unlawful and inconsistent with this Court's approach to implementing §2. The numbers bear the point out well. At the congressional level, the fraction of districts in which black-preferred candidates are likely to win "is currently below the Black share of the eligible voter population in every state but three." Brief for Professors Jowei Chen et al. as *Amici Curiae* 3 (Chen Brief). Only one

State in the country, meanwhile, "has attained a proportional share" of districts in which Hispanic-preferred candidates are likely to prevail. *Id.*, at 3–4. That is because as residential segregation decreases—as it has "sharply" done since the 1970s—satisfying traditional districting criteria such as the compactness requirement "becomes more difficult." T. Crum, Reconstructing Racially Polarized Voting, 70 Duke L. J. 261, 279, and n. 105 (2020).

Indeed, as *amici* supporting the appellees emphasize, §2 litigation in recent years has rarely been successful for just that reason. See Chen Brief 3–4. Since 2010, plaintiffs nationwide have apparently succeeded in fewer than ten §2 suits. *Id.*, at 7. And "the *only* state legislative or congressional districts that were redrawn because of successful Section 2 challenges were a handful of state house districts near Milwaukee and Houston." *Id.*, at 7–8. By contrast, "[n]umerous lower courts" have upheld districting maps "where, due to minority populations' geographic diffusion, plaintiffs couldn't design an additional majority-minority district" or satisfy the compactness requirement. *Id.*, at 15–16 (collecting cases). The same has been true of recent litigation in this Court. See *Abbott*, 585 U. S., at ___–___ (slip op., at 33–34) (finding a Texas district did not violate §2 because "the geography and demographics of south and west Texas do not permit the creation of any more than the seven Latino . . . districts that exist under the current plan").[4]

———————

[4] Despite this all, the dissent argues that courts have apparently been "methodically carving the country into racially designated electoral districts" for decades. *Post*, at 48 (opinion of THOMAS, J.). And that, the dissent inveighs, "should inspire us to repentance." *Ibid.* But proportional representation of minority voters is absent from nearly every corner of this country despite §2 being in effect for over 40 years. And in case after case, we have rejected districting plans that would bring States closer to proportionality when those plans violate traditional districting criteria. See *supra*, at 19–21. It seems it is the dissent that is "quixotically joust[ing] with an imaginary adversary." *Post*, at 47 (opinion of THOMAS, J.).

Reapportionment, we have repeatedly observed, "is primarily the duty and responsibility of the State[s]," not the federal courts. *Id.*, at ___ (slip op., at 21). Properly applied, the *Gingles* factors help ensure that remains the case. As respondents themselves emphasize, §2 "never require[s] adoption of districts that violate traditional redistricting principles." Brief for Respondents in No. 21–1087, p. 3. Its exacting requirements, instead, limit judicial intervention to "those instances of intensive racial politics" where the "excessive role [of race] in the electoral process . . . den[ies] minority voters equal opportunity to participate." Senate Report 33–34.

## B

Although we are content to reject Alabama's invitation to change existing law on the ground that the State misunderstands §2 and our decisions implementing it, we also address how the race-neutral benchmark would operate in practice. Alabama's approach fares poorly on that score, which further counsels against our adopting it.

## 1

The first change to existing law that Alabama would require is prohibiting the illustrative maps that plaintiffs submit to satisfy the first *Gingles* precondition from being "based" on race. Brief for Alabama 56. Although Alabama is not entirely clear whether, under its view, plaintiffs' illustrative plans must not take race into account at all or whether they must just not "prioritize" race, *ibid.*, we see no reason to impose such a new rule.

When it comes to considering race in the context of districting, we have made clear that there is a difference "between being aware of racial considerations and being motivated by them." *Miller*, 515 U. S., at 916; see also *North Carolina* v. *Covington*, 585 U. S. ___, ___ (2018) (*per curiam*) (slip op., at 8). The former is permissible; the latter

is usually not. That is because "[r]edistricting legislatures will . . . almost always be aware of racial demographics," *Miller*, 515 U. S., at 916, but such "race consciousness does not lead inevitably to impermissible race discrimination," *Shaw*, 509 U. S., at 646. Section 2 itself "demands consideration of race." *Abbott*, 581 U. S., at ___ (slip op., at 4). The question whether additional majority-*minority* districts can be drawn, after all, involves a "quintessentially race-conscious calculus." *De Grandy*, 512 U. S., at 1020.

At the same time, however, race may not be "the predominant factor in drawing district lines unless [there is] a compelling reason." *Cooper*, 581 U. S., at 291. Race predominates in the drawing of district lines, our cases explain, when "race-neutral considerations [come] into play only after the race-based decision had been made." *Bethune-Hill* v. *Virginia State Bd. of Elections*, 580 U. S. 178, 189 (2017) (internal quotation marks omitted). That may occur where "race for its own sake is the overriding reason for choosing one map over others." *Id.*, at 190.

While the line between racial predominance and racial consciousness can be difficult to discern, see *Miller*, 515 U. S., at 916, it was not breached here. The *Caster* plaintiffs relied on illustrative maps produced by expert Bill Cooper. See 2 App. 591–592. Cooper testified that while it was necessary for him to *consider* race, he also took several other factors into account, such as compactness, contiguity, and population equality. *Ibid.* Cooper testified that he gave all these factors "equal weighting." *Id.*, at 594. And when asked squarely whether race predominated in his development of the illustrative plans, Cooper responded: "No. It was a consideration. This is a Section 2 lawsuit, after all. But it did not predominate or dominate." *Id.*, at 595.

The District Court agreed. It found "Cooper's testimony highly credible" and commended Cooper for "work[ing] hard to give 'equal weight[]' to all traditional redistricting criteria." 582 F. Supp. 3d, at 1005–1006; see also *id.*, at 978–

979.  The court also explained that Alabama's evidence of racial predominance in Cooper's maps was exceedingly thin.  Alabama's expert, Thomas Bryan, "testified that he never reviewed the exhibits to Mr. Cooper's report" and "that he never reviewed" one of the illustrative plans that Cooper submitted.  *Id.*, at 1006.  Bryan further testified that he could offer no "conclusions or opinions as to the apparent basis of any individual line drawing decisions in Cooper's illustrative plans."  2 App. 740.  By his own admission, Bryan's analysis of any race predominance in Cooper's maps "was pretty light."  *Id.*, at 739.  The District Court did not err in finding that race did not predominate in Cooper's maps in light of the evidence before it.[5]

The dissent contends that race nevertheless predominated in both Cooper's and Duchin's maps because they were designed to hit "'express racial target[s]'"—namely, two "50%-plus majority-black districts."  *Post*, at 15 (opinion of THOMAS, J.) (quoting *Bethune-Hill*, 580 U. S., at 192).  This argument fails in multiple ways.  First, the dissent's reliance on *Bethune-Hill* is mistaken.  In that case, this Court was unwilling to conclude that a State's maps were produced in a racially predominant manner.  Instead, we

---

[5] The dissent claims that Cooper "treated 'the minority population in and of itself' as the paramount community of interest in his plans."  *Post*, at 14 (opinion of THOMAS, J.) (quoting 2 App. 601).  But Cooper testified that he was "aware that the minority population in and of itself *can* be a community of interest."  *Id.,* at 601 (emphasis added).  Cooper then explained that the relevant community of interest here—the Black Belt— was a "*historical* feature" of the State, not a demographic one.  *Ibid.* (emphasis added).  The Black Belt, he emphasized, was defined by its "historical boundaries"—namely, the group of "rural counties plus Montgomery County in the central part of the state."  *Ibid.*  The District Court treated the Black Belt as a community of interest for the same reason.

The dissent also protests that Cooper's "plans prioritized race over neutral districting criteria."  *Post*, at 14 (opinion of THOMAS, J.).  But as the District Court found, and as Alabama does not contest, Cooper's maps satisfied other traditional criteria, such as compactness, contiguity, equal populations, and respect for political subdivisions.

remanded for the lower court to conduct the predominance analysis itself, explaining that "the use of an express racial target" was just one factor among others that the court would have to consider as part of "[a] holistic analysis." *Id.*, at 192. JUSTICE THOMAS dissented in relevant part, contending that because "the legislature sought to achieve a [black voting-age population] of at least 55%," race necessarily predominated in its decisionmaking. *Id.*, at 198 (opinion concurring in part and dissenting in part). But the Court did not join in that view, and JUSTICE THOMAS again dissents along the same lines today.

The second flaw in the dissent's proposed approach is its inescapable consequence: *Gingles* must be overruled. According to the dissent, racial predominance plagues *every single illustrative map ever adduced* at the first step of *Gingles*. For all those maps were created with an express target in mind—they were created to show, as our cases require, that an additional majority-minority district could be drawn. That is the whole point of the enterprise. The upshot of the approach the dissent urges is not to change how *Gingles* is applied, but to reject its framework outright.

The contention that mapmakers must be entirely "blind" to race has no footing in our §2 case law. The line that we have long drawn is between consciousness and predominance. Plaintiffs adduced at least one illustrative map that comported with our precedents. They were required to do no more to satisfy the first step of *Gingles*.

### 2

The next condition Alabama would graft onto §2 is a requirement that plaintiffs demonstrate, at the totality of circumstances stage, that the State's enacted plan contains fewer majority-minority districts than the race-neutral benchmark. Brief for Alabama 43. If it does not, then §2 should drop out of the picture. *Id.*, at 44.

Alabama argues that is what should have happened here.

It notes that one of plaintiffs' experts, Dr. Duchin, used an algorithm to create "2 million districting plans for Alabama . . . without taking race into account in any way in the generation process." 2 App. 710. Of these two million "race-blind" plans, none contained two majority-black districts while many plans did not contain any. *Ibid.* Alabama also points to a "race-neutral" computer simulation conducted by another one of plaintiffs' experts, Dr. Kosuke Imai, which produced 30,000 potential maps. Brief for Alabama 55. As with Dr. Duchin's maps, none of the maps that Dr. Imai created contained two majority-black districts. See 2 App. 571–572. Alabama thus contends that because HB1 sufficiently "resembles" the "race-neutral" maps created by Dr. Duchin and Dr. Imai—all of the maps lack two majority-black districts—HB1 does not violate §2. Brief for Alabama 54.

Alabama's reliance on the maps created by Dr. Duchin and Dr. Imai is misplaced. For one, neither Duchin's nor Imai's maps accurately represented the districting process in Alabama. Dr. Duchin's maps were based on old census data—from 2010 instead of 2020—and ignored certain traditional districting criteria, such as keeping together communities of interest, political subdivisions, or municipalities.[6] And Dr. Imai's 30,000 maps failed to incorporate Alabama's own districting guidelines, including keeping together communities of interest and preserving municipal boundaries. See Supp. App. 58–59.[7]

_____

[6] Dr. Duchin created her two million map sample as part of an academic article that she helped author, not for her work on this case, and the article was neither entered into evidence below nor made part of the record here. See 2 App. 710; see also M. Duchin & D. Spencer, Models, Race, and the Law, 130 Yale L. J. Forum 744, 763–764 (2021) (Duchin & Spencer).

[7] The principal dissent decrees that Dr. Duchin's and Dr. Imai's maps are "surely probative," forgiving the former's use of stale census data as well as both mapmakers' collective failure to incorporate many traditional districting guidelines. *Post,* at 23–24, and n. 14 (opinion of

But even if the maps created by Dr. Duchin and Dr. Imai were adequate comparators, we could not adopt the map-comparison test that Alabama proposes. The test is flawed in its fundamentals. Districting involves myriad considerations—compactness, contiguity, political subdivisions, natural geographic boundaries, county lines, pairing of incumbents, communities of interest, and population equality. See *Miller*, 515 U. S., at 916. Yet "[q]uantifying, measuring, prioritizing, and reconciling these criteria" requires map drawers to "make difficult, contestable choices." Brief for Computational Redistricting Experts as *Amici Curiae* 8 (Redistricting Brief). And "[i]t is easy to imagine how different criteria could move the median map toward different . . . distributions," meaning that "the same map could be [lawful] or not depending solely on what the mapmakers said they set out to do." *Rucho* v. *Common Cause*, 588 U. S. ___, ___–___ (2019) (slip op., at 27–28). For example, "the scientific literature contains dozens of competing metrics" on the issue of compactness. Redistricting Brief 8. Which one of these metrics should be used? What happens when

_____

THOMAS, J.); see also *post*, at 15, n. 9, 16. In doing so, that dissent ignores Dr. Duchin's testimony that—when using the correct census data—the "randomized algorithms" she employed "found plans with two majority-black districts in literally thousands of different ways." MSA 316–317. The principal dissent and the dissent by JUSTICE ALITO also ignore Duchin's testimony that "it is certainly possible" to draw the illustrative maps she produced in a race-blind manner. 2 App. 713. In that way, even the race-blind standard that the dissents urge would be satisfied here. See *post*, at 21 (opinion of THOMAS, J.); *post*, at 6 (opinion of ALITO, J.). So too could that standard be satisfied in every §2 case; after all, as Duchin explained, any map produced in a deliberately race-predominant manner would necessarily emerge at some point in a random, race-neutral process. 2 App. 713. And although JUSTICE ALITO voices support for an "old-school approach" to §2, even that approach cannot be squared with his understanding of *Gingles*. *Post*, at 6. The very reason a plaintiff adduces a map at the first step of *Gingles* is precisely *because of* its racial composition—that is, because it creates an additional majority-minority district that does not then exist.

the maps they produce yield different benchmark results? How are courts to decide?

Alabama does not say; it offers no rule or standard for determining which of these choices are better than others. Nothing in §2 provides an answer either. In 1982, the computerized mapmaking software that Alabama contends plaintiffs must use to demonstrate an (unspecified) level of deviation did not even exist. See, *e.g.*, J. Chen & N. Stephanopoulos, The Race-Blind Future of Voting Rights, 130 Yale L. J. 862, 881–882 (2021) (Chen & Stephanopoulos). And neither the text of §2 nor the fraught debate that produced it suggests that "equal access" to the fundamental right of voting turns on computer simulations that are technically complicated, expensive to produce, and available to "[o]nly a small cadre of university researchers [that] have the resources and expertise to run" them. Brief for United States as *Amicus Curiae* 28 (citing Chen & Stephanopoulos 882–884).[8]

One final point bears mentioning. Throughout these cases, Alabama has repeatedly emphasized that HB1 cannot have violated §2 because none of plaintiffs' two million odd maps contained more than one majority-minority district. See, *e.g.*, Brief for Alabama 1, 23, 30, 31, 54–56, 70, 79. The point is that two million is a very big number and that sheer volume matters. But as elsewhere, Alabama misconceives the math project that it expects courts to oversee. A brief submitted by three computational redistricting experts explains that the number of possible districting maps in Alabama is at least in the "trillion trillions." Redistricting Brief 6, n. 7. Another publication reports that

---

[8] None of this is to suggest that algorithmic mapmaking is categorically irrelevant in voting rights cases. Instead, we note only that, in light of the difficulties discussed above, courts should exercise caution before treating results produced by algorithms as all but dispositive of a §2 claim. And in evaluating algorithmic evidence more generally in this context, courts should be attentive to the concerns we have discussed.

the number of potential maps may be orders of magnitude higher: "the universe of all possible connected, population-balanced districting plans that satisfy the state's requirements," it explains, "is likely in the range of googols." Duchin & Spencer 768. Two million maps, in other words, is not many maps at all. And Alabama's insistent reliance on that number, however powerful it may sound in the abstract, is thus close to irrelevant in practice. What would the next million maps show? The next billion? The first trillion of the trillion trillions? Answerless questions all. See, *e.g.*, Redistricting Brief 2 ("[I]t is computationally intractable, and thus effectively impossible, to generate a complete enumeration of all potential districting plans. [Even] algorithms that attempt to create a manageable sample of that astronomically large universe do not consistently identify an average or median map."); Duchin & Spencer 768 ("[A] comprehensive survey of [all districting plans within a State] is impossible.").

Section 2 cannot require courts to judge a contest of computers when there is no reliable way to determine who wins, or even where the finish line is.

3

Alabama's final contention with respect to the race-neutral benchmark is that it requires plaintiffs to demonstrate that any deviations between the State's enacted plan and race-neutral alternatives "can be explained *only* by racial discrimination." Brief for Alabama 44 (emphasis added).

We again find little merit in Alabama's proposal. As we have already explained, our precedents and the legislative compromise struck in the 1982 amendments clearly rejected treating discriminatory intent as a requirement for liability under §2. See, *e.g.*, *Chisom*, 501 U. S., at 403–404; *Shaw*, 509 U. S., at 641; *Reno* v. *Bossier Parish School Bd.*, 520 U. S. 471, 481–482 (1997). Yet Alabama's proposal is

even *more* demanding than the intent test Congress jetti-
soned. Demonstrating discriminatory intent, we have long
held, "does not require a plaintiff to prove that the chal-
lenged action rested *solely* on racially discriminatory pur-
pose[]." *Arlington Heights* v. *Metropolitan Housing Devel-
opment Corp.*, 429 U. S. 252, 265 (1977) (emphasis added);
see also *Reno*, 520 U. S., at 488. Alabama's proposed ap-
proach stands in sharp contrast to all this, injecting into the
effects test of §2 an evidentiary standard that even our pur-
poseful discrimination cases eschew.

## C

Alabama finally asserts that the Court should outright
stop applying §2 in cases like these because the text of §2
does not apply to single-member redistricting and because
§2 is unconstitutional as the District Court applied it here.
We disagree on both counts.

Alabama first argues that §2 does not apply to single-
member redistricting. Echoing JUSTICE THOMAS's concur-
rence in *Holder* v. *Hall*, Alabama reads §2's reference to
"standard, practice, or procedure" to mean only the "meth-
ods for conducting a part of the voting process that might
. . . be used to interfere with a citizen's ability to cast his
vote." 512 U. S., at 917–918 (opinion concurring in judg-
ment). Examples of covered activities would include "regis-
tration requirements, . . . the locations of polling places, the
times polls are open, the use of paper ballots as opposed to
voting machines, and other similar aspects of the voting
process." *Id.*, at 922. But not "a single-member districting
system or the selection of one set of districting lines over
another." *Id.*, at 923.

This understanding of §2 cannot be reconciled with our
precedent. As recounted above, we have applied §2 to
States' districting maps in an unbroken line of decisions
stretching four decades. See *supra*, at 11; see also *Brnovich*,
594 U. S., at ___, n. 5 (slip op., at 7, n. 5) (collecting cases).

In doing so, we have unanimously held that §2 and *Gingles* "[c]ertainly . . . apply" to claims challenging single-member districts. *Growe*, 507 U. S., at 40. And we have even invalidated portions of a State's single-district map under §2. See *LULAC*, 548 U. S., at 427–429.[9] Alabama's approach would require "abandoning" this precedent, "overruling the interpretation of §2" as set out in nearly a dozen of our cases. *Holder*, 512 U. S., at 944 (opinion of THOMAS, J.).

We decline to take that step. Congress is undoubtedly aware of our construing §2 to apply to districting challenges. It can change that if it likes. But until and unless it does, statutory *stare decisis* counsels our staying the course. See, *e.g.*, *Kimble* v. *Marvel Entertainment, LLC*, 576 U. S. 446, 456 (2015).[10]

The statutory text in any event supports the conclusion that §2 applies to single-member districts. Alabama's own proffered definition of a "procedure is the manner or method

─────────

[9] The dissent suggests that *Growe* does not support the proposition that §2 applies to single-member redistricting. *Post*, at 4–5 (opinion of THOMAS, J.). The Court has understood *Growe* much differently. See, *e.g.*, *Abrams* v. *Johnson*, 521 U. S. 74, 90 (1997) ("Our decision in [*Gingles*] set out the basic framework for establishing a vote dilution claim against at-large, multimembers districts; we have since extended the framework to single-member districts." (citing *Growe*, 507 U. S., at 40–41)); *Johnson* v. *De Grandy*, 512 U. S. 997, 1006 (1994) ("In *Growe*, we held that a claim of vote dilution in a single-member district requires proof meeting *the same* three threshold conditions for a dilution challenge to a multimember district . . . ."); *Bartlett* v. *Strickland*, 556 U. S. 1, 12 (plurality opinion) ("The Court later held that the three *Gingles* requirements apply equally in §2 cases involving single-member districts . . . ." (citing *Growe*, 507 U. S., at 40–41)).

[10] JUSTICE ALITO argues that "[t]he *Gingles* framework should be [re]interpreted" in light of changing methods in statutory interpretation. *Post*, at 10 (dissenting opinion). But as we have explained, *Gingles* effectuates the delicate legislative bargain that §2 embodies. And statutory *stare decisis* counsels strongly in favor of not "undo[ing] . . . the compromise that was reached between the House and Senate when §2 was amended in 1982." *Brnovich*, 594 U. S., at ___ (slip op., at 22).

of proceeding in a process or course of action."  Brief for Alabama 51 (internal quotation marks omitted).  But the manner of proceeding in the act of voting entails determining in which districts voters will vote.  The fact that the term "procedure" is preceded by the phrase "qualification or prerequisite to voting," 52 U. S. C. §10301(a), does not change its meaning.  It is hard to imagine many more fundamental "prerequisites" to voting than determining where to cast your ballot or who you are eligible to vote for.  Perhaps for that reason, even Alabama does not bear the courage of its conviction on this point.  It refuses to argue that §2 is inapplicable to multimember districting, though its textual arguments apply with equal force in that context.

The dissent, by contrast, goes where even Alabama does not dare, arguing that §2 is wholly inapplicable to districting because it "focuses on ballot access and counting" only.  *Post*, at 2 (opinion of THOMAS, J.).  But the statutory text upon which the dissent relies supports the exact opposite conclusion.  The relevant section provides that "[t]he terms 'vote' or 'voting' shall include *all action necessary to make a vote effective.*"  *Ibid.* (quoting 52 U. S. C. §10310(c)(1); emphasis added).  Those actions "includ[e], but [are] not limited to, . . . action[s] required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast."  §10310(c)(1).  It would be anomalous to read the broad language of the statute—"all action necessary," "including but not limited to"—to have the crabbed reach that JUSTICE THOMAS posits.  And we have already discussed why determining where to cast a ballot constitutes a "prerequisite" to voting, as the statute requires.

The dissent also contends that "applying §2 to districting rests on systematic neglect of . . . the ballot-access focus of the 1960s' voting-rights struggles."  *Post*, at 3 (opinion of THOMAS, J.).  But history did not stop in 1960.  As we have explained, Congress adopted the amended §2 in response to

the 1980 decision *City of Mobile*, a case about *districting*. And—as the dissent itself acknowledges—"Congress drew §2(b)'s current operative language" from the 1973 decision *White* v. *Regester*, *post*, at 4, n. 3 (opinion of THOMAS, J.), a case that was also about districting (in fact, a case that invalidated two multimember districts in Texas and ordered them redrawn into single-member districts, 412 U. S., at 765). This was not lost on anyone when §2 was amended. Indeed, it was the precise reason that the contentious debates over proportionality raged—debates that would have made little sense if §2 covered only poll taxes and the like, as the dissent contends.

We also reject Alabama's argument that §2 as applied to redistricting is unconstitutional under the Fifteenth Amendment. According to Alabama, that Amendment permits Congress to legislate against only purposeful discrimination by States. See Brief for Alabama 73. But we held over 40 years ago "that, even if §1 of the [Fifteenth] Amendment prohibits only purposeful discrimination, the prior decisions of this Court foreclose any argument that Congress may not, pursuant to §2 [of the Fifteenth Amendment] outlaw voting practices that are discriminatory in effect." *City of Rome* v. *United States*, 446 U. S. 156, 173 (1980). The VRA's "ban on electoral changes that are discriminatory in effect," we emphasized, "is an appropriate method of promoting the purposes of the Fifteenth Amendment." *Id.*, at 177. As *City of Rome* recognized, we had reached the very same conclusion in *South Carolina* v. *Katzenbach*, a decision issued right after the VRA was first enacted. 383 U. S., at 308–309, 329–337; see also *Brnovich*, 594 U. S., at ___ (slip op., at 3).

Alabama further argues that, even if the Fifteenth Amendment authorizes the effects test of §2, that Amendment does not authorize race-based redistricting as a remedy for §2 violations. But for the last four decades, this Court and the lower federal courts have repeatedly applied

the effects test of §2 as interpreted in *Gingles* and, under certain circumstances, have authorized race-based redistricting as a remedy for state districting maps that violate §2.  See, *e.g.*, *supra,* at 11; cf. *Mississippi Republican Executive Committee* v. *Brooks*, 469 U. S. 1002 (1984).  In light of that precedent, including *City of Rome*, we are not persuaded by Alabama's arguments that §2 as interpreted in *Gingles* exceeds the remedial authority of Congress.

The concern that §2 may impermissibly elevate race in the allocation of political power within the States is, of course, not new.  See, *e.g.*, *Shaw*, 509 U. S., at 657 ("Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters.").  Our opinion today does not diminish or disregard these concerns.  It simply holds that a faithful application of our precedents and a fair reading of the record before us do not bear them out here.

\*     \*     \*

The judgments of the District Court for the Northern District of Alabama in the *Caster* case, and of the three-judge District Court in the *Milligan* case, are affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 21–1086 and 21–1087

_____

### WES ALLEN, ALABAMA SECRETARY OF STATE, ET AL., APPELLANTS

21–1086       *v.*

### EVAN MILLIGAN, ET AL.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ALABAMA

### WES ALLEN, ALABAMA SECRETARY OF STATE, ET AL., PETITIONERS

21–1087       *v.*

### MARCUS CASTER, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED
STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[June 8, 2023]

JUSTICE KAVANAUGH, concurring in all but Part III–B–1.

I agree with the Court that Alabama's redistricting plan violates §2 of the Voting Rights Act as interpreted in *Thornburg* v. *Gingles*, 478 U. S. 30 (1986). I write separately to emphasize four points.

*First*, the upshot of Alabama's argument is that the Court should overrule *Gingles*. But the *stare decisis* standard for this Court to overrule a statutory precedent, as distinct from a constitutional precedent, is comparatively strict. Unlike with constitutional precedents, Congress and the President may enact new legislation to alter statutory precedents such as *Gingles*. In the past 37 years, however, Congress and the President have not disturbed *Gingles*, even as they have made other changes to the Voting Rights Act. Although statutory *stare decisis* is not absolute, "the

Court has ordinarily left the updating or correction of erroneous statutory precedents to the legislative process." *Ramos* v. *Louisiana*, 590 U. S. ___, ___ (2020) (KAVANAUGH, J., concurring in part) (slip op., at 4); see also, *e.g.*, *Kimble* v. *Marvel Entertainment, LLC*, 576 U. S. 446, 456 (2015); *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 172–173 (1989); *Flood* v. *Kuhn*, 407 U. S. 258, 283–284 (1972); *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 406 (1932) (Brandeis, J., dissenting).[1]

*Second*, Alabama contends that *Gingles* inevitably requires a proportional number of majority-minority districts, which in turn contravenes the proportionality disclaimer in §2(b) of the Voting Rights Act. 52 U. S. C. §10301(b). But Alabama's premise is wrong. As the Court's precedents make clear, *Gingles* does not mandate a proportional number of majority-minority districts. *Gingles* requires the creation of a majority-minority district only when, among other things, (i) a State's redistricting map cracks or packs a large and "geographically compact" minority population and (ii) a plaintiff's proposed alternative map and proposed majority-minority district are "reasonably configured"—namely, by respecting compactness principles and other traditional districting criteria such as county, city, and town lines. See, *e.g.*, *Cooper* v. *Harris*, 581 U. S. 285, 301–302 (2017); *Voinovich* v. *Quilter*, 507 U. S. 146, 153–154 (1993); *ante*, at 10–12, 18–22.

_____

[1] Unlike ordinary statutory precedents, the "Court's precedents applying common-law statutes and pronouncing the Court's own interpretive methods and principles typically do not fall within that category of stringent statutory *stare decisis*." *Ramos*, 590 U. S., at ___, n. 2 (opinion of KAVANAUGH, J.) (slip op., at 5, n. 2); see also, *e.g.*, *Kisor* v. *Wilkie*, 588 U. S. ___, ___–___ (2019) (GORSUCH, J., concurring in judgment) (slip op., at 34–36); *id.*, at ___–___ (KAVANAUGH, J., concurring in judgment) (slip op., at 1–2); *Leegin Creative Leather Products, Inc.* v. *PSKS, Inc.*, 551 U. S. 877, 899–907 (2007); *Arbaugh* v. *Y & H Corp.*, 546 U. S. 500, 510–516 (2006).

If *Gingles* demanded a proportional number of majority-minority districts, States would be forced to group together geographically dispersed minority voters into unusually shaped districts, without concern for traditional districting criteria such as county, city, and town lines. But *Gingles* and this Court's later decisions have flatly rejected that approach. See, *e.g.*, *Abbott* v. *Perez*, 585 U. S. \_\_\_, \_\_\_–\_\_\_ (2018) (slip op., at 33–34); *Bush* v. *Vera*, 517 U. S. 952, 979 (1996) (plurality opinion); *Gingles*, 478 U. S., at 50; see also *Miller* v. *Johnson*, 515 U. S. 900, 917–920 (1995); *Shaw* v. *Reno*, 509 U. S. 630, 644–649 (1993); *ante*, at 18–22.[2]

*Third*, Alabama argues that courts should rely on race-blind computer simulations of redistricting maps to assess whether a State's plan abridges the right to vote on account of race. It is true that computer simulations might help detect the presence or absence of *intentional* discrimination. For example, if all of the computer simulations generated only one majority-minority district, it might be difficult to say that a State had intentionally discriminated on the basis of race by failing to draw a second majority-minority district.

But as this Court has long recognized—and as all Members of this Court today agree—the text of §2 establishes an effects test, not an intent test. See *ante*, at 17; *post*, at 7 (THOMAS, J., dissenting); *post*, at 16 (ALITO, J., dissenting). And the effects test, as applied by *Gingles* to redistricting, requires in certain circumstances that courts account for the race of voters so as to prevent the cracking or packing—whether intentional or not—of large

---

[2] To ensure that *Gingles* does not improperly morph into a proportionality mandate, courts must rigorously apply the "geographically compact" and "reasonably configured" requirements. See *ante*, at 22 (§2 requirements under *Gingles* are "exacting"). In this case, for example, it is important that at least some of the plaintiffs' proposed alternative maps respect county lines at least as well as Alabama's redistricting plan. See *ante*, at 12.

and geographically compact minority populations.   See
*Abbott*, 585 U. S., at ___ (slip op., at 4); *Johnson* v. *De
Grandy*, 512 U. S. 997, 1006–1007, 1020 (1994) *Voinovich*,
507 U. S., at 153–154; see generally *Brnovich* v. *Democratic
National Committee*, 594 U. S. ___, ___ (2021) (slip op., at
22) ("§2 does not demand proof of discriminatory purpose");
*Reno* v. *Bossier Parish School Bd.*, 520 U. S. 471, 482 (1997)
(Congress "clearly expressed its desire that §2 *not* have an
intent component"); *Holder* v. *Hall*, 512 U. S. 874, 923–924
(1994) (THOMAS, J., concurring in judgment) (§2 adopts a
"'results' test, rather than an 'intent' test"); *Chisom* v.
*Roemer*, 501 U. S. 380, 394, 404 (1991) ("proof of intent is
no longer required to prove a §2 violation" as "Congress
made clear that a violation of §2 could be established by
proof of discriminatory results alone"); *Gingles*, 478 U. S.,
at 71, n. 34 (plurality opinion) (§2 does not require
"'purpose of racial discrimination'").

*Fourth*, Alabama asserts that §2, as construed by *Gingles*
to require race-based redistricting in certain circumstances,
exceeds Congress's remedial or preventive authority under
the Fourteenth and Fifteenth Amendments.  As the Court
explains, the constitutional argument presented by
Alabama is not persuasive in light of the Court's
precedents.  See *ante*, at 33–34; see also *City of Rome* v.
*United States*, 446 U. S. 156, 177–178 (1980).  JUSTICE
THOMAS notes, however, that even if Congress in 1982 could
constitutionally authorize race-based redistricting under §2
for some period of time, the authority to conduct race-based
redistricting cannot extend indefinitely into the future.  See
*post*, at 44–45 (dissenting opinion).  But Alabama did not
raise that temporal argument in this Court, and I therefore
would not consider it at this time.

For those reasons, I vote to affirm, and I concur in all but
Part III–B–1 of the Court's opinion.

# SUPREME COURT OF THE UNITED STATES

————————

Nos. 21–1086 and 21–1087

————————

WES ALLEN, ALABAMA SECRETARY OF STATE,
ET AL., APPELLANTS
21–1086          *v.*
EVAN MILLIGAN, ET AL.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ALABAMA

WES ALLEN, ALABAMA SECRETARY OF STATE,
ET AL., PETITIONERS
21–1087          *v.*
MARCUS CASTER, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED
STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[June 8, 2023]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins, with whom JUSTICE BARRETT joins as to Parts II and III, and with whom JUSTICE ALITO joins as to Parts II–A and II–B, dissenting.

