# No. 22-1395

IN THE

# United States Court of Appeals

FOR THE EIGHTH CIRCUIT

▸▸◂◂

Arkansas State Conference NAACP, *et al.*,

*Plaintiffs-Appellants*,

*v.*

Arkansas Board of Apportionment, *et al.*,

*Defendants-Appellees.*

On Appeal from the Eastern District of Arkansas
(No. 4:21-cv-01239-LPR)
District Judge: Honorable Lee P. Rudofsky

## BRIEF OF PLAINTIFFS-APPELLANTS

Sophia Lin Lakin
Jonathan Topaz
Adriel I. Cepeda Derieux
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION, INC.
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
slakin@aclu.org
jtopaz@aclu.org
acepedaderieux@aclu.org

Gary Sullivan (AR Bar: 92051)
ARKANSAS CIVIL LIBERTIES
FOUNDATION UNION, INC.
904 West 2nd Street
Little Rock, AR 72201
(501) 374-2842
gary@acluarkansas.org

Ceridwen Cherry
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION, INC.
915 15th St NW
Washington, DC 20015
(202) 457-0800
ccherry@aclu.org

*Counsel continued on next page*

Neil Steiner
DECHERT LLP
Three Bryant Park
1095 Avenue of The Americas
New York, NY 10036-6797
(212) 698-3500 | (212) 698-3599
neil.steiner@dechert.com

Angela Liu
DECHERT LLP
35 West Wacker Drive, Suite 3400
Chicago, IL 60601
(312) 646-5800 | (312) 646-5858
angela.liu@dechert.com

Luke M. Reilly
DECHERT LLP
Cira Centre 2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994-4000 | (215) 994-2222
luke.reilly@dechert.com

Bryan L. Sells
THE LAW OFFICE OF
BRYAN L. SELLS, LLC
Post Office Box 5493
Atlanta, Georgia 31107-0493
(404) 480-4212
bryan@bryansellslaw.com

Matthew F. Williams
DECHERT LLP
One Bush Street, Suite 1600
San Francisco, CA 94104-4446
(415) 262-4500 | (415) 262-4555
matthew.williams@dechert.com

*Counsel for Plaintiffs-Appellants*

**SUMMARY OF CASE AND STATEMENT REGARDING ARGUMENT**

This appeal presents the question whether there is a private right of action to enforce Section 2 of the Voting Rights Act. The Arkansas State Conference NAACP and the Arkansas Public Policy Panel challenged Arkansas's newly adopted redistricting plan for its state House of Representatives, alleging it dilutes Black voting strength in violation of Section 2. The district court acknowledged that Plaintiffs presented a "strong merits case that at least some of the challenged districts . . . are unlawful under § 2," Add. 3; R. Doc. 100, at 3, but erroneously concluded that Section 2 lacks a private right of action. The district court's opinion is unprecedented. It flies in the face of the statute's plain text and hundreds of Voting Rights Act ("VRA") cases decided over the past 50 years. This Court should reverse the trial court's legal error.

This appeal raises a critical issue of law. It implicates the fundamental fairness of our democracy and the Constitution's promise of racial equality. Consequently, Plaintiffs-Appellants believe that oral argument would be helpful to resolve the issue on appeal. Plaintiffs-Appellants request 20 minutes for oral argument.

Appellate Case: 22-1395     Page: 3     Date Filed: 04/18/2022 Entry ID: 5148453

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, counsel of record for Arkansas State Conference National Association for the Advancement of Colored People hereby discloses that its parent corporation is:

> National Association for the Advancement of Colored People
> 4805 Mount Hope Drive
> Baltimore, Maryland 21215

There is no stock in Arkansas State Conference National Association for the Advancement of Colored People and, thus, no publicly held company or corporation owns ten percent or more of its stock.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, counsel of record for the Arkansas Public Policy Panel hereby discloses that it is a membership organization that does not have stock. It has no corporate parent and no publicly held corporation owns ten percent or more of its stock.

Appellate Case: 22-1395    Page: 4    Date Filed: 04/18/2022 Entry ID: 5148453

# TABLE OF CONTENTS

SUMMARY OF CASE AND STATEMENT REGARDING ARGUMENT .......... i

CORPORATE DISCLOSURE STATEMENT ....................... ii

TABLE OF AUTHORITIES .................................................v

INTRODUCTION ......................................................1

JURISDICTIONAL STATEMENT ...................................2

STATEMENT OF THE ISSUES.....................................2

STATEMENT OF THE CASE........................................3

   I.  THE VOTING RIGHTS ACT OF 1965 ........................3

   II.  PROCEEDINGS BELOW ......................................9

SUMMARY OF THE ARGUMENT ...............................15

ARGUMENT ........................................................19

   I.  CONTROLLING PRECEDENT THAT THERE IS A PRIVATE RIGHT OF ACTION TO ENFORCE SECTION 2 RESOLVES THIS APPEAL. ......................................................20

   II.  THE VRA'S TEXT AND STRUCTURE CLEARLY DEMONSTRATES CONGRESSIONAL INTENT TO ESTABLISH A PRIVATE RIGHT OF ACTION TO ENFORCE SECTION 2. ...............27

     A. Section 2 Employs "Rights-Creating" Language By Protecting The Right Of Any Citizen To Vote Free From Racial Discrimination. ..........28

     B. Sections 3 And Section 14(e) Of Provide Private Remedies For Violations Of Section 2. ..........................................30

       1.  Section 3 contains private remedies for Section 2 violations. ............30

Appellate Case: 22-1395   Page: 5   Date Filed: 04/18/2022 Entry ID: 5148453

2.  Section 14(e) also contains private remedies for Section 2 violations. ............................................................................40

III. THE LONGSTANDING LEGISLATIVE UNDERSTANDING IS UNEQUIVOCAL THAT THERE IS A PRIVATE RIGHT OF ACTION TO ENFORCE SECTION 2.........................................44

CONCLUSION ..................................................................................51

CERTIFICATE OF COMPLIANCE.......................................................53

CERTIFICATE OF SERVICE ..............................................................54

iv

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*,
    138 S. Ct. 2305 (2018)................................................................7

*African American Citizens for Change v. St. Louis Board of Police Commissioners*,
    24 F.3d 1052 (8th Cir. 1994) ................................................8

*African American Legal Defense Fund v. Villa*,
    54 F.3d 1345 (8th Cir. 1995) ................................................8

*African American Voting Rights Legal Defense Fund v. Missouri*,
    133 F.3d 921 (8th Cir. 1998) (unpublished)........................8

*Agostini v. Felton*,
    521 U.S. 203 (1997)...........................................................22

*Alabama State Conference of N.A.A.C.P. v. Alabama*,
    949 F.3d 647 (11th Cir. 2020),
    *rev'd and vacated as moot by* 141 S. Ct. 2618 (2021) ........5

*Albernaz v. United States*,
    450 U.S. 333 (1981)..........................................................49

*Alexander v. Sandoval*,
    532 U.S. 275 (2001)................................................... *passim*

*Allen v. Board of Elections*,
    393 U.S. 544 (1969)................................................... *passim*

*Alpha Phi Alpha Fraternity v. Raffensperger*,
    No. 1:21-cv-5337-SCJ, Order Denying Def.'s Mot. to Dismiss,
    Slip Opinion (N.D. Ga. Jan. 27, 2022) ....................... 26, 43

*Alpha Phi Alpha Fraternity, Inc. v. Raffensperger*,
    No. 1:21-cv-5337-SCJ, 2022 WL 633312 (N.D. Ga. Feb. 28, 2022) ......... 24, 27

v

*Animal Legal Defense Fund v. Vaught,*
  8 F.4th 714 (8th Cir. 2021) ...................................................................26

*Arakaki v. Hawaii,*
  314 F.3d 1091 (9th Cir. 2002) .............................................................25

*Arbor Hill Concerned Citizens v. County of Albany,*
  357 F.3d 260 (2d Cir. 2004) ................................................................25

*Arkansas United v. Thurston,*
  517 F. Supp. 3d 777 (W.D. Ark. 2021) ..............................................33

*Bakewell v. United States,*
  110 F.2d 564 (8th Cir. 1940) ...............................................................23

*Bartlett v. Strickland,*
  556 U.S. 1 (2009)......................................................................................7

*Bone Shirt v. Hazeltine,*
  461 F.3d 1011 (8th Cir. 2006) ...................................................... 8, 44

*Bone Shirt v. Hazeltine,*
  No. CIV. 01-3032-KES, 2006 WL 1788307 (D.S.D. June 22, 2006)...............43

*Brnovich v. Democratic National Committee,*
  141 S. Ct. 2321 (2021).................................................................. *passim*

*Brooks v. Georgia State Board of Elections,*
  997 F.2d 857 (11th Cir. 1993) .............................................................42

*Brown v. Post,*
  279 F. Supp. 60 (W.D. La. 1968) ..........................................................3

*Buckanaga v. Sisseton Independent School District,*
  804 F.2d 469 (8th Cir. 1986) ........................................................ 8, 44

*Cannon v. University of Chicago,*
  441 U.S. 677 (1979)................................................................................29

*Chisom v. Roemer,*
  501 U.S. 380 (1991)....................................................................... *passim*

vi

Appellate Case: 22-1395    Page: 8    Date Filed: 04/18/2022 Entry ID: 5148453

*City of Boerne v. Flores*,
  521 U.S. 507 (1997)........................................................................... 3, 37

*City of Mobile v. Bolden*,
  446 U.S. 55 (1980)............................................................................ 6, 36

*Clark v. Calhoun County, Mississippi*,
  88 F.3d 1393 (5th Cir. 1996) ................................................................25

*Clay v. Board of Education of City of St. Louis*,
  90 F.3d 1357 (8th Cir. 1996) ..................................................................8

*Corbett v. Sullivan*,
  353 F.3d 628 (8th Cir. 2003) ..................................................................8

*Cottier v. City of Martin*,
  604 F.3d 553 (8th Cir. 2010) ..................................................................8

*Cross v. Fox*,
  23 F.4th 797 (8th Cir. 2022) .......................................................... 15, 26

*Dakota, Minnesota & East Railroad Corp. v. Schieffer*,
  711 F.3d 878 (8th Cir. 2013) ................................................................19

*Dalton v. JJSC Properties, LLC*,
  967 F.3d 909 (8th Cir. 2020) ................................................................19

*Dillard v. City of Greensboro*,
  213 F.3d 1347 (11th Cir. 2000) ...................................................... 41, 42

*Duncan v. Walker*,
  533 U.S. 167 (2001)..............................................................................36

*Emery v. Hunt,*
  272 F.3d 1042 (8th Cir. 2001) ..............................................................43

*Ford v. Strange*,
  580 F. App'x 701 (11th Cir. 2014) (unreported)...................................21

*Georgia State Conference of the NAACP v. Georgia*,
  269 F. Supp. 3d 1266 (N.D. Ga. 2017).................................................24

vii

Appellate Case: 22-1395     Page: 9     Date Filed: 04/18/2022 Entry ID: 5148453

*Gonzaga University v. Doe*,
    536 U.S. 273 (2002) ................................................................ 28, 29

*Griffin v. Oceanic Contractors, Inc.*,
    458 U.S. 564 (1982) ........................................................................ 46

*Growe v. Emison*,
    507 U.S. 25 (1993) ........................................................................... 7

*Hadnott v. Amos*,
    394 U.S. 358 (1969) ......................................................................... 3

*Hall v. Virginia*,
    385 F.3d 421 (4th Cir. 2004) .......................................................... 25

*Harry v. Bladen County, North Carolina*,
    No. 87-72-CIV-7, 1989 WL 253428, (E.D.N.C. Dec. 11, 1989) ...... 43

*Harvell v. Blytheville School District No. 5*,
    71 F.3d 1382 (8th Cir. 1995) ............................................................ 8

*Holder v. Hall*,
    512 U.S. 874 (1994) ................................................................... 7, 44

*Houston Lawyers' Ass'n v. Attorney General of Texas*,
    501 U.S. 419 (1991) ......................................................................... 7

*Hutto v. Davis*,
    454 U.S. 370 (1982) ....................................................................... 21

*Jeffers v. Beebe*,
    895 F. Supp. 2d 920 (E.D. Ark. 2012) .............................................. 9

*Jeffers v. Clinton*,
    730 F. Supp. 196 (E.D. Ark. 1989) ................................................... 9

*Jeffers v. Clinton*,
    740 F. Supp. 585 (E.D. Ark. 1990) ................................................. 35

*Jeffers v. Clinton*,
    992 F.2d 826 (8th Cir. 1993) ............................................................ 8

Appellate Case: 22-1395    Page: 10    Date Filed: 04/18/2022 Entry ID: 5148453

*Jeffers v. Tucker,*
   847 F. Supp. 655 (E.D. Ark. 1994).......................................................9

*Jenkins v. Red Clay Consolidated School District Board of Education,*
   4 F.3d 1103 (3d Cir. 1993) ...............................................................25