These cases "are yet another installment in the 'disastrous misadventure' of this Court's voting rights jurisprudence." *Alabama Legislative Black Caucus* v. *Alabama*, 575 U. S. 254, 294 (2015) (THOMAS, J., dissenting) (quoting *Holder* v. *Hall*, 512 U. S. 874, 893 (1994) (THOMAS, J., concurring in judgment)). What distinguishes them is the uncommon clarity with which they lay bare the gulf between our "color-blind" Constitution, *Plessy* v. *Ferguson*, 163 U. S. 537, 559 (1896) (Harlan, J., dissenting), and "the consciously segregated districting system currently being constructed in the name of the Voting Rights Act." *Holder*, 512

Appellate Case: 22-1395     Page: 49     Date Filed: 06/09/2023 Entry ID: 5285428

U. S., at 907 (opinion of THOMAS, J.).  The question presented is whether §2 of the Act, as amended, requires the State of Alabama to intentionally redraw its longstanding congressional districts so that black voters can control a number of seats roughly proportional to the black share of the State's population.  Section 2 demands no such thing, and, if it did, the Constitution would not permit it.

## I

At the outset, I would resolve these cases in a way that would not require the Federal Judiciary to decide the correct racial apportionment of Alabama's congressional seats. Under the statutory text, a §2 challenge must target a "voting qualification or prerequisite to voting or standard, practice, or procedure." 52 U. S. C. §10301(a).  I have long been convinced that those words reach only "enactments that regulate citizens' access to the ballot or the processes for counting a ballot"; they "do not include a State's . . . choice of one districting scheme over another." *Holder*, 512 U. S., at 945 (opinion of THOMAS, J.).  "Thus, §2 cannot provide a basis for invalidating any district." *Abbott* v. *Perez*, 585 U. S. ___, ___ (2018) (THOMAS, J., concurring) (slip op., at 1).

While I will not repeat all the arguments that led me to this conclusion nearly three decades ago, see *Holder*, 512 U. S., at 914–930 (opinion concurring in judgment), the Court's belated appeal to the statutory text is not persuasive.  See *ante*, at 31–32.  Whatever words like "practice" and "procedure" are capable of meaning in a vacuum, the prohibitions *of §2* apply to practices and procedures that affect "voting" and "the right . . . to vote." §10301(a).  "Vote" and "voting" are defined terms under the Act, and the Act's definition plainly focuses on ballot access and counting:

"The terms 'vote' or 'voting' shall include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to,

registration, listing pursuant to this chapter, or other
action required by law prerequisite to voting, casting a
ballot, and having such ballot counted properly and in-
cluded in the appropriate totals of votes cast with re-
spect to candidates for public or party office and propo-
sitions for which votes are received in an election."
§10310(c)(1).

In enacting the original Voting Rights Act in 1965, Con-
gress copied this definition almost verbatim from Title VI
of the Civil Rights Act of 1960—a law designed to protect
access to the ballot in jurisdictions with patterns or prac-
tices of denying such access based on race, and which can-
not be construed to authorize so-called vote-dilution
claims. See 74 Stat. 91–92 (codified in relevant part at 52 U. S. C.
§10101(e)). Title I of the Civil Rights Act of 1964, which
cross-referenced the 1960 Act's definition of "vote," likewise
protects ballot access alone and cannot be read to address
vote dilution. See 78 Stat. 241 (codified in relevant part at
52 U. S. C. §10101(a)). Tellingly, the 1964 Act also used the
words "standard, practice, or procedure" to refer specifically
to voting qualifications for individuals and the actions of
state and local officials in administering such require-
ments.[1] Our entire enterprise of applying §2 to districting
rests on systematic neglect of these statutory antecedents
and, more broadly, of the ballot-access focus of the 1960s'
voting-rights struggles. See, *e.g.*, *Brnovich* v. *Democratic
National Committee*, 594 U. S. ___, ___ (2021) (slip op., at
2) (describing the "notorious methods" by which, prior to the

_____

[1] "No person acting under color of law shall . . . in determining whether
any individual is qualified under State law or laws to vote in any election,
apply any standard, practice, or procedure different from the standards,
practices, or procedures applied under such law or laws to other individ-
uals within the same county, parish, or similar political subdivision who
have been found by State officials to be qualified to vote." 52 U. S. C.
§10101(a)(2)(A).

Voting Rights Act, States and localities deprived black Americans of the ballot: "poll taxes, literacy tests, property qualifications, white primaries, and grandfather clauses" (alterations and internal quotation marks omitted).[2]

Moreover, the majority drastically overstates the *stare decisis* support for applying §2 to single-member districting plans like the one at issue here.[3] As the majority implicitly acknowledges, this Court has only applied §2 to invalidate one single-member district in one case. See *League of United Latin American Citizens* v. *Perry*, 548 U. S. 399, 447 (2006) (*LULAC*) (opinion of Kennedy, J.). And no party in that case argued that the plaintiffs' vote-dilution claim was not cognizable. As for *Growe* v. *Emison*, 507 U. S. 25 (1993), it held only that the threshold preconditions for challenging

––––––––––

[2] The majority suggests that districting lines are a "'prerequisite to voting'" because they "determin[e] where" voters "cast [their] ballot[s]." *Ante*, at 32. But, of course, a voter's polling place is a separate matter from the district to which he is assigned, and communities are often moved between districts without changing where their residents go to vote. The majority's other example ("who [voters] are eligible to vote for," *ibid.*) is so far a stretch from the Act's focus on voting qualifications and voter action that it speaks for itself.

[3] The majority chides Alabama for declining to specifically argue that §2 is inapplicable to multimember and at-large districting plans. But these cases are about a single-member districting plan, and it is hardly uncommon for parties to limit their arguments to the question presented. Further, while I do not myself believe that the text of §2 applies to multimember or at-large plans, the idea that such plans might be especially problematic from a vote-dilution standpoint is hardly foreign to the Court's precedents, see *Johnson* v. *De Grandy*, 512 U. S. 997, 1012 (1994); *Growe* v. *Emison*, 507 U. S. 25, 40 (1993); cf. *Holder* v. *Hall*, 512 U. S. 874, 888 (1994) (O'Connor, J., concurring in part and concurring in judgment) (explaining that single-member districts may provide the benchmark when multimember or at-large systems are challenged, but suggesting no benchmark for challenges to single-member districts), or to the historical evolution of vote-dilution claims. Neither the case from which the 1982 Congress drew §2(b)'s current operative language, see *White* v. *Regester*, 412 U. S. 755, 766 (1973), nor the one it was responding to, *Mobile* v. *Bolden*, 446 U. S. 55 (1980), involved single-member districts.

multimember and at-large plans must limit challenges to
single-member districts with *at least* the same force, as "[i]t
would be peculiar [if] a vote-dilution challenge to the (more
dangerous) multimember district require[d] a higher
threshold showing than a vote-fragmentation challenge to
a single-member district." *Id.*, at 40. *Growe* did not con-
sider (or, thus, reject) an argument that §2 does not apply
to single-member districts.

In any event, *stare decisis* should be no barrier to recon-
sidering a line of cases that "was based on a flawed method
of statutory construction from its inception," has proved in-
capable of principled application after nearly four decades
of experience, and puts federal courts in the business of
"methodically carving the country into racially designated
electoral districts." *Holder*, 512 U. S., at 945 (opinion of
THOMAS, J.). This Court has "never applied *stare decisis*
mechanically to prohibit overruling our earlier decisions de-
termining the meaning of statutes," and it should not do so
here. *Monell* v. *New York City Dept. of Social Servs.*, 436
U. S. 658, 695 (1978). *Stare decisis* did not save "separate
but equal," despite its repeated reaffirmation in this Court
and the pervasive reliance States had placed upon it for dec-
ades. See, *e.g.*, Brief for Appellees in *Brown* v. *Board of Ed-
ucation*, O. T. 1953, No. 1, pp. 18–30. It should not rescue
modern-day forms of *de jure* racial balkanization—which,
as these cases show, is exactly where our §2 vote-dilution
jurisprudence has led.[4]

_____

[4]JUSTICE KAVANAUGH's partial concurrence emphasizes the supposedly
enhanced *stare decisis* force of statutory-interpretation precedents. See
*ante*, at 1–2. This emphasis is puzzling in several respects. As an initial
matter, I can perceive no conceptual "basis for applying a heightened
version of *stare decisis* to statutory-interpretation decisions"; rather, "our
judicial duty is to apply the law to the facts of the case, regardless of how
easy it is for the law to change." *Gamble* v. *United States*, 587 U. S. ___,
___ (2019) (THOMAS, J., concurring) (slip op., at 14). Nor does that ap-
proach appear to have any historical foundation in judicial practice at

## II

Even if §2 applies here, however, Alabama should prevail. The District Court found that Alabama's congressional districting map "dilutes" black residents' votes because, while it is *possible* to draw two majority-black districts, Alabama's map only has one.[5] But the critical question in all vote-dilution cases is: "Diluted relative to what benchmark?" *Gonzalez* v. *Aurora*, 535 F. 3d 594, 598 (CA7 2008) (Easterbrook, C. J.). Neither the District Court nor the majority has any defensible answer. The text of §2 and the logic of vote-dilution claims require a meaningfully race-neutral benchmark, and no race-neutral benchmark can justify the District Court's finding of vote dilution in these cases. The only benchmark that can justify it—and the one that the District Court demonstrably applied—is

——————

the founding or for more than a century thereafter. See T. Lee, Stare Decisis in Historical Perspective: From the Founding Era to the Rehnquist Court, 52 Vand. L. Rev. 647, 708–732 (1999). But, even putting those problems aside, any appeal to heightened statutory *stare decisis* is particularly misplaced in this context. As the remainder of this dissent explains in depth, the Court's §2 precedents differ from "ordinary statutory precedents" in two vital ways. *Ante*, at 2, n. 1 (opinion of KAVANAUGH, J.). The first is their profound tension with the Constitution's hostility to racial classifications, a tension that JUSTICE KAVANAUGH acknowledges and that makes every §2 question the reverse side of a corresponding constitutional question. See *ante*, at 4. The second is that, to whatever extent §2 applies to districting, it can only "be understood as a delegation of authority to the courts to develop a common law of racially fair elections." C. Elmendorf, Making Sense of Section 2: Of Biased Votes, Unconstitutional Elections, and Common Law Statutes, 160 U. Pa. L. Rev. 377, 383 (2012). It would be absurd to maintain that this Court's "notoriously unclear and confusing" §2 case law follows, in any straightforward way, from the statutory text's high-flown language about the equal openness of political processes. *Merrill* v. *Milligan*, 595 U. S. ___, ___ (2022) (KAVANAUGH, J., concurring in grant of applications for stays) (slip op., at 6).

[5] Like the majority, I refer to both courts below as "the District Court" without distinction.

the decidedly nonneutral benchmark of proportional alloca-
tion of political power based on race.

### A

As we have long recognized, "the very concept of vote di-
lution implies—and, indeed, necessitates—the existence of
an 'undiluted' practice against which the fact of dilution
may be measured." *Reno* v. *Bossier Parish School Bd.*, 520
U. S. 471, 480 (1997). In a challenge to a districting plan, a
court must be able to compare a State's enacted plan with
"a hypothetical, undiluted plan," *ibid.*, ascertained by an
"objective and workable standard." *Holder*, 512 U. S., at
881 (plurality opinion); see also *id.*, at 887 (opinion of
O'Connor, J.) (noting the "general agreement" on this
point).

To be sure, it is no easy task to identify an objective, "un-
diluted" benchmark against which to judge a districting
plan. As we recently held in the analogous context of par-
tisan gerrymandering, "federal courts are not equipped to
apportion political power as a matter of fairness." *Rucho* v.
*Common Cause*, 588 U. S. ___, ___ (2019) (slip op., at 17).
Yet §2 vote-dilution cases require nothing less. If §2 pro-
hibited only intentional racial discrimination, there would
be no difficulty in finding a clear and workable rule of deci-
sion. But the "results test" that Congress wrote into §2 to
supersede *Mobile* v. *Bolden*, 446 U. S. 55 (1980), eschews
intent as the criterion of liability. See *Bossier Parish School
Bd.*, 520 U. S., at 482. Accordingly, a §2 vote-dilution claim
does not simply "as[k] . . . for the elimination of a racial clas-
sification." *Rucho*, 588 U. S., at ___ (slip op., at 21). It asks,
instead, "for a fair share of political power and influence,
with all the justiciability conundrums that entails." *Ibid.*
Nevertheless, if §2 applies to single-member districts, we
must accept that some "objective and workable standard for
choosing a reasonable benchmark" exists; otherwise, single-
member districts "cannot be challenged as dilutive under

§2." *Holder*, 512 U. S., at 881 (plurality opinion).

Given the diverse circumstances of different jurisdictions, it would be fanciful to expect a one-size-fits-all definition of the appropriate benchmark. Cf. *Thornburg* v. *Gingles*, 478 U. S. 30, 79 (1986) (explaining that the vote-dilution inquiry "is peculiarly dependent upon the facts of each case and requires an intensely local appraisal" (citation and internal quotation marks omitted)). One overriding principle, however, should be obvious. A proper districting benchmark must be *race neutral*: It must not assume, *a priori*, that an acceptable plan should include any particular number or proportion of minority-controlled districts.

I begin with §2's text. As relevant here, §2(a) prohibits a State from "impos[ing] or appl[ying]" any electoral rule "in a manner which results in a denial or abridgement of the right . . . to vote on account of race or color." §10301(a). Section 2(b) then provides that §2(a) is violated

> "if, based on the totality of circumstances, . . . the political processes leading to nomination or election in the State . . . are not equally open to participation by members of [a protected class] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State . . . is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." §10301(b).

As we held two Terms ago in *Brnovich*, the "equal openness" requirement is "the core" and "touchstone" of §2(b),

with "equal opportunity" serving an ancillary function.[6] 594 U. S., at ___ (slip op., at 15). Relying significantly on §2(b)'s disclaimer of a right to proportional representation, we also held that §2 does not enact a "freewheeling disparate-impact regime." *Id.*, at ___, and n. 14 (slip op., at 22, and n. 14). *Brnovich* further stressed the value of "benchmarks with which . . . challenged [electoral] rule[s] can be compared," *id.*, at ___ (slip op., at 17), and that "a meaningful comparison is essential" in judging the significance of any challenged scheme's racially disparate impact. *Id.*, at ___ (slip op., at 18). To the extent §2 applies to districting plans, then, it requires that they be "equally open to participation" by voters of all races, but it is not a pure disparate-impact statute and does not guarantee proportional representation.

In its main argument here, Alabama simply carries these principles to their logical conclusion: Any vote-dilution benchmark must be race neutral. See Brief for Appellants 32–46. Whatever "equal openness" means in the context of single-member districting, no "meaningful comparison" is possible using a benchmark that builds in a presumption in favor of minority-controlled districts. Indeed, any benchmark other than a race-neutral one would render the vote-dilution inquiry fundamentally circular, allowing courts to conclude that a districting plan "dilutes" a minority's voting strength "on account of race" merely because it does not measure up to an ideal already defined in racial terms. Such a question-begging standard would not answer our precedents' demand for an "*objective*," "reasonable benchmark." *Holder*, 512 U. S., at 881 (plurality opinion) (emphasis added). Nor could any nonneutral benchmark be reconciled with *Brnovich*'s rejection of a disparate-impact

─────────

[6]While *Brnovich* involved a time-place-and-manner voting rule, not a vote-dilution challenge to a districting plan, its analysis logically must apply to vote-dilution cases if the text of §2 covers such claims at all.

regime or the text's disclaimer of a right to proportional representation. 594 U. S., at ___, and n. 14 (slip op., at 22, and n. 14).

There is yet another compelling reason to insist on a race-neutral benchmark. "The Constitution abhors classifications based on race." *Grutter* v. *Bollinger*, 539 U. S. 306, 353 (2003) (THOMAS, J., concurring in part and dissenting in part). Redistricting is no exception. "Just as the State may not, absent extraordinary justification, segregate citizens on the basis of race in its public parks, buses, golf courses, beaches, and schools," the State also "may not separate its citizens into different voting districts on the basis of race." *Miller* v. *Johnson*, 515 U. S. 900, 911 (1995) (citations omitted). "[D]istricting maps that sort voters on the basis of race '"are by their very nature odious."'" *Wisconsin Legislature* v. *Wisconsin Elections Comm'n*, 595 U. S. ___, ___ (2022) (*per curiam*) (slip op., at 2) (quoting *Shaw* v. *Reno*, 509 U. S. 630, 643 (1993) (*Shaw I*)). Accordingly, our precedents apply strict scrutiny whenever race was "the predominant factor motivating [the placement of] a significant number of voters within or without a particular district," *Miller*, 515 U. S., at 916, or, put another way, whenever "[r]ace was the criterion that . . . could not be compromised" in a district's formation. *Shaw* v. *Hunt*, 517 U. S. 899, 907 (1996) (*Shaw II*).

Because "[r]acial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions" and undermine "the goal of a political system in which race no longer matters," *Shaw I*, 509 U. S., at 657, our cases have long recognized the need to interpret §2 to avoid "unnecessarily infus[ing] race into virtually every redistricting" plan. *LULAC*, 548 U. S., at 446 (opinion of Kennedy, J.); accord, *Bartlett* v. *Strickland*, 556 U. S. 1, 21 (2009) (plurality opinion). Plainly, however, that "infusion" is the inevitable result of any race-based benchmark. Any interpretation of §2 that permits courts to condemn enacted

districting plans as dilutive relative to a nonneutral benchmark "would result in a substantial increase in the number of mandatory districts drawn with race as 'the predominant factor motivating the legislature's decision,'" thus "'raising serious constitutional questions.'"  *Id.*, at 21–22 (first quoting *Miller*, 515 U. S., at 916, then quoting *LULAC*, 548 U. S., at 446).  To avoid setting §2 on a collision course with the Constitution, courts must apply a race-neutral benchmark in assessing any claim that a districting plan unlawfully dilutes a racial minority's voting strength.

### B

The plaintiffs in these cases seek a "proportional allocation of political power according to race."  *Holder*, 512 U. S., at 936 (opinion of THOMAS, J.).  According to the 2020 census, black Alabamians account for 27.16% of the State's total population and 25.9% of its voting-age population, both figures slightly less than two-sevenths.  Of Alabama's seven existing congressional districts, one, District 7, is majority-black.[7]  These cases were brought to compel "the creation of

———————

[7]District 7 owes its majority-black status to a 1992 court order.  See *Wesch* v. *Hunt*, 785 F. Supp. 1491, 1493–1494, 1496–1497, 1501–1502 (SD Ala.), aff'd *sub nom. Camp* v. *Wesch*, 504 U. S. 902 (1992).  At the time, the Justice Department's approach to preclearance under §5 of the Act followed the "so-called 'max-black' policy," which "required States, including Alabama, to create supermajority-black voting districts or face denial of preclearance."  *Alabama Legislative Black Caucus* v. *Alabama*, 575 U. S. 254, 298 (2015) (THOMAS, J., dissenting).  Although *Wesch* was a §2 case and the court-imposed plan that resulted was not subject to preclearance, see 785 F. Supp., at 1499–1500, there can be little doubt that a similar ethos dominated that litigation, in which all parties stipulated to the desirability of a *65%-plus* majority-black district.  See *id.*, at 1498–1499.  To satisfy that dubious need, the *Wesch* court aggressively adjusted the northeast and southeast corners of the previous District 7.  In the northeast, where District 7 once encompassed all of Tuscaloosa County and the more or less rectangular portion of Jefferson County not included in District 6, the 1992 plan drew a long, thin "finger" that traversed the southeastern third of Tuscaloosa County to reach deep into the

*two* majority-minority congressional districts"—roughly proportional control. 1 App. 135 (emphasis added); see also *id.*, at 314 ("Plaintiffs seek an order . . . ordering a congressional redistricting plan that includes two majority-Black congressional districts").

Remarkably, the majority fails to acknowledge that two minority-controlled districts would mean proportionality, or even that black Alabamians are about two-sevenths of the State. Yet that context is critical to the issues before us, not least because it explains the extent of the racial sorting the plaintiffs' goal would require. "[A]s a matter of mathematics," single-member districting "tends to deal out representation far short of proportionality to virtually *all* minorities, from environmentalists in Alaska to Republicans in Massachusetts." M. Duchin & D. Spencer, Models, Race, and the Law, 130 Yale L. J. Forum 744, 752 (2021) (Duchin & Spencer). As such, creating two majority-black districts would require Alabama to aggressively "sort voters on the basis of race." *Wisconsin Legislature*, 595 U. S., at ___ (slip op., at 2).

The plaintiffs' 11 illustrative maps make that clear. All 11 maps refashion existing District 2 into a majority-black district while preserving the current black majority in District 7. They all follow the same approach: Starting with majority-black areas of populous Montgomery County, they

———————

heart of urban Birmingham. See Supp. App. 207–208. Of the Jefferson County residents captured by the "finger," 75.48% were black. *Wesch*, 785 F. Supp., at 1569. In the southeast, District 7 swallowed a jigsaw-shaped portion of Montgomery County, the residents of which were 80.18% black. *Id.*, at 1575. Three years later, in *Miller* v. *Johnson*, 515 U. S. 900, 923–927 (1995), we rejected the "max-black" policy as unwarranted by §5 and inconsistent with the Constitution. But "much damage to the States' congressional and legislative district maps had already been done," including in Alabama. *Alabama Legislative Black Caucus*, 575 U. S., at 299 (THOMAS, J., dissenting).

expand District 2 east and west to encompass predomi-
nantly majority-black areas throughout the rural "Black
Belt." In the process, the plans are careful to leave enough
of the Black Belt for District 7 to maintain its black major-
ity. Then—and critically—the plans have District 2 extend
a southwestern tendril into Mobile County to capture a
dense, high-population majority-black cluster in urban Mo-
bile.[8] See Supp. App. 184, 186, 188, 190, 193, 195, 197, 199,
201, 203; see also *id.*, at 149.

Those black Mobilians currently reside in the urban
heart of District 1. For 50 years, District 1 has occupied the
southwestern pocket of Alabama, consisting of the State's
two populous Gulf Coast counties (Mobile and Baldwin) as
well as some less populous areas to the immediate north
and east. See *id.*, at 205–211. It is indisputable that the
Gulf Coast region is the sort of community of interest that
the Alabama Legislature might reasonably think a congres-
sional district should be built around. It contains Ala-
bama's only coastline, its fourth largest city, and the Port
of Mobile. Its physical geography runs north along the
Alabama and Mobile Rivers, whose paths District 1 follows.
Its economy is tied to the Gulf—to shipping, shipbuilding,
tourism, and commercial fishing. See Brief for Coastal
Alabama Partnership as *Amicus Curiae* 13–15.

But, for the plaintiffs to secure their majority-black Dis-
trict 2, this longstanding, compact, and eminently sensible
district must be radically transformed. In the Gulf Coast
region, the newly drawn District 1 would retain only the
majority-white areas that District 2 did not absorb on its
path to Mobile's large majority-black population. To make

---

[8]I have included an Appendix, *infra*, illustrating the plaintiffs' 11 pro-
posed maps. The first 10 images display the "black-only" voting-age pop-
ulation of census-designated voting districts in relation to the maps' hy-
pothetical district lines. The record does not contain a similar
illustration for the 11th map, but a simple visual comparison with the
other maps suffices.

up the lost population, District 1 would have to extend east-
ward through largely majority-white rural counties along
the length of Alabama's border with the Florida panhandle.
The plaintiffs do not assert that white residents on the Gulf
Coast have anything special in common with white resi-
dents in those communities, and the District Court made no
such finding. The plaintiffs' maps would thus reduce Dis-
trict 1 to the leftover white communities of the southern
fringe of the State, its shape and constituents defined al-
most entirely by the need to make District 2 majority-black
while also retaining a majority-black District 7.

The plaintiffs' mapmaking experts left little doubt that
their plans prioritized race over neutral districting criteria.
Dr. Moon Duchin, who devised four of the plans, testified
that achieving "two majority-black districts" was a "nonne-
gotiable principl[e]" in her eyes, a status shared only by our
precedents' "population balance" requirement. 2 App. 634;
see also *id.*, at 665, 678. Only "after" those two "nonnego-
tiable[s]" were satisfied did Dr. Duchin then give lower pri-
ority to "contiguity" and "compactness." *Id.*, at 634. The
architect of the other seven maps, William Cooper, consid-
ered "minority voting strengt[h]" a "traditional redistricting
principl[e]" in its own right, *id.*, at 591, and treated "the mi-
nority population in and of itself" as the paramount com-
munity of interest in his plans, *id.*, at 601.

Statistical evidence also underscored the illustrative
maps' extreme racial sorting. Another of the plaintiffs' ex-
perts, Dr. Kosuke Imai, computer generated 10,000 district-
ing plans using a race-blind algorithm programmed to
observe several objective districting criteria. Supp. App.
58–59. None of those plans contained even one majority-
black district. *Id.*, at 61. Dr. Imai generated another 20,000
plans using the same algorithm, but with the additional con-
straint that they must contain at least one majority-
black district; none of those plans contained a second
majority-black district, or even a second district with a

black voting-age population above 40%. *Id.*, at 54, 67, 71–72. In a similar vein, Dr. Duchin testified about an academic study in which she had randomly "generated 2 million districting plans for Alabama" using a race-neutral algorithm that gave priority to compactness and contiguity. 2 App. 710; see Duchin & Spencer 765. She "found some [plans] with one majority-black district, but never found a second . . . majority-black district in 2 million attempts." 2 App. 710. "[T]hat it is hard to draw two majority-black districts by accident," Dr. Duchin explained, "show[ed] the importance of doing so on purpose." *Id.*, at 714.[9]

The plurality of Justices who join Part III–B–I of THE CHIEF JUSTICE's opinion appear to agree that the plaintiffs could not prove the first precondition of their statewide vote-dilution claim—that black Alabamians could constitute a majority in two "reasonably configured" districts, *Wisconsin Legislature*, 595 U. S., at ___ (slip op., at 3)—by drawing an illustrative map in which race was predominant. See *ante*, at 25. That should be the end of these cases, as the illustrative maps here are palpable racial gerrymanders. The plaintiffs' experts clearly applied "express racial target[s]" by setting out to create 50%-plus majority-black districts in both Districts 2 and 7. *Bethune-Hill* v. *Virginia State Bd. of Elections*, 580 U. S. 178, 192 (2017). And it is impossible to conceive of *the State* adopting the illustrative maps without pursuing the same racially motivated goals. Again, the maps' key design features are: (1) making District 2 majority-black by connecting black

———————

[9]The majority notes that this study used demographic data from the 2010 census, not the 2020 one. That is irrelevant, since the black population share in Alabama changed little (from 26.8% to 27.16%) between the two censuses. To think that this minor increase might have changed Dr. Duchin's results would be to entirely miss her point: that proportional representation for *any* minority, unless achieved "by design," is a statistical anomaly in almost all single-member-districting systems. Duchin & Spencer 764.

residents in one metropolitan area (Montgomery) with
parts of the rural Black Belt and black residents in another
metropolitan area (Mobile); (2) leaving enough of the Black
Belt's majority-black rural areas for District 7 to maintain
its majority-black status; and (3) reducing District 1 to the
white remainder of the southern third of the State.

If the State did this, we would call it a racial gerryman-
der, and rightly so. We would have no difficulty recognizing
race as "the predominant factor motivating [the placement
of] significant number[s] of voters within or without" Dis-
tricts 1, 2, and 7. *Miller*, 515 U. S., at 916. The "stark splits
in the racial composition of populations moved into and out
of" Districts 1 and 2 would make that obvious. *Bethune-
Hill*, 580 U. S., at 192. So would the manifest absence of
any nonracial justification for the new District 1. And so
would the State's clear intent to ensure that *both* Districts
2 and 7 hit their preordained racial targets. See *ibid.* (not-
ing that "pursu[it of] a common redistricting policy toward
multiple districts" may show predominance). That the plan
delivered proportional control for a particular minority—a
statistical anomaly that over 2 million race-blind simula-
tions did not yield and 20,000 *race-conscious* simulations
did not even approximate—would be still further confirma-
tion.

The State could not justify such a plan simply by arguing
that it was less bizarre to the naked eye than other, more
elaborate racial gerrymanders we have encountered. See
*ante*, at 19–20 (discussing cases). As we held in *Miller*, vis-
ual "bizarreness" is not "a necessary element of the consti-
tutional wrong," only "persuasive circumstantial evidence."
515 U. S., at 912–913.[10]

_____

[10] Of course, bizarreness is in the eye of the beholder, and, while labels
like "'tentacles'" or "'appendages'" have no ultimate legal significance,
it is far from clear that they do not apply here. See *ante*, at 12. The
tendrils with which the various versions of illustrative District 2 would

Nor could such a plan be explained by supposed respect for the Black Belt. For present purposes, I accept the District Court's finding that the Black Belt is a significant community of interest. But the entire black population of the Black Belt—some 300,000 black residents, see Supp. App. 33—is too small to provide a majority in a *single* congressional district, let alone two.[11] The black residents needed to populate majority-black versions of Districts 2 and 7 are overwhelmingly concentrated in the urban counties of Jefferson (*i.e.*, the Birmingham metropolitan area, with about 290,000 black residents), Mobile (about 152,000 black residents), and Montgomery (about 134,000 black residents). *Id.*, at 83. Of the three, only Montgomery County is in the

─────────

capture black Mobilians are visually striking and are easily recognized as a racial grab against the backdrop of the State's demography. The District 7 "finger," which encircles the black population of the Birmingham metropolitan area in order to separate them from their white neighbors and link them with black rural areas in the west of the State, also stands out to the naked eye. The District Court disregarded the "finger" because it has been present in every districting plan since 1992, including the State's latest enacted plan. *Singleton* v. *Merrill*, 582 F. Supp. 3d 924, 1011 (ND Ala. 2022) (*per curiam*). But that reasoning would allow plaintiffs to bootstrap one racial gerrymander as a reason for permitting a second. Because the question is not before us, I express no opinion on whether existing District 7 is constitutional as enacted by the State. It is indisputable, however, that race predominated in the original creation of the district, see n. 7, *supra*, and it is plain that the primary race-neutral justification for the district today must be the State's legitimate interest in "preserving the cores of prior districts" and the fact that the areas constituting District 7's core have been grouped together for decades. *Karcher* v. *Daggett*, 462 U. S. 725, 740 (1983); see also *id.*, at 758 (Stevens, J., concurring) (explaining that residents of a political unit "often develop a community of interest"). The plaintiffs' maps, however, necessarily would require the State to assign little weight to core retention with respect to other districts. There could then be no principled race-neutral justification for prioritizing core retention only when it preserved an existing majority-black district, while discarding it when it stood in the way of creating a new one.

[11] The equal-population baseline for Alabama's seven districts is 717,154 persons per district.

Black Belt. The plaintiffs' maps, therefore, cannot and do not achieve their goal of two majority-black districts by "join[ing] together" the Black Belt, as the majority seems wrongly to believe. *Ante*, at 13. Rather, their majority-black districts are anchored by three separate high-density clusters of black residents in three separate metropolitan areas, two of them outside the Black Belt. The Black Belt's largely rural remainder is then *divided* between the two districts to the extent needed to fill out their population numbers with black majorities in both. Respect for the Black Belt as a community of interest cannot explain this approach. The only explanation is the plaintiffs' express racial target: two majority-black districts and statewide proportionality.

The District Court nonetheless found that race did not predominate in the plaintiffs' illustrative maps because Dr. Duchin and Mr. Cooper "prioritized race only as necessary . . . to draw two reasonably compact majority-Black congressional districts," as opposed to "maximiz[ing] the number of majority-Black districts, or the BVAP [black voting-age population] in any particular majority-Black district." *Singleton* v. *Merrill*, 582 F. Supp. 3d 924, 1029–1030 (ND Ala. 2022) (*per curiam*). This reasoning shows a profound misunderstanding of our racial-gerrymandering precedents. As explained above, what triggers strict scrutiny is the intentional use of a racial classification in placing "a significant number of voters within or without a particular district." *Miller*, 515 U. S., at 916. Thus, *any* plan whose predominant purpose is to achieve a nonnegotiable, predetermined racial target in a nonnegotiable, predetermined number of districts is a racial gerrymander subject to strict scrutiny. The precise fraction used as the racial target, and the number of districts it is applied to, are irrelevant.