*Johnson v. De Grandy,*
   512 U.S. 997 (1994)................................................................... 7, 44

*Johnson-Lee v. City of Minneapolis,*
   170 F. App'x 15 (8th Cir. 2006) (unreported) .....................................8

*Kingman Park Civic Ass'n v. Williams,*
   348 F.3d 1033 (D.C. Cir. 2003).........................................................25

*League of United Latin American Citizens v. Abbott,*
   No. EP-21-CV-00259-DCG-JES-JVB, 2021 WL 576203
   (W.D. Tex. Dec. 3, 2021) .......................................................... 24, 29

*League of United Latin American Citizens v. Perry,*
   548 U.S. 399 (2006)................................................................... 7, 44

*Little Rock School District v. Pulaski County Special School District, No. 1,*
   56 F.3d 904 (8th Cir. 1995) ...............................................................8

*Liu v. SEC,*
   140 S. Ct. 1936 (2020).....................................................................48

*Livadas v. Bradshaw,*
   512 U.S. 107 (1994).........................................................................29

*Luft v. Evers,*
   963 F.3d 665 (7th Cir. 2020) ............................................................25

*MacGuire v. Amos,*
   343 F. Supp. 119 (M.D. Ala. 1972) ....................................................3

*Mata v. Lynch,*
   576 U.S. 143 (2015)..........................................................................26

Appellate Case: 22-1395   Page: 11   Date Filed: 04/18/2022 Entry ID: 5148453

*Maxfield v. Cintas Corp., No. 2*,
    487 F.3d 1132 (8th Cir. 2007) ............................................................. 23

*McGruder v. Phillips County Election Commission*,
    850 F.2d 406 (8th Cir. 1988) .................................................................. 8

*Medders v. Autauga County Board of Education*,
    858 F. Supp. 1118 (M.D. Ala. 1994) .................................................... 43

*Metts v. Murphy*,
    363 F.3d 8 (1st Cir. 2004) ..................................................................... 25

*Milligan v. Merrill*,
    No. 2:21-cv-1291-AMM, 2022 WL 265001
    (N.D. Ala. Jan. 24, 2022) ..................................................... 21, 24, 27

*Milner v. Department of the Navy*,
    562 U.S. 562 (2011) .............................................................................. 50

*Miss. State Chapter Operation Push v. Mabus*,
    788 F. Supp. 1406 (N.D. Miss. 1992),
    *aff'd as modified sub nom. Miss. State Chapter, Operation Push, Inc. v. Fordice*, 12 F.3d 208 (5th Cir. 1993) ................................................. 42

*Missouri State Conference of NAACP v. Ferguson-Florissant School District*,
    No. 4:14 CV 2077 RWS, 2020 WL 2747306 (E.D. Mo. May 27, 2020) .......... 42

*Missouri State Conference of the NAACP v. Ferguson-Florissant School District*,
    894 F.3d 924 (8th Cir. 2018) .................................................................. 8

*Mixon v. Ohio*,
    193 F.3d 389 (6th Cir. 1999) ................................................................ 24

*Morris v. Fortson*,
    261 F. Supp. 538 (N.D. Ga. 1966) ......................................................... 3

*Morse v. Republican Party of Virginia*,
    517 U.S. 186 (1996) ....................................................................... *passim*

Appellate Case: 22-1395    Page: 12    Date Filed: 04/18/2022 Entry ID: 5148453

*National Ass'n for the Advancement Colored People, Spring Valley Branch*
    *v. East Ramapo Central School District,*
    462 F. Supp. 3d 368 (S.D.N.Y. 2020),
    *aff'd sub nom. Clerveaux v. East Ramapo Central School District*, 984
    F.3d 213 (2d Cir. 2021) ......................................................................42

*Navajo Nation v. Arizona Independent Redistricting Commission,*
    286 F. Supp. 2d 1087 (D. Ariz. 2003) ................................................42

*Nevada Department of Human Resources v. Hibbs,*
    538 U.S. 721 (2003).............................................................................37

*Northeast Ohio Coalition for the Homeless v. Husted,*
    837 F.3d 612 (6th Cir. 2016) ..............................................................25

*OCA-Greater Houston v. Texas,*
    867 F.3d 604 (5th Cir. 2017) ..............................................................24

*Osher v. City of St. Louis, Missouri,*
    903 F.3d 698 (8th Cir. 2018) ..............................................................28

*Perkins v. Matthews,*
    400 U.S. 379 (1971)...............................................................................3

*Perry-Bey v. City of Norfolk,*
    678 F. Supp. 2d 348 (E.D. Va. 2009) .......................................... 24, 33

*Pope v. County of Albany,*
    94 F. Supp. 3d 302 (N.D.N.Y. 2015)..................................................43

*Puerto Rican Organization for Political Action v. Kusper*,
    490 F.2d 575 (7th Cir. 1973) ................................................................3

*Reno v. Bossier Parish School Board,*
    520 U.S. 471 (1997)............................................................................44

*Roberts v. Wamser,*
    883 F.2d 617 (8th Cir. 1989) ................................................... *passim*

*Robinson v. Norling,*
    25 F.4th 1061 (8th Cir. 2022) .............................................................29

Appellate Case: 22-1395    Page: 13    Date Filed: 04/18/2022 Entry ID: 5148453

*Rodriguez de Quijas v. Shearson/American Express, Inc.*,
  490 U.S. 477 (1989)............................................................22

*Rogers v. Lodge*,
  458 U.S. 613 (1982).......................................................38, 39

*Salve Regina College v. Russell*,
  499 U.S. 225 (1991)............................................................19

*Sanchez v. State of Colorado*,
  97 F.3d 1303 (10th Cir. 1996) ..........................................25

*Seminole Tribe of Florida v. Florida*,
  517 U.S. 44 (1996).............................................................22

*Shelby County v. Holder*,
  570 U.S. 529 (2013).................................................. *passim*

*Shelby County v. Holder*,
  679 F.3d 848 (D.C. Cir. 2012)..........................................46

*Shelby County v. Lynch*,
  799 F.3d 1173 (D.C. Cir. 2015).....................................4, 41

*Smith v. Clinton*,
  687 F. Supp. 1310 (E.D. Ark. 1988)...................................9

*South Carolina v. Katzenbach*,
  383 U.S. 301 (1966)..................................................3, 37, 47

*Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*,
  476 U.S. 409 (1986)......................................................45, 49

*Stabler v. County of Thurston*,
  129 F.3d 1015 (8th Cir. 1997) ............................................8

*Steel Co. v. Citizens for Better Environment*,
  523 U.S. 83 (1998).............................................................26

*Tanzin v. Tanvir*,
  141 S. Ct. 486 (2020)....................................................27, 50

xii

Appellate Case: 22-1395    Page: 14    Date Filed: 04/18/2022 Entry ID: 5148453

*Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*,
    576 U.S. 519 (2015).........................................................................49

*Thornburg v. Gingles*,
    478 U.S. 30 (1986)......................................................... 7, 38, 39, 44

*Thurston Motor Lines, Inc v. Jordan K. Rand, Ltd.*,
    460 U.S. 533 (1983).........................................................................22

*Toney v. White*,
    348 F. Supp. 188 (W.D. La. 1972) ................................................3

*Turner v. State of Arkansas*,
    784 F. Supp. 553 (E.D. Ark. 1991)..................................................9

*United States v. Blaine County*,
    363 F.3d 897 (9th Cir. 2004) ........................................................39

*United States v. Harcevic*,
    999 F. 3d 1172 (8th Cir. 2021) ......................................................26

*United States v. Sandoval County, New Mexico*,
    797 F. Supp. 2d 1249 (D.N.M. 2011)............................................35

*Veasey v. Abbott*,
    No. 2:13-CV-193, 2020 WL 9888360, (S.D. Tex. May 27, 2020),
    *aff'd*, 13 F.4th 362, 365 (5th Cir. 2021)..........................................42

*Veasey v. Perry*,
    29 F. Supp. 3d 896 (S.D. Tex. 2014)........................................ 24, 33

*Verizon Maryland Inc. v. Public Service Commission of Maryland*,
    535 U.S. 635 (2002).........................................................................15

*Voinovich v. Quilter*,
    507 U.S. 146 (1993)...........................................................................7

*Whitfield v. Democratic Party of State of Arkansas*,
    890 F.2d 1423 (8th Cir. 1989),
    *on reh'g*, 902 F.2d 15 (8th Cir. 1990)...............................................8

xiii

*Williams v. City of Texarkana,*
    32 F.3d 1265 (8th Cir. 1994) ...............................................................8

*Wilson v. Huckabee,*
    No. 2:06-cv-00132-WRW, 2008 WL 360617 (E.D. Ark. Feb. 8, 2008)..............9

*Wisniewski v. Rodale, Inc.,*
    510 F.3d 294 (3d Cir. 2007) ...............................................................28

*Wright v. Sumter County Board of Elections & Registration,*
    979 F.3d 1282 (11th Cir. 2020) ...........................................................25

*Wright v. Sumter County Board of Elections & Registration,*
    No. 1:14-CV-00042-WLS, 2020 WL 11772602 (M.D. Ga. Dec. 7, 2020),
    *vacated*, 2021 WL 5025095 (M.D. Ga. Jan. 5, 2021) ........................................43

*Zimmer v. McKeithen,*
    485 F.2d 1297 (5th Cir. 1973) ........................................................ 6, 39

**Statutes**

28 U.S.C. § 1295 .................................................................................26

42 U.S.C. § 1983 .................................................................................29

42 U.S.C. § 2000(d) .............................................................................29

52 U.S.C. § 10301(a) ................................................................. *passim*

52 U.S.C. § 10302 ...............................................................................30

52 U.S.C. § 10302(a) ................................................................. 4, 30, 32, 34

52 U.S.C. § 10302(b) ................................................................. 4, 30, 35

52 U.S.C. § 10302(c) ................................................................. 4, 30, 36

52 U.S.C. § 10306 .................................................................................8

52 U.S.C. § 10308 ...............................................................................14

Appellate Case: 22-1395    Page: 16    Date Filed: 04/18/2022 Entry ID: 5148453

52 U.S.C. § 10310(e) ......................................................................... 5, 41

79 Stat. 437 ................................................................................. 5, 32

**Constitutional Provisions**

U.S. Const. amend. XV, § 1 ................................................................. 5

U.S. Const. amend. XXIV ................................................................. 34

**Legislative Materials**

H.R. Rep. No. 91-397 (1970) ............................................................ 4, 45

H.R. Rep. No. 94-196 (1975) ........................................................... 19, 48

H.R. Rep. No. 97-227 (1981) ..................................................... 1, 6, 41, 45

H.R. Rep. No. 109-478 (2006) ........................................................... 49

S. Rep. No. 94-295 (1975) ...................................................... 19, 41, 45, 47

S. Rep. No. 97-417 (1982) ........................................................... *passim*

**Other Authorities**

Christopher S. Elmendorf, *Making Sense of Section 2: Of Biased Votes,*
*Unconstitutional Elections, and Common Law Statutes*,
160 U. Pa. L. Rev. 377 (2012) ........................................................... 40

Ellen D. Katz et al., *Section 2 Cases Database*,
University of Michigan Law School Voting Rights Initiative (2022),
https://voting.law.umich.edu/database ................................................ 7, 8, 43, 48

Luke P. McLoughlin, *Section 2 of the Voting Rights Act and City of Boerne:*
*The Continuity, Proximity, and Trajectory of Vote-Dilution Standards*,
31 Vt. L. Rev. 39 (2006) ................................................................. 40

U.S. Department of Justice, *Voting Section Litigation: Cases Raising Claims*
*Under Section 2 of the Voting Rights Act*,
https://www.justice.gov/crt/voting-section-litigation#sec2cases ........................ 7

Appellate Case: 22-1395    Page: 17    Date Filed: 04/18/2022 Entry ID: 5148453

# INTRODUCTION

"[T]he existence of the private right of action under Section 2 [of the VRA] . . . has been clearly intended by Congress since 1965." *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (plurality opinion) (quoting S. Rep. No. 97-417, at 30 (1982)). *Every* court that has addressed this issue—including the Supreme Court and multiple federal courts of appeals—has recognized its existence. And for good reason. That conclusion follows from the VRA's plain text and structure. And it is consistent with the VRA's legislative history and decades-long congressional understanding. Indeed, when Congress last amended Section 2 by explicitly expanding its reach to voting laws that have racially discriminatory results, it expressly "reiterat[ed] the existence of the private right of action under Section 2." S. Rep. No. 97-417, at 30; *see also* H.R. Rep. No. 97-227, at 32 (1981). Over decades, federal courts—including this Court—have heard hundreds of Section 2 cases brought by private plaintiffs, not once dismissing those plaintiffs on grounds that Section 2 lacks a private right of action.