In affirming the District Court's nonpredominance finding, the plurality glosses over these plain legal errors,[12] and it entirely ignores Dr. Duchin's plans—presumably because her own explanation of her method sounds too much like textbook racial predominance. Compare 2 App. 634 ("[A]fter . . . what I took to be *nonnegotiable* principles of population balance *and seeking two majority-black districts*, *after that*, I took contiguity as a requirement and compactness as paramount" (emphasis added)) and *id.*, at 635 ("I took . . . county integrity to take precedence over the level of [black voting-age population] *once that level was past 50 percent*" (emphasis added)), with *Bethune-Hill*, 580 U. S., at 189 (explaining that race predominates when it "'was the criterion that . . . could not be compromised,' and race-neutral considerations 'came into play only after the race-based decision had been made'" (quoting *Shaw II*, 517 U. S., at 907)), and *Miller*, 515 U. S., at 916 (explaining that race predominates when "the [mapmaker] subordinated traditional race-neutral districting principles . . . to racial

───────────

[12]The plurality's somewhat elliptical discussion of "the line between racial predominance and racial consciousness," *ante*, at 23, suggests that it may have fallen into a similar error. To the extent the plurality supposes that, under our precedents, a State may purposefully sort voters based on race to some indefinite extent without crossing the line into predominance, it is wrong, and its predominance analysis would water down decades of racial-gerrymandering jurisprudence. Our constitutional precedents' line between racial awareness and racial predominance simply tracks the distinction between awareness of consequences, on the one hand, and discriminatory *purpose*, on the other. See *Miller*, 515 U. S., at 916 ("'Discriminatory purpose implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects'" (alterations and some internal quotation marks omitted)); accord, *Shaw I*, 509 U. S. 630, 646 (1993). And our statements that §2 "demands consideration of race," *Abbott* v. *Perez*, 585 U. S. ___, ___ (2018) (slip op., at 4), and uses a "race-conscious calculus," *De Grandy*, 512 U. S., at 1020, did not imply that a State can ever purposefully sort voters on a race-predominant basis without triggering strict scrutiny.

considerations"). The plurality thus affirms the District Court's finding only in part and with regard to Mr. Cooper's plans alone.

In doing so, the plurality acts as if the only relevant evidence were Mr. Cooper's testimony about his own mental state and the State's expert's analysis of Mr. Cooper's maps. See *ante*, at 23–24. Such a blinkered view of the issue is unjustifiable. All 11 illustrative maps follow the same approach to creating two majority-black districts. The essential design features of Mr. Cooper's maps are indistinguishable from Dr. Duchin's, and it is those very design features that would require race to predominate. None of the plaintiffs' maps could possibly be drawn by a mapmaker who was merely "aware of," rather than motivated by, "racial demographics." *Miller*, 515 U. S., at 916. They could only ever be drawn by a mapmaker whose predominant motive was hitting the "express racial target" of two majority-black districts. *Bethune-Hill*, 580 U. S., at 192.[13]

The plurality endeavors in vain to blunt the force of this obvious fact. See *ante*, at 24–25. Contrary to the plurality's apparent understanding, nothing in *Bethune-Hill* suggests

_____

[13]The plurality's reasoning does not withstand scrutiny even on its own terms. Like Dr. Duchin, Mr. Cooper found it "necessary to consider race" to construct two majority-black districts, 2 App. 591, and he frankly acknowledged "reconfigur[ing]" the southern part of the State "to create the second African-American majority district," *id.*, at 610. Further, his conclusory statement that race did not "predominate" in his plans, *id.*, at 595, must be interpreted in light of the rest of his testimony and the record as a whole. Mr. Cooper recognized communities of interest as a traditional districting principle, but he applied that principle in a nakedly race-focused manner, explaining that "the minority population in and of itself" was the community of interest that was "top of mind as [he] was drawing the plan[s]." *Id.*, at 601. As noted, he also testified that he considered "minority voting strengt[h]" to be a "traditional redistricting principl[e]" in its own right. *Id.*, at 591. His testimony therefore buttresses, rather than undermines, the conclusion already obvious from the maps themselves: Only a mapmaker pursuing a fixed racial target would produce them.

that "an express racial target" is not highly probative evidence of racial predominance.  580 U. S., at 192 (placing "express racial target[s]" alongside "stark splits in the racial composition of [redistricted] populations" as "relevant districtwide evidence").  That the *Bethune-Hill* majority "decline[d]" to act as a "'court of . . . first view,'" instead leaving the ultimate issue of predominance for remand, cannot be transmuted into such an implausible holding or, in truth, any holding at all.  *Id.*, at 193.

The plurality is also mistaken that my predominance analysis would doom every illustrative map a §2 plaintiff "ever adduced." *Ante*, at 25 (emphasis deleted).  Rather, it would mean only that—because §2 requires a race-neutral benchmark—plaintiffs cannot satisfy their threshold burden of showing a reasonably configured alternative plan with a proposal that could only be viewed as a racial gerrymander if enacted by the State.  This rule would not bar a showing, in an appropriate case, that a State could create an additional majority-minority district through a reasonable redistricting process in which race did not predominate.  It would, on the other hand, screen out efforts to use §2 to push racially proportional districting to the limits of what a State's geography and demography make possible—the approach taken by the illustrative maps here.

## C

The foregoing analysis should be enough to resolve these cases: If the plaintiffs have not shown that Alabama could create two majority-black districts without resorting to a racial gerrymander, they cannot have shown that Alabama's one-majority-black-district map "dilutes" black Alabamians' voting strength relative to any meaningfully race-neutral benchmark.  The inverse, however, is not true: Even if it were possible to regard the illustrative maps as not requiring racial predominance, it would not necessarily follow that a two-majority-black-district map was an appropriate

benchmark. All that might follow is that the illustrative maps were reasonably configured—in other words, that they were consistent with some reasonable application of traditional districting criteria in which race did not predominate. See *LULAC*, 548 U. S., at 433. But, in virtually all jurisdictions, there are countless possible districting schemes that could be considered reasonable in that sense. The mere fact that a plaintiff's illustrative map is *one* of them cannot justify making it the benchmark against which other plans should be judged. Cf. *Rucho*, 588 U. S., at \_\_\_–\_\_\_ (slip op., at 19–20) (explaining the lack of judicially manageable standards for evaluating the relative fairness of different applications of traditional districting criteria).

That conceptual gap—between "reasonable" and "benchmark"—is highly relevant here. Suppose, for argument's sake, that Alabama *reasonably* could decide to create two majority-black districts by (1) connecting Montgomery's black residents with Mobile's black residents, (2) dividing up the rural parts of the Black Belt between that district and another district with its population core in the majority-black parts of the Birmingham area, and (3) accepting the extreme disruption to District 1 and the Gulf Coast that this approach would require. The plaintiffs prefer that approach because it allows the creation of two majority-black districts, which they think Alabama should have. But even if that approach were reasonable, there is hardly any compelling race-neutral reason to elevate such a plan to a *benchmark* against which all other plans must be measured. Nothing in Alabama's geography or demography makes it clearly the best way, or even a particularly attractive way, to draw three of seven equally populous districts. The State has obvious legitimate, race-neutral reasons to prefer its own map—most notably, its interest in "preserving the cores of prior districts" and the Gulf Coast community of interest in District 1. *Karcher* v. *Daggett*, 462 U. S. 725, 740 (1983). And even *discounting* those interests

would not yield a race-neutral case for treating the plaintiffs' approach as a suitable benchmark: Absent core retention, there is no apparent race-neutral reason to insist that District 7 remain a majority-black district uniting Birmingham's majority-black neighborhoods with majority-black rural areas in the Black Belt.

Finally, it is surely probative that over 2 million race-neutral simulations did not yield a single plan with two majority-black districts, and even 20,000 simulations with a one-majority-black-district floor did not yield a second district with a black voting-age population over 40%. If any plan with two majority-black districts would be an "out-out-out-outlier" within the likely universe of race-neutral districting plans, *Rucho*, 588 U. S., at ___ (KAGAN, J., dissenting) (slip op., at 19), it is hard to see how the mere possibility of drawing two majority-black districts could show that a one-district map diluted black Alabamians' votes relative to any appropriate benchmark.[14]

––––––––––––

[14]The majority points to limitations of Dr. Duchin's and Dr. Imai's algorithms that do not undermine the strong inference from their results to the conclusion that no two-majority-black-district plan could be an appropriate proxy for the undiluted benchmark. *Ante*, at 26, 28–29. I have already explained why the fact that Dr. Duchin's study used 2010 census data is irrelevant. See n. 9, *supra*. As for the algorithms' inability to incorporate all possible districting considerations, the absence of additional *constraints* cannot explain their failure to produce any maps hitting the plaintiffs' preferred racial target. Next, while it is true that the number of possible districting plans is extremely large, that does not mean it is impossible to generate a statistically significant sample. Here, for instance, Dr. Imai explained that "10,000 simulated plans" was sufficient to "yield statistically precise conclusions" and that any higher number would "not materially affect" the results. Supp. App. 60. Finally, the majority notes Dr. Duchin's testimony that her "exploratory algorithms" found "thousands" of possible two-majority-black-district maps. 2 App. 622; see *ante*, at 27, n. 7. Setting aside that Dr. Duchin never provided the denominator of which those "thousands" were the numerator, it is no wonder that the algorithms in question generated such maps; as Dr.

### D

Given all this, by what benchmark did the District Court find that Alabama's enacted plan was dilutive? The answer is as simple as it is unlawful: The District Court applied a benchmark of proportional control based on race. To be sure, that benchmark was camouflaged by the elaborate vote-dilution framework we have inherited from *Gingles*. But nothing else in that framework or in the District Court's reasoning supplies an alternative benchmark capable of explaining the District Court's bottom line: that Alabama's one-majority-black-district map dilutes black voters' fair share of political power.

Under *Gingles*, the majority explains, there are three "preconditions" to a vote-dilution claim: (1) the relevant "minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district"; (2) the minority group must be "politically cohesive"; and (3) the majority group must "vot[e] sufficiently as a bloc to enable it to defeat the minority's preferred candidate[s]." *Ante*, at 10 (alterations and internal quotation marks omitted). If these preconditions are satisfied, *Gingles* instructs courts to "consider the totality of the circumstances and to determine, based upon a searching practical evaluation of the past and present reality, whether the political process is equally open to minority voters." 478 U. S., at 79 (citation and internal quotation marks omitted).

The majority gives the impression that, in applying this framework, the District Court merely followed a set of well-

––––––––
Duchin explained, she programmed them with "an algorithmic preference" for "plans in which there would be a second majority-minority district." 2 App. 709. Thus, all that those algorithmic results prove is that it is *possible* to draw two majority-black districts in Alabama if one sets out to do so, especially with the help of sophisticated mapmaking software. What is still lacking is any justification for treating a two-majority-black-district map as a proxy for the undiluted benchmark.

settled, determinate legal principles. But it is widely acknowledged that "*Gingles* and its progeny have engendered considerable disagreement and uncertainty regarding the nature and contours of a vote dilution claim," with commentators "noting the lack of any 'authoritative resolution of the basic questions one would need to answer to make sense of [§2's] results test.'" *Merrill* v. *Milligan*, 595 U. S. ___, ___–___ (2022) (Roberts, C. J., dissenting from grant of applications for stays) (slip op., at 1–2) (quoting C. Elmendorf, Making Sense of Section 2: Of Biased Votes, Unconstitutional Elections, and Common Law Statutes, 160 U. Pa. L. Rev. 377, 389 (2012)). If there is any "area of law notorious for its many unsolved puzzles," this is it. J. Chen & N. Stephanopoulos, The Race-Blind Future of Voting Rights, 130 Yale L. J. 862, 871 (2021); see also Duchin & Spencer 758 ("Vote dilution on the basis of group membership is a crucial instance of the lack of a prescribed ideal").

The source of this confusion is fundamental: Quite simply, we have never succeeded in translating the *Gingles* framework into an objective and workable method of identifying the undiluted benchmark. The second and third preconditions are all but irrelevant to the task. They essentially collapse into one question: Is voting racially polarized such that minority-preferred candidates consistently lose to majority-preferred ones? See *Gingles,* 478 U. S., at 51. Even if the answer is yes, that tells a court nothing about "how hard it 'should' be for minority voters to elect their preferred candidates under an acceptable system." *Id.*, at 88 (O'Connor, J., concurring in judgment). Perhaps an acceptable system is one in which the minority simply cannot elect its preferred candidates; it is, after all, a minority. Rejecting that outcome as "dilutive" requires a value judgment relative to a benchmark that polarization alone cannot provide.

The first *Gingles* precondition is only marginally more useful. True, the benchmark in a redistricting challenge

must be "a hypothetical, undiluted plan," *Bossier Parish School Bd.*, 520 U. S., at 480, and the first precondition at least requires plaintiffs to identify *some* hypothetical alternative plan. Yet that alternative plan need only be "reasonably configured," and—as explained above—to say that a plan is *reasonable* is a far cry from establishing an objective standard of fairness.

That leaves only the *Gingles* framework's final stage: the totality-of-circumstances determination whether a State's "political process is equally open to minority voters." 478 U. S., at 79. But this formulation is mere verbiage unless one knows what an "equally open" system should look like—in other words, what the benchmark is. And, our cases offer no substantive guidance on how to identify the undiluted benchmark at the totality stage. The best they have to offer is a grab bag of amorphous "factors"—widely known as the Senate factors, after the Senate Judiciary Committee Report accompanying the 1982 amendments to §2—that *Gingles* said "typically may be relevant to a §2 claim." See *id.*, at 44–45. Those factors, however, amount to no more than "a list of possible considerations that might be consulted by a court attempting to develop a *gestalt* view of the political and racial climate in a jurisdiction." *Holder*, 512 U. S., at 938 (opinion of THOMAS, J.). Such a *gestalt* view is far removed from the necessary benchmark of a hypothetical, undiluted districting plan.

To see this, one need only consider the District Court's use of the Senate factors here. See 582 F. Supp. 3d, at 1018–1024. The court began its totality-stage analysis by reiterating what nobody disputes: that voting in Alabama is racially polarized, with black voters overwhelmingly preferring Democrats and white voters largely preferring Republicans. To rebut the State's argument that this pattern is attributable to politics, not race *per se*, the court noted that Donald Trump (who is white) prevailed over Ben Car-

son (who is black) in the 2016 Republican Presidential primary. Next, the court observed that black candidates rarely win statewide elections in Alabama and that black state legislators overwhelmingly come from majority-minority districts. The court then reviewed Alabama's history of racial discrimination, noted other voting-rights cases in which the State was found liable, and cataloged socioeconomic disparities between black and white Alabamians in everything from car ownership to health insurance coverage. The court attributed these disparities "at least in part" to the State's history of discrimination and found that they hinder black residents from participating in politics today, notwithstanding the fact that black and white Alabamians register and turn out to vote at similar rates. *Id.*, at 1021–1022. Last, the court interpreted a handful of comments by three white politicians as "racial campaign appeals." *Id.*, at 1023–1024.

In reviewing this march through the Senate factors, it is impossible to discern any overarching standard or central question, only what might be called an impressionistic moral audit of Alabama's racial past and present. Nor is it possible to determine any logical nexus between this audit and the remedy ordered: a congressional districting plan in which black Alabamians can control more than one seat. Given the District Court's finding that two reasonably configured majority-black districts could be drawn, would Alabama's one-district map have been acceptable if Ben Carson had won the 2016 primary, or if a greater number of black Alabamians owned cars?

The idea that such factors could explain the District Court's judgment line is absurd. The plaintiffs' claims pose one simple question: What is the "right" number of Alabama's congressional seats that black voters who support Democrats "should" control? Neither the Senate factors nor the *Gingles* framework as a whole offers any principled answer.

In reality, the limits of the *Gingles* preconditions and the aimlessness of the totality-of-circumstances inquiry left the District Court only one obvious and readily administrable option: a benchmark of "allocation of seats in direct proportion to the minority group's percentage in the population." *Holder*, 512 U. S., at 937 (opinion of THOMAS, J.). True, as disussed above, that benchmark is impossible to square with what the majority calls §2(b)'s "robust disclaimer against proportionality," *ante*, at 5, and it runs headlong into grave constitutional problems. See *Parents Involved in Community Schools* v. *Seattle School Dist. No. 1*, 551 U. S. 701, 730 (2007) (plurality opinion). Nonetheless, the intuitive pull of proportionality is undeniable. "Once one accepts the proposition that the effectiveness of votes is measured in terms of the control of seats, the core of any vote dilution claim" "is inherently based on ratios between the numbers of the minority in the population and the numbers of seats controlled," and there is no more logical ratio than direct proportionality. *Holder*, 512 U. S., at 902 (opinion of THOMAS, J.). Combine that intuitive appeal with the "lack of any better alternative" identified in our case law to date, *id.*, at 937, and we should not be surprised to learn that proportionality generally explains the results of §2 cases after the *Gingles* preconditions are satisfied. See E. Katz, M. Aisenbrey, A. Baldwin, E. Cheuse, & A. Weisbrodt, Documenting Discrimination in Voting: Judicial Findings Under Section 2 of the Voting Rights Act Since 1982, 39 U. Mich. J. L. Reform 643, 730–732 (2006) (surveying lower court cases and finding a near-perfect correlation between proportionality findings and liability results).

Thus, in the absence of an alternative benchmark, the vote-dilution inquiry has a strong and demonstrated tendency to collapse into a rough two-part test: (1) Does the challenged districting plan give the relevant minority group control of a proportional share of seats? (2) If not, has the plaintiff shown that some reasonably configured districting

plan could better approximate proportional control? In this approach, proportionality is the ultimate benchmark, and the first *Gingles* precondition becomes a proxy for whether that benchmark is reasonably attainable in practice.

Beneath all the trappings of the *Gingles* framework, that two-part test describes how the District Court applied §2 here. The gravitational force of proportionality is obvious throughout its opinion. At the front end, the District Court even built proportionality into its understanding of *Gingles*' first precondition, finding the plaintiffs' illustrative maps to be reasonably configured in part *because* they "provide[d] a number of majority-Black districts . . . roughly proportional to the Black percentage of the population." 582 F. Supp. 3d, at 1016. At the back end, the District Court concluded its "totality" analysis by revisiting proportionality and finding that it "weigh[ed] decidedly in favor of the plaintiffs." *Id.*, at 1025. While the District Court disclaimed giving overriding significance to proportionality, the fact remains that nothing else in its reasoning provides a logical nexus to its finding of a districting wrong and a need for a districting remedy. Finally, as if to leave no doubt about its implicit benchmark, the court admonished the State that "any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close." *Id.*, at 1033. In sum, the District Court's thinly disguised benchmark was proportionality: Black Alabamians are about two-sevenths of the State's population, so they should control two of the State's seven congressional seats.

That was error—perhaps an understandable error given the limitations of the *Gingles* framework, but error nonetheless. As explained earlier, any principled application of §2 to cases such as these requires a meaningfully race-neutral benchmark. The benchmark cannot be an *a priori* thumb on the scale for racially proportional control.

## E

The majority opinion does not acknowledge the District Court's express proportionality-based reasoning. That omission is of a piece with its earlier noted failures to acknowledge the well-known indeterminacy of the *Gingles* framework, that black Alabamians are about two-sevenths of the State's population, and that the plaintiffs here are thus seeking statewide proportionality. Through this pattern of omissions, the majority obscures the burning question in these cases. The District Court's vote-dilution finding can be justified only by a racially loaded benchmark—specifically, a benchmark of proportional control based on race. Is that the benchmark the statute demands? The majority fails to confront this question head on, and it studiously avoids mentioning anything that would require it to do so.

The same nonresponsiveness infects the majority's analysis, which is largely devoted to rebutting an argument nobody makes. Contrary to the majority's telling, Alabama does not equate the "race-neutral benchmark" with "the median or average number of majority-minority districts" in a large computer-generated set of race-blind districting plans. *Ante,* at 15. The State's argument for a race-neutral benchmark is rooted in the text of §2, the logic of vote-dilution claims, and the constitutional problems with any nonneutral benchmark. See Brief for Appellants 32–46. It then relies on the computer evidence in these cases, among other facts, to argue that the plaintiffs have not shown dilution relative to any race-neutral benchmark. See *id.*, at 54–56. But the idea that "race-neutral benchmark" *means* the composite average of many computer-generated plans is the majority's alone.

After thus straw-manning Alabama's arguments at the outset, the majority muddles its own response. In a perfunctory footnote, it disclaims any holding that "algorithmic map making" evidence "is categorically irrelevant" in §2

cases. *Ante*, at 28, n. 8. That conclusion, however, is the obvious implication of the majority's reasoning and rhetoric. See *ante*, at 27 (decrying a "map-comparison test" as "flawed in its fundamentals" even if it involves concededly "adequate comparators"); see also *ante*, at 17–18 (stating that the "focu[s]" of §2 analysis is "on the specific illustrative maps that a plaintiff adduces," leaving unstated the implication that other algorithmically generated maps are irrelevant). The majority in effect, if not in word, thus forecloses any meaningful use of computer evidence to help locate the undiluted benchmark.

There are two critical problems with this fiat. The first, which the majority seems to recognize yet fails to resolve, is that excluding such computer evidence from view cannot be reconciled with §2's command to consider "the totality of circumstances."[15] Second—and more fundamentally—the reasons that the majority gives for downplaying the relevance of computer evidence would more logically support a holding that there is no judicially manageable way of applying §2's results test to single-member districts. The majority waxes about the "myriad considerations" that go into districting, the "difficult, contestable choices" those considerations require, and how "[n]othing in §2 provides an an-

_____

[15]The majority lodges a similar accusation against the State's arguments (or what it takes to be the State's arguments). See *ante*, at 18 ("Alabama suggests there is only one 'circumstance' that matters—how the State's map stacks up relative to the benchmark" (alteration omitted)). But its rebuke is misplaced. The "totality of circumstances" means that courts must consider all circumstances relevant to an issue. It does not mean that they are forbidden to attempt to define the substantive standard that governs that issue. In arguing that a vote-dilution claim requires judging a State's plan relative to an undiluted benchmark to be drawn from the totality of circumstances—including, where probative, the results of districting simulations—the State argues little more than what we have long acknowledged. See *Reno* v. *Bossier Parish School Bd.*, 520 U. S. 471, 480 (1997).

swer" to the question of how well any given algorithm approximates the correct benchmark. *Ante*, at 27–28 (internal quotation marks omitted). In the end, it concludes, "Section 2 cannot require courts to judge a contest of computers" in which "there is no reliable way to determine who wins, or even where the finish line is." *Ante*, at 29.

The majority fails to recognize that *whether* vote-dilution claims require an undiluted benchmark is not up for debate. If §2 applies to single-member districting plans, courts cannot dispense with an undiluted benchmark for comparison, ascertained by an objective and workable method. *Bossier Parish School Bd.*, 520 U. S., at 480; *Holder*, 512 U. S., at 881 (plurality opinion). Of course, I would be the last person to deny that defining the undiluted benchmark is difficult. See *id.*, at 892 (opinion of THOMAS, J.) (arguing that it "immerse[s] the federal courts in a hopeless project of weighing questions of political theory"). But the "myriad considerations" and "[a]nswerless questions" the majority frets about, *ante*, at 27, 29, are inherent in the very enterprise of applying §2 to single-member districts. Everything the majority says about the difficulty of defining the undiluted benchmark *with* computer evidence applies with equal or greater force to the task of defining it *without* such evidence. At their core, the majority's workability concerns are an isolated demand for rigor against the backdrop of a legal regime that has long been "'inherently standardless,'" and must remain so until the Court either discovers a principled and objective method of identifying the undiluted benchmark, *Holder*, 512 U. S., at 885 (plurality opinion), or abandons this enterprise altogether, see *id.*, at 945 (opinion of THOMAS, J.).

Ultimately, the majority has very little to say about the appropriate benchmark. What little it does say suggests that the majority sees no real alternative to the District Court's proportional-control benchmark, though it appears unwilling to say so outright. For example, in a nod to the

statutory text and its "equal openness" requirement, the majority asserts that "[a] district is not equally open . . . when minority voters face—unlike their majority peers— bloc voting along racial lines, arising against the backdrop of substantial racial discrimination within the State, that renders a minority vote unequal to a vote by a nonminority voter." *Ante*, at 17. But again, we have held that dilution cannot be shown without an objective, undiluted benchmark, and this verbiage offers no guidance for how to determine it.[16] Later, the majority asserts that "the *Gingles* framework itself imposes meaningful constraints on proportionality." *Ante*, at 18–19. But the only constraint on proportionality the majority articulates is that it is often *difficult to achieve*—which, quite obviously, is no principled limitation at all. *Ante*, at 20–22.

Thus, the end result of the majority's reasoning is no different from the District Court's: The ultimate benchmark is a racially proportional allocation of seats, and the main question on which liability turns is whether a closer approximation to proportionality is possible under any reasonable application of traditional districting criteria.[17] This ap-

---

[16] To the extent it is any sort of answer to the benchmark question, it tends inevitably toward proportionality. By equating a voting minority's inability to win elections with a vote that has been "render[ed] . . . unequal," *ante*, at 17, the majority assumes "that members of [a] minority are denied a fully effective use of the franchise unless they are able to control seats in an elected body." *Holder*, 512 U. S., at 899 (opinion of Thomas, J.). That is precisely the assumption that leads to the proportional-control benchmark. See *id.*, at 902, 937.

[17] Indeed, the majority's attempt to deflect this analysis only confirms its accuracy. The majority stresses that its understanding of *Gingles* permits the rejection of "plans that would bring States closer to proportionality *when those plans violate traditional districting criteria*." *Ante*, at 21, n. 4 (emphasis added). Justice Kavanaugh, similarly, defends *Gingles* against the charge of "mandat[ing] a proportional number of

proach, moreover, is consistent with how the majority describes the role of plaintiffs' illustrative maps, as well as an unjustified practical asymmetry to which its rejection of computer evidence gives rise.  Courts are to "focu[s] . . . on the specific illustrative maps that a plaintiff adduces," *ante*, at 17–18, by which the majority means that courts should *not* "focu[s]" on statistical evidence showing those maps to be outliers.  Thus, plaintiffs may use an algorithm to generate any number of maps that meet specified districting criteria and a preferred racial target; then, they need only produce one of those maps to "sho[w] it is *possible* that the State's map" is dilutive.  *Ante*, at 18 (emphasis in original).  But the State may not use algorithmic evidence to suggest that the plaintiffs' map is an unsuitable benchmark for comparison—not even, apparently, if it can prove that the illustrative map is an outlier among "billion[s]" or "trillion[s]" of concededly "adequate comparators."  *Ante*, at 27, 29; see also *ante*, at 29 (rejecting sampling algorithms).  This arbitrary restriction amounts to a thumb on the scale for §2 plaintiffs—an unearned presumption that any "reasonable" map they put forward constitutes a benchmark against which the State's map can be deemed dilutive.  And, once the comparison is framed in that way, the only workable rule of decision is proportionality.  See *Holder*, 512 U. S., at 941–943 (opinion of THOMAS, J.).

By affirming the District Court, the majority thus approves its benchmark of proportional control limited only by feasibility, and it entrenches the most perverse tendencies

——————

majority-minority districts" by emphasizing that it requires only the creation of majority-minority districts that are compact and reasonably configured.  *Ante*, at 2 (opinion concurring in part).  All of this precisely tracks my point: As construed by the District Court and the majority, §2 mandates an ever closer approach to proportional control that stops only when a court decides that a further step in that direction would no longer be consistent with any reasonable application of traditional districting criteria.

of our vote-dilution jurisprudence. It guarantees that courts will continue to approach vote-dilution claims just as the District Court here did: with no principled way of determining how many seats a minority "should" control and with a strong temptation to bless every incremental step toward a racially proportional allocation that plaintiffs can pass off as consistent with any reasonable map.

## III

As noted earlier, the Court has long recognized the need to avoid interpretations of §2 that "'would unnecessarily infuse race into virtually every redistricting, raising serious constitutional questions.'" *Bartlett*, 556 U. S., at 21 (plurality opinion) (quoting *LULAC*, 548 U. S., at 446 (opinion of Kennedy, J.)). Today, however, by approving the plaintiffs' racially gerrymandered maps as reasonably configured, refusing to ground §2 vote-dilution claims in a race-neutral benchmark, and affirming a vote-dilution finding that can only be justified by a benchmark of proportional control, the majority holds, in substance, that race belongs in virtually every redistricting. It thus drives headlong into the very constitutional problems that the Court has long sought to avoid. The result of this collision is unmistakable: If the District Court's application of §2 was correct as a statutory matter, §2 is unconstitutional as applied here.

Because the Constitution "restricts consideration of race and the [Voting Rights Act] demands consideration of race," *Abbott*, 585 U. S., at ___ (slip op., at 4), strict scrutiny is implicated wherever, as here, §2 is applied to require a State to adopt or reject any districting plan on the basis of race. See *Bartlett*, 556 U. S., at 21–22 (plurality opinion). At this point, it is necessary to confront directly one of the more confused notions inhabiting our redistricting jurisprudence. In several cases, we have "assumed" that compliance with §2 of the Voting Rights Act could be a compelling state interest, before proceeding to *reject* race-predominant

plans or districts as insufficiently tailored to that asserted interest. See, *e.g.*, *Wisconsin Legislature*, 595 U. S., at ___ (slip op., at 3); *Cooper* v. *Harris*, 581 U. S. 285, 292 (2017); *Shaw II*, 517 U. S., at 915; *Miller*, 515 U. S., at 921. But we have never applied this assumption to *uphold* a districting plan that would otherwise violate the Constitution, and the slightest reflection on first principles should make clear why it would be problematic to do so.[18] The Constitution is supreme over statutes, not vice versa. *Marbury* v. *Madison*, 1 Cranch 137, 178 (1803). Therefore, if complying with a federal statute would require a State to engage in unconstitutional racial discrimination, the proper conclusion is not that the statute excuses the State's discrimination, but that the statute is invalid.

If Congress has any power at all to require States to sort voters into congressional districts based on race, that power must flow from its authority to "enforce" the Fourteenth and Fifteenth Amendments "by appropriate legislation." Amdt. 14, §5; Amdt. 15, §2. Since Congress in 1982 replaced intent with effects as the criterion of liability, however, "a violation of §2 is no longer *a fortiori* a violation of" either Amendment. *Bossier Parish School Bd.*, 520 U. S., at 482. Thus, §2 can be justified only under Congress' power to "enact reasonably prophylactic legislation to deter constitutional harm." *Allen* v. *Cooper*, 589 U. S. ___, ___ (2020) (slip op., at 11) (alteration and internal quotation marks omitted); see *City of Boerne* v. *Flores*, 521 U. S. 507, 517–529 (1997). Because Congress' prophylactic-

───────────────

[18] In *Bethune-Hill* v. *Virginia State Bd. of Elections*, 580 U. S. 178 (2017), the Court upheld a race-predominant district based on the assumed compelling interest of complying with §5 of the Voting Rights Act. *Id.*, at 193–196. There, the Court was explicit that it was still merely "assum[ing], without deciding," that the asserted interest was compelling, as the plaintiffs "d[id] not dispute that compliance with §5 was a compelling interest at the relevant time." *Id.*, at 193.

enforcement authority is "remedial, rather than substantive," "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end."[19] *Id.*, at 520. Congress' chosen means, moreover, must "'consist with the letter and spirit of the constitution.'" *Shelby County* v. *Holder*, 570 U. S. 529, 555 (2013) (quoting *McCulloch* v. *Maryland*, 4 Wheat. 316, 421 (1819)); accord, *Miller*, 515 U. S., at 927.

Here, as with everything else in our vote-dilution jurisprudence, the task of sound analysis is encumbered by the lack of clear principles defining §2 liability in districting. It is awkward to examine the "congruence" and "proportionality" of a statutory rule whose very meaning exists in a perpetual state of uncertainty. The majority makes clear, however, that the primary factual predicate of a vote-dilution claim is "bloc voting along racial lines" that results in majority-preferred candidates defeating minority-preferred ones. *Ante*, at 17; accord, *Gingles*, 478 U. S., at 48 ("The theoretical basis for [vote-dilution claims] is that where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters"). And, as I have shown, the remedial logic with which the District Court's construction of §2 addresses that "wrong" rests on a proportional-control benchmark limited only by feasibility. Thus, the relevant statutory rule may be approximately stated as follows: If voting is racially polarized in a jurisdiction, and if there exists any more or less reasonably configured districting plan that would enable the minority group to constitute a majority in a number of districts roughly proportional to its share of the population, then the jurisdiction

_____

[19]While our congruence-and-proportionality cases have focused primarily on the Fourteenth Amendment, they make clear that the same principles govern "Congress' parallel power to enforce the provisions of the Fifteenth Amendment." *City of Boerne*, 521 U. S., at 518.

must ensure that its districting plan includes that number of majority-minority districts "or something quite close."[20] 582 F. Supp. 3d, at 1033. Thus construed and applied, §2 is not congruent and proportional to any provisions of the Reconstruction Amendments.

To determine the congruence and proportionality of a measure, we must begin by "identify[ing] with some precision the scope of the constitutional right at issue." *Board of Trustees of Univ. of Ala.* v. *Garrett*, 531 U. S. 356, 365 (2001). The Reconstruction Amendments "forbi[d], so far as civil and political rights are concerned, discrimination . . . against any citizen because of his race," ensuring that "[a]ll citizens are equal before the law." *Gibson* v. *Mississippi*, 162 U. S. 565, 591 (1896) (Harlan, J.). They dictate "that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Miller*, 515 U. S., at 911 (internal quotation marks omitted). These principles are why the Constitution presumptively forbids race-predominant districting, "even for remedial purposes." *Shaw I*, 509 U. S., at 657.