Until now. Ignoring binding Supreme Court and Eighth Circuit precedent, the district court dismissed Plaintiffs' "strong merits case" on a rationale that Section 2 lacks a private right of action, proclaiming itself "the first federal court in the nation to do so." Add. 3, 17 n.73; R. Doc. 100, at 3. The district court's unprecedented decision concludes that hundreds of federal courts got it wrong, and

1

the district court alone is right. In the process, it disregards and effectively encourages other courts to ignore binding vertical precedent.

The question presented on appeal is straightforward and settled. The district court's erroneous decision should be reversed.

## JURISDICTIONAL STATEMENT

The United States District Court for the Eastern District of Arkansas had original jurisdiction over Plaintiffs-Appellants' Section 2 claim pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4), 1357, and 2201(a), and 52 U.S.C. § 10308(f). This Court has jurisdiction over this appeal pursuant to 15 U.S.C. § 1121(a) and 28 U.S.C. § 1291 because the district court entered final judgment on February 22, 2022 and Plaintiffs-Appellants timely filed a notice of appeal the next day.

## STATEMENT OF THE ISSUES

1. Is there a private right of action to enforce Section 2 of the Voting Rights Act of 1965?

   a. 52 U.S.C. § 10301

   b. 52 U.S.C. § 10302

   c. 52 U.S.C. § 10310(e)

   d. *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996)

   e. *Roberts v. Wamser*, 883 F.2d 617 (8th Cir. 1989)

2

## STATEMENT OF THE CASE

## I.    THE VOTING RIGHTS ACT OF 1965

Congress enacted the Voting Rights Act of 1965 "for the broad remedial purpose of 'rid[ding] the country of racial discrimination in voting.'" *Chisom v. Roemer*, 501 U.S. 380, 403 (1991) (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 315 (1966)).  It acted pursuant to its "power to enforce the provisions of the Fifteenth Amendment." *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997) (citation omitted).

In the years following the VRA's passage, courts regularly adjudicated VRA cases brought by private parties, including claims under Section 2.[1]  Both the Supreme Court and Congress repeatedly confirmed a private right of action to enforce the VRA's substantive provisions.  For example, four years after the VRA's enactment, in *Allen v. Board of Elections*, 393 U.S. 544 (1969), the Supreme Court confirmed that private plaintiffs could sue to enforce Section 5, which "required [certain] States to obtain federal permission before enacting any law related to voting." *Shelby Cnty. v. Holder*, 570 U.S. 529, 534–35 (2013).  The

---

[1] *See, e.g.*, *Morris v. Fortson*, 261 F. Supp. 538 (N.D. Ga. 1966); *Brown v. Post*, 279 F. Supp. 60 (W.D. La. 1968); *Toney v. White*, 348 F. Supp. 188 (W.D. La. 1972), *aff'd as modified*, 488 F.2d 310 (5th Cir. 1973); *see also, e.g.*, *Hadnott v. Amos*, 394 U.S. 358 (1969); *Perkins v. Matthews*, 400 U.S. 379 (1971); *MacGuire v. Amos*, 343 F. Supp. 119 (M.D. Ala. 1972); *Puerto Rican Org. for Pol. Action v. Kusper*, 490 F.2d 575 (7th Cir. 1973).

3

Court observed that the VRA "might well prove an empty promise unless the private citizen were allowed to seek judicial enforcement" of its prohibitions. *Allen*, 393 U.S. at 557.

The next year, Congress reauthorized Section 5 and noted approvingly in the accompanying House Report that "*Allen* . . . makes clear that private persons have authority" to sue to enforce Section 5. H.R. Rep. No. 91-397, at 8 (1970). And in 1975, Congress codified *Allen*'s holding that private parties could enforce the VRA by amending Section 3 of the Act and adding Section 14(e). *See, e.g.*, *Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989); *Shelby Cnty. v. Lynch*, 799 F.3d 1173, 1179 (D.C. Cir. 2015). As amended, Section 3 provides broadly for relief in a "proceeding" brought by "the Attorney General or *an aggrieved person* . . . under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. § 10302(a); Add. 45 (emphasis added) (authorizing federal observers); *see also id.* § 10302(b); Add. 45 (authorizing courts to suspend tests or devices that "ha[ve] been used for the purpose or with the effect of denying or abridging the right . . . to vote on account of race or color"); *id.* § 10302(c); Add. 45–46 (authorizing court-imposed preclearance where court finds "violations of fourteenth or fifteenth amendment" justifies such relief). In turn, Section 14(e) allows for "the prevailing party, other than the United States" to seek attorney's fees "[i]n any action or proceeding to enforce the voting guarantees

4

of the fourteenth or fifteenth amendment." 52 U.S.C. § 10310(e); Add. 54. Thus, Congress "amended § 3 in 1975 to make what was once implied now explicit: private parties can sue to enforce the VRA." *Ala. State Conf. of N.A.A.C.P. v. Alabama*, 949 F.3d 647, 651 (11th Cir. 2020), *rev'd and vacated as moot by* 141 S. Ct. 2618 (2021).

Congress and the courts have specifically recognized a private right of action to enforce Section 2, both as enacted and as amended. That provision was meant "to forbid, in all 50 States, any 'standard, practice, or procedure . . . imposed or applied . . . to deny or abridge the right of any citizen of the United States to vote on account of race or color.'" *Shelby Cnty.*, 570 U.S. at 536 (quoting 79 Stat. 437). The statute's original language tracked the text of Section 1 of the Fifteenth Amendment, which provides: "The right of citizens . . . to vote shall not be denied or abridged . . . by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1.

In 1982, Congress amended Section 2 to establish a discriminatory "results" standard for liability, and made clear that private parties could sue to enforce it. The 1982 Senate Report expressly "reiterate[d] the existence of the private right of action under Section 2, as has been clearly intended by Congress since 1965." S. Rep. No. 97-417, at 30 (citing *Allen*, 393 U.S. 544). And the House Report confirmed Congress's "inten[t] that citizens have a private cause of action to

5

enforce their rights under Section 2 . . . [and] [i]f they prevail they are entitled to attorneys' fees under 42 U.S.C. §§ 1973l (e)"—*i.e.*, Section 14(e), now codified at 52 U.S.C. § 10310(e);—and 42 U.S.C. § 1988. H.R. Rep. No. 97-227, at 32. Section 2 now proscribes "any 'standard, practice, or procedure' that 'results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color.'" *Shelby Cnty.*, 570 U.S. at 537 (quoting 52 U.S.C. § 10301).

Congress did not act unprompted in 1982. It amended Section 2 in response to the Supreme Court's determination in *City of Mobile v. Bolden* that Section 2 prohibited voting laws "only if motivated by a discriminatory purpose," 446 U.S. 55, 62 (1980). Congress disagreed and amended Section 2 "to repudiate" that intentional discrimination requirement, by establishing instead a "results" standard for liability under the statute. *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2332 (2021). This legislative choice "reflected the results of the Senate Judiciary Committee's extensive survey of what it regarded as Fifteenth Amendment violations that called out for legislative redress." *Id.* at 2333 (citation omitted). The revised Section 2 standard for liability incorporated factors identifying circumstances probative of unconstitutional vote dilution for liability that had been set forth in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973), a

6

Fifth Circuit decision in a case brought by private plaintiffs. *See* S. Rep. No. 97-417, at 28–29 (citing *Zimmer*, 485 F.2d at 1305–06).

Consistent with Congress's intentions, for decades, "[b]oth the Federal Government and individuals have sued to enforce § 2," seeking injunctive relief "in appropriate cases to block voting laws from going into effect." *Shelby Cnty.*, 570 U.S. at 537. Since 1982, more than 400 Section 2 cases have been litigated in federal court.[2] And private plaintiffs have been the primary driver. Indeed, the U.S. Department of Justice's ("DOJ") own website lists only forty-four Section 2 cases brought by the Attorney General.[3] The Supreme Court has heard at least 11 Section 2 cases since 1982 in which private plaintiffs have participated.[4] The Eighth Circuit has heard at least 18 Section 2 cases; none of those 18 cases were

---

[2] *See* Ellen D. Katz et al., *Section 2 Cases Database*, Univ. of Mich. L. Sch. Voting Rights Initiative (2022), https://voting.law.umich.edu/database (hereinafter "Katz Study") (VRI_Dataset_2021.12.31 listing 439 electronically-reported cases with judicial decisions between 1982 and 2021 addressing a substantive Section 2 claim).

[3] U.S. Dep't of Justice, *Voting Section Litigation: Cases Raising Claims Under Section 2 of the Voting Rights Act,* https://www.justice.gov/crt/voting-section-litigation#sec2cases (last visited Apr. 14, 2022).

[4] *See e.g.*, *Brnovich*, 141 S. Ct. 2321; *Abbott v. Perez*, 138 S. Ct. 2305 (2018); *Bartlett v. Strickland*, 556 U.S. 1 (2009); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) ("*LULAC I*"); *Holder v. Hall*, 512 U.S. 874 (1994); *Johnson v. De Grandy*, 512 U.S. 997 (1994); *Growe v. Emison*, 507 U.S. 25 (1993); *Voinovich v. Quilter*, 507 U.S. 146 (1993); *Houston Lawyers' Ass'n v. Attorney General of Tex.*, 501 U.S. 419 (1991); *Chisom*, 501 U.S. 380; *Thornburg v. Gingles*, 478 U.S. 30 (1986).

Appellate Case: 22-1395     Page: 24     Date Filed: 04/18/2022 Entry ID: 5148453

brought by the Attorney General.[5]  Over the past forty years, there have been at least 182 successful Section 2 cases; of those 182 cases, only 15 were brought solely by the Attorney General.[6]

In 1996, the Supreme Court decided *Morse v. Republican Party of Virginia*, 517 U.S. 186.  *Morse* held that private plaintiffs can enforce Section 10 of the VRA, which prohibits poll taxes.  52 U.S.C. § 10306; Add. 49.  517 U.S. at 233–34.  To reach that conclusion, a majority of the Court expressly recognized a

---

[5] *See, e.g.*, *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924 (8th Cir. 2018); *Cottier v. City of Martin*, 604 F.3d 553 (8th Cir. 2010); *Bone Shirt v. Hazeltine*, 461 F.3d 1011 (8th Cir. 2006); *Johnson-Lee v. City of Minneapolis*, 170 F. App'x 15 (8th Cir. 2006) (unreported); *Corbett v. Sullivan*, 353 F.3d 628 (8th Cir. 2003); *African Am. Voting Rights Legal Defense Fund v. Missouri*, 133 F.3d 921 (8th Cir. 1998) (unpublished); *Stabler v. Cnty. of Thurston*, 129 F.3d 1015 (8th Cir. 1997); *Clay v. Bd. of Educ. of City of St. Louis*, 90 F.3d 1357 (8th Cir. 1996); *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382 (8th Cir. 1995); *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist., No. 1*, 56 F.3d 904 (8th Cir. 1995); *African Am. Legal Defense Fund v. Villa*, 54 F.3d 1345 (8th Cir. 1995); *Williams v. City of Texarkana*, 32 F.3d 1265 (8th Cir. 1994); *African Am. Citizens for Change v. St. Louis Bd. of Police Comm'rs*, 24 F.3d 1052 (8th Cir. 1994); *Jeffers v. Clinton*, 992 F.2d 826 (8th Cir. 1993); *Whitfield v. Democratic Party of State of Ark.*, 890 F.2d 1423 (8th Cir. 1989), *on reh'g*, 902 F.2d 15 (8th Cir. 1990); *Roberts*, 883 F.2d 617; *McGruder v. Phillips Cnty. Election Comm'n*, 850 F.2d 406 (8th Cir. 1988); *Buckanaga v. Sisseton Indep. Sch. Dist.*, 804 F.2d 469 (8th Cir. 1986).  *See also* Katz Study, *supra* note 2.

[6] *See* Katz Study, *supra* note 2, at Codebook, https://voting.law.umich.edu/wp-content/uploads/2022/02/VRI_Codebook.pdf (defining successful cases as those where "the ultimate outcome of the lawsuit was that a plaintiff achieved success on the merits by proving a violation of the VRA," or where "a positive real-world outcome could be determined from the opinions reviewed, e.g. a consent decree or a positive settlement").

8

Section 2 private right of action. Justice Stevens's lead opinion, joined by Justice Ginsburg, held that "[a]lthough § 2, like § 5, provides no right to sue on its face, the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965." *Morse*, 517 U.S. at 232 (quoting S. Rep. No. 97-417, at 30). "We, in turn," Justice Stevens explained, "have entertained cases brought by private litigants to enforce § 2." *Id.* In a concurring opinion, Justice Breyer, joined by two other Justices, likewise observed that "Congress intended to establish a private right of action to enforce § 10, no less than it did to enforce §§ 2 and 5." *Id.* at 240.

Congress most recently amended the VRA in 2006. It did not in any way suggest that courts had wrongly interpreted the VRA to permit private plaintiffs to enforce Section 2 in the hundreds of cases where they have done so.