These same principles foreclose a construction of the Amendments that would entitle members of racial minorities, *qua* racial minorities, to have their preferred candidates win elections. Nor do the Amendments limit the rights of members of a racial majority to support *their* preferred candidates—regardless of whether minorities prefer different candidates and of whether "the majority, by virtue of its numerical superiority," regularly prevails. *Gingles*, 478 U. S., at 48. Nor, finally, do the Amendments establish a norm of proportional control of elected offices on the basis of race. See *Parents Involved*, 551 U. S., at 730–731 (plurality opinion); *Shaw I*, 509 U. S., at 657. And these notions

---

[20] This formulation does not specifically account for the District Court's findings under the Senate factors, which, as I have explained, lack any traceable logical connection to the finding of a districting wrong or the need for a districting remedy.

are not merely *foreign to* the Amendments. Rather, they are *radically inconsistent* with the Amendments' command that government treat citizens as individuals and their "goal of a political system in which race no longer matters." *Ibid.*

Those notions are, however, the values at the heart of §2 as construed by the District Court and the majority. As applied here, the statute effectively considers it a legal wrong by the State if white Alabamians vote for candidates from one political party at high enough rates, provided that black Alabamians vote for candidates from the other party at a still higher rate. And the statute remedies that wrong by requiring the State to engage in race-based redistricting in the direction of proportional control.

I am not certain that Congress' enforcement power could *ever* justify a statute so at odds "'with the letter and spirit of the constitution.'" *Shelby County*, 570 U. S., at 555. If it could, it must be because Congress "identified a history and pattern" of actual constitutional violations that, for some reason, required extraordinary prophylactic remedies. *Garrett*, 531 U. S., at 368. But the legislative record of the 1982 amendments is devoid of any showing that might justify §2's blunt approximation of a "racial register for allocating representation on the basis of race." *Holder*, 512 U. S., at 908 (opinion of THOMAS, J.). To be sure, the Senate Judiciary Committee Report that accompanied the 1982 amendment to the Voting Rights Act "listed many examples of what the Committee *took to be* unconstitutional vote dilution." *Brnovich*, 594 U. S., at ___ (slip op., at 6) (emphasis added). But the Report also showed the Committee's fundamental lack of "concern with whether" those examples reflected the "intentional" discrimination required "to raise a constitutional issue." *Allen*, 589 U. S., at ___ (slip op., at 15). The Committee's "principal reason" for rejecting discriminatory purpose was simply that it preferred an alternative legal standard; it thought *Mobile*'s intent test was

"the wrong question," and that courts should instead ask whether a State's election laws offered minorities "a fair opportunity to participate" in the political process. S. Rep. No. 97–417, p. 36.

As applied here, the amended §2 thus falls on the wrong side of "the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law." *City of Boerne*, 521 U. S., at 519. It replaces the constitutional right against intentionally discriminatory districting with an amorphous race-based right to a "fair" distribution of political power, a "right" that cannot be implemented without requiring the very evils the Constitution forbids.

If that alone were not fatal, §2's "reach and scope" further belie any congruence and proportionality between its districting-related commands, on the one hand, and actionable constitutional wrongs, on the other. *Id.*, at 532. Its "[s]weeping coverage ensures its intrusion at every level of government" and in every electoral system. *Ibid.* It "has no termination date or termination mechanism." *Ibid.* Thus, the amended §2 is not spatially or temporally "limited to those cases in which constitutional violations [are] most likely." *Id.*, at 533. Nor does the statute limit its reach to "attac[k] a particular type" of electoral mechanism "with a long history as a 'notorious means to deny and abridge voting rights on racial grounds.'" *Ibid.* (quoting *South Carolina* v. *Katzenbach*, 383 U. S. 301, 355 (1966) (Black, J., concurring and dissenting)). In view of this "indiscriminate scope," "it simply cannot be said that 'many of [the districting plans] affected by the congressional enactment have a significant likelihood of being unconstitutional.'" *Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank*, 527 U. S. 627, 647 (1999) (quoting *City of Boerne*, 521 U. S., at 532).

Of course, under the logically unbounded totality-of-

circumstances inquiry, a court applying §2 can always embroider its vote-dilution determination with findings about
past or present unconstitutional discrimination.  But this
possibility does nothing to heal either the fundamental contradictions between §2 and the Constitution or its extreme
overbreadth relative to actual constitutional wrongs.  "A
generalized assertion of past discrimination" cannot justify
race-based redistricting, "because it provides no guidance
for a legislative body to determine the precise scope of the
injury it seeks to remedy."  *Shaw II*, 517 U. S., at 909 (internal quotation marks omitted).  To justify a statute tending toward the proportional allocation of political power by
race throughout the Nation, it cannot be enough that a
court can recite some indefinite quantum of discrimination
in the relevant jurisdiction.  If it were, courts "could uphold
[race-based] remedies that are ageless in their reach into
the past, and timeless in their ability to affect the future."
*Wygant* v. *Jackson Bd. of Ed.*, 476 U. S. 267, 276 (1986)
(plurality opinion).  That logic "would effectively assure
that race will always be relevant in [redistricting], and that
the ultimate goal of eliminating entirely from governmental
decisionmaking such irrelevant factors as a human being's
race will never be achieved."  *Parents Involved*, 551 U. S.,
at 730 (plurality opinion) (alteration and internal quotation
marks omitted).

For an example of these baleful results, we need look no
further than the congressional districts at issue here.  In
1992, Alabama and a group of §2 plaintiffs, whom a federal
court chose to regard as the representatives "of all African-
American citizens of the State of Alabama," stipulated that
the State's black population was "'sufficiently compact and
contiguous to comprise a single member significant majority (65% or more) African American Congressional district,'" and that, "'[c]onsequently,'" such a "'district should
be created.'"  *Wesch* v. *Hunt*, 785 F. Supp. 1491, 1493, 1498
(SD Ala.).  Accepting that stipulation, the court reworked

District 7 into an irregularly shaped supermajority-black district—one that scooped up populous clusters of black voters in the disparate urban centers of Birmingham and Montgomery to connect them across a swath of largely majority-black rural areas—without even "decid[ing] whether the creation of a majority African-American district [was] mandated by either §2 or the Constitution." *Id.*, at 1499; see n. 7, *supra*. It did not occur to the court that the Constitution might *forbid* such an extreme racial gerrymander, as it quite obviously did. But, once District 7 had come into being as a racial gerrymander thought necessary to satisfy §2, it became an all-but-immovable fixture of Alabama's districting scheme.

Now, 30 years later, the plaintiffs here demand that Alabama carve up not two but three of its main urban centers on the basis of race, and that it configure those urban centers' black neighborhoods with the outlying majority-black rural areas so that black voters can control not one but two of the State's seven districts. The Federal Judiciary now upholds their demand—overriding the State's undoubted interest in preserving the core of its existing districts, its plainly reasonable desire to maintain the Gulf Coast region as a cohesive political unit, and its persuasive arguments that a race-neutral districting process would not produce anything like the districts the plaintiffs seek. Our reasons for doing so boil down to these: that the plaintiffs' proposed districts are more or less within the vast universe of reasonable districting outcomes; that Alabama's white voters do not support the black minority's preferred candidates; that Alabama's racial climate, taken as a rarefied whole, crosses some indefinable line justifying our interference; and, last but certainly not least, that black Alabamians are about two-sevenths of the State's overall population.

By applying §2 in this way to claims of this kind, we encourage a conception of politics as a struggle for power between "competing racial factions." *Shaw I,* 509 U. S., at

657. We indulge the pernicious tendency of assigning Americans to "creditor" and "debtor race[s]," even to the point of redistributing political power on that basis. *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 239 (1995) (Scalia, J., concurring in part and concurring in judgment). We ensure that the race-based redistricting we impose on Alabama now will bear divisive consequences long into the future, just as the initial creation of District 7 segregated Jefferson County for decades and minted the template for crafting black "political homelands" in Alabama. *Holder*, 512 U. S., at 905 (opinion of THOMAS, J.). We place States in the impossible position of having to weigh just how much racial sorting is necessary to avoid the "competing hazards" of violating §2 and violating the Constitution. *Abbott*, 585 U. S., at ___ (slip op., at 4) (internal quotation marks omitted). We have even put ourselves in the ridiculous position of "assuming" that compliance with a statute can excuse disobedience to the Constitution. Worst of all, by making it clear that there are political dividends to be gained in the discovery of new ways to sort voters along racial lines, we prolong immeasurably the day when the "sordid business" of "divvying us up by race" is no more. *LULAC*, 548 U. S., at 511 (ROBERTS, C. J., concurring in part, concurring in judgment in part, and dissenting in part). To the extent §2 requires any of this, it is unconstitutional.

The majority deflects this conclusion by appealing to two of our older Voting Rights Act cases, *City of Rome* v. *United States*, 446 U. S. 156 (1980), and *South Carolina* v. *Katzenbach*, 383 U. S. 301, that did not address §2 at all and, indeed, predate Congress' adoption of the results test. *Ante*, at 33–34. That maneuver is untenable. *Katzenbach* upheld §5's preclearance requirements, §4(b)'s original coverage formula, and other related provisions aimed at "a small number of States and political subdivisions" where "systematic resistance to the Fifteenth Amendment" had long been

flagrant. 383 U. S., at 328; see also *id.*, at 315–317 (describing the limited issues presented). Fourteen years later, *City of Rome* upheld the 1975 Act extending §5's preclearance provisions for another seven years. See 446 U. S., at 172–173. The majority's reliance on these cases to validate a statutory rule not there at issue could make sense only if we assessed the congruence and proportionality of the Voting Rights Act's rules wholesale, without considering their individual features, or if *Katzenbach* and *City of Rome* meant that Congress has plenary power to enact whatever rules it chooses to characterize as combating "discriminatory . . . effect[s]." *Ante*, at 33 (internal quotation marks omitted). Neither proposition makes any conceptual sense or is consistent with our cases. See, *e.g.*, *Shelby County*, 570 U. S., at 550–557 (holding the 2006 preclearance coverage formula unconstitutional); *Northwest Austin Municipal Util. Dist. No. One* v. *Holder*, 557 U. S. 193, 203 (2009) (emphasizing the distinctness of §§2 and 5); *City of Boerne*, 521 U. S., at 533 (discussing *City of Rome* as a paradigm case of congruence-and-proportionality review of remedial legislation); *Miller*, 515 U. S., at 927 (stressing that construing §5 to require "that States engage in presumptively unconstitutional race-based districting" would raise "troubling and difficult constitutional questions," notwithstanding *City of Rome*).

In fact, the majority's cases confirm the very limits on Congress' enforcement powers that are fatal to the District Court's construction of §2. *City of Rome*, for example, immediately after one of the sentences quoted by the majority, explained the remedial rationale for its approval of the 1975 preclearance extension: "Congress could rationally have concluded that, because electoral changes *by jurisdictions with a demonstrable history of intentional racial discrimination in voting create the risk of purposeful discrimination*, it was proper to prohibit changes that have a discriminatory impact." 446 U. S., at 177 (emphasis added; footnote

omitted). The next section of *City of Rome* then separately examined and upheld the reasonableness of the extension's 7-year time period. See *id.*, at 181–182. *City of Rome* thus stands for precisely the propositions for which *City of Boerne* cited it: Congress may adopt "[p]reventive measures . . . when there is reason to believe that many of the laws affected by the congressional enactment have a significant likelihood of being unconstitutional," 521 U. S., at 532, particularly when it employs "termination dates, geographic restrictions, or egregious predicates" that "tend to ensure Congress' means are proportionate to ends legitimate," *id.*, at 533; see also *id.*, at 532–533 (analyzing *Katzenbach* in similar terms); *Shelby County*, 570 U. S., at 535, 545–546 (same). Again, however, the amended §2 lacks any such salutary limiting principles; it is unbounded in time, place, and subject matter, and its districting-related commands have no nexus to any likely constitutional wrongs.

In short, as construed by the District Court, §2 does not remedy or deter unconstitutional discrimination in districting in any way, shape, or form. On the contrary, it *requires* it, hijacking the districting process to pursue a goal that has no legitimate claim under our constitutional system: the proportional allocation of political power on the basis of race. Such a statute "cannot be considered remedial, preventive legislation," and the race-based redistricting it would command cannot be upheld under the Constitution. *City of Boerne*, 521 U. S., at 532.[21]

----

[21] Justice Kavanaugh, at least, recognizes that §2's constitutional footing is problematic, for he agrees that "race-based redistricting cannot extend indefinitely into the future." *Ante*, at 4 (opinion concurring in part). Nonetheless, Justice Kavanaugh votes to sustain a system of institutionalized racial discrimination in districting—under the aegis of a statute that applies nationwide and has no expiration date—and thus to prolong the "lasting harm to our society" caused by the use of racial classifications in the allocation of political power. *Shaw I*, 509 U. S., at 657. I cannot agree with that approach. The Constitution no more tolerates this discrimination today than it will tolerate it tomorrow.

## IV

These cases are not close.  The plaintiffs did not prove
that Alabama's districting plan "impose[s] or applie[s]" any
"voting qualification or prerequisite to voting or standard,
practice, or procedure" that effects "a denial or abridgment
of the[ir] right . . . to vote on account of race or color."
§10301(a).  Nor did they prove that Alabama's congres-
sional districts "are not equally open to participation" by
black Alabamians.  §10301(b).  The plaintiffs did not
even prove that it is possible to achieve two majority-black dis-
tricts without resorting to a racial gerrymander.  The most
that they can be said to have shown is that sophisticated
mapmakers can proportionally allocate Alabama's congres-
sional districts based on race in a way that exceeds the Fed-
eral Judiciary's ability to recognize as a racial gerrymander
with the naked eye.  The District Court held that this show-
ing, plus racially polarized voting and its *gestalt* view of Al-
abama's racial climate, was enough to require the State to
redraw its districting plan on the basis of race.  If that is
the benchmark for vote dilution under §2, then §2 is noth-
ing more than a racial entitlement to roughly proportional
control of elective offices—limited only by feasibility—
wherever different racial groups consistently prefer differ-
ent candidates.

If that is what §2 means, the Court should hold that it is
unconstitutional.  If that is not what it means, but §2 ap-
plies to districting, then the Court should hold that vote-
dilution challenges require a race-neutral benchmark that
bears no resemblance to unconstitutional racial registers.
On the other hand, if the Court believes that finding a race-
neutral benchmark is as impossible as much of its rhetoric
suggests, it should hold that §2 cannot be applied to single-
member districting plans for want of an "objective and
workable standard for choosing a reasonable benchmark."
*Holder*, 512 U. S., at 881 (plurality opinion).  Better yet, it
could adopt the correct interpretation of §2 and hold that a

single-member districting plan is not a "voting qualification," a "prerequisite to voting," or a "standard, practice, or procedure," as the Act uses those terms. One way or another, the District Court should be reversed.

The majority goes to great lengths to decline all of these options and, in doing so, to fossilize all of the worst aspects of our long-deplorable vote-dilution jurisprudence. The majority recites *Gingles*' shopworn phrases as if their meaning were self-evident, and as if it were not common knowledge that they have spawned intractable difficulties of definition and application. It goes out of its way to reaffirm §2's applicability to single-member districting plans both as a purported original matter and on highly exaggerated *stare decisis* grounds. It virtually ignores Alabama's primary argument—that, whatever the benchmark is, it must be race neutral—choosing, instead, to quixotically joust with an imaginary adversary. In the process, it uses special pleading to close the door on the hope cherished by some thoughtful observers, see *Gonzalez*, 535 F. 3d, at 599–600, that computational redistricting methods might offer a principled, race-neutral way out of the thicket *Gingles* carried us into. Finally, it dismisses grave constitutional questions with an insupportably broad holding based on demonstrably inapposite cases.[22]

I find it difficult to understand these maneuvers except as proceeding from a perception that what the District Court did here is essentially no different from what many courts have done for decades under this Court's superintendence, joined with a sentiment that it would be unthinkable to disturb that approach to the Voting Rights Act in any way. I share the perception, but I cannot understand the sentiment. It is true that, "under our direction, federal

———————
[22] The Court does not address whether §2 contains a private right of action, an issue that was argued below but was not raised in this Court. See *Brnovich* v. *Democratic National Committee*, 594 U. S. ___, ___ (2021) (GORSUCH, J., concurring) (slip op., at 1).

courts [have been] engaged in methodically carving the country into racially designated electoral districts" for decades now. *Holder*, 512 U. S., at 945 (opinion of THOMAS, J.). But that fact should inspire us to repentance, not resignation. I am even more convinced of the opinion that I formed 29 years ago:

> "In my view, our current practice should not continue. Not for another Term, not until the next case, not for another day. The disastrous implications of the policies we have adopted under the Act are too grave; the dissembling in our approach to the Act too damaging to the credibility of the Federal Judiciary. The 'inherent tension'—indeed, I would call it an irreconcilable conflict—between the standards we have adopted for evaluating vote dilution claims and the text of the Voting Rights Act would itself be sufficient in my view to warrant overruling the interpretation of §2 set out in *Gingles*. When that obvious conflict is combined with the destructive effects our expansive reading of the Act has had in involving the Federal Judiciary in the project of dividing the Nation into racially segregated electoral districts, I can see no reasonable alternative to abandoning our current unfortunate understanding of the Act." *Id.*, at 944.

I respectfully dissent.

# APPENDIX





Appendix to opinion of THOMAS, J.





# SUPREME COURT OF THE UNITED STATES

———————

Nos. 21–1086 and 21–1087

———————

WES ALLEN, ALABAMA SECRETARY OF STATE,
ET AL., APPELLANTS
21–1086          *v.*
EVAN MILLIGAN, ET AL.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ALABAMA

WES ALLEN, ALABAMA SECRETARY OF STATE,
ET AL., PETITIONERS
21–1087          *v.*
MARCUS CASTER, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED
STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[June 8, 2023]

JUSTICE ALITO, with whom JUSTICE GORSUCH joins, dissenting.

Based on a flawed understanding of the framework adopted in *Thornburg* v. *Gingles*, 478 U. S. 30 (1986), the Court now holds that the congressional districting map adopted by the Alabama Legislature violates §2 of the Voting Rights Act. Like the Court, I am happy to apply *Gingles* in these cases. But I would interpret that precedent in a way that heeds what §2 actually says, and I would take constitutional requirements into account. When the *Gingles* framework is viewed in this way, it is apparent that the decisions below must be vacated.

Appellate Case: 22-1395     Page: 100     Date Filed: 06/09/2023 Entry ID: 5285428

I

A

*Gingles* marked the Court's first encounter with the amended version of §2 that Congress enacted in 1982, and the Court's opinion set out an elaborate framework that has since been used to analyze a variety of §2 claims. Under that framework, a plaintiff must satisfy three "preconditions." *Id.*, at 50. As summarized in more recent opinions, they are as follows:

> "First, [the] 'minority group' [whose interest the plaintiff represents] must be 'sufficiently large and geographically compact to constitute a majority' in some reasonably configured legislative district. Second, the minority group must be 'politically cohesive.' And third, a district's white majority must 'vote[ ] sufficiently as a bloc' to usually 'defeat the minority's preferred candidate.'" *Cooper* v. *Harris*, 581 U. S. 285, 301–302 (2017) (citations omitted).

See also *Wisconsin Legislature* v. *Wisconsin Elections Comm'n*, 595 U. S. ___, ___ (2022) (*per curiam*) (slip op., at 3); *Merrill* v. *Milligan*, 595 U. S. ___, ___ (2022) (KAGAN, J., dissenting from grant of applications for stays) (slip op., at 3–4).

If a §2 plaintiff can satisfy all these preconditions, the court must then decide whether, based on the totality of the circumstances, the plaintiff's right to vote was diluted. See *Gingles*, 478 U. S., at 46–48, 79. And to aid in that inquiry, *Gingles* approved consideration of a long list of factors set out in the Senate Judiciary Committee's Majority Report on the 1982 VRA amendments. *Id.*, at 44–45 (citing S. Rep. No. 97–417, pp. 28–30 (1982)).

B

My fundamental disagreement with the Court concerns the first *Gingles* precondition. In cases like these, where

the claim is that §2 requires the creation of an additional majority-minority district, the first precondition means that the plaintiff must produce an additional illustrative majority-minority district that is "reasonably configured." *Cooper*, 581 U. S., at 301; *Wisconsin Legislature*, 595 U. S., at ___ (slip op., at 3); see also *Gingles*, 478 U. S., at 50.

The Court's basic error is that it misunderstands what it means for a district to be "reasonably configured." Our cases make it clear that "reasonably configured" is not a synonym for "compact." We have explained that the first precondition also takes into account other traditional districting criteria like attempting to avoid the splitting of political subdivisions and "communities of interest." *League of United Latin American Citizens* v. *Perry*, 548 U. S. 399, 433–434 (2006) (*LULAC*).

To its credit, the Court recognizes that compactness is not enough and that a district is not reasonably configured if it flouts other "traditional districting criteria." *Ante*, at 10. At various points in its opinion it names quite a few: minimizing the splitting of counties and other political subdivisions, keeping "communities of interest" together where possible, and avoiding the creation of new districts that require two incumbents to run against each other. *Ante*, at 12, 26–27. In addition, the Court acknowledges that a district is not "reasonably configured" if it does not comport with the Equal Protection Clause's one-person, one-vote requirement. *Ante*, at 27. But the Court fails to explain why compliance with "traditional districting criteria" matters under §2 or why the only relevant equal protection principle is the one-person, one-vote requirement. If the Court had attempted to answer these questions, the defect in its understanding of the first *Gingles* precondition would be unmistakable.

To explain this, I begin with what is probably the most frequently mentioned traditional districting criterion and ask why it should matter under §2 whether a proposed

majority-minority district is "compact." Neither the Voting
Rights Act (VRA) nor the Constitution imposes a compact-
ness requirement. The Court notes that we have struck
down bizarrely shaped districts, *ante,* at 19–20, but we did
not do that for esthetic reasons. Compactness in and of it-
self is not a legal requirement—or even necessarily an es-
thetic one. (Some may find fancifully shaped districts more
pleasing to the eye than boring squares.)

The same is true of departures from other traditional dis-
tricting criteria. Again, nothing in the Constitution or the
VRA demands compliance with these criteria. If a whimsi-
cal state legislature cavalierly disregards county and mu-
nicipal lines and communities of interest, draws weirdly
shaped districts, departs radically from a prior map solely
for the purpose of change, and forces many incumbents to
run against each other, neither the Constitution nor the
VRA would make any of that illegal *per se.* Bizarrely
shaped districts and other marked departures from tradi-
tional districting criteria matter because mapmakers usu-
ally heed these criteria, and when it is evident that they
have not done so, there is reason to suspect that something
untoward—specifically, unconstitutional racial gerryman-
dering—is afoot. See, *e.g., Shaw* v. *Reno,* 509 U. S. 630,
643–644 (1993); *Bush* v. *Vera,* 517 U. S. 952, 979 (1996)
(plurality opinion); cf. *LULAC,* 548 U. S., at 433–435.

Conspicuous violations of traditional districting criteria
constitute strong *circumstantial evidence* of unconstitution-
ality. And when it is shown that the configuration of a dis-
trict is attributable predominantly to race, that is more
than circumstantial evidence that the district is unlawful.
That is *direct evidence* of illegality because, as we have of-
ten held, race may not "predominate" in the drawing of dis-
trict lines. See, *e.g., Cooper,* 581 U. S., at 292; *Bethune-Hill*
v. *Virginia State Bd. of Elections,* 580 U. S. 178, 191–192
(2017); *Shaw* v. *Hunt,* 517 U. S. 899, 906–907 (1996)

(*Shaw II*); *Miller* v. *Johnson*, 515 U. S. 900, 920 (1995).[1]

Because non-predominance is a longstanding and vital feature of districting law, it must be honored in a *Gingles* plaintiff's illustrative district.  If race predominated in the creation of such a district, the plaintiff has failed to satisfy both our precedent, which requires "reasonably configured" districts, and the terms of §2, which demand equal openness.  Two Terms ago, we engaged in a close analysis of the text of §2 and explained that its "key requirement" is that the political processes leading to nomination or election must be "'equally open to participation' by members of a protected class."  *Brnovich* v. *Democratic National Committee*, 594 U. S. ___, ___ (2021) (slip op., at 6, 15) (quoting 52 U. S. C. §10301(b); emphasis deleted).  "[E]qual openness," we stressed, must be our "touchstone" in interpreting and applying that provision.  594 U. S., at ___ (slip op., at 15).

When the race of one group is the predominant factor in the creation of a district, that district goes beyond making the electoral process equally open to the members of the group in question.  It gives the members of that group an advantage that §2 does not require and that the Constitution may forbid.  And because the creation of majority-minority districts is something of a zero-sum endeavor, giving an advantage to one minority group may disadvantage others.

## C

What all this means is that a §2 plaintiff who claims that a districting map violates §2 because it fails to include an additional majority-minority district must show at the outset that such a district can be created without making race the predominant factor in its creation.  The plaintiff bears both the burden of production and the burden of persuasion

---

[1] Alabama's districting guidelines explicitly incorporate this non-predominance requirement.  See *Singleton* v. *Merrill*, 582 F. Supp. 3d 924, 1036 (ND Ala. 2022*)*.

on this issue, see *Voinovich* v. *Quilter*, 507 U. S. 146, 155–156 (1993); *White* v. *Regester*, 412 U. S. 755, 766 (1973), but a plaintiff can satisfy the former burden simply by adducing evidence—in any acceptable form—that race did not predominate.

A plaintiff need not offer computer-related evidence. Once upon a time, legislative maps were drawn without using a computer, and nothing prevents a §2 plaintiff from taking this old-school approach in creating an illustrative district. See, *e.g.*, M. Altman, K. McDonald, & M. McDonald, From Crayons to Computers: The Evolution of Computer Use in Redistricting, 23 Soc. Sci. Computer Rev. 334, 335–336 (2005). In that event, the plaintiff can simply call upon the mapmaker to testify about the process he or she used and the role, if any, that race played in that process. The defendant may seek to refute that testimony in any way that the rules of civil procedure and evidence allow.

If, as will often be the case today, a §2 plaintiff's mapmaker uses a computer program, the expert can testify about the weight, if any, that the program gives to race. The plaintiff will presumably argue that any role assigned to race was not predominant, and the defendant can contest this by cross-examining the plaintiff's expert, seeking the actual program in discovery, and calling its own expert to testify about the program's treatment of race. After this, the trial court will be in a position to determine whether the program gave race a "predominant" role.

This is an entirely workable scheme. It does not obligate either party to offer computer evidence, and it minimizes the likelihood of a clash between what §2 requires and what the Constitution forbids. We have long assumed that §2 is consistent with the Constitution. See, *e.g.*, *Cooper*, 581 U. S., at 301 (assuming States have a compelling interest in complying with §2); *Shaw II*, 517 U. S., at 915 (same); *Vera*, 517 U. S., at 977 (plurality opinion) (same). But that cannot mean that every conceivable interpretation of §2 is

constitutional, and I do not understand the majority's analysis of Alabama's constitutional claim to suggest otherwise. *Ante*, at 33–34; *ante*, at 4 (KAVANAUGH, J., concurring in part).

Our cases make it perfectly clear that using race as a "predominant factor" in drawing legislative districts is unconstitutional unless the stringent requirements of strict scrutiny can be satisfied,[2] and therefore if §2 can be found to require the adoption of an additional majority-minority district that was created under a process that assigned race a "predominant" role, §2 and the Constitution would be headed for a collision.

## II

When the meaning of a "reasonably configured" district is properly understood, it is apparent that the decisions below must be vacated and that the cases must be remanded for the application of the proper test. In its analysis of whether the plaintiffs satisfied the first *Gingles* precondition, the District Court gave much attention to some traditional districting criteria—specifically, compactness and avoiding the splitting of political subdivisions and communities of interest—but it failed to consider whether the plaintiffs had shown that their illustrative districts were created without giving race a "predominant role." *Singleton* v. *Merrill*, 582 F. Supp. 3d 924, 1008–1016 (ND Ala. 2022). For this reason, the District Court's §2 analysis was deficient.

It is true that the District Court addressed the question of race-predominance when it discussed and rejected the State's argument that the plaintiffs' maps violated the Equal Protection Clause, but the court's understanding of predominance was deeply flawed. The court began this part

---

[2] Although our cases have posited that racial predominance may be acceptable if strict scrutiny is satisfied, the Court does not contend that it is satisfied here.

of its opinion with this revealing statement:

> "Dr. Duchin and Mr. Cooper [plaintiffs' experts] testi-
> fied that they *prioritized race* only for the purpose of
> determining and to the extent necessary to determine
> whether it was possible for the *Milligan* plaintiffs and
> the *Caster* plaintiffs to state a Section Two claim. As
> soon as they determined the answer to that question,
> they assigned greater weight to other traditional redis-
> tricting criteria." *Id.*, at 1029–1030 (emphasis added).

This statement overlooks the obvious point that by "priori-
tiz[ing] race" at the outset, Dr. Duchin and Mr. Cooper gave
race a predominant role.

The next step in the District Court's analysis was even
more troubling. The court wrote, "Dr. Duchin's testimony
that she considered two majority-Black districts as 'non-
negotiable' does not" show that race played a predominant
role in her districting process. *Id.*, at 1030. But if achieving
a certain objective is "non-negotiable," then achieving that
objective will necessarily play a predominant role. Suppose
that a couple are relocating to the Washington, D. C., met-
ropolitan area, and suppose that one says to the other, "I'm
flexible about where we live, but it has to be in Maryland.
That's non-negotiable." Could anyone say that finding a
home in Maryland was not a "predominant" factor in the
couple's search? Or suppose that a person looking for a
flight tells a travel agent, "It has to be non-stop. That's non-
negotiable." Could it be said that the number of stops be-
tween the city of origin and the destination was not a "pre-
dominant" factor in the search for a good flight? The obvi-
ous answer to both these questions is no, and the same is
true about the role of race in the creation of a new district.
If it is "non-negotiable" that the district be majority black,
then race is given a predominant role.

The District Court wrapped up this portion of its opinion
with a passage that highlighted its misunderstanding of the

first *Gingles* precondition. The court thought that a §2 plaintiff cannot proffer a reasonably configured majority-minority district without first attempting to see if it is possible to create such a district—that is, by first making the identification of such a district "non-negotiable." *Ibid.* But that is simply not so. A plaintiff's expert can first create maps using only criteria that do not give race a predominant role and then determine how many contain the desired number of majority-minority districts.

One final observation about the District Court's opinion is in order. The opinion gives substantial weight to the disparity between the percentage of majority-black House districts in the legislature's plan (14%) and the percentage of black voting-age Alabamians (27%), while the percentage in the plaintiffs' plan (29%) came closer to that 27% mark. See, *e.g.*, *id.*, at 946, 1016, 1018, 1025–1026; see also *id.*, at 958–959, 969, 976, 982, 991–992, 996–997. Section 2 of the VRA, however, states expressly that no group has a right to representation "in numbers equal to their proportion in the population." 52 U. S. C. §10301(b). This provision was a critical component of the compromise that led to the adoption of the 1982 amendments, as the Court unanimously agreed two Terms ago. See *Brnovich*, 594 U. S., at ___, and n. 14 (slip op., at 22, and n. 14); *id.*, at ___, n. 6 (KAGAN, J., dissenting) (slip op., at 19, n. 6). The District Court's reasoning contravened this statutory proviso. See *ante*, at 11–12, 28–30 (THOMAS, J., dissenting).

## III

The Court spends much of its opinion attacking what it takes to be the argument that Alabama has advanced in this litigation. I will not debate whether the Court's characterization of that argument is entirely correct, but as applied to the analysis I have just set out, the Court's criticisms miss the mark.

A

The major theme of this part of the Court's opinion is that Alabama's argument, in effect, is that "*Gingles* must be overruled." *Ante*, at 25. But as I wrote at the beginning of this opinion, I would decide these cases under the *Gingles* framework. We should recognize, however, that the *Gingles* framework is not the same thing as a statutory provision, and it is a mistake to regard it as such. *National Pork Producers Council* v. *Ross*, 598 U. S. ___, ___ (2023) (slip op., at 9) ("[T]he language of an opinion is not always to be parsed as though we were dealing with language of a statute" (quoting *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 341 (1979))). In applying that framework today, we should keep in mind subsequent developments in our case law.

One important development has been a sharpening of the methodology used in interpreting statutes. *Gingles* was decided at a time when the Court's statutory interpretation decisions sometimes paid less attention to the actual text of the statute than to its legislative history, and *Gingles* falls into that category. The Court quoted §2 but then moved briskly to the Senate Report. See 478 U. S., at 36–37, 43, and n. 7. Today, our statutory interpretation decisions focus squarely on the statutory text. *National Assn. of Mfrs.* v. *Department of Defense*, 583 U. S. 109, 127 (2018); *Puerto Rico* v. *Franklin Cal. Tax-Free Trust*, 579 U. S. 115, 125 (2016); cf. *Brnovich*, 594 U. S., at ___ (slip op., at 14). And as we held in *Brnovich*, "[t]he key requirement" set out in the text of §2 is that a State's electoral process must be "'equally open'" to members of all racial groups. *Id.*, at ___ (slip op., at 15). The *Gingles* framework should be interpreted in a way that gives effect to this standard.