## II. PROCEEDINGS BELOW

The post-2020 Census Arkansas State House of Representatives redistricting plan ("the House Plan") went into effect on December 29, 2021. Joint Appendix ("App.") 4; R. Doc. 1, at 4. That same day, Plaintiffs filed suit[7] and moved to

---

[7] Since 1982, private parties in Arkansas have brought Section 2 litigation each decennial redistricting cycle, with courts adjudicating the merits of each case. *See, e.g.*, *Jeffers v. Beebe*, 895 F. Supp. 2d 920 (E.D. Ark. 2012); *Wilson v. Huckabee*, No. 2:06-cv-00132-WRW, 2008 WL 360617 (E.D. Ark. Feb. 8, 2008); *Jeffers v. Tucker,* 847 F. Supp. 655 (E.D. Ark. 1994); *Turner v. State of Ark.*, 784 F. Supp. 553 (E.D. Ark. 1991); *Jeffers v. Clinton*, 730 F. Supp. 196 (E.D. Ark. 1989); *Smith v. Clinton*, 687 F. Supp. 1310 (E.D. Ark. 1988).

9

preliminarily enjoin its implementation for the 2022 elections. App. 1; R. Doc, 1, 2, 3. Plaintiffs asserted that the House Plan "dilutes Black voting strength in violation of Section 2" of the VRA. App. 10; R. Doc. 1, at 10. Although the citizen voting age population of Arkansas is approximately 15.5 percent Black, the Plan provides Black Arkansans with an opportunity to elect their preferred candidates in only 11 out of 100 House districts. App. 4–5; R. Doc. 1, at 4–5. Plaintiffs alleged that the Plan denies Black voters an equal opportunity to elect their preferred candidates in as many as five House districts across the state. App. 6–7; R. Doc. 1, at 6–7.

On January 19, 2022, Defendants filed a response opposing the preliminary injunction motion. R. Doc. 53. They did not argue that Section 2 lacks a private right of action. *See id.*

The next day, the district court issued a *sua sponte* order directing the parties to "be prepared to discuss" whether Section 2 can be enforced via a private right of action. App. 42; R. Doc. 55, at 1. Because Defendants did not raise the issue, the court noted that if the existence of a private right of action is not a jurisdictional issue in the Eighth Circuit, "any potential arguments in this area have been forfeited by Defendants for purposes of the Preliminary Injunction Motion." App. 43; R. Doc. 55, at 2. The text order offered Defendants an opportunity to address these issues in surreply. App. 43; R. Doc. 55, at 2.

Appellate Case: 22-1395    Page: 27    Date Filed: 04/18/2022 Entry ID: 5148453

In their reply, Plaintiffs argued that Section 2 provides a private right of action. R. Doc. 68, at 45–49. The DOJ filed a Statement of Interest arguing the same and stressing that "courts have never denied a private plaintiff the ability to bring Section 2 claims." R. Doc. 71, at 8. Defendants' surreply devoted only five pages to the private right-of-action issue. R. Doc. 77, at 7–11.

The district court then held a five-day hearing on Plaintiffs' preliminary injunction motion. The hearing featured extensive testimony from fifteen fact and expert witnesses. The parties entered more than 80 exhibits into evidence. *See* R. Docs. 95, 96, 98, 99.

In a 41-page decision, the district court dismissed the case for lack of subject matter jurisdiction, holding that Section 2 lacks a private right of action. Add. 1–42; R. Doc. 100. The court recognized that Plaintiffs have a "strong merits case that at least some of the challenged districts in the Board['s House Plan] are unlawful under § 2." *Id.* at 3. But it held that "[o]nly the Attorney General of the United States can bring a case" under Section 2. *Id.* at 16. The district court acknowledged that its decision is extraordinary, emphasizing that it gave "the Court pause to be the first federal court in the nation to affirmatively conclude that the judiciary may not imply a private right of action to enforce § 2." *Id.* at 17 n.73. But the court pointed to a recent one-paragraph concurring opinion in *Brnovich*—a Section 2 action brought by private plaintiffs—by Justice Gorsuch (joined by

11

Justice Thomas), voicing the view that whether private plaintiffs may enforce Section 2 is an "open question." *Id.* at 31 (quoting *Brnovich*, 141 S. Ct. at 2350 (Gorsuch, J., concurring)).

The district court acknowledged that the Supreme Court's decision in *Morse* remains "binding precedent," Add. 28; R. Doc. 100, at 28, and that every lower court to consider the question has found a Section 2 private right of action, *see id.* at 16–17 n.73. The court, however, proclaimed that it was not "bound by the way other courts have treated this question." *Id.* Rather, it explained that it considered the Supreme Court's decisions in *Allen* and *Morse* now "simply inapplicable" to Section 2, *id.* at 28; that "*Allen* has been relegated to the dustbin of history," *id.* at 25; and that the reasoning of *Morse* "does not survive" the Supreme Court's decision in *Alexander v. Sandoval*, 532 U.S. 275 (2001), which sets forth the prevailing test to determine whether a statute contains an implied private right of action, *id.* at 27.

The district court also chose to disregard this Court's decision in *Roberts v. Wamser*, which recognized that "standing to sue under [Section 2] is limited to the Attorney General *and to 'aggrieved persons'*"—*i.e.*, private "persons whose voting rights have been denied or impaired," 883 F.2d at 624 (emphasis added). *Roberts*, the court acknowledged, was also "potentially binding precedent." Add. 28; R. Doc. 100, at 28. But the court opined that this Court's understanding of Section

12

2's enforceability by private individuals was just dicta that "has long since faded into jurisprudential oblivion." *Id.* at 29–30.

In concluding that Section 2 lacks a private right of action, the district court purported to apply the two-part *Sandoval* test. That test examines whether: (1) the statutory provision contains a private right, as evinced by "rights-creating" language; and (2) the statute provides for "a private remedy." Add. 17–18; R. Doc. 100, at 17–18 (quoting *Sandoval*, 532 U.S. at 286).

The district court focused exclusively on the *Sandoval* test's second prong. *See* Add. 17–18; R. Doc. 100, at 17–18. It determined that the VRA's text and structure "do[] not manifest an intent to create a private remedy" for Section 2 violations. *Id.* at 24 (cleaned up). The court noted that Section 2 itself does not contain a private remedy, and further held that the remedies found in Sections 3 and 14 of the Act do not apply to Section 2 because, in its view, in 1982 "Congress intentionally divorced § 2 from the Fourteenth and Fifteenth Amendments." *Id.* at 28 n.117. Section 2, the district court explained, protects a right "different from, and broader than, the right[s] secured by the Constitution," and thus, a proceeding under Section 2 is not a "proceeding" to "enforce the voting guarantees of the fourteenth of fifteenth amendment," as contemplated by the text of Sections 3 and 14. *Id.* at 19, 22–23. The court also devoted a substantial portion of its analysis to Section 12, which authorizes civil and criminal sanctions for VRA violations, 52

13

U.S.C. § 10308; Add. 51, even though neither Plaintiffs nor the DOJ claimed Section 12 provided a private remedy for Section 2. *See* Add. 19–22; R. Doc. 100, at 19–22.

In concluding that Section 2 lacks a private right of action, the district court declined to credit statements in the 1982 Senate and House Committee Reports that expressed Congress's understanding that Section 2's results standard is enforceable via a private right of action (as had the original version of Section 2). *See id.* at 24 n.101.

Moreover, although Defendants did not raise the private-right-of-action issue in their opposition to Plaintiffs' preliminary injunction motion, the district court concluded that they did not waive it because they "remain[ed] free to raise the issue in their answer or a motion to dismiss." Add. 38 n.162; R. Doc. 100, at 38. And it opined that, given its roadmap, it "would be close to malpractice" for defense counsel not to do so. *Id.* Even though Defendants subsequently requested that the district court reach the merits of the case, *see* R. Doc. 77, at 6, the court did not. Add. 3; R. Doc. 100, at 3.

In any event, the district court held that the question whether a private right of action exists is jurisdictional and therefore cannot be waived. *See id.* at 38. It acknowledged decades of Supreme Court precedent holding that "the absence of a valid cause of action . . . does not implicate subject-matter jurisdiction" "appears

14

to settle the issue." *Id.* at 31 (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642–43 (2002)).  But the court then cited *Cross v. Fox*, 23 F.4th 797 (8th Cir. 2022), for the proposition that this issue is jurisdictional and could not be waived.  Ultimately, the district court concluded it was "duty-bound" to follow *Cross*—noting that *Cross* was decided after the Supreme Court cases in question and dismissing other Eighth Circuit cases that follow Supreme Court precedent stating that this issue is non-jurisdictional.  S*ee id.* at 33–37.

Before dismissing the case for lack of subject-matter jurisdiction, the district court allowed five calendar days (over a three-day holiday weekend) for the U.S. Attorney General to join as a plaintiff.  *Id.* at 41.  When the DOJ indicated that it would not intervene as a party, *see* App. 86–88; R. Doc. 101, at 1, the court dismissed the case without prejudice.  Add. 43; R. Doc. 102.

## SUMMARY OF THE ARGUMENT

Since the VRA's enactment in 1965, *every* court to consider the issue has concluded that private plaintiffs who have been directly injured, like Plaintiffs here, have a right of action to enforce and seek redress for Section 2 violations. That includes a Supreme Court majority in *Morse v. Republican Party of Virginia. See* 517 U.S. at 232 (Stevens, J., for two Justices, writing for the Court); *id.* at 240 (Breyer, J., for three Justices).  It also includes numerous courts of appeals and district courts.  Indeed, federal courts—including this one—have heard and

Appellate Case: 22-1395    Page: 32    Date Filed: 04/18/2022 Entry ID: 5148453

decided hundreds of Section 2 cases and provided relief to private plaintiffs for Section 2 violations for decades.  Scores of courts have not gotten the law wrong; that Section 2 is privately enforceable is plain from the statute's text and structure.  And it is confirmed by the unbroken, decades-long legislative understanding of the statute.  Congress has been explicit: "the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965."  S. Rep. No. 97-417, at 30.  That intent has carried through the 1982 amendments and into Section 2's discriminatory results standard for liability.  *Id.*

Nevertheless, the district court came to the extraordinary conclusion that Section 2 lacks a private right of action—by its own acknowledgment, "the first federal court in the nation" to do so.  Add. 17 n.73; R. Doc. 100, at 17 n.73.  This Court should reverse the district court's unprecedented holding.

The Supreme Court's decision in *Morse* alone demands reversal.  *Morse* held that private plaintiffs can enforce Section 10 of the VRA, which prohibits poll taxes.  But its holding hinged on a majority of the Justices' reasoning that plaintiffs can enforce Section 2 via private right of action.  As a necessary predicate to *Morse*'s holding, the determination that Section 2 is privately enforceable is binding on lower courts.  And this Court, too, has spoken clearly that Section 2 has a private right of action.  In *Roberts*, 883 F.2d 617, the Court held that while candidates did not have standing to sue under Section 2, "persons whose voting

16

rights have been denied or impaired," *i.e.*, private litigants, do. *Id.* at 624. The district court's decision to ignore these binding precedents is reversible error.

To avoid the conclusion *Morse* dictates, the district court claimed that *Morse*'s reasoning did not survive *Alexander v. Sandoval*, 532 U.S. 275. But *Sandoval*, which sets forth the prevailing test to evaluate whether a statute provides an implied private right of action, in no way overrules *Morse*. *Sandoval* does not discuss *Morse* or the VRA. Nor does it call into question *Morse*'s reasoning that Section 2 contains a private right of action. There was no reason to apply *Sandoval* here.

Even if the *Sandoval* test applied, Section 2 easily satisfies it. Section 2 protects the "right of any citizen . . . to vote" free from racial discrimination. 52 U.S.C. § 10301(a); Add. 44. This language shows Congress's intent to create a private right: it explicitly mentions a "right" and focuses on the individuals protected. *See Sandoval*, 532 U.S. at 286. And two VRA provisions—Section 3 and Section 14(e)—provide private remedies for "proceeding[s]" or "action[s]" "to enforce the voting guarantees of the fourteenth or fifteenth amendment*"—i.e.*, the prohibitions on racial discrimination in voting—precisely what Section 2 actions aim to do.

The district court nevertheless concluded that neither Section 3 nor Section 14(e) provides a private remedy for Section 2 violations because, in its view,

17

Section 2's results standard (prohibiting voting laws with discriminatory results, without requiring plaintiffs to directly prove discriminatory intent) protects "voting rights [that are] different from" the voting guarantees of the Fourteenth and Fifteenth Amendments. Add. 23; R. Doc. 100, at 23. This ignores overwhelming precedent—including from this Court and all nine justices in *Morse*—recognizing that Section 3's private remedies apply to actions under substantive VRA provisions "designed for enforcement of the guarantees of the Fourteenth and Fifteenth Amendments." *Morse*, 517 U.S. at 233–34. That plainly includes Section 2, which "was adopted to enforce" the Fifteenth Amendment, *Brnovich*, 141 S. Ct. at 2331, and was amended to include a discriminatory results standard to remedy "violations [of those Amendments] that called out for legislative redress," *id.* at 2333 (citation omitted).