Another development that we should not ignore concerns our case law on racial predominance. Post-*Gingles* decisions like *Miller*, 515 U. S., at 920, *Shaw II*, 517 U. S., at 906–907, and *Vera*, 517 U. S., at 979 (plurality opinion), made it clear that it is unconstitutional to use race as a

"predominant" factor in legislative districting. "[W]hen statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings* v. *Rodriguez*, 583 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 2). This same principle logically applies with even greater force when we interpret language in one of our prior opinions. It therefore goes without question that we should apply the *Gingles* framework in a way that does not set up a confrontation between §2 and the Constitution, and understanding the first *Gingles* precondition in the way I have outlined achieves that result.[3]

### B

The Court's subsidiary criticisms of Alabama's arguments are likewise inapplicable to my analysis. The Court suggests that the "centerpiece" of Alabama's argument regarding the role race can permissibly play in a plaintiff's illustrative map seeks the imposition of "a new rule." *Ante*, at 15, 22. But I would require only what our cases already demand: that all legislative districts be produced without giving race a "predominant" role.[4]

—————

[3] The second and third *Gingles* preconditions, which concern racially polarized voting, cannot contribute to avoiding a clash between §2 and the Constitution over racial predominance in the drawing of lines. Those preconditions do not concern the drawing of lines in plaintiffs' maps, and in any event, because voting in much of the South is racially polarized, they are almost always satisfied anyway. Alabama does not contest that they are satisfied here.

[4] The Court appears to contend that it does not matter if race predominated in the drawing of these maps because the maps *could have* been drawn without race predominating. See *ante*, at 26–27, n. 7. But of course, many policies *could be* selected for race-neutral reasons. They nonetheless must be assessed under the relevant standard for intentional reliance on race if their imposition was in fact motivated by race. See, *e.g., Hunter* v. *Underwood*, 471 U. S. 222, 227–231 (1985); *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 264–

The Court maintains that Alabama's benchmark scheme would be unworkable because of the huge number of different race-neutral maps that could be drawn. As the Court notes, there are apparently numerous "competing metrics on the issue of compactness" alone, and each race-neutral computer program may assign different values to each traditional districting criterion. *Ante*, at 27 (internal quotation marks omitted).

My analysis does not create such problems. If a §2 plaintiff chooses to use a computer program to create an illustrative district, the court need ask only whether *that program* assigned race a predominant role.

The Court argues that Alabama's focus on race-neutral maps cannot be squared with a totality-of-the-circumstances test because "Alabama suggests there is only one 'circumstance[ ]' that matters—how the State's map stacks up relative to the benchmark" maps. *Ante*, at 18. My analysis, however, simply follows the *Gingles* framework, under which a court must first determine whether a §2 plaintiff has satisfied three "preconditions" before moving on to consider the remainder of relevant circumstances. See *Growe* v. *Emison*, 507 U. S. 25, 40–41 (1993) (unless plaintiffs establish all three preconditions, there "neither has been a wrong nor can be a remedy").

## IV

As noted, I would vacate and remand for the District Court to apply the correct understanding of *Gingles* in the first instance. Such a remand would require the District Court to determine whether the plaintiffs have shown that their illustrative maps did not give race a predominant role, and I will therefore comment briefly on my understanding of the relevant evidence in the record as it now stands.

———————

266 (1977); *Washington* v. *Davis*, 426 U. S. 229, 241–248 (1976).

A

In my view, there is strong evidence that race played a predominant role in the production of the plaintiffs' illustrative maps and that it is most unlikely that a map with more than one majority-black district could be created without giving race such a role. An expert hired by the *Milligan* plaintiffs, Dr. Kosuke Imai, used a computer algorithm to create 30,000 potential maps, none of which contained two majority-black districts. See 2 App. 571–572; Supp. App. 59, 72. In fact, in 20,000 of those simulations, Dr. Imai intentionally created one majority-minority district, and yet even with one majority-minority district guaranteed as a baseline, none of those 20,000 attempts produced a second one. See 2 App. 571–572; Supp. App. 72.

Similarly, Dr. Moon Duchin, another expert hired by the *Milligan* plaintiffs, opined that "it is hard to draw two majority-black districts by accident." 2 App. 714. Dr. Duchin also referred to a study where she generated two million maps of potential district configurations in Alabama, none of which contained a second majority-minority district. *Id.*, at 710. And the first team of trained mapmakers that plaintiff Milligan consulted was literally unable to draw a two-majority-black-district map, even when they tried. *Id.*, at 511–512. Milligan concluded at the time that the feat was impossible. *Id.*, at 512.

The majority quibbles about the strength of this evidence, protesting that Dr. Imai's studies failed to include as controls certain redistricting criteria and that Dr. Duchin's two-million-map study was based on 2010 census data, see *ante*, at 26–27, and nn. 6–7, but this is unconvincing for several reasons. It is plaintiffs' burden to produce evidence and satisfy the *Gingles* preconditions, so if their experts' maps were deficient, that is no strike against Alabama. And the racial demographics of the State changed little between 2010 and 2020, Supp. App. 82, which is presumably why Dr. Duchin herself raised the older study in answering

questions about her work in this litigation, see 2 App. 710. If it was impossible to draw two such districts in 2010, it surely at least requires a great deal of intentional effort now.

The Court suggests that little can be inferred from Dr. Duchin's two-million-map study because two million maps are not that many in comparison to the "trillion trillion" maps that are possible. See *ante*, at 28–29, and n. 9. In making this argument, the Court relies entirely on an *amicus* brief submitted by three computational redistricting experts in support of the appellees. See Brief for Computational Redistricting Experts 2, 6, n. 7. These experts' argument concerns a complicated statistical issue, and I think it is unwise for the Court to make their argument part of our case law based solely on this brief. By the time this *amicus* brief was submitted, the appellants had already filed their main brief, and it was too late for any experts with contrary views to submit an *amicus* brief in support of appellants. Computer simulations are widely used today to make predictions about many important matters, and I would not place stringent limits on their use in VRA litigation without being quite sure of our ground. If the cases were remanded, the parties could take up this issue if they wished and call experts to support their positions on the extent to which the two million maps in the study are or can be probative of the full universe of maps.

In sum, based on my understanding of the current record, I am doubtful that the plaintiffs could get by the first *Gingles* precondition, but I would let the District Court sort this matter out on remand.

B

Despite the strong evidence that two majority-minority districts cannot be drawn without singular emphasis on race, a plurality nonetheless concludes that race did not predominate in the drawing of the plaintiffs' illustrative

maps. See *ante*, at 22–25. Their conclusion, however, rests on a faulty view of what non-predominance means.

The plurality's position seems to be that race does not predominate in the creation of a districting map so long as the map does not violate other traditional districting criteria such as compactness, contiguity, equally populated districts, minimizing county splits, etc. *Ibid.* But this conclusion is irreconcilable with our cases. In *Miller*, for instance, we acknowledged that the particular district at issue was not "shape[d] . . . bizarre[ly] on its face," but we nonetheless held that race predominated because of the legislature's "overriding desire to assign black populations" in a way that would create an additional "majority-black district." 515 U. S., at 917.

Later cases drove home the point that conformity with traditional districting principles does not necessarily mean that a district was created without giving race a predominant role. In *Cooper*, we held that once it was shown that race was "'the overriding reason'" for the selection of a particular map, "a further showing of 'inconsistency between the enacted plan and traditional redistricting criteria' is unnecessary to a finding of racial predominance." 581 U. S., at 301, n. 3 (quoting *Bethune-Hill*, 580 U. S., at 190). We noted that the contrary argument was "foreclosed almost as soon as it was raised in this Court." *Cooper*, 581 U. S., at 301, n. 3; see also *Vera*, 517 U. S., at 966 (plurality opinion) (race may still predominate even if "traditional districting principle[s] do correlate to some extent with the district's layout"). "Traditional redistricting principles . . . are numerous and malleable. . . . By deploying those factors in various combinations and permutations, a [mapmaker] could construct a plethora of potential maps that look consistent with traditional, race-neutral principles." *Bethune-Hill*, 580 U. S., at 190. Here, a plurality allows plaintiffs to do precisely what we warned against in *Bethune-Hill*.

The plurality's analysis of predominance contravenes our

precedents in another way. We have been sensitive to the gravity of "'trapp[ing]'" States "'between the competing hazards of liability'" imposed by the Constitution and the VRA. *Id.*, at 196 (quoting *Vera*, 517 U. S., at 977). The VRA's demand that States not unintentionally "dilute" the votes of particular groups must be reconciled with the Constitution's demand that States generally avoid intentional augmentation of the political power of any one racial group (and thus the diminution of the power of other groups). The plurality's predominance analysis shreds that prudential concern. If a private plaintiff can demonstrate §2 liability based on the production of a map that the State has every reason to believe it could not constitutionally draw, we have left "state legislatures too little breathing room" and virtually guaranteed that they will be on the losing end of a federal court's judgment. *Bethune-Hill*, 580 U. S., at 196.

\*      \*      \*

The Court's treatment of *Gingles* is inconsistent with the text of §2, our precedents on racial predominance, and the fundamental principle that States are almost always prohibited from basing decisions on race. Today's decision unnecessarily sets the VRA on a perilous and unfortunate path. I respectfully dissent.

EXHIBIT B

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HEALTH AND HOSPITAL CORPORATION OF MARION COUNTY ET AL. *v.* TALEVSKI, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF TALEVSKI

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 21–806.   Argued November 8, 2022—Decided June 8, 2023

After Gorgi Talevski's move to a nursing home in 2016 proved problematic, Talevski (through his wife Ivanka) brought an action under 42 U. S. C. §1983 against a county-owned nursing home and its agents (collectively, HHC), claiming that HHC's treatment of Talevski violated rights guaranteed him under the Federal Nursing Home Reform Act (FNHRA). The District Court granted HHC's subsequent motion to dismiss Talevski's complaint, reasoning that no plaintiff can enforce provisions of the FNHRA via §1983. The Seventh Circuit reversed, concluding that the rights referred to in two FNHRA provisions invoked by Talevski—the right to be free from unnecessary chemical restraints, see §1396r(c)(1)(A)(ii), and rights to be discharged or transferred only when certain preconditions are met, see §1396r(c)— "unambiguously confer individually enforceable rights on nursing-home residents," making those rights presumptively enforceable via §1983. 6 F. 4th 713, 720. The Seventh Circuit further found nothing in the FNHRA to indicate congressional intent to foreclose §1983 enforcement.

*Held*: The FNHRA provisions at issue unambiguously create §1983-enforceable rights, and the Court discerns no incompatibility between private enforcement under §1983 and the remedial scheme that Congress devised. Pp. 5–23.

  (a) Section 1983 has, since the 1870s, provided an express cause of action to any person deprived (by someone acting under color of state law) of "any rights . . . secured by the Constitution and laws." The Court has long refused to read §1983's unmodified term "laws" to mean

only *some* of the laws. *Maine* v. *Thiboutot*, 448 U. S. 1, 6. Looking to history, HHC attempts to sow doubt about §1983's textually unqualified sweep, and proffers a Spending Clause-based argument to narrow §1983's meaning. But a fuller picture of the relevant history lends HHC no aid.

The Court is unpersuaded by HHC's argument that, because Congress seems to have enacted the FNHRA pursuant to the Spending Clause, Talevski cannot invoke §1983 to vindicate rights recognized by the FNHRA. HHC starts with the Court's observation that federal legislation premised on the Spending Clause power is "much in the nature of a contract," *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17. From there, HHC argues that Spending Clause statutes may not be enforced via §1983 because contracts were not generally enforceable by third-party beneficiaries at when §1983 was enacted in the 1870s. The Court rejects HHC's argument. First, while the Court has reasoned that Congress's failure to displace firmly rooted common-law principles generally indicates that it incorporated those established principles into §1983, *Wyatt* v. *Cole*, 504 U. S. 158, 163–164, HHC's key common-law plank here—that third-party beneficiaries could not sue to enforce contractual obligations during the relevant time—is, at a minimum, contestable. "[S]omething more than 'ambiguous historical evidence' is required [to] 'flatly overrule a number of major decisions of this Court,' " *Gamble* v. *United States*, 587 U. S. ___, ___. Second, because "[t]here is no doubt that the cause of action created by §1983 is, and was always regarded as, a tort claim," *Monterey* v. *Del Monte Dunes at Monterey, Ltd.*, 526 U. S. 687, 727 (Scalia, J., concurring in part and concurring in judgment), HHC's focus on 1870s law governing third-party-beneficiary suits in contract is perplexing, and HHC offers no reason those principles should be read to displace the plain scope of "laws" in §1983. Pp. 5–10.

(b) Under the Court's precedent, the FNHRA provisions at issue here unambiguously confer individual federal rights enforceable under §1983, and the Court discerns no intent by Congress in FNHRA to preclude private enforcement of these rights under §1983. Pp. 11–23.

(1) Although federal statutes have the potential to create §1983-enforceable rights, they do so under this Court's precedents only when the statute unambiguously confers those rights. The Court has recognized that the typical remedy for noncompliance with a federal statute enacted pursuant to the Spending Clause is not a private cause of action for noncompliance but rather termination of funds to the State. See *Gonzaga Univ.* v. *Doe*, 536 U. S. 273, 280. The parties here thus dispute whether this is the atypical case; that is, whether the unnecessary-restraint and predischarge-notice provisions of the FNHRA

"unambiguously confe[r]" individual rights, making those rights "presumptively enforceable" under §1983. *Id.*, at 283–284.

*Gonzaga* sets forth the Court's established method for ascertaining unambiguous conferral. Courts must employ traditional tools of statutory construction to assess whether Congress has "unambiguously conferred" "individual rights upon a class of beneficiaries" to which the plaintiff belongs. *Id.*, at 283, 285–286. Notably, it must be determined that "Congress intended to create a federal right" *for* the identified class, not merely that the plaintiffs fall "within the general zone of interest that the statute is intended to protect." *Id.*, at 283 (emphasis deleted). The test for unambiguous conferral is satisfied where the provision in question is "'phrased in terms of the persons benefited'" and contains "rights-creating," individual-centric language with an "'unmistakable focus on the benefited class.'" *Id.*, at 284, 287 (emphasis deleted). If a statutory provision surmounts this significant hurdle, it "secures" individual rights that are deemed "presumptively enforceable" under §1983. *Id.*, at 284.

The unnecessary-restraint and predischarge-notice provisions in FNHRA that Talevski's complaint invokes meet this test. The FNHRA lays out a litany of statutory "[r]equirements relating to residents' rights," §1396r(c). The unnecessary-restraint provision requires nursing facilities to "protect and promote" residents' "right to be free from . . . any physical or chemical restraints . . . not required to treat the resident's medical symptoms." §1396r(c)(1)(A)(ii). The predischarge-notice provision imposes preconditions that a nursing facility must meet to "transfer or discharge [a] resident." §§1396r(c)(2)(A)–(B). Both provisions reside in §1396r(c), which expressly concerns "[r]equirements *relating to residents' rights*." *Ibid.* (emphasis added). This framing is indicative of an individual "rights-creating" focus. *Gonzaga*, 536 U. S., at 284. That these two provisions also establish who must comply with these statutory rights (namely, the Medicaid-participant nursing homes) does not dispel the statute's focus on the nursing-home residents, *i.e.*, the benefited class. The provisions use clear "rights-creating language," speak "'in terms of the persons benefited,'" and have an "'unmistakable focus on the benefited class.'" *Id.*, at 284, 287, 290 (emphasis deleted). Thus, they satisfy *Gonzaga*'s stringent standard, and the rights they recognize are presumptively enforceable under §1983. Pp. 11–17.

(2) Even if a statutory provision unambiguously secures rights, a defendant "may defeat [the] presumption by demonstrating that Congress did not intend" that §1983 be available to enforce those rights. *Rancho Palos Verdes* v. *Abrams*, 544 U. S. 113, 120. Evidence of such intent may be found expressly in the statute creating the right, or im-

plicitly, by creating "a 'comprehensive enforcement scheme that is incompatible with individual enforcement under §1983," *ibid.* Here, the Court finds evidence of neither. The FNHRA establishes a detailed administrative scheme for inspections of nursing facilities, see §1396r(g), and authorizes governments to sanction and correct noncompliant facilities, see §1396r(h). But the statute lacks any indicia of congressional intent to preclude §1983 enforcement, such as an express private judicial right of action or any other provision that might signify that intent. HHC focuses on comprehensiveness of FNHRA's enforcement mechanisms, but implicit preclusion is shown only by a "'comprehensive enforcement scheme *that is incompatible* with individual enforcement under §1983.'" *Fitzgerald* v. *Barnstable School Comm.*, 555 U. S. 246, 252 (emphasis added). The Court's prior cases finding implicit preclusion involved statutes where private enforcement under §1983 would have thwarted Congress's scheme by circumventing the statutes' presuit procedures, or by giving plaintiffs access to tangible benefits otherwise unavailable under the statutes construed. HHC has identified no equivalent sign of incompatibility in the FNHRA, which lacks a private judicial right of action, a private federal administrative remedy, or any "carefu[l]" congressional "tailor[ing]," *Fitzgerald*, 555 U. S., at 255, that §1983 actions would "distort," *Rancho Palos Verdes*, 544 U. S., at 127. Finally, the Court rejects any speculation that because Congress knew most nursing homes are private entities not subject to suit under §1983, the FNHRA's remedial scheme "necessarily reflects Congress's judgment that these administrative enforcement mechanisms appropriately protect the rights the statute confers," Brief for United States as *Amicus Curiae* 31. The focus in the implicit-preclusion inquiry remains whether something in the FNHRA has foreclosed §1983's "genera[l]" availability as "a remedy for the vindication of rights secured by federal statutes." *Gonzaga*, 536 U. S., at 284. The Court sees no such sign, much less a license for the Court to construct and impute to Congress an intent that the FNHRA does not embody. Pp. 17–23.

6 F. 4th 713, affirmed.

JACKSON, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SOTOMAYOR, KAGAN, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. GORSUCH, J., filed a concurring opinion. BARRETT, J., filed a concurring opinion, in which ROBERTS, C. J., joined. THOMAS, J., filed a dissenting opinion. ALITO, J., filed a dissenting opinion, in which THOMAS, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

_____

No. 21–806

_____

## HEALTH AND HOSPITAL CORPORATION OF MARION COUNTY, ET AL., PETITIONERS *v.* IVANKA TALEVSKI, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF GORGI TALEVSKI, DECEASED

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[June 8, 2023]

JUSTICE JACKSON delivered the opinion of the Court.

The Federal Nursing Home Reform Act (FNHRA or Act) ensures that nursing homes that receive Medicaid funding respect and protect their residents' health, safety, and dignity. Provisions of the FNHRA refer to rights of nursing-home residents to be free from unnecessary physical or chemical restraints and to be discharged or transferred only when certain preconditions are satisfied. This case is about these particular provisions and whether nursing-home residents can seek to vindicate those FNHRA rights in court.

Respondent Ivanka Talevski maintains that she can enforce the rights these particular FNHRA provisions describe via 42 U. S. C. §1983, which, since the 1870s, has provided an express cause of action to any person deprived (by someone acting under color of state law) of "any rights . . . secured by the Constitution and laws." Petitioners insist that respondent is wrong about being able to rely on §1983 in this context, for two independent reasons. First, petitioners urge us to discard our longstanding recognition that

§1983's unqualified reference to "laws" "means what it says," *Maine* v. *Thiboutot*, 448 U. S. 1, 4 (1980), and to rule instead that §1983 contains an implicit carveout for laws that Congress enacts via its spending power—a holding that, according to petitioners, would mean that §1983 could not be used to enforce any rights the FNHRA purports to recognize. In the alternative, petitioners point to our established methods for determining whether a statutory provision creates a §1983-enforceable right and maintain that these FNHRA provisions do not create rights that nursing-home residents can enforce via §1983.

We reject both propositions. "Laws" means "laws," no less today than in the 1870s, and nothing in petitioners' appeal to Reconstruction-era contract law shows otherwise. Consequently, as we have previously held, §1983 can presumptively be used to enforce unambiguously conferred federal individual rights, unless a private right of action under §1983 would thwart any enforcement mechanism that the rights-creating statute contains for protection of the rights it has created. *Fitzgerald* v. *Barnstable School Comm.*, 555 U. S. 246, 253–255 (2009); *Gonzaga Univ.* v. *Doe*, 536 U. S. 273, 284, and n. 4 (2002). We hold that the two FNHRA provisions at issue here do unambiguously create §1983-enforceable rights. And we discern no incompatibility between private enforcement under §1983 and the statutory scheme that Congress has devised for the protection of those rights. Accordingly, we affirm the lower court's judgment that respondent's §1983 action can proceed in court.

## I

In 2016, when Gorgi Talevski's dementia progressed to the point that his family members could no longer care for him, they placed him in petitioner Valparaiso Care and Rehabilitation's (VCR) nursing home.[1] When he entered VCR,

---

[1] We rely for these facts on the operative complaint's well-pleaded allegations. See *Walden* v. *Fiore*, 571 U. S. 277, 281, n. 2 (2014).

Mr. Talevski could talk, feed himself, walk, socialize, and recognize his family. Later in 2016, however, Mr. Talevski's condition suddenly deteriorated. He became unable to eat on his own and began losing the ability to communicate in English (leaving him to rely primarily on Macedonian, his native language).

VCR staff claimed this was dementia's natural progression. But Mr. Talevski's daughter suspected, and then confirmed with outside physicians, that VCR was chemically restraining Mr. Talevski with six powerful psychotropic medications. With the help of an outside neurologist, his medication was tapered down, and he began to regain the ability to feed himself. Around this time, the Indiana State Department of Health (Department) conducted its periodic inspection of VCR, and the Talevskis filed a formal complaint with the inspectors regarding the chemical restraints.

The problems did not end there. Toward the end of 2016, VCR began asserting that Mr. Talevski was harassing female residents and staff. Based on that claim, VCR began sending Mr. Talevski to a psychiatric hospital 90 minutes away for several days at a time. VCR readmitted Mr. Talevski the first two times it sent him away. But the third time, instead of accepting him back, VCR tried to force his permanent transfer to a dementia facility in Indianapolis. It executed these changed circumstances without first notifying Mr. Talevski or his family.

The Talevskis filed a complaint with the Department regarding Mr. Talevski's forced transfer. While the complaint was pending, Mr. Talevski had to stay at another facility that was 90 minutes away from his family. Eventually, a Department administrative law judge nullified VCR's attempted transfer of Mr. Talevski. Based on that determination, the Talevskis endeavored to have Mr. Talevski returned to VCR. But VCR ignored the judge's decision and refused readmission.

The Talevskis complained again to the Department, which later issued a report regarding the Talevskis' complaints. Subsequently, petitioner American Senior Communities LLC (ASC), which manages VCR, contacted Mr. Talevski's wife, Ivanka, to discuss the possibility of Mr. Talevski's return. At this point, however, Mr. Talevski had acclimated to his new home, and the Talevskis feared retribution against him if he returned to VCR. So they opted to leave him in the new facility, which meant that every family visit required a 3-hour round trip.

In 2019, Mr. Talevski (through Ivanka) sued VCR, ASC, and petitioner Health and Hospital Corporation of Marion County (collectively, HHC) under Rev. Stat. §1979, 42 U. S. C. §1983.[2] The lawsuit claimed that HHC's treatment of Mr. Talevski—in particular, the use of chemical restraints and the persistent transfer attempts—had violated rights that the FNHRA guaranteed him as a nursing-home resident. The District Court granted HHC's subsequent motion to dismiss the complaint, reasoning that no plaintiff can enforce provisions of the FNHRA via §1983.

The Court of Appeals for the Seventh Circuit reversed. It concluded that, under this Court's precedent, the relevant FNHRA provisions "unambiguously confer individually enforceable rights on nursing-home residents," making those rights presumptively enforceable via §1983. 6 F. 4th 713, 720 (2021). The Court of Appeals held further that the presumption had not been rebutted here, because nothing in the FNHRA indicated congressional intent to foreclose §1983 enforcement of these rights. *Id.*, at 720–721.

HHC filed a petition for certiorari, which we granted.[3]

––––––––

[2]Marion County, Indiana, owns Health and Hospital Corporation, which in turn wholly owns VCR.

[3]After the Seventh Circuit's ruling, Mr. Talevski passed away. We granted Ivanka Talevski's substitution motion, and substituted her as a party at the same time we granted certiorari. See Supreme Court Rule

596 U. S. ___ (2022). For the reasons explained below, we affirm the Seventh Circuit's judgment.

## II
### A

As relevant here, §1983 provides that

> "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

That is, any person within the jurisdiction of the United States may invoke this cause of action against any other person who, acting "under color of" state law, has deprived them of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States.

We have been asked before to narrow the scope of this express authorization, *i.e.*, to read "laws" to mean only "civil rights or equal protection laws." *Thiboutot*, 448 U. S., at 6. We declined to do so, reasoning that a straightforward reading of the "plain language" of §1983 is required. *Id.*, at 4. That should have been no surprise; "Congress attached no modifiers to the phrase ['and laws']." *Ibid.*

Since *Thiboutot*, we have crafted a test for determining whether a particular federal law actually secures rights for §1983 purposes. See *Gonzaga*, 536 U. S., at 283–285; Part III–B, *infra*. But we have not previously doubted that any federal law can do so.

––––––––
35.1. Subsequent references to Talevski encompass both Talevskis insofar as Ivanka is advancing Gorgi's interests.

## B

### 1

HHC attempts to sow renewed doubt about §1983's textually unqualified sweep by proffering "historical evidence." Brief for Petitioners 3; see also *id.*, at 2 (asserting that "[f]or most of this nation's history, individuals did not have a recognized private right to enforce obligations prescribed by federal statutes"). As background for our evaluation of the particulars of HHC's Spending Clause-based argument regarding §1983's meaning, see Part II–B–2, *infra*, a fuller picture of the relevant historical context is warranted. *United States* v. *Union Pacific R. Co.*, 91 U. S. 72, 79 (1875); accord, *Towne* v. *Eisner*, 245 U. S. 418, 425 (1918) (Holmes, J., for the Court).

Before the Civil War, few direct federal protections for individual rights against state infringements existed. The Thirteenth, Fourteenth, and Fifteenth Amendments worked a sea change in this regard. See *McDonald* v. *Chicago*, 561 U. S. 742, 754 (2010); *Fitzpatrick* v. *Bitzer*, 427 U. S. 445, 453–456 (1976); *Ex parte Virginia*, 100 U. S. 339, 344–345 (1880). Still, neither these Civil War Amendments nor the landmark Civil Rights Act of 1866 successfully prevented postbellum state actors from continuing to deprive American citizens of federally protected rights. *Mitchum* v. *Foster*, 407 U. S. 225, 240 (1972).

In early 1871, a Senate Select Committee produced and distributed a Report that ran hundreds of pages and recounted pervasive state-sanctioned lawlessness and violence against the freedmen and their White Republican allies. *Monroe* v. *Pape*, 365 U. S. 167, 174 (1961) (citing S. Rep. No. 1, 42d Cong., 1st. Sess. (1871)).[4] After reading the

---

[4] Encapsulating the Report, victim testimony, and press accounts for his colleagues, one Congressman (as *Monroe* noted) lamented that "'murder is stalking abroad in disguise, . . . whippings and lynchings and banishment have been visited upon unoffending American citizens, [and] the local administrations have been found inadequate or unwilling to apply

Report, President Ulysses S. Grant implored Congress to act.

It is against this backdrop that the 42d Congress enacted, and President Grant signed, the Civil Rights Act of 1871. The first section of that statute, as reenacted in 1874, created the federal cause of action now codified as §1983. *Chapman* v. *Houston Welfare Rights Organization*, 441 U. S. 600, 608, and n. 16 (1979) (citing Rev. Stat. §1979 (1874)). The "plain language['s]" lack of "modifiers," *Thiboutot*, 448 U. S., at 4, reflected the regrettable reality that "state instrumentalities" could not, or would not, fully protect federal rights, *Mitchum*, 407 U. S., at 242.

We have adhered to this understanding of §1983's operation. To guarantee the protection of federal rights, "the §1983 remedy . . . is, in all events, supplementary to any remedy any State might have." *Owens* v. *Okure*, 488 U. S. 235, 248 (1989) (internal quotation marks omitted); *Knick* v. *Township of Scott*, 588 U. S. ___, ___ (2019) (slip op., at 11). And we have consistently refused to read §1983's "plain language" to mean anything other than what it says. *Thiboutot*, 448 U. S., at 4–6 (observing that our cases, running back to at least 1968, only make sense if "laws" indeed means "laws").

2

We are not persuaded by HHC's argument (which JUSTICE THOMAS supports, see *post*, at 1, 35 (dissenting

_____

the proper corrective.'" 365 U. S., at 175 (quoting Cong. Globe, 42d Cong., 1st Sess., App. 374 (1871)). Another, summing up the same facts, stated:

"'Sheriffs, having eyes to see, see not; judges, having ears to hear, hear not; witnesses conceal the truth or falsify it; grand and petit juries act as if they might be accomplices. . . . [A]ll the apparatus and machinery of civil government, all the processes of justice, skulk away as if government and justice were crimes and feared detection. Among the most dangerous things an injured party can do is to appeal to justice.'" *Mitchum*, 407 U. S., at 241 (quoting Cong. Globe, 42d Cong., 1st Sess., App. 78).

opinion)), that Talevski cannot invoke §1983 to vindicate the rights the FNHRA provisions at issue here purport to recognize because Congress seems to have enacted the FNHRA pursuant to the spending power recognized in Article I, §8, of the Constitution.[5]

HHC's argument generally proceeds as follows. Starting with our precedent regarding Congress's spending power, HHC begins by emphasizing our observation that federal legislation premised on that power is "much in the nature of a contract," because, "in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17 (1981); see also *Cummings* v. *Premier Rehab Keller*, 596 U. S. ___, ___ (2022) (slip op., at 4). HHC then seizes on the "contract" analogy to create a syllogism. It reasons that (1) any private party suing to enforce an obligation between Federal and State Governments that a Spending Clause statute creates is, essentially, a "third-party beneficiary" (by which HHC means beneficiaries of rights created in any such statute); and (2) under common-law contract principles extant at the time that Congress enacted §1983, third-party beneficiaries were "generally" barred from suing to enforce contract obligations; therefore, (3) plaintiffs like Talevski, as a purported third-party beneficiary of the FNHRA, may not use §1983 to do something that third-party beneficiaries of contracts generally could not do in the 1870s. Brief for Petitioners 13, 17–18 (citing 1870s treatises and state cases).

The upshot, for HHC, is that "Spending Clause statutes do not give rise to privately enforceable rights under Section 1983" because contracts were not "generally" enforceable by third-party beneficiaries at common law. *Id.*, at 11,

_____

[5] See Art. I, §8, cl. 1 (authorizing the Legislature to "lay and collect Taxes . . . to pay the Debts and provide for the common Defence and general Welfare of the United States").

13. On this basis alone, HHC thus, in effect, urges us to reject decades of precedent, and to rewrite §1983's plain text to read "laws (unless those laws rest on the Spending Power)."

Two well-established principles, applied here, suffice to reject HHC's invitation to reimagine Congress's handiwork (and our precedent interpreting it).

First, our prior §1983 cases reference "'firmly rooted'" common-law principles. *Wyatt* v. *Cole*, 504 U. S. 158, 164 (1992). We implement Congress's choices rather than re-make them. *Azar* v. *Allina Health Services*, 587 U. S. ___, ___–___ (2019) (slip op., at 14–15). Thus, we have reasoned that Congress's failure to displace *firmly rooted* common-law principles generally indicates that it incorporated those established principles into §1983. *Wyatt*, 504 U. S., at 163–164.[6] Here, HHC's key common-law plank—that third-party beneficiaries could not sue to enforce contractual obligations during the relevant time—is, at a minimum, contestable. See Brief for Contract Law Professors et al. as *Amici Curiae* 4 ("[A] majority of American jurisdictions . . . permit[ted] third-party beneficiaries to sue through at least the early 1870s"); see also *Hendrick* v. *Lindsay*, 93 U. S. 143, 149 (1876) (concluding that "the right of a party to

_____

[6] For example, we have recognized immunities in the §1983 context when a "'tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that "Congress would have specifically so provided had it wished to abolish"'" that particular immunity. *Wyatt*, 504 U. S., at 164 (quoting *Owen* v. *Independence*, 445 U. S. 622, 637 (1980)); see also *Tenney* v. *Brandhove*, 341 U. S. 367, 372–376 (1951) (rooting immunity in a well-settled, pre-Revolutionary tradition that Congress could not be thought to have "covert[ly]" abrogated). We relied on similar reasoning when consulting well-settled common-law principles to determine the "contours of a [§1983] claim," *Nieves* v. *Bartlett*, 587 U. S. ___, ___ (2019) (slip op., at 12), the accrual date for §1983 claims, *McDonough* v. *Smith*, 588 U. S. ___, ___ (2019) (slip op., at 5) (citing, *inter alia*, *Heck* v. *Humphrey*, 512 U. S. 477, 483 (1994)), and "prerequisites for th[e] recovery" of monetary damages, *id.*, at 483 (citing *Carey* v. *Piphus*, 435 U. S. 247, 257–258 (1978)).

maintain assumpsit on a promise not under seal, made to
another for his benefit, . . . is now the prevailing rule in this
country").[7]  "[S]omething more than 'ambiguous historical
evidence' is required before we will 'flatly overrule a num-
ber of major decisions of this Court,'" *Gamble* v. *United
States*, 587 U. S. ___, ___ (2019) (slip op., at 11), as HHC
essentially asks us to do here.