Finally, for decades, from the VRA's original enactment through its four reauthorizations, Congress has consistently made known its intent that the VRA, generally, and Section 2, specifically, can be enforced by private actors harmed by discriminatory voting procedures. Congress was unequivocal on this point in committee report after committee report reauthorizing the VRA. And when Congress amended Section 2 in 1982 to incorporate the results standard and revisited the VRA in 2006 after *Morse*, it was undoubtedly aware that federal courts had long interpreted the statute to provide a cause of action for private

18

litigants.  Yet Congress never indicated that hundreds of courts around the country were repeatedly misinterpreting Section 2.  Not in 1970, 1975, 1982, or 2006.  Instead, Congress recognized that the VRA "might well prove an empty promise unless the private citizen were allowed to seek judicial enforcement."  *Allen*, 393 U.S. at 557; *see also* S. Rep. No. 94-295, at 40 (1975) ("Congress depends heavily upon private citizens to enforce the fundamental [voting] rights involved."); H.R. Rep. No. 94-196, at 34 (1975) (noting "private citizens must play" a "significant role" in VRA enforcement).  The overwhelming evidence of congressional intent underscores what the VRA's text already demonstrates, and the district court erred in completely disregarding it.

The Court should reverse the district court's unprecedented decision.

## ARGUMENT

This Court "review[s] de novo a district court's dismissal for lack of jurisdiction."  *Dalton v. JJSC Properties, LLC*, 967 F.3d 909, 912 (8th Cir. 2020); *see also Dakota, Minn. & E. R.R. Corp. v. Schieffer*, 711 F.3d 878, 880 (8th Cir. 2013).  "When *de novo* review is compelled, no form of appellate deference is acceptable."  *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991).

19

## I. CONTROLLING PRECEDENT THAT THERE IS A PRIVATE RIGHT OF ACTION TO ENFORCE SECTION 2 RESOLVES THIS APPEAL.

The district court was correct on one thing: it stands alone as "the first federal court in the nation" to deny a "private right of action to enforce § 2." Add. 17 n.73; R. Doc. 100, at 17 n.73. But its unprecedented decision was otherwise wrong. Since the VRA's enactment, *every* court to consider the issue has concluded that private parties may sue to enforce and redress Section 2 violations. That includes a majority of Supreme Court Justices in *Morse v. Republican Party v. Virginia*. 517 U.S. at 232, 240. And it includes numerous courts of appeals and district courts.[8] Indeed, federal courts have decided hundreds of Section 2 cases and provided private plaintiffs relief for Section 2 violations for decades.

*Morse* is dispositive. In *Morse*, three Virginia voters challenged the Republican Party's registration fee to participate in the nomination of U.S. Senate candidates. *Id.* at 190. The Supreme Court addressed whether private parties "were permitted to challenge [the party registration fee] as a poll tax prohibited by § 10" of the VRA, *id.*, and answered in the affirmative, *id.* at 232. Justice Stevens' lead opinion, joined by another Justice, explained that, "[a]lthough § 2, like § 5, provides no right to sue on its face, 'the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965'" and noted

---

[8] *See*, *infra*, notes 10 and 11.

Appellate Case: 22-1395    Page: 37    Date Filed: 04/18/2022 Entry ID: 5148453

that federal courts had "entertained cases brought by private litigants to enforce §
2," at the time, for thirty years. *Id.* (quoting S. Rep. No. 97-417, at 30). Section 10
must also be enforceable by private action, Justice Stevens reasoned, otherwise it
would lead to the "anomalous" result that Sections 2 and 5 could be enforced by
private action but Section 10 could not, even though all three provisions "lack[ed]
the same express authorizing language." *Id.* Justice Breyer, joined by two other
Justices, concurred and relied on the same reasoning, concluding that "Congress
intended to establish a private right of action to enforce § 10, no less than it did to
enforce §§ 2 and 5." *Id*. at 240 (Breyer, J., concurring). Thus, "[f]ive Justices
concurred in that reasoning and judgment." *Milligan v. Merrill* ("*Milligan*"), No.
2:21-cv-1291-AMM, 2022 WL 265001, at *79 (N.D. Ala. Jan. 24, 2022); *see also*
*Ford v. Strange*, 580 F. App'x 701, 705 n.6 (11th Cir. 2014) (unreported) (per
curiam) (noting that "[a] majority of the Supreme Court" in *Morse* agreed that
"section 2 . . . contains an implied private right of action").

The district court correctly saw "*Morse* [as] binding precedent." Add. 28; R.
Doc. 100, at 28. That ought to have ended its private-right-of-action sojourn. *See*
*Hutto v. Davis*, 454 U.S. 370, 375 (1982) ("[P]recedent of this Court must be
followed by lower federal courts . . . "). Instead, the district court disregarded
*Morse*, mischaracterizing its acknowledgment of a Section 2 private right of action
as "only dicta." Add. 28; R. Doc. 100, at 28. That is wrong. As one three-judge

21

panel recently explained, "the understanding [in *Morse*] that Section Two provides a private right of action was *necessary* to reach the judgment that Section Ten provides a private right of action." *Milligan*, 2022 WL 265001, at *79 (emphasis added). The determination that there is a private right of action under Section 2 is therefore part of *Morse*'s holding and controls here. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66–67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound.").

The district court disagreed because, in its view, *Morse*'s reasoning "does not survive" later Supreme Court decisions, namely, *Alexander v. Sandoval*, 532 U.S. 275. Add. 27; R. Doc. 100, at 27. But *Sandoval*, which addressed disparate-impact regulations promulgated under Title VI of the Civil Rights Act of 1964, says nothing about the VRA, Section 2, or *Morse*. *See* 517 U.S. at 278–93. A lower court cannot ignore binding Supreme Court precedent on belief that it was wrongly decided, belief that the Court will change it in the near future, or the court's own view that it has been overruled *sub silentio*. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997); *Thurston Motor Lines, Inc v. Jordan K. Rand, Ltd.*, 460 U.S. 533 (1983) (per curiam).

The Supreme Court has been clear on this rule: if a precedent "has direct application in a case, yet appears to rest on reasons rejected in some other line of

22

decisions" the lower court "should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989); *see also Bakewell v. United States*, 110 F.2d 564, 564 (8th Cir. 1940) (per curiam) ("If the [Supreme Court's] decision in [a] case is to be modified, overruled or disregarded, that will have to be done by the Supreme Court."). *Sandoval* did not address the question whether private litigants may enforce Section 2—the Supreme Court did so directly in *Morse*, and the district court erred in ignoring that binding precedent.

This Court has also already spoken clearly on the existence of a Section 2 private right of action. As the district court recognized, "[t]he Eighth Circuit treated § 2 of the Voting Rights Act as privately enforceable" in cases including *Roberts v. Wamser*, 883 F.2d 617. Add. 29; R. Doc. 100, at 29. That should have also bound the district court from reaching a different result.[9] In *Roberts*, this Court held that candidates may not bring suit under Section 2, reasoning that "standing to sue under [Section 2] is limited to the Attorney General and to 'aggrieved persons,' a category that *we hold to be limited to persons whose voting rights have been denied or impaired*." 883 F.2d at 624 (emphasis added). Under

_____

[9] Under the prior panel rule, *Roberts* is binding on this Court. *See generally Maxfield v. Cintas Corp., No. 2*, 487 F.3d 1132, 1135 (8th Cir. 2007) ("[O]ne panel of this court has no authority to overrule an earlier decision of another panel.").

23

*Roberts*, private litigants like Plaintiffs in this case—organizations whose members' voting rights have been impaired by the House Plan—can plainly enforce Section 2.

Until the district court's decision, every other court to consider the question directly—including the Fifth, Sixth, and Eleventh Circuits[10] and numerous district courts[11]—has uniformly followed *Morse* to hold that private plaintiffs may enforce Section 2.  And, notwithstanding the district court's insistence that federal courts

---

[10] *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017) (affirming that § 2 contains a private right of action); *Mixon v. Ohio*, 193 F.3d 389, 398–99 (6th Cir. 1999) (same); *Ala. State Conf. of N.A.A.C.P.*, 949 F.3d at 652 ("The VRA, as amended, clearly expresses an intent to allow private parties to sue the States.'").

[11] *See e.g.*, *Alpha Phi Alpha Fraternity, Inc. v. Raffensperger*, No. 1:21-cv-5337-SCJ, 2022 WL 633312, at *11 n.10 (N.D. Ga. Feb. 28, 2022) (court was "aware of the recent decision" by the district court in this case, but rejected arguments that there is no private right of action under Section 2 "[g]iven the extent and weight of the authority holding otherwise, including from the Supreme Court" (citation omitted)); *Milligan,* 2022 WL 265001, at *79 (three-judge court) (rejecting argument that "Section Two does not provide a private right of action," because such a holding "would work a major upheaval in the law"); *League of United Latin Am. Citizens v. Abbott*, No. EP-21-CV-00259-DCG-JES-JVB, 2021 WL 5762035, *1 (W.D. Tex. Dec. 3, 2021) (three-judge court) ("*LULAC II*") (denying motion to dismiss and holding that there is a private cause of action to enforce Section 2); *Ga. State Conf. of the NAACP v. Georgia,* 269 F. Supp. 3d 1266, 1275 (N.D. Ga. 2017) (three-judge court) (explaining that "Section 2 contains an implied private right of action"); *Veasey v. Perry,* 29 F. Supp. 3d 896, 905–07 (S.D. Tex. 2014) (detailing long history of "[o]rganizations and private parties" enforcing Section 2); *Perry-Bey v. City of Norfolk,* 678 F. Supp. 2d 348, 362 (E.D. Va. 2009) (holding that Section 2 "creates a private cause of action").

24

lack jurisdiction and cannot reach the merits of Section 2 cases unless brought by the Attorney General, courts have implicitly determined that there is a Section 2 private right of action by reaching the merits of hundreds of cases in which private "individuals have sued to enforce § 2," seeking "injunctive relief . . . to block voting laws from going into effect," *Shelby Cnty.*, 570 U.S. at 536–37. Many of these cases were brought after Congress amended Section 2 to add a discriminatory results standard in 1982. Indeed, since then, the Supreme Court has "heard a steady stream of § 2 vote-dilution cases," *Brnovich*, 141 S. Ct. at 2333, reaching the merits in numerous Section 2 cases brought by private plaintiffs.[12] In that same period, this Court has reached the merits in at least 18 Section 2 cases brought by private plaintiffs.[13] In total, since 1982, federal courts—including virtually all federal courts of appeal[14]—have heard hundreds of cases under Section 2 brought

---

[12] *See supra*, note 4 (collecting cases).

[13] *See supra* note 5 (collecting cases).

[14] *See, e.g.*, *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282 (11th Cir. 2020); *Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020); *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612 (6th Cir. 2016); *Arbor Hill Concerned Citizens v. Cnty. of Albany*, 357 F.3d 260 (2d Cir. 2004); *Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004); *Metts v. Murphy*, 363 F.3d 8, 11 (1st Cir. 2004); *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033 (D.C. Cir. 2003); *Arakaki v. Hawaii*, 314 F.3d 1091 (9th Cir. 2002); *Sanchez v. State of Colo.*, 97 F.3d 1303 (10th Cir. 1996); *Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393 (5th Cir. 1996); *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103 (3d Cir. 1993). The Federal Circuit is not empowered to hear Section 2 cases, and is the lone exception. *See* 28 U.S.C. § 1295.

25

by private plaintiffs. Against this backdrop—and unsurprisingly—even Defendants in this case did not initially argue that Section 2 lacks a private right of action until prompted by the district court.

Under the district court's "Attorney General-only" theory, *all* these courts have gotten Section 2 cases wrong hundreds of times over the past 40 years, with the district court alone as the only court to have ever ruled correctly in a Section 2 case brought by private plaintiffs.[15] Neither this Court nor the district court should find "reason to ignore or refute the decades of Section 2 litigation . . . in which courts (including the Supreme Court) have never denied a private plaintiff the ability to bring a Section 2 claim." *Alpha Phi Alpha Fraternity*, No. 1:21-cv-5337-

---

[15] The district court's conclusion that the private-right-of-action issue is jurisdictional is also wrong, and thus Defendants waived it by not raising it in their opposition to Plaintiffs' preliminary injunction motion. As the Supreme Court has stated, "[i]t is firmly established . . . that the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction." *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 89 (1998); *see also Brnovich*, 141 S. Ct. at 2350 (Gorsuch, J. concurring) ("[T]he existence (or not) of a cause of action does not go to a court's subject-matter jurisdiction . . . ."); *Mata v. Lynch*, 576 U.S. 143, 150 (2015). The district court ignored this binding precedent. It relied instead on *Cross*, 23 F.4th at 800, for the proposition that the private-right-of-action issue is jurisdictional. Add. 35; R. Doc. 100, at 35. But despite the district court's claim that it "must assume the Eighth Circuit believes *Cross* is a faithful understanding and application of Supreme Court precedent," Add. 35; R. Doc. 100, at 35, there is no way to reconcile *Cross* and this Supreme Court precedent, or the several Eighth Circuit cases relying on that precedent to likewise hold that the private-right-of-action issue is not jurisdictional. *See, e.g.*, *Animal Legal Def. Fund v. Vaught*, 8 F.4th 714, 721 (8th Cir. 2021); *United States v. Harcevic*, 999 F. 3d 1172, 1178–79 (8th Cir. 2021).