Second, because "[t]here is no doubt that the cause of ac-
tion created by §1983 is, and was always regarded as, a tort
claim," *Monterey* v. *Del Monte Dunes at Monterey, Ltd.*, 526
U. S. 687, 727 (1999) (Scalia, J., concurring in part and con-
curring in judgment), HHC's particular focus on 1870s law
governing third-party-beneficiary suits in contract is, at the
very least, perplexing.  If there is a reason that the princi-
ples governing those suits should be read to displace the
plain scope of §1983's "'species of tort liability,'" *Heck* v.
*Humphrey*, 512 U. S. 477, 483 (1994), HHC has utterly
failed to identify it.

We have no doubt that HHC wishes §1983 said something
else.  But that is "an appeal better directed to Congress."
*Nieves* v. *Bartlett*, 587 U. S. ___, ___ (2019) (GORSUCH, J.,
concurring in part and dissenting in part) (slip op., at 2).
Hewing to §1983's text and history (not to mention our prec-
edent and constitutional role), we reject HHC's request, and
reaffirm that "laws" in §1983 means what it says.  *Thi-
boutot*, 448 U. S., at 4.[8]

---

[7] Black's Law Dictionary 154 (11th ed. 2019) (defining assumpsit, as
relevant, as a "common-law action for . . . breach of a contract").

[8] HHC's reply brief retreats from its initial ask, by appearing to con-
cede that Spending Clause legislation *can* secure individual rights under
§1983, but (it says) only if the statutory language "giv[es] funding recip-
ients clear notice."  Reply Brief 1.  This newly minted argument contra-
dicts the opening brief's categorical claims about the scope of §1983.  In
any event, the well-established requirement that Congress must have
"unambiguously conferred" a §1983-enforceable right in a Spending
Clause statute ensures the clear notice that HHC's reply brief requests.
*Gonzaga Univ.* v. *Doe*, 536 U. S. 273, 279–280, 283 (2002); Part III, *infra*.

### III

The FNHRA *can* create §1983-enforceable rights.  But do the two FNHRA provisions at issue in this case actually do so?  In that respect, our precedent sets a demanding bar: Statutory provisions must *unambiguously* confer individual federal rights.  *Gonzaga*, 536 U. S., at 280.  For the reasons explained below, we conclude that the bar has been cleared with respect to the presently contested provisions.  And while the FNHRA itself might nevertheless evince Congress's intent to preclude the use of §1983 to enforce these particular rights, *id.*, at 284, n. 4, we hold further that it does not.

### A

The FNHRA provisions at issue in this case, like the rest of the Act, stem from a longstanding national commitment to provide safe and dignified care for the elderly.  Since as early as the Social Security Act of 1935, federal law has aimed in myriad ways to promote nursing homes that provide quality services.  Yet, concerns about the poor condition of such facilities persisted even after Congress enacted the 1965 Medicare and Medicaid Acts,[9] partly due to widespread noncompliance with existing federal and state laws. See Institute of Medicine, Improving the Quality of Care in Nursing Homes 2–3, 11, 241–246 (1986); H. R. Rep. No. 100–391, pt. 1, pp. 448–452 (1987).  Thus, in 1987, Congress passed, and President Ronald Reagan signed, the FNHRA, effecting a "seismic shift" in nursing-home quality standards.  B. Furrow, T. Greaney, S. Johnson, T. Jost, & R. Schwartz, Health Law 51 (3d ed. 2015) (Health Law).[10]  The

———————

[9] Medicare "provides Government-funded health insurance to" millions of "elderly or disabled Americans," while Medicaid "provides health insurance to all low-income individuals, regardless of age or disability." *Becerra* v. *Empire Health Foundation, for Valley Hospital Medical Center*, 597 U. S. ___, ___–___ (2022) (slip op., at 2–3).

[10] The Omnibus Budget Reconciliation Act of 1987 added the FNHRA

FNHRA is largely composed of a litany of statutory requirements that Congress laid out for Medicaid-participant States and "nursing facilities." §1396a(a)(28).[11] Those include "[r]equirements relating to residents' rights," §1396r(c) (boldface deleted), two of which Talevski's complaint invoked.

The first requires nursing facilities to "protect and promote" residents' "right to be free from . . . any physical or chemical restraints imposed for purposes of discipline or convenience and not required to treat the resident's medical symptoms." §1396r(c)(1)(A)(ii) (referred to herein as "the unnecessary-restraint provision"). The second appears in a subparagraph concerning "[t]ransfer and discharge rights," §1396r(c)(2)(A) (boldface deleted), and tells nursing facilities that they "must not transfer or discharge [a] resident" unless certain enumerated preconditions, including advance notice of such a transfer or discharge, are met. *E.g.*, §§1396r(c)(2)(A)–(B) (referred to herein as "the predischarge-notice provision").

As for enforcement, like other aspects of Medicaid, the FNHRA anticipates "cooperative federalism"—*i.e.*, federal and state actors working together—to carry out the statute's aims. *Wisconsin Dept. of Health and Family Servs.* v. *Blumer*, 534 U. S. 473, 495 (2002). Thus, qualifying State Medicaid plans, which are approved by the Secretary of the U. S. Department of Health and Human Services (HHS Secretary), §1396a(b), must include provisions that relate to

_____

to Title XIX of the Social Security Act, *i.e.*, Medicaid. See 101 Stat. 1330–182. The FNHRA added a materially identical section to the Medicare-focused portion of the Social Security Act, 101 Stat. 1330–160, 42 U. S. C. §1395i–3 *et seq.* Because Talevski's complaint relies only on the Medicaid-related FNHRA provisions, App. to Pet. for Cert. 76a, we hereafter follow the parties and the Court of Appeals in referring only to the pertinent Medicaid provisions, as codified in the U. S. Code (§§1396a(a)(28), 1396r).

[11] "Nursing facility" is the FNHRA's term for a nursing home. §1396r(a).

nursing facilities, and must require "any nursing facility receiving payments under" the plan to satisfy certain FNHRA mandates. §1396a(a)(28). The HHS Secretary must also "assure that" approved state plans—and "the enforcement of [plan] requirements"—are, *inter alia*, "adequate" to "protect the health, safety, welfare, and rights of [nursing-home] residents." §1396r(f)(1).

The FNHRA also establishes a detailed administrative scheme for government inspections of nursing facilities. §1396r(g). "Surveys" (in the statute's parlance) must be conducted to detect nursing homes that are falling short of the FNHRA's minimum standards, and state and federal officials must periodically file certifications, based on these surveys, regarding nursing-home compliance, see §1396r(g)(1)(A). In addition, the statute authorizes government actors to sanction and correct noncompliant facilities, or, if appropriate, exclude them from the Medicaid program entirely. §1396r(h); see also Health Law 56–63.

### B

#### 1

Although federal statutes have the potential to create §1983-enforceable rights, they do not do so as a matter of course. For Spending Clause legislation in particular, we have recognized that "'the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State.'" *Gonzaga*, 536 U. S., at 280 (quoting *Pennhurst*, 451 U. S., at 28). The parties here thus dispute whether this is the atypical case; that is, whether the unnecessary-restraint and predischarge-notice provisions of the FNHRA "unambiguously confe[r]" individual rights, making those rights "presumptively enforceable" under §1983. 536 U. S., at 283–284.

*Gonzaga* sets forth our established method for ascertaining unambiguous conferral.  Courts must employ traditional tools of statutory construction to assess whether Congress has "unambiguously conferred" "individual rights upon a class of beneficiaries" to which the plaintiff belongs. *Id.*, at 283, 285–286; see also *Rancho Palos Verdes* v. *Abrams*, 544 U. S. 113, 120 (2005).  Notably, it must be determined that "Congress intended to create a federal right *for* the identified class, not merely that the plaintiffs fall "within the general zone of interest that the statute is intended to protect." *Gonzaga*, 536 U. S., at 283 (emphasis deleted).  This paradigm respects Congress's primacy in this arena and thus vindicates the separation of powers. *Id.*, at 286.

We have held that the *Gonzaga* test is satisfied where the provision in question is "'phrased in terms of the persons benefited'" and contains "rights-creating," individual-centric language with an "'unmistakable focus on the benefited class.'" *Id.*, at 284, 287 (emphasis deleted).  Conversely, we have rejected §1983 enforceability where the statutory provision "contain[ed] no rights-creating language"; had "an aggregate, not individual, focus"; and "serve[d] primarily to direct the [Federal Government's] distribution of public funds." *Id.*, at 290.

If a statutory provision surmounts this significant hurdle, it "secure[s]" §1983-enforceable rights, consistent with §1983's text.  And because "§1983 generally supplies a remedy for the vindication of rights secured by federal statutes," rights so secured are deemed "presumptively enforceable" under §1983. *Gonzaga*, 536 U. S., at 284.

### 2

The unnecessary-restraint and predischarge-notice provisions meet this test.  To start, we note that both reside in 42 U. S. C. §1396r(c), which expressly concerns "[r]equirements *relating to residents' rights.*" *Ibid.* (emphasis added;

boldface deleted); see also *West Virginia* v. *EPA*, 597 U. S. ___, ___ (2022) (slip op., at 16) (statutory provisions "'must be read in their context and with a view to their place in the overall statutory scheme'"). This framing is indicative of an individual "rights-creating" focus. *Gonzaga*, 536 U. S., at 284. Examined further, the text of the unnecessary-restraint and predischarge-notice provisions unambiguously confers rights upon the residents of nursing-home facilities.

The unnecessary-restraint provision requires nursing homes to "protect and promote . . . *[t]he right* to be free from . . . any physical or chemical restraints imposed for purposes of discipline or convenience and not required to treat *the resident's* medical symptoms." §1396r(c)(1)(A)(ii) (emphasis added). The provision's enumerated exceptions further sustain the focus on individual residents. For example, nursing homes may use restraints "to ensure the physical safety *of the resident or other residents*," but "only upon the written order of a physician that specifies the duration and circumstances under which the restraints are to be used" (absent emergency circumstances specified by the HHS Secretary). §§1396r(c)(1)(A)(ii)(I)–(II) (emphasis added).

The predischarge-notice provision is more of the same. Nestled in a paragraph concerning "transfer and discharge *rights*," §1396r(c)(2) (emphasis added; boldface deleted), that provision tells nursing facilities that they "must not transfer or discharge [a] *resident*" unless certain preconditions are met, including advance notice of the transfer or discharge to the resident and his or her family. §§1396r(c)(2)(A)–(B) (emphasis added). And, again, the statute's caveats remain focused on individual residents: A nursing home may transfer or discharge such an individual if, among other things, the transfer is "necessary to meet *the resident's* welfare"; or if the resident's health has improved so much that the facility is no longer necessary; or if

the safety or health of other individuals would be endangered. §1396r(c)(2)(A) (emphasis added). The exceptions to the advance-notice requirement, too, turn (*inter alia*) on the "*resident's* health," the "*resident's* urgent medical needs," or the existence of threats to the safety or health of other individuals in the nursing home. §§1396r(c)(2)(B)(ii)(I)–(III) (emphasis added).

To be sure, these two provisions also establish who it is that must respect and honor these statutory rights; namely, the Medicaid-participant nursing homes in which these residents reside. See, *e.g.*, §§1396a(a)(28), 1396r(c)(1)(A), 1396r(c)(2)(A); see also §§1396r(c)(1)(B)(i)–(ii) (requiring nursing homes to inform nursing-home residents of their rights, orally and in writing, upon admission and upon request). But that is not a material diversion from the necessary focus on the nursing-home residents, contrary to HHC's representations. Indeed, it would be strange to hold that a statutory provision fails to secure rights simply because it considers, alongside the rights bearers, the actors that might threaten those rights (and we have never so held).[12]

The unnecessary-restraint and predischarge-notice provisions thus stand in stark contrast to the statutory provisions that failed *Gonzaga*'s test in *Gonzaga* itself. Those provisions lacked "rights-creating language," primarily directed the Federal Government's "distribution of public funds," and had "an aggregate, not individual, focus." 536 U. S., at 290. The opposite is true here. The unnecessary-restraint and predischarge-notice provisions use clear "rights-creating language," speak "'in terms of the persons benefited,'" and have an "'unmistakable focus on the benefited class.'" *Id.*, at 284, 287, 290 (emphasis deleted). Thus, they satisfy *Gonzaga*'s stringent standard, and the rights

––––––––

[12]The Fourteenth Amendment hardly fails to secure §1983-enforceable rights because it directs state actors not to deny equal protection.

they recognize are presumptively enforceable under §1983.

### C

Even if a statutory provision unambiguously secures rights, a defendant "may defeat t[he] presumption by demonstrating that Congress did not intend" that §1983 be available to enforce those rights. *Rancho Palos Verdes*, 544 U. S., at 120.[13] For evidence of such intent, we have looked to "the statute creating the right." *Ibid.* A statute could, of course, expressly forbid §1983's use. *Fitzgerald*, 555 U. S., at 252; *Rancho Palos Verdes*, 544 U. S., at 120. Absent such a sign, a defendant must show that Congress issued the same command implicitly, by creating "a 'comprehensive enforcement scheme that is incompatible with individual enforcement under §1983.'" *Id.*, at 120. Only the latter path is at issue here.

### 1

Our precedent outlines what HHC must show to traverse the implicit-preclusion path. "'The crucial consideration'" is whether "Congress intended a statute's remedial scheme to 'be *the exclusive avenue* through which a plaintiff may assert [his] claims.'" *Fitzgerald*, 555 U. S., at 252 (quoting *Smith* v. *Robinson*, 468 U. S. 992, 1009, 1012 (1984) (emphasis added)); *Fitzgerald*, 555 U. S., at 252 (framing "'[t]he

———————

[13]The "'rebuttable presumption'" that our cases describe, *Rancho Palos Verdes*, 544 U. S., at 120, is not an artificially onerous court-made hurdle. It merely reflects what §1983's plain text commands: The §1983 remedy is available to vindicate federal individual rights "secured by . . . la[w]." In other words, the presumption recognizes that, even where Congress has unambiguously secured certain federal individual rights by law, it *may* have simultaneously given good reason (detectable with ordinary interpretive tools) to conclude that the §1983 remedy is not available for those rights, even though it "generally" is. *Gonzaga*, 536 U. S., at 284, and n. 4. And it also recognizes that it is the defendant's burden to show that a right otherwise secured by law is not §1983 enforceable. *Rancho Palos Verdes*, 544 U. S., at 120; *Gonzaga*, 536 U. S., at 284, and n. 4.

critical question'" as "'whether Congress meant [the stat-
ute's remedial scheme] to coexist with . . . a §1983 action'"
(quoting *Rancho Palos Verdes*, 544 U. S., at 120–121)).

Our precedents make clear that the *sine qua non* of a find-
ing that Congress implicitly intended to preclude a private
right of action under §1983 is incompatibility between en-
forcement under §1983 and the enforcement scheme that
Congress has enacted. 555 U. S., at 252–254. We have used
many terms and concepts to describe the necessary discord-
ance between §1983 and a rights-conferring statute's reme-
dial scheme: "'incompatible,'" "'inconsistent,'" and
"thwar[t]" are examples. *Id.*, at 252–255. In all events, the
question is whether the design of the enforcement scheme
in the rights-conferring statute is inconsistent with enforce-
ment under §1983, such that a court must infer that "Con-
gress did not intend" to make available the "[§1983] remedy
for [these] newly created right[s]." *Rancho Palos Verdes*,
544 U. S., at 120; see also *Fitzgerald*, 555 U. S., at 252.

Put another way, the inquiry boils down to what Con-
gress intended, as divined from text and context. The ap-
plication of the traditional tools of statutory construction to
a statute's remedial scheme may reveal no incompatibility
between the enforcement scheme that Congress crafted in
the rights-conferring statute and enforcement under §1983,
or it may uncover sufficient incompatibility to make mani-
fest Congress's intent to preclude §1983 actions. See, *e.g.*,
*id.*, at 253 (explaining a past implicit-preclusion case on the
ground that permitting §1983 claims there would have
"thwarted Congress' intent"); *Rancho Palos Verdes*, 544
U. S., at 127 (§1983's operation would have "distort[ed]" the
pertinent other statute's remedial scheme).

## 2

We discern no incompatibility between the FNHRA's re-
medial scheme and §1983 enforcement of the rights that the
unnecessary-restraint and predischarge-notice provisions

unambiguously secure.

As explained in Part III–A, *supra*, the FNHRA details administrative processes concerning inspection of covered nursing facilities and accountability for noncompliant facilities. But the statute lacks any indicia of congressional intent to preclude §1983 enforcement, such as an express private judicial right of action or any other provision that might signify that intent. See, *e.g.*, *id.*, at 121 ("[T]he existence of a more restrictive private remedy [in the statute itself] for statutory violations has been the dividing line between those cases in which we have held that an action would lie under §1983 and those in which we have held that it would not"). Nor has HHC otherwise demonstrated that enforcement via §1983 would thwart the operation of the administrative remedial scheme in any respect.

HHC's argument that we need look no further than the detail of the FNHRA's enforcement mechanisms to find conclusive evidence of implicit preclusion is unpersuasive. Implicit preclusion is shown by a "'comprehensive enforcement scheme *that is incompatible* with individual enforcement under §1983.'" *Fitzgerald*, 555 U. S., at 252 (emphasis added). HHC's single-minded focus on comprehensiveness mistakes the shadow for the substance, and it disregards the import of these FNHRA provisions' unambiguous conferral of rights. The attendant presumption is that §1983 can play its textually prescribed role as a vehicle for enforcing those rights, even alongside a detailed enforcement regime that also protects those interests, so long as §1983 enforcement is not "'incompatible'" with Congress's handiwork. *Rancho Palos Verdes*, 544 U. S., at 120, 122; *Blessing* v. *Freestone*, 520 U. S. 329, 347–348 (1997) (collecting cases).

To be clear, a defendant *can* discharge its burden of showing that the presumption is rebutted by pointing to a comprehensive scheme. *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1, 20 (1981)

(statutory "remedial devices" that are "sufficiently comprehensive . . . may suffice" to show implicit preclusion). But when a particular comprehensive remedial scheme discharges the defendant's burden, it does so because the application of ordinary interpretive tools reveals incompatibility, *i.e.*, it demonstrates that "Congress intended [that] statute's remedial scheme to be the 'exclusive avenue through which a plaintiff may assert [his] claims.'" *Fitzgerald*, 555 U. S., at 252.

Nothing in the FNHRA indicates the incompatibility evinced in our three prior cases finding implicit preclusion. *Rancho Palos Verdes*, 544 U. S., at 120–123, 127; *Smith*, 468 U. S., at 1008–1013; *Sea Clammers*, 453 U. S., at 6–7, 19–21. *Rancho Palos Verdes*, *Smith*, and *Sea Clammers* concerned statutes with self-contained enforcement schemes that included statute-specific rights of action. *Rancho Palos Verdes*, 544 U. S., at 120–123; *Smith*, 468 U. S., at 1008–1012; *Sea Clammers*, 453 U. S., at 6–7, 17, and n. 27, 19–21. Each such statute required plaintiffs to "comply with particular procedures and/or to exhaust particular administrative remedies" under the statute's enforcement scheme before suing under its dedicated right of action. *Fitzgerald*, 555 U. S., at 254. And each statute-specific right of action offered fewer benefits than those available under §1983. *Ibid.*, and n. 1. Thus, in all three cases, §1983's operation would have thwarted Congress's scheme coming and going: It would have "circumvented" the statutes' presuit procedures, and would have also "given plaintiffs access to tangible benefits" as remedies that were "unavailable under the statutes." *Id.*, at 254. Those "'comprehensive enforcement scheme[s]'" were "'incompatible with individual enforcement under §1983.'" *Id.*, at 252 (quoting *Rancho Palos Verdes*, 544 U. S., at 120).

HHC has identified no equivalent sign in the FNHRA; nor has JUSTICE ALITO, see *post*, at 1, 3–5 (dissenting opinion). In focusing on what the FNHRA contains, they ignore

what it lacks—a private judicial right of action, a private federal administrative remedy, or any "'carefu[l]'" congressional "'tailor[ing],'" *Fitzgerald*, 555 U. S., at 255, that §1983 actions would "distort," *Rancho Palos Verdes*, 544 U. S., at 127. HHC seems to think it enough to show that Congress was not slipshod in crafting the remedial scheme. But in a world where the FNHRA's remedial scheme could "complement," not "supplant, §1983," *id.*, at 122, HHC must demonstrate more than that.

One last rebuttal argument warrants addressing. The United States says that, because private entities owned most nursing homes when the FNHRA was enacted in 1987 (as they do now), the FNHRA is a rare bird for implicit-preclusion purposes. In the United States' view, because Congress knew that most nursing homes could not be subject to suit under §1983 anyway, see, *e.g.*, *Polk County* v. *Dodson*, 454 U. S. 312, 317–319 (1981), the FNHRA's remedial scheme "necessarily reflects Congress's judgment that these administrative enforcement mechanisms appropriately protect the rights the statute confers," Brief for United States as *Amicus Curiae* 31.

This argument is unavailing. The implicit-preclusion inquiry looks to "the *statute* creating the right" and any "'comprehensive enforcement scheme'" Congress has created in the statute "'that is incompatible with individual enforcement under §1983.'" *Rancho Palos Verdes*, 544 U. S., at 120 (emphasis added). It does not invite speculation about ostensible marketplace realities that appear nowhere in the statute's text or relevant context. The relevant FNHRA provisions speak in neutral terms that do not distinguish between private and public nursing homes. And, regardless, the question remains whether something in the FNHRA has foreclosed §1983's "genera[l]" availability as "a remedy for the vindication of rights secured by federal statutes." *Gonzaga*, 536 U. S., at 284. We see no such sign,

much less a license for us to construct and impute congressional intent that the FNHRA does not embody.

The difficulty for HHC and the United States is that implicit preclusion, in this context, requires something in the statute that shows that permitting §1983 to operate would "thwar[t] Congress' intent" in crafting the FNHRA. *Fitzgerald*, 555 U. S., at 253. We see nothing in the FNHRA that even hints at Congress's intent in this regard; if anything, the language of the Act confirms otherwise, for it plainly states that "[t]he remedies provided under" its enforcement-process subsection are "*in addition to* those otherwise available under State or Federal law and shall not be construed as limiting such other remedies." §1396r(h)(8) (emphasis added).[14] We will not rewrite §1396r(h)(8) in lieu of rewriting §1983.[15]

*     *     *

At oral argument, HHC's counsel remarked that the "right question" is "what rights are secured by law within

_____

[14] We found similar (but not identical) language to be insufficient to preserve the presumption in *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1 (1981), and *Rancho Palos Verdes* v. *Abrams*, 544 U. S. 113 (2005). See *id.*, at 125–127. But those clauses did not purport to preserve "other remedies," and were embedded in statutes that (unlike the FNHRA) contained private judicial rights of action. See *ibid.*; *Sea Clammers*, 453 U. S., at 6–7, 20, and n. 31. The FNHRA's explicitly expressed objective of preserving other remedies bolsters our reluctance to infer implicit displacement of the §1983 remedy. We think JUSTICE ALITO's response in this regard overreads *Rancho Palos Verdes*. See *post*, at 6. That case merely provided an unremarkable description of *Sea Clammers*' "refus[al] to read" the saving clauses there as preserving §1983 actions, in light of the different (and significant) textual and contextual evidence of preclusion that the statutes at issue provided. *Rancho Palos Verdes*, 544 U. S., at 127.

[15] The United States' suggestion that §1396r(h)(8) just ensures that remedies available under non-FNHRA, non-§1983 statutes remain available is not persuasive. Brief for United States as *Amicus Curiae* 34. Nothing in the Act supports interpreting §1396r(h)(8)'s language in that manner, especially given §1983's unqualified command.

the meaning of §1983." Tr. of Oral Arg. 39. That is an accurate statement of the key issue in this case. Section 1983 itself provides the answer. By its terms, §1983 is available to enforce every right that Congress validly and unambiguously creates; we will not impose a categorical font-of-power condition that the Reconstruction Congress did not. And, here, the test that our precedents establish leads inexorably to the conclusion that the FNHRA secures the particular rights that Talevski invokes, without otherwise signaling that enforcement of those rights via §1983 is precluded as incompatible with the FNHRA's remedial scheme.

    Accordingly, we affirm the judgment of the Court of Appeals.

<em>It is so ordered.</em>

# SUPREME COURT OF THE UNITED STATES

_____

No. 21–806

_____

HEALTH AND HOSPITAL CORPORATION OF MARION
COUNTY, ET AL., PETITIONERS v. IVANKA TALEVSKI,
AS PERSONAL REPRESENTATIVE OF THE ESTATE
OF GORGI TALEVSKI, DECEASED

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[June 8, 2023]

JUSTICE GORSUCH, concurring.

Section 1983 permits individuals to sue to vindicate their
"rights . . . secured by . . . la[w]." Rev. Stat. §1979, 42
U. S. C. §1983. I agree with the Court's disposition of the
two questions we took this case to decide and in arriving
there largely track JUSTICE BARRETT's reasoning. First, the
Federal Nursing Home Reform Act qualifies as a "law" for
purposes of §1983. _Post,_ at 1 (BARRETT, J., concurring).
Second, the text of the Act's operative provisions refers to
individual "rights." _Post,_ at 2–4 (same). But, to my mind,
there are other issues lurking here that petitioners failed to
develop fully—whether legal rights provided for in spend-
ing power legislation like the Act are "secured" as against
States in particular and whether they may be so secured
consistent with the Constitution's anti-commandeering
principle. See, _e.g., National Federation of Independent
Business_ v. _Sebelius,_ 567 U. S. 519, 575–578 (2012); _Mur-
phy_ v. _National Collegiate Athletic Assn.,_ 584 U. S. ___, ___–
___ (2018) (slip op., at 14–18). As I see it, those are ques-
tions for another day.

# SUPREME COURT OF THE UNITED STATES

———————

No. 21–806

———————

## HEALTH AND HOSPITAL CORPORATION OF MARION COUNTY, ET AL., PETITIONERS *v.* IVANKA TALEVSKI, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF GORGI TALEVSKI, DECEASED

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[June 8, 2023]

JUSTICE BARRETT, with whom THE CHIEF JUSTICE joins, concurring.

Today's opinion makes three important points. First, *Maine* v. *Thiboutot* remains good law. 448 U. S. 1 (1980). Second, *Gonzaga University* v. *Doe* sets the standard for determining when a Spending Clause statute confers individual rights, and the Federal Nursing Home Reform Act (FNHRA) satisfies it. 536 U. S. 273 (2002). Third, courts must carefully consider whether individual rights established by a Spending Clause statute are enforceable through 42 U. S. C. §1983—in the FNHRA's case, they are.

As to the first point: Section 1983 provides a cause of action against "[e]very person" who, under color of state law, violates "any rights, privileges, or immunities secured by the Constitution and laws." In *Thiboutot*, we held that the plain language of the statute was not limited to "some subset of laws." 448 U. S., at 4. Rather, the term "laws" encompasses all federal laws, including those passed pursuant to Congress's Spending Clause authority. *Ibid.* Like the Court, I would not abandon that holding based on petitioners' novel contract-law theory.

Second, our decision in *Gonzaga* establishes the standard for analyzing whether Spending Clause statutes give rise to

individual rights. Under *Gonzaga*, courts must ask whether "text and structure" indicate that the statute "unambiguously" confers federal rights. 536 U. S., at 283, 286. Relevant considerations include whether the statute is "'phrased in terms of the persons benefited,'" whether it uses "explicit rights-creating terms," and whether it has an "individual," rather than an "aggregate," focus. *Id.*, at 284, 290.

This bar is high, and although the FNHRA clears it, many federal statutes will not. As the Court explains, §1983 actions are the exception—not the rule—for violations of Spending Clause statutes. *Ante*, at 13. This is because "the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 28 (1981). Indeed, since *Pennhurst*, we have interpreted only two Spending Clause statutes to be enforceable through §1983. See *Wright* v. *Roanoke Redevelopment and Housing Authority*, 479 U. S. 418, 432 (1987); *Wilder* v. *Virginia Hospital Assn.*, 496 U. S. 498, 522–523 (1990).

The third point is that even when a statute unambiguously confers rights, Congress can "supplant any remedy that otherwise would be available under §1983." *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1, 21 (1981). At this step of the analysis, courts should apply ordinary interpretive tools to determine whether the statute allows access to §1983. *Ante*, at 18; see *Sea Clammers*, 453 U. S., at 13, 20–21 ("We look first, of course, to the statutory language, particularly to the provisions made therein for enforcement and relief"). In some cases, the text may expressly forbid §1983 actions. In others, context may point to the same result. It is especially telling, for example, if the statute "'creat[es] a comprehen-

sive enforcement scheme that is incompatible with individual enforcement under §1983.'" *Gonzaga*, 536 U. S., at 284–285, n. 4.

As the Court notes, the presence of an "express private judicial right of action" typically demonstrates that a §1983 suit is not also available. *Ante*, at 19; see *Rancho Palos Verdes* v. *Abrams*, 544 U. S. 113, 121 (2005) (express cause of action "is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under §1983"). When the statutory cause of action restricts available remedies or imposes procedural hurdles to obtaining relief, the inference is even stronger. See *Fitzgerald* v. *Barnstable School Comm.*, 555 U. S. 246, 254 (2009) (considering whether a §1983 suit "would have circumvented these procedures and given plaintiffs access to tangible benefits—such as damages, attorney's fees, and costs—that were unavailable under the statut[e]"); *Rancho Palos Verdes*, 544 U. S., at 122–123 (similar).

But an actual clash—one private judicial remedy against another, more expansive remedy—is not required to find that a statute forecloses recourse to §1983. Our cases have looked to a wide range of contextual clues, like "enforcement provisions" that "confe[r] authority to sue . . . on government officials," *Sea Clammers*, 453 U. S., at 13, 20, and any "administrative remedies" that the statute offers, *Smith* v. *Robinson*, 468 U. S. 992, 1012 (1984). We have noted the relevance of a centralized review mechanism that would be undermined by piecemeal litigation. *Gonzaga*, 536 U. S., at 289–290 (statute directed the Secretary of Education to establish a review board to investigate and adjudicate alleged violations). And we have regularly taken account of the overall comprehensiveness of the statute's enforcement scheme. The more comprehensive the scheme, the less likely that it leaves the door open for §1983 suits. *Sea Clammers*, 453 U. S., at 20 ("When the remedial devices provided in a particular Act are sufficiently comprehensive,

they may suffice to demonstrate congressional intent to pre-
clude the remedy of suits under §1983"); *Smith*, 468 U. S.,
at 1011–1012 (§1983 suits unavailable "[i]n light of the com-
prehensive nature of the procedures and guarantees set
out" in the statute). None of these features is necessarily
determinative, but each is part of the larger picture that
courts must assess.

Courts must tread carefully before concluding that
Spending Clause statutes may be enforced through §1983.
In this case, however, the Seventh Circuit correctly allowed
Talevski's §1983 suit to proceed. I therefore join the Court's
opinion in full.

# SUPREME COURT OF THE UNITED STATES

_____

No. 21–806

_____

## HEALTH AND HOSPITAL CORPORATION OF MARION COUNTY, ET AL., PETITIONERS v. IVANKA TALEVSKI, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF GORGI TALEVSKI, DECEASED

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[June 8, 2023]

JUSTICE THOMAS, dissenting.

I agree with JUSTICE ALITO that the Federal Nursing Home Reform Act (FNHRA) cannot be enforced through Rev. Stat. §1979, 42 U. S. C. §1983, under *Gonzaga Univ.* v. *Doe*, 536 U. S. 273 (2002). I write separately to highlight another and more fundamental reason why FNHRA cannot be enforced under §1983. Section 1983 provides a cause of action to redress only "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." But legislation enacted pursuant to Congress' spending power, like FNHRA, does not "secure" rights by "law."

For nearly all of our Nation's history, it was understood that there is a fundamental difference between the exercise of Congress' sovereign legislative powers, on the one hand, and the exercise of its power to spend money and to attach conditions to the receipt of that money, on the other. Only the former sort of legislation, which imposes obligations on regulated parties with the force of law, directly secures by law the rights corresponding to those obligations. By contrast, an exercise of Congress' spending power, whether it comes from the so-called Spending Clause or elsewhere in the Constitution, is no more than a disposition of funds. As

such, a *conditional* exercise of the spending power is nothing more than a contractual offer; any "rights" that may flow from that offer are "secured" only by the offeree's acceptance and implementation, not federal law itself.

Since *Maine* v. *Thiboutot*, 448 U. S. 1 (1980), however, this Court has ignored that fundamental distinction, permitting third parties who benefit from spending conditions to enforce them in §1983 suits against state actors. In doing so, it has created a constitutional quandary: If spending conditions that benefit third parties are laws and secure rights in the same manner as ordinary lawmaking under Congress' sovereign legislative powers, then such conditions would contradict the bedrock constitutional prohibition against federal commandeering of the States. We escape this quandary only by recognizing spending conditions, not as rights-securing laws, but as the terms of possible contracts that secure rights only by virtue of an offeree's acceptance—the very conclusion compelled by the traditional understanding of the spending power. The choice between these alternatives is stark and unavoidable: Either spending conditions in statutes like FNHRA are not laws that secure rights cognizable under §1983, or they are unconstitutional direct regulations of States. The Court must, at some point, revisit its understanding of the spending power and its relation to §1983.