Appellate Case: 22-1395    Page: 43    Date Filed: 04/18/2022 Entry ID: 5148453

SCJ, Order Denying Def.'s Mot. to Dismiss, slip op. at 34; Add. 88. To put it mildly, the district court's reasoning would "work a major upheaval in the law," *Milligan*, 2022 WL 265001, at *79, as the unanimous "extent and weight of the authority hold otherwise, including from the Supreme Court," *Alpha Phi Alpha Fraternity*, 2022 WL 633312, at *11 n.10. *Cf. Tanzin v. Tanvir,* 141 S. Ct. 486, 490 (2020) (instructing that it is important to consider the way the "Court has long interpreted" a statute).

## II. THE VRA'S TEXT AND STRUCTURE CLEARLY DEMONSTRATES CONGRESSIONAL INTENT TO ESTABLISH A PRIVATE RIGHT OF ACTION TO ENFORCE SECTION 2.

*Morse*, *Roberts*, and unanimous lower court authority all hold that there is a Section 2 private right of action because the VRA's plain text and statutory structure compel that conclusion. The district court concluded otherwise, purporting to apply *Sandoval*'s test to evaluate whether a statute provides an implied private right of action. That test has two requirements to determine that private plaintiffs can enforce a statute: (1) the statutory provision contains a "private right," as evinced by "rights-creating" language; and (2) the statute provides for "a private remedy." *See* 532 U.S. at 286–88. But that analysis is inapplicable because binding precedent on Section 2's private right of action dictates a clear answer that *Sandoval* did not overrule. But even if the *Sandoval* test were applicable, Section 2 satisfies it. The provision expressly protects the

27

"right of any citizen . . . to vote," 52 U.S.C. §10301(a); Add. 44, precisely the "rights-creating language" that courts look for when determining that Congress implied a private right of action in a statute. And two other VRA provisions—Section 3 and Section 14(e)—both provide a private remedy for Section 2 violations.

### A. Section 2 Employs "Rights-Creating" Language By Protecting The Right Of Any Citizen To Vote Free From Racial Discrimination.

Section 2 contains rights-creating language, and the district court did not conclude otherwise. *See* Add. 17; R. Doc. 100, at 17. The provision protects the "right of any citizen . . . to vote" free from racial discrimination. 52 U.S.C. § 10301(a); Add. 44. It explicitly refers to a citizen's "right" and is "phrased in terms of the person benefitted"—the main criteria for whether a statute contains rights-creating language. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002); *Osher v. City of St. Louis, Mo.*, 903 F.3d 698, 702–03 (8th Cir. 2018). In focusing on the "individuals protected," Section 2's "right of any citizen" language creates an "implication of an intent to confer rights on a particular class of persons," *Sandoval*, 532 U.S. at 289 (citation omitted). *See also Wisniewski v. Rodale, Inc.*, 510 F.3d 294, 302 (3d Cir. 2007) ("With an explicit reference to a right and a focus on the individual protected, this language suffices to demonstrate Congress's intent to create a personal right.").

28

On this point, *Sandoval* is illuminating. Section 2 parallels Section 601 of Title VI of the Civil Rights Act of 1964—precisely the statute *Sandoval* pointed to as an exemplar of "rights-creating" language. 532 U.S. at 288–89 (citing *Cannon v. Univ. of Chi.*, 441 U.S. 677, 690 n.13 (1979)). Section 601 provides that "[n]o person . . . shall, on the ground of race, color, or national origin, be . . . subjected to discrimination . . . ." 42 U.S.C. § 2000(d). As a three-judge district court recently observed, Section 601's "paradigmatic rights-creating language . . . seems to mirror [VRA] Section 2's." *LULAC II,* 2021 WL 5762035, at *1 & n.1; *see* 52 U.S.C. § 10301(a); Add. 44 ("No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen . . . to vote on account of race or color[.]").[16]

---

[16] Because Section 2 creates a personal right, it can also be enforced under 42 U.S.C. § 1983. A federal law that unambiguously creates an individual right is presumptively enforceable in a Section 1983 action. *See Gonzaga*, 536 U.S. at 284; *see also id.* § 1983 (providing injunctive relief for violations of rights "secured by the Constitution and laws"). This presumption can be rebutted only in "exceptional cases," *Livadas v. Bradshaw*, 512 U.S. 107, 133 (1994)—either "through specific evidence from the statute itself" or where Congress "creat[ed] a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983," *Gonzaga*, 536 U.S. at 284 n.4 (cleaned up). Neither exception is applicable here. Plaintiffs did not specifically invoke § 1983 in their complaint, but because Section 2 is privately enforceable under § 1983, the district court erred in dismissing Plaintiffs' complaint without providing leave to amend to do so. Where a pleading defect is a "purely legal issue that is beyond doubt," this Court can "exercise [its] discretion to correct the error and remand . . . to the

29

## B. Sections 3 And Section 14(e) Of Provide Private Remedies For Violations Of Section 2.

The VRA also sets forth remedies for actions brought by private individuals to enforce Section 2, satisfying *Sandoval*'s second requirement. When analyzing whether Congress provided for a private remedy to enforce a statutory provision, "[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create . . . a private remedy." *Sandoval*, 532 U.S. at 289. Two provisions—Section 3 and Section 14(e)—display that intent to provide private remedies for Section 2 violations.

### 1. *Section 3 contains private remedies for Section 2 violations.*

Section 3 is titled "Proceeding to enforce the right to vote." 52 U.S.C. § 10302; Add. 45. It provides broadly for relief in "proceeding[s]" brought by "the Attorney General or an aggrieved person . . . under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. § 10302(a); Add. 45; *see also id.* § 10302(b), *id.* § 10302(c); Add. 45–46. That text contemplates private remedies for Section 2 violations, because: (a) private plaintiffs are "aggrieved persons" whose voting rights have been violated, and (b) cases under Section 2—a statute designed to protect the "right of any citizen . . . to vote" free from racial discrimination, 52 U.S.C. § 10301(a); Add. 44—are

---

district court." *Robinson v. Norling*, 25 F.4th 1061, 1063 (8th Cir. 2022) (cleaned up).

30

"proceeding[s] . . . under a[] statute to enforce the voting guarantees" of the Fourteenth and Fifteenth Amendments, Add. 44.

    **a.** *"Aggrieved persons."* As this Court held in *Roberts*, Section 3's reference to "aggrieved persons" encompasses private "persons whose voting rights have been denied or impaired." 883 F.2d at 624; *see also id.* at 621 (noting Section 3 "reflect[s] the standing of 'aggrieved persons' to enforce their right to vote"). The district court agreed. *See* Add. 22; R. Doc. 100, at 22 (acknowledging that an "aggrieved person" under Section 3 refers to "an injured potential voter"). Indeed, the statute's reference to "the Attorney General *or* an aggrieved person," cannot mean only the Attorney General; it must include those private "persons" whose voting rights are impaired. *See Morse*, 517 U.S. at 233 (noting the purpose of Congress' addition of "or an aggrieved person" to Section 3 "was to provide the same remedies to private parties as had formerly been available to the Attorney General alone.").

    **b.** *"[A] proceeding . . . under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment."* Next, a lawsuit brought to enforce Section 2 is "a proceeding" brought "under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. § 10302(a); Add. 45. As the Supreme Court has explained, Section 3 provides private remedies for actions under "a statute" that, "by its terms," is "*designed for*

31

enforcement of the guarantees of the Fourteenth and Fifteenth Amendments."
*Morse*, 517 U.S. at 233–34 (emphasis added).  Section 2 of the VRA is just such a statute.  The VRA's purpose is "to achieve at long last what the Fifteenth Amendment had sought to bring about 95 years earlier: an end to the denial of the right to vote based on race." *Brnovich*, 141 S. Ct. at 2330.  And Section 2 "was enacted to forbid, in all 50 States, any 'standard, practice, or procedure . . . imposed or applied . . . to deny or abridge the right of any citizen of the United States to vote on account of race or color.'" *Shelby Cnty.*, 570 U.S. at 536 (quoting 79 Stat. 437).  In banning racially discriminatory voting practices, Section 2 is the core statute that "enforces the voting guarantees of the fourteenth or fifteenth amendment," and therefore falls within Section 3's provision for private remedies.

This Court in *Roberts* confirmed that Section 3 provides private remedies for Section 2.  To determine who may sue under Section 2, this Court looked to who was entitled to remedies under Section 3.  It held that unsuccessful candidates are not among the "aggrieved persons" who, under Section 3, may bring suit to enforce Section 2, drawing a contrast to those who can: "an aggrieved voter suing to protect his right to vote," or an individual whose "right to vote has been infringed because of his race." *Roberts*, 883 F.2d at 621.

32

Indeed, until the district court in this case, federal courts had uniformly concluded that Section 3 provides private remedies for Section 2 violations. *See, e.g.*, *Ala. State Conf. of N.A.A.C.P.*, 949 F.3d at 652 ("The language of § 2 and § 3, read together, imposes direct liability on States for discrimination in voting and explicitly provides remedies to private parties to address violations under the statute."); *see also id.* at 653 n.6 ("[T]he VRA is, by definition, 'any' such statute" under Section 3 because "it is designed to enforce the voting guarantees of the Fourteenth and Fifteenth Amendments."); *Veasey,* 29 F. Supp. 3d at 906 (holding that private plaintiffs can bring suit to "enforce Section 2 as such aggrieved persons" under Section 3); *Perry-Bey,* 678 F. Supp. 2d at 362 (Section 3 "creates a private cause of action permitting plaintiffs to file suit if they are an 'aggrieved person'" for Section 2 vote dilution claims); *cf. Arkansas United v. Thurston*, 517 F. Supp. 3d 777, 790 (W.D. Ark. 2021) (holding Section 3 "explicitly creates a private right of action to enforce the VRA").

The district court, however, wrongly concluded that Section 3 does not provide a remedy for Section 2 violations, based on a misreading of Section 3 as providing a private remedy only for claims of Fourteenth or Fifteenth Amendment violations, Add. 22–23; R. Doc. 100, at 22–23, and its mistaken view that Section 2 protects "voting rights [that are] different from" the voting guarantees of the

33

Fourteenth and Fifteenth Amendments. *Id.* at 23 (quoting 52 U.S.C. § 10302(a)). The district court was wrong on both counts.

First, *Morse* forecloses the district court's conclusion that Section 3 applies only to claims for violations of the Fourteenth or Fifteenth Amendments. There, the Supreme Court explained that, by amending "Section 3 . . . to cover actions brought by the Attorney General *or an aggrieved person*," Congress in 1975 " recognized that private rights of action were . . . available under § 10" to challenge poll taxes. 517 U.S. at 233 (cleaned up). The Court so ruled, even though neither the Fourteenth nor Fifteenth Amendment specifically prohibits poll taxes (which are covered by the Twenty-Fourth Amendment, *see* U.S. Const. amend. XXIV). *Morse's* holding thus necessarily rejects the view that Section 3's remedies are limited only to direct violations of the Fourteenth and Fifteenth Amendments.

Even the four dissenting Justices in *Morse* acknowledged that Section 3 provides private remedies for VRA provisions whose purpose is to eradicate racial discrimination in voting, even if those provisions are not perfectly co-extensive with the Fourteenth or Fifteenth Amendments. In an opinion that three other Justices joined, Justice Thomas wrote that "§ 3 explicitly recognizes that private individuals can sue under the [VRA]," including "suits under § 5"—a provision that undisputedly extends beyond the Fourteenth and Fifteenth Amendments

34

themselves—"as well as any rights of action that we might recognize in the future." *Morse*, 517 U.S. at 289 (Thomas, J., dissenting). Accordingly, the Supreme Court in *Morse* unanimously rejected the view that Section 3 provides private remedies only for actions alleging direct Fourteenth and Fifteenth Amendment violations.

Indeed, Section 3 explicitly permits a court to provide a remedy where a direct constitutional violation is not shown. For example, under Section 3(b), a court may suspend the use of a test or device if the court finds in such a proceeding that the test or device is used "for the purpose *or with the effect* of denying or abridging the right of any citizen . . . to vote on account of race or color." 52 U.S.C. § 10302(b); Add. 45 (emphasis added); *cf. United States v. Sandoval Cnty., N.M.*, 797 F. Supp. 2d 1249, 1256 (D.N.M. 2011) (finding that, "[n]otably, § 3[a] of the VRA authorizes" the court to appoint observers "as 'appropriate' to enforce *the VRA and* underlying constitutional guarantees found in the Fifteenth Amendment" and appointing observers to enforce VRA Section 203, which protects ballot access for language minority groups) (emphasis added).