## I

This case arises from a §1983 suit to enforce FNHRA's spending conditions against a county-owned nursing home that receives federal funding. Enacted under Congress' spending power, FNHRA conditions the receipt of federal Medicaid funding by States and nursing facilities on compliance with a broad range of requirements.

These conditions largely consist of requirements that funding recipients protect certain "rights" of nursing-home residents. In a subsection entitled "[r]equirements relating

to residents' rights," the Act requires recipients to "protect and promote the rights of each resident," including "[t]he right to choose a personal attending physician" and make informed medical decisions; "[t]he right to be free from physical or mental abuse, corporal punishment, involuntary seclusion, and any [medically unnecessary] physical or chemical restraints"; and "[t]he right[s] to privacy" and "confidentiality." 42 U. S. C. §§1396r(c)(1)(A)(i)–(iv). The Act further provides that funding recipients "must permit each resident to remain in the facility and must not transfer or discharge the resident" without cause. §1396r(c)(2)(A). Recipients must also adopt procedures for residents to assert these "rights" and to otherwise "voice grievances with respect to [their] treatment or care." §1396r(c)(1)(A)(vi).

The Act also imposes many requirements directly and uniquely upon participating States, including in a subsection entitled "State requirements relating to nursing facility requirements." §1396r(e). For instance, States must establish procedures for residents to challenge transfer and discharge decisions and an appeals process for other determinations. §§1396r(e)(3) and (e)(7)(F). States are also required to certify non-state-run facilities' compliance with the Act's provisions by conducting annual surveys using protocols developed by the Secretary of Health and Human Services. §1396r(g)(2)(A). If a State finds that a facility is not providing adequate care, it must conduct an extended survey. §1396r(g)(2)(B). The Act also requires States to investigate resident complaints and perform onsite monitoring at previously noncompliant or potentially noncompliant facilities. §1396r(g)(4)(B). And, if it finds a violation that "jeopardize[s] the health or safety of [a facility's] residents, the State shall take immediate action to remove the jeopardy and correct the deficiencies." §1396r(h)(1)(A).[1]

_____

[1] This survey merely scratches the surface of the requirements that FNHRA imposes upon participating States. See also, *e.g.*, 42 U. S. C.

FNHRA's scheme is illustrative of many modern federal spending programs, which often impose obligations directly on States as a condition of funding. For example, as a condition on highway funding, the Clean Air Act requires States to draft "State implementation plans" if their metropolitan areas fail to satisfy national ambient air quality standards. 42 U. S. C. §§7410 and 7509(a)–(b). Among other requirements, these plans must include emission limitations, compliance timetables, source monitoring, permitting systems, enforcement programs, and public participation. See §7410(a)(2). Other examples, spanning virtually every domain of national and state policy, abound.

The ubiquity of such spending conditions, combined with the Federal Government's overwhelming financial heft, has made Spending Clause legislation an extraordinarily potent instrument of federal control.[2]  Congress and federal

———————

§1396r(e)(4) ("[T]he State must have implemented and enforced the nursing facility administrator standards developed" by the Secretary for Health and Human Services); §1396r(e)(7)(B)(i)(I) (in the case of mentally ill residents, "the State . . . must review and determine . . . whether or not the resident . . . requires the level of services provided by a nursing facility" or the services of different institutions).

[2]The power of this tool has grown with the steady increase in federal income-tax revenues since the adoption of the Sixteenth Amendment. Although the Revenue Act of 1913 accounted for only 10% of federal revenue, by 1950 the income tax was the Nation's largest source of revenue, and, by 2010, it accounted for a whopping 82% of federal revenue overall. E. Jensen, Did the Sixteenth Amendment Ever Matter? Does It Matter Today? 108 Nw. U. L. Rev. 799, 807, n. 44 (2014). This explosion of funds created unprecedented threats to federalism due to the increased use of grants. Federal "[m]onetary grants, so-called grants-in-aid, became more frequent during the 1930's, and by 1950 they had reached $20 billion or 11.6% of state and local government expenditures." *National Federation of Independent Business* v. *Sebelius*, 567 U. S. 519, 674 (2012) (*NFIB*) (joint dissent of Scalia, Kennedy, Thomas, and Alito, JJ.) (citation and footnote omitted). "By 1970 this number had grown to $123.7 billion or 29.1% of state and local government expenditures . . . . As of 2010, federal outlays to state and local governments came to over $608

agencies "regularly us[e] conditions to direct state and local governments in their regulatory and spending policies." P. Hamburger, Purchasing Submission 139 (2021) (Hamburger). As a result, "the priorities and programs of state and local governments have increasingly come to reflect federal decisions," to the point that the States have virtually become "disaggregated sites of national governance, not separate sovereigns." *Id.*, at 141 (internal quotation marks omitted). Given the profound consequences of spending conditions for the Nation's governance and the fundamental shift that they have wrought in our federalist system, a sound understanding of their constitutional basis and permissible legal effects is essential.

## II

This case presents one aspect of that question: whether spending conditions that impose obligations on States for the benefit of third parties may be enforced under §1983. That statute provides a cause of action against any "person who, under color" of state law, deprives the plaintiff "of any rights, privileges, or immunities secured by the Constitution and laws." Accordingly, for the violation of a federal statutory provision to give rise to a cognizable §1983 claim, the provision must confer "rights, privileges, or immunities" that are "secured by . . . la[w]." This Court's cases make clear that a right is secured by law in the relevant sense if, and only if, federal law imposes a binding obligation on the defendant to respect a corresponding substantive right that belongs to the plaintiff.[3]

_____

billion or 37.5% of state and local government expenditures." *Ibid.* (footnotes omitted).

[3] See *Golden State Transit Corp.* v. *Los Angeles*, 493 U. S. 103, 106 (1989) ("[T]he plaintiff must assert the violation of a federal right. . . . In deciding whether a federal right has been violated, we have considered whether the provision in question creates obligations binding on the governmental unit" and "whether the provision in question was intended to benefit the putative plaintiff" (alteration and internal quotation marks

In *Thiboutot*, the Court held that "the plain language of [§1983] undoubtedly embraces [a] claim that [the defendant] violated" a spending-power statute, reasoning that "the phrase 'and laws' . . . means what it says" and is not "limited to some subset of laws." 448 U. S., at 4. The Court unquestioningly follows *Thiboutot*'s logic today.

It is obvious, however, that conditional spending legislation does not function—and, in particular, does not "secure rights"—like laws enacted under Congress' enumerated legislative powers, such as the Commerce Clause. The latter, which I will refer to as "sovereign legislative" or "regulatory" powers, include powers to directly impose obligations, duties, prohibitions, and the like on individuals and entities beyond the Federal Government, and hence to secure corresponding rights in the persons and entities to which such obligations are owed. Laws that Congress enacts pursuant to its regulatory powers are binding on the regulated parties and pre-empt contrary state law of their own force. Whatever rights such laws secure, those rights are secured "by the . . . laws" themselves. §1983.

By contrast, legislation that conditions a State's receipt of federal funds on compliance with certain requirements imposes no obligations and secures no rights of its own force. The stated conditions simply have no effect and do not arguably secure any rights ("by law" or otherwise) unless and until they are freely accepted by the State. Not only that, the Executive Branch can prevent the conditions

_____

omitted)); *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 15, 16, n. 12, 18–19 (1981) (repeatedly using the formula "rights and obligations" correlatively); see also W. Hohfeld, Some Fundamental Legal Conceptions as Applied in Judicial Reasoning, 23 Yale L. J. 16, 28–32 (1913). This rule, it should be noted, addresses *what it means* for private rights to be secured by law, a distinct question from the level of clarity with which Congress must speak before courts may infer that it intended to create such rights. See *Gonzaga Univ.* v. *Doe*, 536 U. S. 273, 290 (2002).

from taking effect by rejecting a State's application to participate in the spending program, and it can terminate their effect by cutting off a State's participation for noncompliance with the conditions. In addition, States can opt out of spending programs, completely nullifying whatever force the spending conditions once had. This alone suggests that spending conditions do not operate with the force of federal law, as "Congress' legislative powers cannot be avoided by simply opting out." D. Engdahl, The Contract Thesis of the Federal Spending Power, 52 S. D. L. Rev. 496, 498 (2007) (emphasis deleted); see also *Townsend* v. *Swank*, 404 U. S. 282, 292 (1971) (Burger, C. J., concurring in result) ("[A]dherence to the provisions of [spending statutes] is in no way mandatory upon the States under the Supremacy Clause").

Indeed, spending conditions like those in FNHRA do not function as laws enacted under Congress' regulatory powers, and, if they did, they would unconstitutionally commandeer the States to administer federal programs ranging from welfare, to healthcare, to air quality, and much more. Such conditions are thus constitutional, if at all, only if understood as setting forth the terms of a federal-state contract, rather than as binding federal law imposing legally enforceable obligations of its own force. In holding that FNHRA secures rights by federal law, the majority ignores the contractual understanding of spending conditions and, by doing so, calls their very constitutionality into question.

## A

As noted earlier, a defining characteristic of modern spending legislation is the imposition of obligations on States that accept federal funds. Understanding a State's breach of such obligations as akin to violating rights secured by federal law is incompatible with this Court's anti-commandeering doctrine. Under this bedrock constitutional principle, Congress generally cannot directly

regulate the States or require them to implement federal programs.

"When the original States declared their independence, they claimed the powers inherent in sovereignty." *Murphy* v. *National Collegiate Athletic Assn.*, 584 U. S. ___, ___ (2018) (slip op., at 14) (citing Declaration of Independence ¶32).[4] Later, in ratifying the Constitution, the people of the original States granted carefully enumerated legislative powers to the new Federal Congress, while preserving the States' pre-existing legislative power. 584 U. S., at ___ (slip op., at 15). "[C]onspicuously absent from" Congress' enumerated powers was "the power to issue direct orders to the governments of the States." *Ibid.*

Thus, as this Court has made clear, the Constitution "confers upon Congress the power to regulate individuals, not States." *New York* v. *United States*, 505 U. S. 144, 166 (1992).[5] As a corollary, Congress "may not conscript state governments as its agents," nor can it "require the States to govern according to [its] instructions." *Id.*, at 162, 178. And, "[w]hatever the outer limits of [state] sovereignty may be, one thing is clear: The Federal Government may not

_____

[4] The Articles of Confederation granted Congress only the power to act upon States; it had no power to directly regulate individuals. The Constitution flipped this arrangement by granting the Federal Government the power to regulate individuals directly, but not States. See *New York* v. *United States*, 505 U. S. 144, 162 (1992) ("'The people, through [the Constitution], established a more perfect union by substituting a national government, acting, with ample power, directly upon the citizens, instead of the Confederate government, which acted with powers, greatly restricted, only upon the States'" (quoting *Lane County* v. *Oregon*, 7 Wall. 71, 76 (1869); emphasis deleted)).

[5] Congress possesses limited powers to directly regulate the States under the Reconstruction Amendments. See, *e.g.*, *City of Boerne* v. *Flores*, 521 U. S. 507, 518 (1997). Due to the federalism concerns inherent in such regulation, these enforcement powers are cabined by the congruence-and-proportionality test. *Id.*, at 518–519. The careful tailoring of this exception vividly proves the rule.

compel the States to enact or administer a federal regula-
tory program." *Id.*, at 188.[6]

Yet that is precisely what many spending conditions re-
quire the State to do. Spending conditions like FNHRA's
are nothing more than commands to States, *qua* States, to
administer federal benefits programs on terms dictated by
Congress. Such conditions cannot be treated as having the
force of federal law imposing direct obligations on the
States and securing correlative rights of private parties
without violating the anticommandeering doctrine.

It is no answer that the States consent to direct regula-
tion by agreeing to the spending conditions in return for
federal dollars. As the Court held in *New York*, "[w]here
Congress exceeds its authority relative to the States, . . . the
departure from the constitutional plan cannot be ratified by
the 'consent' of state officials." *Id.*, at 182. Because the peo-
ple have surrendered only limited and enumerated powers
to the Federal Government, the States and Congress cannot
jointly circumvent the ratification and amendment process
by agreeing "to the enlargement of the powers of Congress
beyond those enumerated in the Constitution." *Ibid.* The
Federal Government cannot buy (or rent) the States' power
to implement a federal program and then regard the condi-
tions that the States are implementing themselves as hav-
ing the force of federal law.

B

Of course, it is ultimately the States' consent that gives
effect to conditions in spending legislation, but it does so in
an entirely different manner from an illicit expansion of

_____

[6]The anticommandeering doctrine protects "political subdivisions" of
States against federal cooptation, as well as the States themselves.
*Printz* v. *United States*, 521 U. S. 898, 935 (1997); see also *id.*, at 931,
n. 15 ("[T]he distinction in our Eleventh Amendment jurisprudence be-
tween States and municipalities is of no relevance here").

Congress' regulatory powers.  Rather, as the Court observed in *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1 (1981), "legislation enacted pursuant to the spending power is much in the nature of a contract." *Id.*, at 17.  A federal statute imposing conditions upon the receipt of federal funding does not enact those conditions with "the obligation of law"; it merely "proposes them as the terms of a contractual promise."  Hamburger 132.  Such spending provisions "merely stipulate what the government expects from recipients if it is to pay them or, later, not withhold further payment and demand its money back." *Ibid.*  Thus, "even when fully recited in statutes, federal conditions do not come with legal obligation." *Ibid.*

Further, and as already noted, the conditions in spending legislation only come into force upon the acceptance of another party.  Such conditions are thus "obligatory only by virtue of such agreement and not by force of law."  D. Engdahl, The Spending Power, 44 Duke L. J. 1, 104 (1994).  To be sure, "it is a statute that prescribes the funding condition and requires denial of federal assistance if the funding condition is not agreed to." *Ibid.*  But, "only the agreement— and not the statute—makes the terms obligatory on the funds recipient and thus 'secures' the contemplated third-party rights." *Ibid.*[7]  Accordingly, such "third-party rights

––––––––––

[7] For this reason, the mere fact that spending conditions are enacted in statutory form is irrelevant; "not everything in a statute is legally binding."  Hamburger 131; see also D. Engdahl, The Contract Thesis of the Federal Spending Power, 52 S. D. L. Rev. 496, 500 (2007).  In other words, while Congress may influence policy "by attaching 'strings' to grants of money given to state and local governments, . . . those strings aren't *laws*," and do not secure rights, in the sense needed to support §1983 liability. *United States* v. *Morgan*, 230 F. 3d 1067, 1073 (CA8 2000) (Bye, J., specially concurring); see also *Westside Mothers* v. *Haveman*, 133 F. Supp. 2d 549, 581–582 (ED Mich. 2001) ("[N]o interest is 'secured' by the federal Medicaid statute.  Upon its enactment, this federal law does not vest in a single American the right or privilege of receiving federally-subsidized medical care. . . . [T]hough passed by both

. . . are 'secured' (if at all) not by any 'law,' but only by the contract between the recipient and the United States." *Ibid.*

This contractual understanding of conditional spending legislation is much more than a mere analogy; it is the only possible explanation for why such legislation is not an unconstitutional direct regulation of the States. To deny or downplay this principle is to seek to have it both ways. Much spending legislation conditions States' receipt of federal funds on their undertaking obligations with respect to third parties. For such legislation to survive a federalism challenge, it must not directly impose obligations on the States with the force of federal law. But, for those conditions to be enforceable under §1983, they must secure third-party rights by directly imposing correlative obligations on the States with the force of federal law. Both of these things cannot be true.

### III

This contractual understanding of spending conditions is also a necessary consequence of the limited nature of Congress' spending power, as consistently understood for nearly two centuries of our Nation's history. Indeed, this is one point on which the Framers all seem to have agreed. Despite heated debates over the source and scope of Congress' power to spend, all understood that this power did not carry with it any independent regulatory authority. That agreement persisted throughout the 19th century. And, in the 20th, it was a critical underpinning of this Court's precedents upholding expansive uses of the spending power as consistent with Congress' limited legislative powers and our federalist system of government.

_____

houses of Congress and signed by the President, the Medicaid statute has no force of its own. It is only when a State . . . accepts the Federal Government's offer and agrees to participate in the program that any benefits accrue to eligible individuals"), rev'd, 289 F. 3d 852 (CA6 2002).

A

At the outset, while Congress undoubtedly possesses the power to direct the expenditure of federal funds, it is important to note that the Constitution contains no "spending clause." From the beginning, some have located the spending power in the General Welfare Clause, and that view has generally been accepted by this Court's modern doctrine. See Engdahl, 44 Duke L. J., at 53, and n. 220 (describing Alexander Hamilton's views); *South Dakota* v. *Dole*, 483 U. S. 203, 206 (1987). Yet, there are serious problems with that view.

The General Welfare Clause is simply part of the Taxing Clause, which reads in relevant part: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." Art. 1, §8, cl. 1. By its terms, the only authority vested by this text is a power to "lay and collect Taxes, Duties, Imposts and Excises." This power is then qualified by the Debts and General Welfare Clauses, which limit the objects for which Congress can exercise that power. The General Welfare Clause is thus most naturally read as a qualification on the substantive taxing power.

Consider also that the General Welfare Clause references not only the "general Welfare" but also "the common Defence." If the Clause were construed as an affirmative grant of power to spend for the common defense, it would make redundant Congress' powers to "raise and support Armies" and to "provide and maintain a Navy," also found in Article I, §8, cls. 12–13. Thus, "[i]f the reference to 'common Defence' spending simply alludes to power conferred elsewhere," then it seems illogical to consider the terms "general Welfare" as the source of a freestanding power to spend for whatever purposes. D. Engdahl, The Basis of the Spending Power, 18 Seattle U. L. Rev. 215, 222 (1995).

The Taxing Clause is also a strange candidate for the

source of a general congressional spending power because
"it fails to provide any authority at all to spend money ac-
quired otherwise than by taxation." *Ibid.* Yet, "[t]he federal
treasury receives money from many other sources, includ-
ing penalties, fines, user fees, leases, surplus property
sales, gifts, bequests, and returns on investments." *Ibid.*
And those sums are a pittance in comparison to those raised
under Congress' Borrowing Clause power, see Art. I., §8,
cl. 2, which has always been one of the major sources of fed-
eral funds. Unless federal spending on credit and from rev-
enues not derived from "Taxes, Duties, Imposts and Ex-
cises" is unconstitutional, the General Welfare Clause
cannot be the source of Congress' spending power.

  The Clause certainly is not an independent grant of *reg-
ulatory* power to legislate for the general welfare, as the his-
tory of the Constitution's framing and ratification makes
clear. The Philadelphia Convention initially adopted a res-
olution that Congress be authorized "'to legislate in all
cases for the general interests of the Union, and also in
those to which the States are separately incompetent, or in
which the harmony of the United States may be interrupted
by the exercise of individual legislation.'" J. Renz, What
Spending Clause? (Or the President's Paramour), 33 John
Marshall L. Rev. 81, 104 (1999) (Renz). But the Convention
later abandoned this vesting of a broad power to legislate
for the general welfare in favor of the enumeration of spe-
cific federal legislative powers and the creation of a taxing
power limited by the General Welfare Clause. See R. Natel-
son, The General Welfare Clause and the Public Trust: An
Essay in Original Understanding, 52 Kan. L. Rev. 1, 23–29
(2003) (Natelson); see also Renz 104–105 (counting five in-
stances in which the Convention considered and rejected at-
tempts "to insert a grant of general legislative power into
the Constitution").[8]

_____

  [8]One instance in particular demonstrates that the General Welfare

Consistent with its text, Federalist advocates of the Constitution defended the General Welfare Clause to the ratifying public as nothing more than a limitation on the taxing power. See, *e.g.*, 3 Debates on the Constitution 207 (J. Elliot ed. 1876) (Elliot's Debates) (E. Randolph, Virginia Convention) ("The plain and obvious meaning of this is, that no more duties, taxes, imposts, and excises, shall be laid, than are sufficient to pay the debts, and provide for the common defence and general welfare, of the United States"); N. Webster, An Examination Into the Leading Principles of the Federal Constitution, in Pamphlets on the Constitution of the United States 50 (P. Ford ed. 1888) ("[I]n the very clause which gives the power of levying duties and taxes, the purposes to which the money shall be appropriated are specified, viz. *to pay the debts and provide for the common defence and general welfare of the United States*"); see also Natelson 47–49. "[T]heir basic message was that the language in question was not a grant at all—rather it was a restriction on federal authority." *Id.,* at 39. As Governor Randolph emphatically declared: "Is this an independent, separate, substantive power, to provide for the general welfare of the United States? No, sir." 3 Elliot's Debates 466.

Federalists went out of their way to specifically disclaim that the General Welfare Clause would vest any independent *regulatory* power. For example, James Madison expressly rejected Anti-Federalist attempts to portray the General Welfare Clause as granting "an unlimited commis-

––––––––––

Clause is simply a restriction on the Taxing Clause. The Committee of Style slightly altered the text agreed to by the Convention by changing the comma after "Excises" into a semicolon, so that the General Welfare Clause "became an additional power, conjoined to the power to tax, rather than merely a limitation on it." Hamburger 283. The Convention, however, recognized the alteration and restored the comma, "corroborat[ing] the conclusion that the General Welfare Clause was not an independent power." Natelson 28.

sion to exercise every power which may be alleged to be necessary for the common defense or general welfare." The Federalist No. 41, p. 262 (C. Rossiter ed. 1961). Similarly, in rebutting Patrick Henry's warning that the Clause would vest a regulatory power, Governor Randolph observed: "You must violate every rule of construction and common sense, if you sever it from the power of raising money, and annex it to anything else, in order to make it that formidable power which it is represented to be." 3 Elliot's Debates 600. Again and again, leading Federalists represented the General Welfare Clause simply "as qualifying the fiscal power." E. Corwin, The Spending Power of Congress—Apropos the Maternity Act, 36 Harv. L. Rev. 548, 552 (1923) (citing The Federalist Nos. 30 and 34 (A. Hamilton), and 41 (J. Madison)). "It was generally understood" by the Constitution's ratifiers "that the General Welfare Clause did not confer power to regulate"; such regulatory powers were conferred only by specific enumerations such as the Commerce Clause. T. Sky, To Provide for the General Welfare 67 (2003) (Sky).

Thus, even if one implausibly regards the General Welfare Clause as a "Spending Clause," it is unambiguous that the Clause confers no independent regulatory power. Importantly, the same holds for every other plausible textual anchor for Congress' general spending power. First, the Necessary and Proper Clause is a natural candidate for the spending power because spending funds may be "necessary and proper for carrying into Execution" the Federal Government's enumerated powers. Art. I., §8, cl. 18; see G. Lawson & G. Seidman, The Constitution of Empire 30 (2004) (Lawson & Seidman) ("This 'Sweeping Clause' . . . unquestionably includes the power to enact spending laws that are 'necessary and proper' for effectuating federal powers"); K. Stith, Congress' Power of the Purse, 97 Yale L. J. 1343, 1348 (1988) (arguing that the Necessary and Proper

Clause "includes the power to spend public funds on authorized federal activities"). But, because the Clause authorizes only those spending measures that are "'necessary and proper for carrying into Execution' other enumerated federal powers[,] Congress can . . . spend only if the appropriation is tied to the execution of one of the federal government's granted powers." Lawson & Seidman 30. The Clause thus "does not provide a stand-alone grant of spending authority, and certainly not an authority to spend for a nonspecific 'general welfare of the United States.'" *Ibid.*

A second plausible source of the spending power is the Property Clause, which provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." Art. IV, §3, cl. 2. The term "other Property" may "comprehen[d] personal property no less than real," and "personal property includes money, as well as financial assets of all kinds." Engdahl, 18 Seattle U. L. Rev., at 250 (emphasis deleted). But the power to dispose of funds does not carry with it any regulatory power; the Property Clause "only authorizes the control and disposition of federal property" and "does not disturb the allocation of *governance* authority otherwise accomplished under the principle of enumerated powers." *Id.*, at 251. Thus, when disposing of federal property under the Property Clause, "Congress has no more competence to make 'law' than any private donor or testator has." Engdahl, 44 Duke L. Rev., at 104.

B

In the early decades after ratification, both the source and the scope of the spending power were hotly contested, usually in debates over "internal improvements" such as roads and canals. One side, represented by Madison, maintained that federal spending must be strictly in aid of the Federal Government's specifically enumerated powers—for

instance, expenditures to construct a road would be justified only if the road could be constructed under the Post Roads Clause or some other enumerated power. See Renz 108–119; see also J. Eastman, Restoring the "General" to the General Welfare Clause, 4 Chap. L. Rev. 63, 72 (2001). As this side of the debate also took a narrow view of the enumerated powers, it generally argued that the Federal Government could not fund internal improvements without a constitutional amendment. See Sky 140–141. The other camp, associated with the nationalist views of Hamilton and Joseph Story, understood the General Welfare Clause to "include a very broad spending authority," which could be applied to purposes not specifically enumerated by the Constitution. Natelson 12; see also Renz 124–126.

Even this camp, however, understood that "the General Welfare Clause does not include a power to regulate." Natelson 12; see also Sky 96. Hamilton, for example, made clear that the spending power did not "imply a power to do whatever else should appear to Congress conducive to the general welfare." Report on the Subject of Manufactures 37 (1791). As he further elaborated, "[a] power to appropriate money [does] not carry a power to do any other thing, not authorized in the Constitution, either expressly or by fair implication." *Ibid.* Instead, any regulatory authority had to be tethered to some independent regulatory power. Thus, under this view, Congress could spend money on roads and canals unconnected with the enumerated powers, but it would have to depend on the States for any regulatory legislation needed to complete and preserve the improvements.

This understanding that the spending power itself extended only to the "*application of money,*" *ibid.* (emphasis in original), led Hamilton to favor a constitutional amendment "empowering Congress to open canals." Letter from A. Hamilton to J. Dayton (1799), in 10 Works of Alexander Hamilton 334 (H. Lodge ed. 1904). After all, opening canals

"involve[d] much more than spending money: it involve[d] acquiring rights of way and constructing and operating the improvements." Engdahl, 44 Duke L. Rev., at 23. Thus, it was precisely the "insufficiency of the spending power to override state law obstacles to achieving the targeted end that made Hamilton conclude that a constitutional amendment for canals was necessary." *Id.*, at 24. "[F]ederal funding alone" could not "override" "incompatable or adverse state policies." *Ibid.* As this example demonstrates, even those who held the broadest conception of the spending power recognized that it was only a power to spend, not a power to impose binding requirements with the force of federal law. See Sky 95.

The limited nature of the spending power was also a rare point of agreement in Hamilton and Jefferson's bitter quarrel over the constitutionality of a national bank. Reflecting the ratification era understanding of the General Welfare Clause, Jefferson observed that "the laying of taxes is the *power* and the general welfare the *purpose* for which the power is to be exercised." Opinion on the Constitutionality of the Bill for Establishing a National Bank (Feb. 15, 1791), in 19 Papers of Thomas Jefferson 277 (J. Boyd ed. 1974) (emphasis in original). If the General Welfare Clause went beyond "describing the purpose of the" Taxing Clause and represented "a distinct and independent power to do any act [Congress may] please, which might be for the good of the Union," it "would render all the preceding and subsequent enumerations of power completely useless." *Ibid.*; accord, J. Madison, The Bank Bill (Feb. 2, 1791), in 13 Papers of James Madison 375 (C. Hobson & R. Rutland eds. 1981) (interpreting the General Welfare Clause as a distinct power "would supersede all the powers reserved to the state governments"). In response, Hamilton justified the bank based on Congress' enumerated powers, such as the Commerce and Taxing Clauses. Opinion on the Constitutionality of an

Act To Establish a Bank (Feb. 23, 1791), in 8 Papers of Alexander Hamilton 97 (H. Syrett ed. 1965). He discussed the General Welfare Clause only as a limitation: "It is true, that [Congress] cannot without breach of trust, lay taxes for any other purpose than the general welfare." *Id.*, at 129. In his view, the spending power was emphatically limited to "*the application* of *money*." *Ibid.* (emphasis in original). Jefferson and Hamilton could agree that it was no independent font of legislative power.

In sum, the Framers and Ratifiers understood the Taxing and General Welfare Clause as granting only a power to tax. What our modern cases refer to as the "Spending Clause"—in fact, the General Welfare Clause—was understood by the Framers and the ratifying public as granting no regulatory authority. One thing that the opposing men and factions of the founding generation agreed upon was that the Federal Government's power to spend was just that—a power to spend, involving no regulatory authority. Instead, the power to bind with the force of law must come from Congress' enumerated legislative powers rather than its spending power.

## C

Though the scope and source of the spending power continued to be vigorously contested into the 19th century, the fundamental understanding that federal spending measures could not bind with the force of law remained common ground. For example, in his last official act, President Madison vetoed an internal improvements bill in part because the "train of powers incident" to constructing and maintaining such improvements were beyond Congress' enumerated powers. 30 Annals of Cong. 211, 212 (1817). The General Welfare Clause could not provide the needed regulatory authority, as such an interpretation "would have the effect of giving to Congress a general power of legislation," thus rendering the Constitution's "special and careful

enumeration of powers . . . nugatory and improper." *Id.*, at 212. That the bill required state consent was likewise insufficient because, if the power "be not possessed by Congress, the assent of the States . . . cannot confer the power." *Ibid.*

Upon assuming office, President James Monroe sent a message to Congress agreeing with Madison's views; the message was then referred to a special Committee in the House of Representatives led by Congressman Henry Tucker. Corwin, 36 Harv. L. Rev., at 559–560. The Tucker Committee produced an exhaustive report on internal improvements, which disagreed with nearly every aspect of Madison and Monroe's position. *Id.*, at 560–561. Significantly, however, the Committee agreed that the General Welfare Clause did not vest the power needed to make internal improvements, relying instead on the Constitution's specific enumerations such as the Post Roads Clause. 31 Annals of Cong. 454 (1817) ("disavow[ing] any use of the general phrase in the Constitution to provide for the common defence and general welfare, as applicable to the enumeration of powers, or as extending the power of Congress beyond the specified powers"). The Tucker Committee also agreed with President Monroe that the spending power did not "extend the specified or incidental powers of the Government" or allow Congress to exercise any "jurisdictional [*i.e.*, regulatory] rights" over improvements. *Id.*, at 459–460. Thus, "if the power to make a road or dig a canal is not given" by one of Congress' enumerated regulatory powers, "the power of appropriating money cannot confer it." *Id.*, at 459.[9]

_____

[9]After a debate on the Tucker Report, the House approved a resolution declaring Congress' authority to appropriate money to construct internal improvements pursuant to its enumerated powers, voting down several other resolutions that would have declared a congressional power to make monetary grants to States untethered to any enumerated power and that the Federal Government had the power to itself construct and

In his second term, President Monroe set forth the fullest exposition of the understanding that the spending power involved no regulatory authority. In 1822, Congress passed a bill to establish a system of internal improvements, asserting the "power to establish turnpikes with gates and tolls, and to enforce the collection of tolls by [federal] penalties." Sky 147 (internal quotation marks omitted). President Monroe then vetoed the measure, judging that Congress' spending authority did not extend to such "a complete right of jurisdiction and sovereignty for all the purposes of internal improvement, and not merely the right of applying money under the power vested in Congress to make appropriations." 2 Messages and Papers of the Presidents 1789–1908, p. 142 (J. Richardson ed. 1897) (Richardson). Because Monroe understood "that Congress do[es] not possess this power [and] the States individually can not grant it," he agreed with Madison and Hamilton that the "power can be granted only by an amendment to the Constitution." *Id.*, at 143.

To explain his veto, President Monroe sent Congress an extensive report entitled "Views of the President of the United States on the Subject of Internal Improvements." In this report—perhaps "the most elaborate constitutional discussion ever sent to the Capitol from the White House"— Monroe synthesized the understanding of the spending power from the founding of the Republic. L. Rogers, The Postal Power of Congress 75 (1916). And, in doing so, he largely settled the contours of that understanding for over a century.

In the centerpiece of the Views, Monroe explained that the spending power carries no incidental power to regulate individuals or States. Echoing Hamilton, Monroe understood the spending power to consist of "a right to appropriate the public money, and nothing more." Richardson 162.

—————

maintain internal improvements. 32 Annals of Cong. 1381–1389 (1818).

It carries with it "no incidental power, nor does it draw after it any consequences of that kind." *Id.*, at 168. Monroe proceeded to carefully distinguish the spending power from Congress' authority to impose obligations and duties: "[T]he use or application of the money after it is raised is a power altogether of a different character" from Congress' enumerated regulatory powers such as the taxing power; "[i]t imposes no burden on the people, nor can it act on them in a sense to take power from the States." *Id.*, at 164.