Section 3(c), known as the VRA's "bail-in" provision, also demonstrates that the "voting guarantees" of the Fourteenth and Fifteenth Amendments are *not* identical to the Amendments themselves. Section 3(c) permits courts to authorize preclearance in "proceeding[s] . . . under any statute to enforce the voting

35

guarantees of the fourteenth or fifteenth amendment" where the court *also* finds "violations of the fourteenth or fifteenth amendment" themselves. 52 U.S.C. § 10302(c); Add. 45–46; *cf.*, *Jeffers v. Clinton*, 740 F. Supp. 585, 587, 601 (E.D. Ark. 1990) (ordering preclearance remedy under Section 3(c) in Section 2 challenge to apportionment plan, even though court found plan violated Section 2's result standard and *not* the Constitution directly, based on other constitutional violations that the district court found). To conclude that the voting guarantees of the Amendments and the Amendments themselves are the same would render the words "voting guarantees" mere surplusage. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (noting it is a "cardinal principle of statutory construction" that "[i]t is [a court's] duty to give effect, if possible, to every clause and word of a statute").

Second, the district court's view that Section 2 protects rights different from the voting guarantees of the Fourteenth and Fifteenth Amendments fundamentally misunderstands the statute's results standard. Section 2, in its original form and as amended, was enacted to enforce constitutional guarantees against racial discrimination in voting.

As originally enacted, Section 2 "closely tracked the language of the [Fifteenth] Amendment." *Brnovich*, 141 S. Ct. at 2331; *see Chisom*, 501 U.S. at 392. In *City of Mobile v. Bolden*, the Supreme Court held that this version of Section 2 prohibited voting laws "only if motivated by a discriminatory purpose,"

36

446 U.S. at 62. However, Congress determined that "extensive . . . Fifteenth Amendment violations" still "called out for legislative redress," and went unremedied under the existing standard of proof for discriminatory intent. *Brnovich*, 141 S. Ct. at 2333; *see also* S. Rep. No. 97-417, at 26–27 (noting how, "[d]espite the overwhelming evidence of unequal access to the electoral system," the *Bolden* intent requirement precluded relief in a subsequent South Carolina voting rights case). In response, Congress in 1982 amended Section 2 to prohibit any voting laws that "*result[]* in a denial or abridgment of the right . . . to vote on account of race," 52 U.S.C. § 10301(a); Add. 44 (emphasis added).

Congress therefore adopted the results standard under its authority to enforce the Reconstruction Amendments, which "includes [] authority both to remedy and to deter violations of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment[s'] text," *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 727 (2003). *See Brnovich*, 141 S. Ct. at 2331; *Katzenbach*, 383 U.S. at 308. For forty years, Section 2 has swept broadly to prohibit racially discriminatory voting laws, precisely to prevent and redress "constitutional violations . . . within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional." *City of Boerne*, 521 U.S. at 518.

37

That Section 2's results standard enforces the Reconstruction Amendments is clear in the way that the factors that establish discriminatory results are also probative of unconstitutional discriminatory *intent*. When Congress amended Section 2, it adopted factors for discriminatory results liability that include the same factors that the Supreme Court has held are "relevant to the issue of intentional discrimination" (*i.e.*, Fifteenth Amendment violations) in minority vote dilution cases in *Rogers v. Lodge*, 458 U.S. 613, 623–24 (1982):

| Factors "relevant to the issue of intentional discrimination" in vote dilution cases in *Rogers*, 458 U.S. at 619–20 n.8, 623, 624: | "Senate Factors" for statutory vote dilution liability under Section 2's results test in *Gingles*, 478 U.S. at 36–37 (quoting S. Rep. No. 97-417 at 28–29): |
| --- | --- |
| "lack of minority access to the candidate selection process" | whether "members of the minority group have been denied access" to "a candidate slating process" (Senate Factor 4) |
| "unresponsiveness of elected officials to minority interests" | "a significant lack of responsiveness on the part of elected officials to" minority voters (Factor 8) |
| "a tenuous state policy" | "whether the policy underlying" the challenged practice "is tenuous" (Factor 9) |
| "the existence of past discrimination which precludes effective participation in the electoral process" | "any history of official discrimination" (Factor 1) |

38

| | |
|---|---|
| "Factors which enhance the proof of voting dilution," including "the existence of large districts, anti-single-shot voting provisions, and the absence of any provision for at-large candidates to run from geographic subdistricts" | "voting practices or procedures that may enhance the opportunity for discrimination," such as "unusually large election districts, majority vote requirements, [or] anti-single shot provisions" (Factor 3) |
| "[v]oting along racial lines," which "allows those elected to ignore black interests without fear of political consequences," and thus "bear[s] heavily on the issue of purposeful discrimination" | whether voting "is racially polarized" (Factor 2) |

Thus, while Section 2 does not require a judicial finding of discriminatory intent, Congress adopted factors for discriminatory results liability that are among the precise circumstances the Supreme Court has held are relevant to discriminatory intent. That is no accident: the Supreme Court's decision on discriminatory intent in *Rogers*, and the Senate Report identifying the relevant factors for discriminatory results liability (which the Supreme Court adopted in *Gingles*, 478 U.S. at 36–37), both drew on a Fifth Circuit decision regarding factors relevant to a finding of unconstitutional vote dilution. *See Rogers*, 458 U.S. at 619–20 n.8 (citing *Zimmer*, 485 F.2d at 1305); *see also* S. Rep. No. 97-417, at 23–24 (citing *Zimmer*, 485 F.2d at 1305). Section 2 therefore requires plaintiffs to adduce evidence that is probative of unconstitutional conduct, but without "placing

39

local judges in the difficult position of labeling their fellow public servants 'racists.'" *United States v. Blaine Cnty.*, 363 F.3d 897, 908 (9th Cir. 2004); *see also* S. Rep. No. 97-417, at 36 ("[T]he intent test is unnecessarily divisive because it involves charges of racism on the part of individual officials or entire communities.").[17]  In this way, Section 2 deters and captures constitutional violations that would otherwise go unremedied under the legal standard of proof for discriminatory intent.  A Section 2 case is thus a "proceeding . . .  under a[] statute to enforce the voting guarantees of the fourteenth or fifteenth amendment," and falls squarely within the private remedies provided under Section 3.

## 2. *Section 14(e) also contains private remedies for Section 2 violations.*

Section 14(e) also encompasses relief for Section 2 actions brought by private litigants.  That provision, part of a section titled "Enforcement Proceedings," provides for broad relief.  It authorizes "the prevailing party, *other than the United States*" to seek attorney's fees "[i]n any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment."  52

---

[17] *See also, e.g.*,  Luke P. McLoughlin, *Section 2 of the Voting Rights Act and City of Boerne: The Continuity, Proximity, and Trajectory of Vote-Dilution Standards,* 31 Vt. L. Rev. 39, 76 (2006) (describing how "intent remains an aspect of Section 2" liability); Christopher S. Elmendorf, *Making Sense of Section 2: Of Biased Votes, Unconstitutional Elections, and Common Law Statutes*, 160 U. Pa. L. Rev. 377, 456 (2012) ("Section 2 prevents or compensates for a type of constitutional violation that the courts cannot remedy through ordinary constitutional litigation[.]").

40

U.S.C. § 10310(e); Add. 54 (emphasis added). "Obviously, a private litigant is not the United States, and the Attorney General does not collect attorney's fees." *Morse*, 517 U.S. at 234. Moreover, as previously explained, a case brought under Section 2 is an "action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. § 10310(e); Add. 54.

Section 14(e) therefore incorporates private plaintiffs into the VRA's fee-shifting structure, including for Section 2 claims. That was by design. Congress confirmed its intent in the Senate Report accompanying the 1975 VRA reauthorization, where it made clear that Section 14(e) applies to "suits to enforce the voting guarantees of the Fourteenth and Fifteenth amendments, *and statutes enacted under those amendments*," S. Rep. No. 94-295, at 40 (emphasis added). And later congressional statements agree. The 1982 House Report states that "if [private plaintiffs] prevail [on a Section 2 claim] they are entitled to attorneys' fees under [Section 14(e)]," H.R. Rep. No. 97-227, at 32.

Numerous federal courts have explicitly concluded that attorneys' fees under Section 14(e) are available for actions to enforce the VRA generally, and Section 2 specifically. *See, e.g.*, *Lynch*, 799 F.3d at 1185 ("Congress intended for courts to award fees under the VRA . . . when prevailing parties helped secure compliance with the statute."); *Dillard v. City of Greensboro*, 213 F.3d 1347, 1353 (11th Cir. 2000) ("This circuit has implicitly construed a violation of § 5 of the [VRA] to be a

41

violation of the 'guarantees of the fourteenth or fifteenth amendment,' and no one argues here that the same implicit extension of [Section 14(e)] would not embrace § 2 claims, as well.") (internal citations omitted); *Brooks v. Ga. State Bd. of Elections*, 997 F.2d 857, 860-61 (11th Cir. 1993) (concluding Section 14(e) provides attorney's fees "to enforce civil rights statutes, including the voting rights statutes"); *Navajo Nation v. Arizona Indep. Redistricting Comm'n*, 286 F. Supp. 2d 1087, 1092 (D. Ariz. 2003) ("Under [Section 14(e)] . . . a prevailing party may recover attorney's fees in an action or proceeding to enforce civil rights statutes, including the [VRA]"); *Miss. State Chapter Operation Push v. Mabus*, 788 F. Supp. 1406, 1411 (N.D. Miss. 1992), *aff'd as modified sub nom. Miss. State Chapter, Operation Push, Inc. v. Fordice*, 12 F.3d 208 (5th Cir. 1993) ("The court concluded that a § 2 violation existed. Therefore . . . plaintiffs are prevailing parties within the meaning of [Section 14(e)].") (internal citations omitted); *see also generally Morse*, 517 U.S. at 289 ("Section 14(e), which provides for attorney's fees to 'the prevailing party, other than the United States,' is likewise a general reference to private rights of action.") (Thomas, J., dissenting).

And federal courts have routinely awarded attorney's fees to private parties bringing successful Section 2 claims.[18] In fact, as the district court recognized, this

---

[18] *See, e.g.*, *Dillard*, 213 F.3d at 1353; *Veasey v. Abbott*, No. 2:13-CV-193, 2020 WL 9888360, *3 (S.D. Tex. May 27, 2020), *aff'd*, 13 F.4th 362, 365 (5th Cir.

Appellate Case: 22-1395    Page: 59    Date Filed: 04/18/2022 Entry ID: 5148453

Court "has granted attorneys' fees in § 2 cases in reliance on this provision."  Add. 23; R. Doc. 100, at 23.  In *Emery v. Hunt*, this Court determined that the plaintiffs were entitled to attorney's fees pursuant to Section 14(e) for their unsuccessful Section 2 claim because it shared a sufficiently "close relationship" with plaintiffs' successful state law claims.  272 F.3d 1042, 1046–47 (8th Cir. 2001).

Under the district court's holding that courts lack jurisdiction to adjudicate Section 2 claims brought by private plaintiffs, all of these courts got it wrong.  But "there is no reason to ignore or refute the decades of Section 2 litigation . . . ." *Alpha Phi Alpha Fraternity*, Order Denying Def's Mot. to Dismiss, slip op. at 34; Add. 88.

---

2021); *Mo. State Conf. of NAACP v. Ferguson-Florissant Sch. Dist.*, No. 4:14 CV 2077 RWS, 2020 WL 2747306, *3 (E.D. Mo. May 27, 2020); *Nat'l Ass'n for Advancement of Colored People, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 418 (S.D.N.Y. 2020), *aff'd sub nom. Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213 (2d Cir. 2021); *Wright v. Sumter Cnty. Bd. of Elections & Registration*, No. 1:14-CV-00042-WLS, 2020 WL 11772602, *1–2 (M.D. Ga. Dec. 7, 2020), *vacated*, 2021 WL 5025095 (M.D. Ga. Jan. 5, 2021) (vacating fees upon joint motion due to settlement agreement); *Pope v. Cnty. of Albany*, 94 F. Supp. 3d 302, 351–52 (N.D.N.Y. 2015); *Bone Shirt v. Hazeltine*, No. CIV. 01-3032-KES, 2006 WL 1788307, *1 (D.S.D. June 22, 2006); *Medders v. Autauga Cnty. Bd. of Educ.*, 858 F. Supp. 1118, 1124 (M.D. Ala. 1994); *Harry v. Bladen Cnty., N.C.*, No. 87-72-CIV-7, 1989 WL 253428, *1, 3 (E.D.N.C. Dec. 11, 1989); *see also* Katz Study, *supra* note 2 (collecting additional decisions awarding fees to private plaintiffs under Section 14(e)).

43

## III. THE LONGSTANDING LEGISLATIVE UNDERSTANDING IS UNEQUIVOCAL THAT THERE IS A PRIVATE RIGHT OF ACTION TO ENFORCE SECTION 2.