Applying this understanding of the spending power to the question of internal improvements, Monroe explained that Congress could only "appropriate the money necessary to make them." *Id.*, at 168. Where none of Congress' enumerated regulatory powers was applicable, Monroe concluded, "[f]or every act requiring legislative sanction or support the State authority must be relied on." *Ibid.* Thus, Congress could not itself pass laws providing for "[t]he condemnation of the land, . . . the establishment of turnpikes and tolls, and the protection of the work when finished." *Ibid.*

Monroe's summation of the federal spending power, reflecting that it does not carry with it any regulatory power, was accepted throughout the 19th century by friends and foes of federal power alike. In his 1825 inaugural address, President John Quincy Adams explained that Monroe's Views had "conciliated the sentiments and approximated the opinions of enlightened minds upon the question of constitutional power." Inaugural Address, Mar. 4, 1825, in 5 American State Papers, Foreign Relations 753, 755 (1858). Five years later, President Andrew Jackson vetoed the Maysville Road Bill of 1830 for the same reasons Monroe had vetoed the Cumberland Road Bill of 1822: Congress lacks "[t]he right to exercise as much jurisdiction as is necessary to preserve the works and to raise funds by the collection of tolls to keep them in repair," and "[w]ithout [such power] nothing extensively useful can be effected." Richardson 492.

Justice Joseph Story's Commentaries on the Constitution also recognized that the spending power did not carry with it any auxiliary power to bind individuals or States. Citing Monroe's Views liberally, Story agreed that Congress could not enact a system of internal improvements under the General Welfare Clause. Although he located the spending power in that Clause, Story understood that the power was confined "to mere appropriations of money," and that, as a result, the Federal Government could not regulate internal improvements except pursuant to its legislative "enumerated powers." 3 Commentaries on the Constitution of the United States, §1269, p. 150 (1833); see also Sky 224 ("[A]s read by Story, the General Welfare Clause did *not* constitute a regulatory power, independent of the spending power, authorizing Congress to enact whatever measures it wished . . . under an unlimited power to legislate for the general welfare of the United States").

Although disagreement on whether Congress could spend for purposes beyond the enumerated powers persisted through the Antebellum and Reconstruction eras, the understanding that the spending power did not imply regulatory power persisted. See generally Sky 232–240, 270–291. Because Congress was acting solely under its power to spend, it relied on the States' acceptance of terms and upon the States' legislative powers to carry out federal spending programs.

## D

Given this consensus, it is not surprising that the first federal grant-in-aid spending programs were contractual in nature. The Morrill Act of 1862, perhaps the first such program, extended an offer to the States to accept donations of federal lands on the condition that the State use the land to establish a college. 12 Stat. 504–505. States had two years to accept the federal terms in the form of an Act by the

State's legislature. *Id.*, at 505  Significantly, the only consequence for a State's breach of the use condition was contractual in nature—"the grant to such State shall cease; and said State shall be bound to pay the United States the amount received of any lands previously sold." *Id.*, at 504–505. The Second Morrill Act, enacted in 1890, followed the same framework, donating money for the endowment of agricultural and mechanical arts colleges, subject to the condition that black students not be excluded. Ch. 841, 26 Stat. 417. Like the First Morrill Act, the only consequence for noncompliance was that future appropriations under the Act would cease until the State brought itself into compliance. *Id.*, at 419.

In the early 20th century, the adoption of the Sixteenth Amendment and the national income tax vastly expanded the revenue available to the Federal Government. But the increasingly ambitious spending programs that followed did not break the contractual pattern established by the Morrill Acts. Thus, early-20th-century highway grants took the form of an offer to enter a contract, with the consequence of noncompliance being the cutoff of federal funds. See Corwin, 36 Harv. L. Rev., at 574, n. 72 (describing Federal Highway Act of 1916); see also *id.*, at 573–575 (collecting other examples).

Even in the New Deal era, advocates of far-reaching spending programs continued to understand the spending power as a mere power of appropriation. Professor Corwin, for example, recognized that the States must be depended upon to exercise the legislative power needed to implement such programs. Thus, "federal highway construction relie[d] on the state power of eminent domain, as well as on state power to police and protect highways during and after their construction." National-State Cooperation—Its Present Possibilities, 46 Yale L. J. 599, 617 (1937). Similarly, national protection of forests depended on "the power of the states to regulate the conduct of persons entering forests,"

and the provision of maternity benefits depended on "the power of the cooperating states to compel birth registration, the licensing of mid-wives, etc." *Ibid.* Thus, more than 100 years after Monroe's Views, it was still well understood that the Federal Government's spending power needed to work with "the wider coercive powers of the states" to accomplish its ends. *Ibid.* And, a State's acceptance of federal funds in return for exercising its own powers did not expand the Federal Government's legislative powers.

In sum, from the framing of the Constitution to well into the 20th century, it was virtually undisputed that Congress' spending power was nothing more than a power to spend. It included no regulatory authority to bind parties, to secure rights or impose duties with the force of federal law, and no authority to directly regulate the States even with their consent.

### E

When cases concerning expansive federal spending programs first began to reach this Court, they vividly illustrated both the enduring understanding of the spending power as a nonregulatory power and the contractual understanding of spending conditions. The Federal Government defended major spending programs on the basis of that understanding, and the programs survived this Court's review only because of those traditional premises.

In *Massachusetts* v. *Mellon*, 262 U. S. 447 (1923), the Court rejected as nonjusticiable Massachusetts' claim that the Maternity Act of 1921 was "an attempt to legislate outside the powers granted to Congress by the Constitution and within the field of local powers exclusively reserved to the States." *Id.*, at 482. The Court first stated that it "[p]robably . . . would be sufficient to point out that the powers of the State are not invaded, since the statute imposes no obligation but simply extends an option which the State is free to accept or reject." *Id.*, at 480. In other words, the

State could not be injured because the Act was not a direct legal regulation. Rather, it was a mere offer to bargain—it "imposed" no "burden . . . upon the States" and did not require them "to do or to yield anything" of its own force. *Id.*, at 482. The State could not seek judicial redress because the contractual nature of the Act's provisions meant that States could vindicate their own rights "by the simple expedient of not yielding." *Ibid.*; see also Corwin, 36 Harv. L. Rev., at 579 (noting that the Maternity Act adhered to the traditional requirements of state consent and the "general *caveat* against jurisdictional rights following in the wake of appropriations"). "[T]he Justices in *Mellon* understood that Congress' power to spend money is *not a legislative* power." Engdahl, 52 S. D. L. Rev., at 498 (emphasis in original).

Cases involving New Deal spending programs teach the same lesson. For example, *United States* v. *Butler*, 297 U. S. 1 (1936), concerned the constitutionality of the Agricultural Adjustment Act, which offered subsidies to farmers not to sell crops. The Government defended the Act on the ground that it did not regulate any private or state party. Instead, "[a]ny commands or restrictions in the Act [were] imposed only upon the use by [federal] administrative officials of the money granted." Brief for United States in *United States* v. *Butler*, O. T. 1935, No. 401, p. 264. In line with the traditional distinction between mere spending and regulatory commands, the Government urged that "Congress ha[d] not gone beyond its power of authorizing an expenditure" precisely because "[i]t ha[d] not sought to force or command citizens to receive the money offered and to perform the conditions upon which the funds are to be disbursed." *Id.*, at 265. The Government expressly relied on the contractual nature of the Act's conditions, as distinct from any "exercise of sovereign regulation":

"It would be most unusual to suppose that a contract

of this nature, entered into freely by both parties, is an exercise of sovereign regulation and control over one of the parties or over the subject matter with which the contract deals. . . . The rights of the United States under the contracts are no greater than would be the rights of a private citizen under similar contracts, and enforcement must be by ordinary judicial process according to the law of the forum. The contracts are not derogatory of any sovereign rights of the States; they are carried out pursuant to and under the protection of the laws of the States. . . . The purpose and effect of the contracts so entered into are simply to accomplish the spending of the money on the conditions imposed by Congress, and in authorizing execution of such contracts Congress was not exerting a power outside of the field of appropriation." *Id.*, at 266–267.

The Government also disclaimed that the Act would have pre-emptive effect: Because it went "no further than offering benefits to those who comply with certain conditions," States "remain[ed] as free after the passage of this Act as before to pass laws rendering it impossible for any of their inhabitants to comply with such conditions." *Id.*, at 268. Thus, to avoid a Tenth Amendment problem, the Government relied on the traditional distinction between the Federal Government's power to spend and its power to regulate:

"The distinction between an application of the Federal lawmaking power to enforce compliance with the desire of Congress and the use of the spending power to offer benefits which might persuade people to that end [was] recognized in this manner by th[e] first Congresses.

.          .          .          .          .

"When the United States goes no further than extending benefits to citizens who arrange their affairs in

a manner thought beneficial by Congress, there is no direct exercise of Federal power on those affairs and they remain subject to the unhampered control of the States. Consequently, in a case of this nature, the effect which the Act of Congress will have in a State is dependent entirely upon the voluntary action of that State and its inhabitants." *Id.*, at 274, 276.

In deciding the case, the Court took the Government's concessions as given, stating, "[i]t is not contended that [the General Welfare Clause] grants power to regulate agricultural production." *Butler*, 297 U. S., at 64. The Court then agreed with Justice Story's observation that "the only thing granted is the power to tax for the purpose of providing funds for payment of the nation's debts and making provision for the general welfare." *Ibid.* Congress' spending power, even if located in the General Welfare Clause, conferred no regulatory power.

The Court proceeded to hold the Act unconstitutional precisely because it was, in reality, "a statutory plan to regulate and control agricultural production, a matter beyond the powers delegated to the federal government." *Id.*, at 68. That was because the "regulation [was] not in fact voluntary," as it would lead to "financial ruin" for farmers who refused the Act's benefits. *Id.*, at 70–71. Confirming another aspect of the traditional doctrine, the Court held that even the purely voluntary consent of private parties could not expand Congress' limited regulatory powers. *Id.*, at 74–75.[10]

_____

[10]The anticoercion rule reflected in *Butler* remains a vital part of this Court's spending-power jurisprudence. See *NFIB*, 567 U. S., at 575–585 (opinion of ROBERTS, C. J.); *id.*, at 671–678 (joint dissent of Scalia, Kennedy, THOMAS, and ALITO, JJ.). As *Butler* makes clear, that rule is firmly rooted in the contractual understanding of spending conditions, and *NFIB* further recognized the close connection between the rule and the anticommandeering doctrine when spending conditions involving States are at issue. See *NFIB*, 567 U. S., at 575–585 (opinion of ROBERTS, C. J.);

The challenge to the Social Security Act in *Steward Machine Co.* v. *Davis*, 301 U. S. 548 (1937), followed a similar pattern but reached the opposite result based on a different level of perceived coercion. As in *Butler*, the Federal Government defended a federal statute—here, the Social Security Act—by representing that conditions on the grant of federal funds "are not regulatory" in nature and are thus within the spending power. Brief for United States in *Steward Machine Co.* v. *Davis*, O. T. 1936, No. 837, p. 135. Seeking to avoid a repeat of its loss in *Butler*, the Government argued that the program was also not regulatory in fact because it did not coerce States to take or refrain from taking any actions. Brief for United States in *Steward Machine Co.* 100, 105–106.

This time, the Court agreed with the Government, finding that the Act was not coercive and thus did not "go beyond the bounds of" Congress' spending power. *Steward Machine Co.*, 301 U. S., at 591–592. Then, in rejecting a federalism challenge to the measure, the Court observed that once the State accepted the federal conditions, it was bound with even lesser force than an ordinary contract. *Id.*, at 594–595. The State was "still free, without breach of an agreement, to change her system over night." *Id.*, at 595. "No officer or agency of the national Government [could] force a compensation law upon her or keep it in existence,"

––––––––

*id.*, at 677–678 (joint dissent). Indeed, the anticoercion rule supplements those doctrines through its recognition of the practical realities of Congress' modern spending power: Because the Federal Government's overwhelming fiscal resources enable it to create "gun to the head" situations in which there is no practical possibility of opting out, the rule prevents the Government from purchasing the States' regulatory powers to implement federal goals that it cannot attain through its own more limited powers. *Id.*, at 581 (opinion of ROBERTS, C. J.); accord, *id.*, at 677 (joint dissent) ("Congress effectively engages in this impermissible compulsion when state participation in a federal spending program is coerced, so that the States' choice whether to enact or administer a federal regulatory program is rendered illusory").

nor could they "supervise or control the application of the payments." *Ibid*.[11]

The Court again demonstrated its adherence to the traditional view in *Oklahoma* v. *Civil Serv. Comm'n*, 330 U. S. 127 (1947). There, the U. S. Civil Service Commission determined that an Oklahoma highway commissioner had violated the Hatch Act, pledging to withhold a portion of the State's highway grants equal to two years' of the commissioner's compensation if the State failed to remove him. Oklahoma challenged the Commission's order and the Act on which it was based as an illicit attempt to regulate the State's internal affairs. *Id.*, at 133. Citing *Mellon*, the Court held that the Act was valid because it did not directly regulate the State, which had "adopted the 'simple expedient' of not yielding" by refusing to remove its highway commissioner. 330 U. S., at 143.

Thus, to defend these spending programs in the first half of the 20th century, the Government relied on the long-settled understanding that the power to spend carries with it no sovereign legislative power to create rights and duties. To the contrary, the Government represented that these programs had the binding force, at most, of contracts. They did not pre-empt, nor did they bind States with the force of law; they merely spent federal dollars upon conditions, the violation of which entitled the Government to cease further payments. The Court took this position as a given, and the contractual nature of spending conditions is precisely what saved them from constitutional challenge.

In sum, the historical record is clear and consistent on a critical proposition: The spending power is the power to spend only. Any duties imposed by regulatory legislation, and any correlative rights secured by law, must find their

---

[11] Justice Sutherland's dissent recognized that the majority had applied the traditional framework, disagreeing only with its interpretation of how the Social Security Act actually functioned. See *Steward Machine Co.*, 301 U. S., at 611–612.

source in one of Congress' enumerated powers or the legislative powers of the States. Congress' spending power cannot secure rights by law.

## IV

The contractual nature of spending conditions was taken as a given until the second half of the 20th century, when individuals first began to bring §1983 suits premised on violations of conditions contained within spending statutes (usually, the Social Security Act). From the enactment of §1983's predecessor statute in 1871 to the Court's decision in *Thiboutot* in 1980, this Court had never held that §1983 was available to redress any and all violations of federal legislation. Indeed, there were almost "no square holdings" concerning the precise scope of the statutory rights vindicable by §1983. *Chapman* v. *Houston Welfare Rights Organization*, 441 U. S. 600, 645 (1979) (Powell, J., concurring); see also *Eisen* v. *Eastman*, 421 F. 2d 560, 561–566 (CA2 1969) (Friendly, J.). Perhaps the only such square holding was that of *Holt* v. *Indiana Mfg. Co.*, 176 U. S. 68 (1900), which narrowly construed §1983's predecessor statute to "refer to civil rights only," making it "inapplicable" in a suit based on the federal patent laws. *Id.*, at 72.[12]

––––––––

[12] This civil rights connection was not arbitrary. Section 1983 originated in the Enforcement Act of 1871, which Congress "passed for the express purpose of 'enforc[ing] the Provisions of the Fourteenth Amendment.'" *Thiboutot*, 448 U. S., at 25, n. 15 (Powell, J., dissenting) (quoting 17 Stat. 13; alteration in original). Moreover, the original text of the statute referred only to rights "secured by the Constitution of the United States," 17 Stat. 13, the words "and laws" being added as part of the general 1874 revision of the federal statutes. Rev. Stat. §1979, 42 U. S. C. §1983. Under the circumstances, there is substantial reason to doubt that Congress fundamentally transformed a mechanism to enforce the Reconstruction Amendments into a freestanding right of action to remediate the violation of any federal statute, even those enacted beyond Congress' civil rights enforcement powers. Importantly, if statutory §1983 actions were confined to laws enacted under Congress' Reconstruction Amendments enforcement powers—under which Congress may directly

The traditional understanding of both the spending power and §1983 began slowly eroding in the 1950s, 1960s, and 1970s, culminating in *Thiboutot*. On the spending-power side, the Court held in *Cannon* v. *University of Chicago*, 441 U. S. 677 (1979), that the spending conditions of Title IX of the Education Amendments created binding duties on private universities, the violation of which could be the ground of a federal lawsuit by a private party. In doing so, the Court "simply ignored the crucial difference between restraints accepted as conditions of funding, and restraints imposed by virtue of a legislative power." Engdahl, 52 S. D. L. Rev., at 509. And, on the §1983 side, the Court considered a number of suits against state officials for violations of the Social Security Act without analyzing their cognizability under §1983. See *Thiboutot*, 448 U. S., at 6 (collecting cases); *id.*, at 26 (Powell, J., dissenting) ("Far from being a long-accepted fact, purely statutory §1983 actions are an invention of the last 20 years").

The stage was thus set for *Thiboutot* to discard nearly two centuries of settled spending-power doctrine by holding that federal spending conditions secure rights by law. Ignoring both the contractual nature of spending programs and the enforcement-power-based understanding of §1983, *Thiboutot* declared that "the plain language of the statute undoubtedly embrace[d] respondents' claim that [the State] violated the Social Security Act." *Id.*, at 4 (majority opinion). The centerpiece of the Court's opinion was its imprecise framing of the relevant question: "whether the phrase 'and laws,' as used in §1983, means what it says, or whether it should be limited to some subset of laws." *Ibid.* After framing the issue thus, the Court reasoned that nothing in the legislative history compelled limiting the term "and laws" to civil rights laws enacted under the Reconstruction

_____

regulate States—the commandeering framework might apply differently—or not at all.

Amendments. See *id.*, at 6–8.

But the Court's opinion completely missed the deeper conceptual question whether spending-power statutes can ever impose obligations, and thus secure corresponding rights, with the force of federal law.[13]  As explained at length above, the limited nature of the spending power dictates a negative answer.  And, a contrary understanding would transform the terms of federal-state agreements into binding regulations of state entities by federal law—violating the constitutional prohibition against directly regulating or commandeering the States.

It took less than a year after *Thiboutot* for the Court to realize the "'constitutional difficulties' with imposing affirmative obligations on the States pursuant to the spending power" and to take the first step toward ameliorating the problems with *Thiboutot*. *Pennhurst*, 451 U. S., at 17, n. 13.  In *Pennhurst*, the Court held that a provision of the Developmentally Disabled Assistance and Bill of Rights Act (a conditional spending Act) could not be enforced against a state entity under §1983.  *Id.*, at 18.  The Court first held that the provision could not be considered as enforcement legislation under the Fourteenth Amendment.  *Id.*, at 16–17.[14]  The Court then explained the fundamentally different

_____

[13] In dissent, Justice Powell set out the textual and historical case for interpreting §1983 to apply only to rights secured by laws enacted under Congress' enforcement powers.  *Thiboutot*, 448 U. S., at 11; see also *Chapman* v. *Houston Welfare Rights Organization*, 441 U. S. 600, 623 (1979) (Powell, J., concurring).  However, neither the Court, the parties, nor the dissent examined whether, even if they were considered "laws" for §1983 purposes, spending-power provisions could "secure" rights.

[14] The court below had recognized but avoided the spending-power question by holding that Congress enacted the legislation at issue pursuant to its power to enforce the Fourteenth Amendment.  See *Halderman* v. *Pennhurst State School and Hospital*, 612 F. 2d 84, 98 (CA3 1979) ("[W]e are not dealing with the implication of a private cause of action from a congressional enactment justified only by the spending power of the federal government, and we need not address the question whether such a statute could ever provide the predicate for private substantive

natures of legislation under the Reconstruction Amendments and "legislation enacted pursuant to the spending power," the latter of which "is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Id.*, at 17. Consistent with the traditional position, the Court also explained that "[i]n legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate the funds to the State." *Id.*, at 28. Ultimately, because the *Pennhurst* Court determined that the provision at issue was not intended to secure rights by imposing obligations on States, see *id.*, at 22–27, it did not need to confront the constitutional problem created by *Thiboutot*. Nonetheless, *Pennhurst* both recognized the problem and pointed to the solution—a return to the traditional contractual understanding that itself flows naturally from the limited nature of Congress' spending authority.

Without that understanding, however, it is unavoidable that spending conditions that impose substantive obligations on the States with the force of federal law are unconstitutional.[15] As shown above, the federal spending power

––––––––––––

rights. . . . Congress may, under section 5 [of the Fourteenth Amendment], establish certain restrictions that might otherwise implicate the prerogatives of the states"). The petitioners in *Pennhurst* squarely recognized that, if the legislation at issue was predicated on the spending power alone, "Congress exceeded the limits of that power." Brief for Petitioners, O.T. 1980, No. 79–1404, etc., p. 36, n. 57.

[15] Many litigants have recognized the constitutional problems. See, *e.g.*, Brief for Petitioner in *Gonzaga Univ.* v. *Doe*, O. T. 2001, No. 01–679, p. 42, n. 14 ("Nor is it clear that the conditions in Spending Clause legislation qualify as 'laws' under §1983. Such conditions only become operative when the contract is accepted by a recipient; it is the resulting contract, not the federal legislation itself, that gives rise to obligations and allegedly enforceable rights"); Brief for Petitioner in *National Collegiate Athletic Assn.* v. *Smith*, O. T. 1998, No. 98–84, p. 3; Brief for United States as *Amicus Curiae* in *Suter* v. *Artist M.*, O. T. 1991, No. 90–1488,

is nothing more than the power to spend. It neither contains nor implies any sovereign regulatory power to legislate rights and duties with the force of federal law, and the regulated party's consent cannot change that conclusion. The contractual nature of the spending power was essential to the Government's defense and this Court's approval of far-reaching spending programs; the programs survived only with that traditional understanding as a premise.[16] The Federal Government and private litigants cannot now discard that understanding to argue that such programs impose obligations directly on the States that are enforceable against state and local officials under §1983, without running headlong into the anticommandeering doctrine and long-recognized limitations on the federal spending power.

*    *    *

By holding that FNHRA creates rights enforceable under §1983, the majority creates a grave constitutional problem that cannot be brushed away with a mere incantation of *Thiboutot*. As explained above, spending-power legislation cannot "secure" rights "by law." Conditions on a State's receipt of federal funds are effective, not by virtue of federal law, but by dint of a federal-state agreement. The very constitutionality of such conditions depends on their eschewal of securing rights and imposing concomitant obligations on

––––––––––

p. 12, n. 6.

[16] Ironically, decades after it expressly disclaimed the pre-emptive effect of spending conditions in defending their constitutionality, see *supra*, at 26–28, the Federal Government argued the exact opposite in *Gonzaga*: "The Act of Congress establishing the program remains binding law with the full force and preemptive authority of federal legislation under the Supremacy Clause, and thus falls squarely within the 'laws' covered by Section 1983 and is fully capable of 'secur[ing]' rights." Brief for United States as *Amicus Curiae* in No. 01–679, p. 19 (alteration in original). With this reversal, the Government unwittingly argued that spending conditions are unconstitutional.

States.

The line from *Mellon* and *Butler*, to *Thiboutot*, to this case amounts to a constitutional bait and switch that cannot continue to be glossed over or ignored.  In holding that spending conditions are not merely contractual, but can directly impose obligations on the States with the force of federal law, the Court unravels the very rationale for their constitutionality.  Either conditions in statutes enacted under the spending power are in the nature of contract terms and do not secure rights by federal law, or they are unconstitutional because they exceed the spending power and illicitly commandeer the States.  The consequence of the majority's rejection of the contractual understanding is not that spending conditions are enforceable under §1983.  Rather, it is that they are unconstitutional.  It is well past time for this Court to re-examine *Thiboutot* and the nature of Congress' spending power.

# SUPREME COURT OF THE UNITED STATES

_____

No. 21–806

_____

## HEALTH AND HOSPITAL CORPORATION OF MARION COUNTY, ET AL., PETITIONERS *v.* IVANKA TALEVSKI, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF GORGI TALEVSKI, DECEASED

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[June 8, 2023]

JUSTICE ALITO, with whom JUSTICE THOMAS joins, dissenting.

I agree with the Court's understanding of the high bar required to bring an action under 42 U. S. C. §1983 for the violation of a federal statute, but I disagree with how that standard applies in this case. In my view, while respondent has established that the Federal Nursing Home Reform Act (FNHRA) creates individual rights, petitioners have established that relief for the violation of those rights under §1983 is foreclosed by the remedial scheme in the Act.

## I

The majority and JUSTICE BARRETT correctly identify the plaintiff's burden under §1983: a statute "must *unambiguously* confer individual federal rights" to create "rights" within the meaning of §1983, and "*Gonzaga* sets forth our established method for ascertaining unambiguous conferral." *Ante*, at 11, 14 (majority opinion); see *ante*, at 1–2 (BARRETT, J., concurring); *Gonzaga Univ.* v. *Doe*, 536 U. S. 273 (2002). In other words, "if Congress wishes to create new rights enforceable under §1983, it must do so in clear and unambiguous terms." *Id.*, at 290. Because the standard demands "*no less and no more* than what is required for

Appellate Case: 22-1395          Page: 185          Date Filed: 06/09/2023 Entry ID: 5285428

Congress to create new rights enforceable under an implied private right of action," I also agree that there is no room for "a multifactor balancing test to pick and choose which federal requirements may be enforced by §1983 and which may not." *Id.*, at 286, 290 (emphasis added) (rejecting the standard articulated in *Blessing* v. *Freestone*, 520 U. S. 329, 340–341 (1997)). None of this is new ground. We have previously held that *Gonzaga* "plainly repudiate[s] the ready implication of a §1983 action that" our earlier decisions "exemplified." *Armstrong* v. *Exceptional Child Center, Inc.*, 575 U. S. 320, 330, n. (2015).

The two FNHRA provisions that respondent invokes demonstrate what it takes to satisfy this demanding standard. First, the Act mandates that a "nursing facility must protect and promote the rights of each resident, including . . . [t]he right to be free from . . . chemical restraints imposed for purposes of discipline or convenience and not required to treat medical symptoms." 42 U. S. C. §1396r(c)(1)(A). Second, the Act protects "[t]ransfer and discharge rights," precluding a "nursing facility" from transferring or discharging "each resident" except in certain circumstances. §1396r(c)(2)(A) (boldface deleted). Both of these provisions explicitly use the term "rights" to describe discrete and concrete duties that a defined party ("nursing facility") owes to a particular individual ("each resident"). When these features are taken together, they satisfy the standard for determining whether a personal right exists. See *Gonzaga*, 536 U. S., at 285–286; *Alexander* v. *Sandoval*, 532 U. S. 275, 288–289 (2001).

## II

### A

When determining whether individual rights are enforceable under §1983, I again see much common ground with the majority and agree entirely with JUSTICE Barrett's explanation of the governing standard. That question "boils

down to what Congress intended, as divined from text and context." *Ante*, at 18 (majority opinion). Notably, we have explicitly held that this standard does not demand anything close to the level of incompatibility required to trigger implied repeal. See *Rancho Palos Verdes* v. *Abrams*, 544 U. S. 113, 120, and n. 2 (2005); see *ante*, at 2 (opinion of BARRETT, J.). Instead, the question is simply "whether the rights created by a later statute 'may be asserted within the *remedial* framework' of the earlier one." *Rancho Palos Verdes*, 544 U. S., at 120, n. 2; see *Great American Fed. Sav. & Loan Assn.* v. *Novotny*, 442 U. S. 366, 375–378 (1979). As the majority explains, §1983 does not apply where Congress has created an individual right but also "simultaneously given good reason (detectable with ordinary interpretive tools) to conclude that the §1983 remedy is not available." *Ante*, at 17, n. 13; see, *e.g.*, *Armstrong*, 575 U. S., at 328 (presumption of equitable remedies rebutted by administrative remedies and statutory requirements).

Finally, I agree that there is no bright-line rule for when a statute evidences an intent to preclude §1983 relief. See *Rancho Palos Verdes*, 544 U. S., at 122; *ante*, at 19–21 (majority opinion); *ante*, at 3–4 (opinion of BARRETT, J.). Courts should consider a "wide range of contextual clues, like 'enforcement provisions'" that government officials can invoke and "any 'administrative remedies that the statute offers.'" *Ante*, at 3 (opinion of BARRETT, J.). Whatever the context, the "more comprehensive the [enforcement] scheme" in a statute, "the less likely that it leaves the door open for §1983 suits." *Ibid.* After all, when a statute "'provides its own comprehensive enforcement scheme, the requirements of that enforcement procedure may not be bypassed by bringing suit directly under §1983.'" *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1, 20 (1981).

B

When all is said and done, my disagreement with the majority is thus narrowly focused on how this standard applies to this case. In my view, FNHRA "foreclose[s] a private cause of action" even though it "admittedly create[s] substantive private rights." *Alexander*, 532 U. S., at 290. The Act creates a reticulated remedial regime that both balances federal and state enforcement and channels disputes through that regime. Allowing §1983 suits will upend this careful balance.

Consider the remedial provisions that the Act provides. When federal officials find that a nursing home does not comply with FNHRA, the Act enumerates certain limited remedies they can pursue, such as withdrawing federal funding and imposing civil penalties "in an amount not to exceed $10,000 for each day of noncompliance." §1396r(h)(3)(C). FNHRA obligates States to establish certain remedies for noncompliance (including civil penalties), but otherwise leaves them free to "specify criteria, as to when and how each of [the required] remedies is to be applied, the amounts of any fines, and the severity of each of these remedies, to be used in the imposition of such remedies." §1396r(h)(2)(A). It also empowers States to "provide for other . . . remedies" as they see fit. *Ibid.* Finally, the Act provides "[s]pecial rules where [s]tate and [federal officials] do not agree on [a] finding of noncompliance." §1396r(h)(6) (boldface deleted).

By specifying limited remedies for federal authorities and tasking States with otherwise determining the consequences for violations, the Act creates a clear division of authority that ensures States retain their historical control over nursing-home regulation. Allowing §1983 suits will upset this balance by allowing any plaintiff to demand damages regardless of the remedial regime that States establish pursuant to their explicit authority under the Act. Moreover, whenever a plaintiff files suit, the determination about

noncompliance will be taken away from federal and state authorities and given to courts. And because the remedies offered under §1983 will often dwarf the relief available under FNHRA's reticulated balance of remedies, §1983 will swallow the centralized state and federal review mechanisms the Act imposes.

The exclusivity of FNHRA's enforcement regime is buttressed by the grievance remedy FNHRA gives to nursing-home residents. Residents have the "[r]ight to voice grievances with respect to treatment or care" and "the right to prompt efforts by the facility to resolve grievances." §1396r(c)(1)(A)(vi). States, in turn, are obligated to "investigate complaints of violations of requirements by nursing facilities" and to take enforcement actions to correct those violations. §§1396r(g)(4), (h)(1); see also 42 CFR §483.10(j) (2021) (obligating States to provide a "grievance process" that includes a "written decision" in response to complaints that provides a full summary of findings, conclusions, and reasoning).

This grievance process dovetails neatly with FNHRA's centralized enforcement regime because it funnels private complaints to the same state authorities that the Act tasks with enforcement. Indeed, respondent in this case wielded FNHRA's grievance process to obtain relief for both of the rights petitioners allegedly violated. See App. to Pet. for Cert. 79a–80a. But because FNHRA's remedies are more limited than the direct judicial highway that §1983 offers, it is hard to see why anyone would use them in the future. See *Rancho Palos Verdes*, 544 U. S., at 122–123.

The only textual evidence the majority can identify in response to this tailored remedial framework is FNHRA's saving clause, which states that the Act's remedies "are in addition to those otherwise available under State or Federal law." §1396r(h)(8). But this provision only begs the question whether relief under §1983 is "otherwise availa-

ble." We have recognized as much when holding that a materially identical saving clause did not authorize implied remedies under a separate remedial provision. See *AMG Capital Management, LLC* v. *FTC*, 593 U. S. ___, ___–___ (2021) (slip op., at 12–13). And in the §1983 context, we have similarly held that saving clauses do "not 'refer to a suit for redress of a violation of the statut[e] at issue.'" *Rancho Palos Verdes*, 544 U. S., at 126–127 (alterations omitted); accord, *Sea Clammers*, 453 U. S., at 20–21, n. 31.

These results are understandable. There is a considerable difference between preserving existing remedies for conduct that happens to violate other laws and providing a one-stop remedy for the precise provisions in a statute. See *Alexander*, 532 U. S., at 289–290. The latter interpretation runs against a century of holdings that a statute "'cannot be held to destroy itself'" through a saving clause. *American Telephone & Telegraph Co.* v. *Central Office Telephone, Inc.*, 524 U. S. 214, 227–228 (1998) (quoting *Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426, 446 (1907)). Conversely, concluding that FNHRA "may be enforced only through the statute's express remed[ies]" gives full effect to §1396r(h)(8) because "the claims available under §1983 prior to the enactment of the [Act] continue to be available." *Rancho Palos Verdes*, 544 U. S., at 126.

In short, "[a]llowing a plaintiff to circumvent [FNHRA's] administrative remedies would be inconsistent with Congress' carefully tailored scheme." *Smith* v. *Robinson*, 468 U. S. 992, 1012 (1984). I would thus hold that the Act precludes enforcement under §1983 and reverse the judgment below. I therefore respectfully dissent.