From the VRA's original enactment through its four reauthorizations, Congress has consistently expressed its intent that private individuals can enforce the VRA generally, and Section 2 specifically.

The Supreme Court has "repeatedly recognized" the VRA Committee Reports as "the authoritative source for legislative intent" for the VRA. *Gingles*, 478 U.S. at 43 n.7. For decades, the Supreme Court and this Court have relied on these reports as key touchstones for interpreting Section 2 and ascertaining congressional intent.[19] The materials are unequivocal on Congress's intent to create a private right of action.

When Congress first reauthorized the VRA in 1970, it favorably cited *Allen* for the proposition that Section 5 contained a private right of action. H.R. Rep. No. 91-397, at 8. During the 1975 reauthorization, Congress stated that it was "amend[ing] Section 3 of the [VRA] to afford to private parties the same remedies which Section 3 [then afforded] only to the Attorney General." S. Rep. No. 94-295, at 39–40. In 1982, when Congress adopted Section 2's results standard, it

---

[19] *See, e.g.*, *LULAC I*, 548 U.S. at 426; *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 476-77, 479 (1997); *Morse*, 517 U.S. at 205, 209-10, 232; *De Grandy*, 512 U.S. at 1018; *Hall*, 512 U.S. at 884; *Chisom*, 501 U.S. at 393 n.20; *Gingles*, 478 U.S. at 43–46, 48, 55–56, 62–63, 65–66, 69, 71, 73, 75, 79; *Bone Shirt*, 461 F.3d at 1021; *Whitfield*, 890 F.2d at 1427; *Buckanaga*, 804 F.2d at 471.

44

was exceedingly clear in the accompanying committee reports about what it meant to do. The Senate Report, which is particularly "oft-cited," *Brnovich*, 141 S. Ct. at 2332, "reiterate[d] the existence of the private right of action under Section 2, as has been clearly intended by Congress since 1965." S. Rep. No. 97-417, at 30; *see also* H.R. Rep. No. 97-227, at 32 ("It is intended that citizens have a private cause of action to enforce their rights under Section 2."). And Congress again cited *Allen*'s holding that the VRA authorized private plaintiffs to enforce Section 5, *see* S. Rep. No. 97-417, at 30—meaning that this court should apply a strong presumption that Congress intended to incorporate *Allen*'s holding that a private right of action is available to enforce the VRA's substantive guarantees. *See Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 419 (1986) (noting where "the legislative history reveals clear congressional awareness of" relevant precedent, evidence of congressional intent is particularly strong).

More generally, the committee reports—and the Supreme Court's repeated reliance on them—show that Congress enacted the Section 2 results standard to make it *easier* for private plaintiffs to vindicate the Reconstruction Amendments' voting guarantees. Congress adopted the Section 2 results standard to "repudiate" the holding in *Bolden*—a case brought by private plaintiffs—by relieving plaintiffs of the burden of obtaining a judicial finding of discriminatory intent. *Brnovich*, 141 S. Ct. at 2332; *see also* S. Rep. No. 97-417, at 16 (stating that *Bolden*'s

45

holding "places an unacceptably difficult burden on plaintiffs"); *id.* at 26

(observing that "[t]he impact of *Bolden* upon voting dilution litigation became

apparent almost immediately" when "litigators virtually stopped filing new voting

dilution cases"); *id.* at 36 ("[t]he intent test will be an inordinately difficult burden

for plaintiffs in most cases"); *id.* at 38 (similar).

The district court's interpretation would mean the reverse: private parties

could sue to enforce the original version of Section 2, but when Congress added

the results standard and expanded the scope of Section 2 liability, it simultaneously

*eliminated* the statute's private right of action.  The Court should not entertain that

result.  *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) (An

"interpretation[] of a statute which would produce absurd results [is] to be avoided

if alternative interpretations consistent with the legislative purpose are available.").

Congress amended Section 2 to make it *easier* for private plaintiffs to obtain relief,

not deprive them of the right to seek relief under the statute altogether.

Congress and the Supreme Court have directly rejected the district court's

read on Section 2, in part, because the Attorney General alone cannot adequately

enforce the statute's guarantees.  The Supreme Court has emphasized that "[t]he

Attorney General has a limited staff," *Allen*, 393 U.S. at 556, and Congress has

long been aware that Section 2 claims "involve 'intensely complex litigation that is

both costly and time-consuming,'" *Shelby Cnty. v. Holder*, 679 F.3d 848, 872

46

(D.C. Cir. 2012) (quoting Modern Enforcement of the Voting Rights Act: Hearing Before the S. Comm. on the Judiciary, 109th Cong. 96 (2006)), *rev'd on other grounds*, 570 U.S. 529 (2013); s*ee also generally Katzenbach*, 383 U.S. at 313 (noting VRA was enacted in part because voting discrimination persisted "[d]espite the earnest efforts of the Justice Department").  Both Congress and the Supreme Court have therefore long recognized that the VRA's protections "might well prove an empty promise unless the private citizen were allowed to seek judicial enforcement."  *See Allen*, 393 U.S. at 557; *see also id.* at 556 ("The achievement of the [VRA's] laudable goal could be severely hampered . . . if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General."); S. Rep. No. 94-295, at 40 ("Congress depends heavily upon private citizens to enforce the fundamental [voting] rights involved."); H.R. Rep. No. 94-196, at 34 (noting "private citizens must play" a "significant role" in the enforcement of the VRA).

Nevertheless, without any basis in precedent, congressional understanding, or the record, the district court voiced "confiden[ce] that the Attorney General of the United States has the resources to litigate" Section 2 cases where necessary, including this case.  Add. 40; R. Doc. 100, at 40.  But the DOJ's failure to join this case—despite the district court's invitation and its recognition of Plaintiffs' "strong merits case," Add. 3; R. Doc. 100, at 3—speaks volumes.  If the past forty years

47

are any indication, the DOJ alone does not have the resources to enforce Section 2. Since 1982, private plaintiffs have brought the vast majority of successful Section 2 cases.[20] This means that, absent a private right of action, most Section 2 violations in the past four decades would have gone unremedied. The district court's interpretation accordingly runs contrary to the Supreme Court's directive that Section 2 "should be interpreted in a manner that provides the broadest possible scope in combating racial discrimination." *Chisom*, 501 U.S. at 403 (internal quotation marks and citation omitted).

Congress also demonstrated its intent through its actions. "[U]nder the prior-construction principle, Congress should be presumed to have been aware of the scope of [the statute] as interpreted by lower courts." *Liu v. SEC*, 140 S. Ct. 1936, 1947 (2020). When Congress amended Section 2 in 1982 to incorporate a results standard, it could certainly be "presumed to have been aware" of nearly two decades of Section 2 cases brought by private litigants and decided on the merits. And when Congress reauthorized the VRA in 2006, it was "presumed to have been aware" of *Morse*'s recognition of Section 2's private right of action and decades more Section 2 cases brought by private plaintiffs. When Congress reauthorized

---

[20] *See* Katz Study, *supra* notes 2, 6 (identifying 182 successful Section 2 cases since 1982, 160 of which were brought by private plaintiffs).

Appellate Case: 22-1395    Page: 65    Date Filed: 04/18/2022 Entry ID: 5148453

the VRA without further revising Section 2 or expressing any disagreement with those cases, it acted "against the backdrop of the uniform view of" the federal courts.[21] *Tex. Dep't of Hous. & Comm. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 536 (2015). "[I]f anything is to be assumed from the congressional silence on this point, it is that Congress was aware of the [earlier cases] and legislated with them in mind." *Albernaz v. United States*, 450 U.S. 333, 341–42 (1981); *see also Square D Co.*, 476 U.S. at 419 (noting "the fact that Congress specifically addressed this area and left" a previous decision related to that area "undisturbed lends powerful support to [the decision's] continued viability."). Indeed, Congress is "aware of . . . unanimous precedent" when it drafts statutory provisions, and courts should consider that precedent when attempting to ascertain congressional intent. *Inclusive Communities Project, Inc.*, 576 U.S. at 536.

The district court disregarded this overwhelming evidence of congressional intent, purporting instead to rely on *Sandoval*'s instruction that courts should not

---

[21] In fact, Congress in 2006 reiterated its approval of litigation by both "the Department of Justice and private citizens" to enforce Section 5, which it stated "played a critical role" in ensuring VRA compliance. H.R. Rep. No. 109-478, at 41–42 (2006). It further observed that "much of the burden of enforcing Section 5 over the years has fallen to private citizens whose assistance has been critical to ensuring that discriminatory changes are stopped before they negatively affect minority voters." *See id.*

49

"accord[] dispositive weight" to legislative history, 532 U.S. at 288. But *Sandoval* did not say courts can *never* consider legislative history or the context in which a statute is enacted, particularly if the court finds any ambiguity in the text and the relevant context "clarifies [that] text." *Id.*; *cf. Milner v. Dep't of the Navy*, 562 U.S. 562, 574 (2011) (resorting to "[l]egislative history" can be appropriate to "clear up ambiguity"). In *Sandoval*, the Court "found no evidence anywhere in the text to suggest that Congress intended to create a private right to enforce regulations promulgated under" Title VI's disparate provisions, and thus had no reason to consider the broader legal context in which Title VI was enacted. 532 U.S. at 291; *see also id.* at 288 ("It is immediately clear [from the statutory text] that the rights-creating language is completely absent from § 602.").

That is a far cry from this case. Section 2 contains rights-creating language, and the text of Sections 3 and 14(e) provide a private remedy for Section 2 violations. In adopting and amending the VRA, "Congress acted against a 'backdrop' of decisions in which implied causes of action were regularly found." *Morse*, 517 U.S. at 231. And insofar as *Sandoval* has since changed the standard for ascertaining a private right of action, the Supreme Court has rejected the idea that Congress should be charged with foreknowledge of interpretive principles or presumptions that arise from cases decided decades after it has passed legislation. *See Tanzin*, 141 S. Ct. at 493 ("Although background presumptions can inform the

50

understanding of a word or phrase, those presumptions must exist at the time of enactment.  We cannot manufacture a new presumption now and retroactively impose it on a Congress that acted [decades] ago.").

Congress intended the words of Section 2 to establish a private right to be free from racial discrimination in voting, and the words of Sections 3 and 14 to provide private remedies for violations of that right.  The district court's attempt to override that reality runs contrary to the long-standing legislative understanding of the VRA.

## CONCLUSION

This Court should reverse the district court's decision, vacate its judgment of dismissal, and remand for further proceedings.  In light of the district court's unprecedented action, the Court should also consider reassigning this case on remand.

51

Dated: April 15, 2022

*/s/ Sophia Lin Lakin*
Sophia Lin Lakin
Jonathan Topaz
Adriel I. Cepeda Derieux
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION, INC.
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
slakin@aclu.org
jtopaz@aclu.org
acepedaderieux@aclu.org

Ceridwen Cherry
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION, INC.
915 15th St NW
Washington, DC 20015
(202) 457-0800
ccherry@aclu.org

Neil Steiner
DECHERT LLP
Three Bryant Park
1095 Avenue of The Americas
New York, NY 10036-6797
(212) 698-3500 | (212) 698-3599
neil.steiner@dechert.com

Matthew F. Williams
DECHERT LLP
One Bush Street, Suite 1600
San Francisco, CA 94104-4446
(415) 262-4500 | (415) 262-4555
matthew.williams@dechert.com

Gary Sullivan (AR Bar: 92051)
ARKANSAS CIVIL LIBERTIES
FOUNDATION UNION, INC.
904 West 2nd Street
Little Rock, AR 72201
(501) 374-2842
gary@acluarkansas.org

Bryan L. Sells
THE LAW OFFICE OF
BRYAN L. SELLS, LLC
Post Office Box 5493
Atlanta, Georgia 31107-0493
(404) 480-4212
bryan@bryansellslaw.com

Angela Liu
DECHERT LLP
35 West Wacker Drive, Suite 3400
Chicago, IL 60601
(312) 646-5800 | (312) 646-5858
angela.liu@dechert.com

Luke M. Reilly
DECHERT LLP
Cira Centre 2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994-4000 | (215) 994-2222
luke.reilly@dechert.com

*Counsel for Plaintiffs-Appellants*

52

## CERTIFICATE OF COMPLIANCE

The undersigned counsel for Plaintiffs-Appellants hereby certify that this brief complies with the requirements of Fed R. App. P. 32(a)(5) and (6) because it has been prepared in Microsoft Office Word 2019 in 14-point Times New Roman, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,964 words, excluding the parts of the brief exempted under Rule 32(f), according to Microsoft Word.

Finally, I certify that this document and the addendum were scanned for viruses with Microsoft Windows Defender, which is continually updated. According to the virus scan, these files are free of viruses.

*/s/ Sophia Lin Lakin*
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION, INC.
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
slakin@aclu.org

Appellate Case: 22-1395     Page: 70     Date Filed: 04/18/2022 Entry ID: 5148453

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Sophia Lin Lakin*

Appellate Case: 22-1395    Page: 71    Date Filed: 04/18/2022 Entry ID: 5148453